IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

FT. LAUDERDALE DIVISION

INDIAN RIVER MERCHANT SERVICES, LLC,

                                                   CASE NO.: 25 CV 60670

        Plaintiff,

v.

RYAN NOLTE; CHRISTOPHER AKEL;
SAMANTHA MARTON; OKSANA MOORE;
TRANSACT FIRST, INC.; ONE PAY CLOUD, LLC;
SKYLIGHT PROCESSING, LLC; ROCKET ONE
CAPITAL, LLC; I-POS SYSTEMS, LLC d/b/a
DEJAVOO; DENOVO SYSTEMS, LLC;
MICHAEL SHVARTSMAN; ERIC HANNELIUS,
BRUCE GARELICK; SHLOMO ZENOU a/k/a
MONY ZENOU; and ENCOMPANY INC.

        Defendants.

_____/

## **COMPLAINT**

Plaintiff, Indian River Merchant Services, LLC ("***IRMS***")  by and through its undersigned

counsel, sues Ryan Nolte; Christopher Akel; Samantha Marton; Oksana Moore; Transact First,

Inc.; One Pay Cloud, LLC; Skylight Processing, LLC; Rocket One Capital, LLC;  I-POS Systems,

LLC *d/b/a* Dejavoo; Denovo Systems, LLC; Michael Shvartsman; Eric Hannelius; Bruce Garelick;

Shlomo Zenou a/k/a Mony Zenou; and Encompany, Inc. (collectively, the "***Defendants***"), and in

support thereof, states as follows:

### **Parties, Jurisdiction, and Venue**

1.      This is an action for damages that exceed $75,000, exclusive of attorneys' fees,

interest, and costs. Specifically IRMS is pursuing claims against the Defendants for (i) Theft of

Trade Secrets (Count I); (ii) Theft of Trade Secrets – Injunctive Relief (Count II); (iii) Tortious

Interference with a Business Relationship (Count III); (iv) Tortious Interference with a Contract

(Count IV); (v) Violations of Florida's Unfair and Deceptive Trade Practices Act (Count V); (vi) Fraud (Count VI); (vii) Fraud by Omission (Count VII); (viii) Aiding and Abetting Fraud (Count VIII); (ix) Theft of Trade Secrets Under Florida Law – Damages (Count IX); (x) Theft of Trade Secrets Under Florida Law – Injunctive Relief (Count X); (xi) Unjust Enrichment (Count XI); (xii) Conversion (Count XII); (xiii) Abuse of Process (Count XIII); (xiv) Malicious Prosecution (XIV); (xv) Civil Conspiracy (XV); (xvi) Violations of Federal RICO (Count XVI); (xvii) Violations of State RICO (Count XVII); (xviii) Conspiracy to Commit Federal Rico (XVIII); (xix) Conspiracy to Commit State Rico (XIX); (xx) Avoidance of Fraudulent Transfer (Count XX); and (xxi) Avoidance of Fraudulent Transfer (XXI).

2. Venue is proper in Broward County, Florida and in the Southern District of Florida pursuant to 28 U.S.C. § 1391 because a majority of the Defendants reside, conduct business, or have agents in Broward County, Florida and the acts and/or omissions giving rise to the instant complaint occurred in Broward County, Florida.

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as a federal question because IRMS is seeking to enforce its rights pursuant to 18 U.S.C. §§ 1836, 1964 for violations of the Defense Against Theft of Trade Secrets Act and the federal RICO statute.

**<u>Plaintiff Indian River Merchant Services and its Former Employees</u>**

4. Plaintiff, Indian River Merchant Services, LLC ("***IRMS***" or "***Plaintiff***") is a Florida limited liability company with its principal place of business in Pinellas County, Florida.

5. IRMS provides merchant processing and other services through its relationship with a sponsoring bank. As set forth in further detail below, IRMS is an ISO, or Independent Sales Organization ("***ISO***") under the Processing Agreement, as defined below, and was a victim and target of the scheme detailed herein.

6.      Defendant, Christopher Akel ("*Akel*"), is a former employee of IRMS, who is a Florida Resident and is otherwise *sui juris*.

### The Nolte Defendants

7.      EFT Services, LLC ("*EFT*"), is a Florida Limited Liability Company that is owned by Randy Nolte ("*Randy*"), who is the sole member and manager of EFT during all times material hereto. Randy has a complicated relationship with IRMS and its principal and was part of a joint venture with it. That venture ended with IRMS's principal and Randy parting ways in or around 2012.

8.      Defendant, Ryan Nolte ("*Ryan*"), is the son of Randy Nolte and is an individual who resides in Davie, Florida, and is otherwise *sui juris*.

9.      Defendant, Samantha Marton ("*Samantha*"), is the daughter of Randy Nolte, was an employee of EFT at all times material hereto, resides in Davie, Florida, and is otherwise *sui juris*.

10.     Although Randy Nolte was the owner of EFT, its day-to-day management and processes were run and managed almost completely and entirely by Samantha and Ryan Nolte. Samantha and Ryan ran all of the processes and were responsible for all of the conduct detailed herein and were involved in the decisions and efforts to misappropriate IRMS' trade secrets and other valuable information.

11.     Defendant, Skylight Processing, LLC ("*Skylight Processing*"), is a Florida Limited Liability Company with its principal place of business in Davie, Florida. Ryan is, and at all times material hereto has been, the manager of Skylight Processing, and at times operated with and through Skylight Processing to conceal the conversion and misappropriation of IRMS's assets.

12.     Skylight Processing, at all times material hereto, operated as an agreed upon Affiliate (defined below), and was subject to the Processing Agreement between IRMS and EFT.

13.     Upon information and belief, Skylight Processing was purchased by the Hannelius Knight Trust and Rocket One Capital, although Ryan remains the manager of Skylight Processing.

14.     Collectively, Samantha and Ryan will be referred to as the Noltes.

**The Shvartsman Defendants**

15.     Defendant, Transact First, Inc. ("***Transact First***"), was a Delaware corporation, authorized to do business in Florida as a foreign corporation, and upon information and belief, was converted from Transact First, LLC, a Delaware Limited Liability Company.

16.     Defendant, One Pay Cloud, LLC ("***OPC***"), is a Florida Limited Liability Company with its principal place of business in Maimi-Dade County, Florida.

17.     Defendant, Rocket One Capital, LLC ("***Rocket One Capital***"), is a Florida Limited Liability Company with its principal place of business in Miami, Florida.

18.     Defendant, Michael Shvartsman ("***Shvartsman***"), is an individual who is *sui juris,* and upon information and belief resides in Miami, Florida. Shvartsman was recently sentenced to federal prison as a result of his admitted participation in securities fraud.

19.     Shvartsman is the Manager of Rocket One Capital, the Manager of OPC, and at all times relevant hereto, was the President of Transact First.

20.      In 2020, Transact First purchased the assets of EFT and currently owns and controls EFT.

21.     Defendant, Bruce Garelick ("***Garelick***"), is an individual, *sui juris*, who, upon information and belief, resides in Miami, Florida.  Garelick is the Chief Strategy Officer of Rocket One Capital.

22.     Defendant, Eric Hannelius ("*Hannelius*"), is an individual, *sui juris*, who, upon information and belief, resides in Studio City, California.

23.     Defendant, Oksana Moore ("*Moore*"), is an individual, *sui juris*, who resides in Miami-Dade County, Florida. Moore is also intimately involved in the day-to-day management and operations of Transact First, OPC and the other entities described herein.

24.     Defendant, Encompany Inc. ("*Encompany*"), is a Florida Limited Liability Company, whose principal place of business is in Miami, Florida.  Although Encompany is not a Shvartsman Defendant, it is an affiliate and insider of the Shvartsman Defendants.

25.     Hannelius is the current president of Transact First.

26.     Upon information and belief, Pepper Pay, LLC, is, at least in part, a successor in interest to Transact First.

27.     Upon information and belief, Hannelius as Trustee of the Hannelius Knight Trust, purchased Skylight from Ryan Nolte, or, alternatively, purchased the assets of Skylight, and is currently in control of Skylight.

28.     Collectively, Hannelius, Garelick, Shvartsman, Transact First, OPC, Rocket One Capital and Moore shall be referred to as the "*Shvartsman Defendants*."

### The Dejavoo Defendants

29.     Defendant, Shlomo Zenou, also known as Mony Zenou ("*Zenou*"), is an individual, *sui juris*, who, upon information and belief, resides in San Juan, Puerto Rico.

30.     Zenou employs a team of software engineers and staff, and prior to engaging in the conduct at issue, was intimately involved in the creation and development of software to be used for various terminals that were operated by IRMS. Zenou managed and helped to service and manage terminals for IRMS and was intimately familiar with IRMS's systems and processes.

31.     Zenou is also the manager of Defendant, I-POS Systems LLC, a New York Limited Liability Company, doing business as Dejavoo ("***Dejavoo***"), which on information and belief, was created to house, misappropriate and monetize software that was derived from IRMS's intellectual property, and which otherwise was used to mask the nature of certain transactions. Dejavoo is a Delaware Limited Liability Company that creates software for processing terminals and has a principal place of business in Wilmington, Delaware.

32.     Defendant, DeNovo Systems, LLC ("***DeNovo***"), is a Puerto Rico Limited Liability Company that creates reporting platforms for the processing terminals using Dejavoo's software and has a principal place of business is in San Juan, Puerto Rico. Zenou is also the manager of Denovo. Collectively, DeNovo, Dejavoo, and Zenou will be referred to as the "***Dejavoo Defendants***."

33.     Collectively, Ryan Nolte, Christopher Akel, Samantha Marton, Oksana Moore, Skylight Processing, LLC, Rocket One Capital, LLC, Transact First, Inc., Michael Shvartsman, OPC, I-POS Systems, LLC *d/b/a* Dejavoo, Eric Hannelius, Bruce Garelick and Shlomo Zenou a/k/a Mony Zenou shall be referred to as the "***Conspiring Defendants***."

### SUMMARY OF THE SCHEME

34.     This cause involves a pattern of criminal activity that occurred over aa several year period, through the misappropriation of trade secrets, wire and bank fraud, the concealment of misconduct, and other efforts to, through unlawful means, take control of the payment processing industry with respect to emerging markets in the cannabis space.

35.     The scheme started with the efforts by the Noltes, Zenou, and Akel, to work for a year to develop the Dejavoo Masking Software (as defined below) with and through access to the IRMS systems and trade secrets. The Dejavoo Masking Software conceals the source and nature

of their transactions while accessing the international banking system through a series of intermediaries, such as IRMS.

36.     These would then use the Dejavoo Masking Software to control the customers and other parties who were engaged in cannabis transactions and divert their income from their servicing agent.

37.     At the same time Shvartsman and the Shvartsman Defendants wanted to gain access to and control over the entire market for payment processing as it relates to cannabis, with him anticipating that regulations would permit him to provide additional services in the cannabis space, including traditional credit card processing.

38.     During this time, the Shvartsman Defendants were, on information and belief, introduced to the Nolte Defendants through Zenou. At first the Shvartsman Defendants and Nolte Defendants were averse to each other, however, the Shvartsman Defendants ultimately recruited and caused the Noltes to work with them to continue to eliminate ISOs (like IRMS) or ISRs to establish a dominate market position in the cannabis processing space, if and when it became federally legal.

39.      To accomplish these goals, the Nolte and/or Shvartsman Defendants provided Independent Sales Representatives (ISR's) with access to the Dejavoo Masking Software. This software allowed them to circumvent certain transaction costs with ISOs by disguising the nature of the transaction and prevented the ISO from accurately recording the transactions. They caused or encouraged ISRs to divert income generated through the Dejavoo Masking Software away from the ISOs like IRMS. In turn, this would diminish the value of the target ISR or ISO and deprive them of income.

40.     The Shvartsman Defendants would then, through an affiliate such as Skylight Marketing, approach the ISR or ISO and attempt to purchase it and/or its assets. During this time the Shvartsman Defendants would have obtained and otherwise secured a portion of the business of the ISR or ISO through the Dejavoo Masking Software. They would not disclose, though they had knowledge of the existence of the Dejavoo Masking Software, to claim that the decreased volume that the Defendants caused would justify a lower price.

41.     In most cases the competition would succumb to the pressure, but in the case of others, such as IRMS, the improper nature of the transactions permitted through the Dejavoo Masking Software, jeopardized its relationship with a sponsoring bank, and prevented IRMS from continuing to operate.

42.     This scheme was also perpetrated on Sterling Payment Solutions, LLC, which was engaged in litigation and ultimately obtained a judgment, in arbitration against Shvartsman. The tactic was also used to prevent and acquire various other independent sales representatives, with Shvartsman bragging about how he intended to use Scrip machines in the Cannabis space to undercut his competition and charge a lower rate for processing.

## BACKGROUND

## PAYMENT PROCESSING IN EMERGING MARKETS

43.     Modern technology has provided a mechanism that permits significant mobility and a variety of different payment options. However, there are certain circumstances or vendors where traditional cash transactions are preferred. In these circumstances, people need ready access to Automatic Teller Machines ("*ATMs*") or other cash terminals to give them access to cash.

44.     ATMs are often found in banks, stores, gas stations, and entertainment venues. They are typically placed at merchant locations, which sell or lease ATMs. Independent Sales

Organizations or "*ISOs*" often work with affiliates who help facilitate ATM placement and management under contractual agreements between them.

45. To integrate an ATM into the cash and payment network, ISOs or authorized parties input its details into a Terminal Management System or TMS, which assigns a unique Terminal ID, and then act as a terminal or switch to provide the ATM terminal with the ability to access the banking system. ISOs must also have agreements with sponsor banks and members of payment card networks like Visa and Mastercard to enable transactions and ensure compliance with network rules.

46. ATM transactions begin when a cardholder inserts a debit or credit card and requests cash. The ATM transmits transaction details, including a unique code, to a processor, which routes the request through card networks to the issuing bank. The bank confirms whether funds are available, and if funds are available, the bank authorizes the withdrawal, and the processor instructs the ATM to dispense cash. These transactions occur within a matter of milliseconds, and a delay, of even a second, could result in a consumer refusing to engage in a particular transaction due to concerns of fraud or glitches. This requires superior and advanced technology and algorithms, which are intended to detect any interference with IRMS's processes.

47. Fees associated with ATM use include network and bank fees, as well as surcharge fees shared among the ISO, affiliates, ATM owner, and merchant. The ATM owner must maintain sufficient vault cash, replenished as needed. Processors track these transactions, ensuring proper settlement of funds between banks, ISOs, and merchants. The owner of the ATM must maintain cash in each ATM from which the withdrawals dispensed can be funded. This cash held within the ATM is known as "Vault Cash". The owner of the ATM, or the merchant, must from time to time replenish the Vault Cash in the ATM from their own funds to allow for its continued use.

48.     ATMs thus function through a complex network of merchants, ISOs, sponsor banks, card networks, and processors, all working together to facilitate secure, efficient cash transactions.

49.     The cardholder initiating a cash withdrawal from an ATM customarily pays fees, through a debit to the cardholder's account with the card's issuing bank (whether depository or credit), in addition to the amount of cash withdrawn. The fees can include amounts remitted to the network by the cardholder's issuing bank or retained by the cardholder's issuing bank for its own fees, as well as a surcharge paid to, and split among, the ISO, the ISO's Affiliates, the owner of the ATM, and the merchant in whose premises the ATM is placed (the "***Surcharge Fees***"). Out of its share of the Surcharge Fees, the ISO, in turn, customarily pays the processor, such as Switch, a fee for each transaction processed.

50.     IRMS operates computer systems which digitally account for the funds that must be paid by the cardholder's card issuing bank, after debiting the cardholder's account, and reimburses the ATM's owner for the Vault Cash dispensed. The process of accounting for and establishing the amount of the debits and credits for Surcharge Fees and Vault Cash to be charged to or paid to ISO, its Affiliates, the ATM owner and the merchant, as well as the processor, is known as the "Settlement."  The ISO, or its affiliates, the ATM owner or the merchant, provide the processor, such as Switch, the account information to which the Surcharge and Vault Cash amounts should be deposited and specify whether the Settlements should occur daily monthly or on another periodic basis.

51.     This process is summarized through the graphic below:

*Graphic: The ATM processing system can be summarized by the accompanying illustration | Image sourced from Switch lawsuit*

### *Electronic Payments in the Cannabis Industry*

52.     Cannabis dispensaries have significant legal and regulatory impediments to access modern electronic payment systems as many credit card companies view cannabis sales as illegal transactions. Traditional cash ATMs could be operated lawfully in cannabis dispensaries so long as (1) suspicious activity reporting requirements were met, (2) the machine was not self-loaded by the dispensary, and (3) the machine was not owned by the dispensary.  However, the placement and use of the machines at dispensaries has significant issues as further described below.  Notably, customers generally prefer the convenience of being able to engage in a single transaction as opposed to withdrawing cash and transferring it.

53.     There are other special requirements as it relates to the processing of cash for dispensaries, with the requirement that the cash used for those ATMs not be tied to the sale of any contraband in violation of the Controlled Substances Act ("**CSA**").

54. Because of these impediments, dispensaries will sometimes operate a cashless ATM system known as a "scrip machine."  This use of cashless ATMs, also known as scrip machines, in cannabis dispensaries is contrary to the network rules which IRMS (and all ISOs) are subject to by its sponsoring bank and network agreements.  Card networks such as Visa and MasterCard warn against such operation, which can result in substantial penalties or fines to the ISO/Processor or even termination of access to the sponsoring bank and card network. The use of these scrip machines also violates the CSA.

55. The use of non-cash dispensing terminals, also known as scrip machines, is prohibited under both federal law (the CSA) and the Processing Agreement (defined below).[1] However, they are highly preferred in connection with cannabis transactions.

56. Despite the high level of compliance associated with cannabis transactions, the risk of chargeback and other related issues, was relatively low, because users of cannabis are not impaired, and are required to use their identification card and pin to participate in a cannabis transaction.

57. The Shvartsman Defendants were aware of the low risk in terms of chargeback, but high risk with respect to regulation, and wished to develop a system to monopolize and/or control the payment processing market for cannabis-based transactions, which Shvartsman himself believed to be a $28 billion per year industry that he wanted to take over.

58. To take over the industry, however, Shvartsman needed to be able to control access to the point of service with respect to the transactions that were being engaged in. This would allow him to eliminate ISOs like IRMS, and act as the ISR, and eliminate them, and because

---

[1] A "scrip transaction," is an electronic payment to a merchant where funds are paid to the merchant, with the merchant providing a credit in its records for the money that has been obtained.

Shvartsman was confident in his assessment of the risk profile for these transactions and was using the reputation and relationship of his competition to use these networks, he would often charge less than his competition to put them out of business.

## IRMS DEVELOPS TRADE SECRETS TO ENABLE IT
## TO ACT AS A PREMIER ISO

59.     IRMS is one of the ISOs that the Shvartsman Defendants ultimately targeted.

60.     IRMS serves as a gatekeeper by providing the software, encryption, and security required for an ATM terminal to securely connect to the banking system.

61.     IRMS also serves the critical role of monitoring its customers to make sure that they are compliant with the requirements of the sponsoring banks and federal regulations, and in doing so shares in the liability associated with compromised transactions.

62.     IRMS became involved in the payment processing industry as a result of its development of carefully curated business relationships with various sponsoring banks and other enterprises. IRMS uses its relationships with various sponsoring banks and other third parties to facilitate the installation of ATMs at various locations, and to streamline processing of payments and money for existing ATM systems, because glitchy ATM machines result in customers feeling like they are being scammed, resulting in less transactions, and smaller cash withdrawals. This limits potential revenue for customers of ISRs that IRMS works with. As such, IRMS provides a one-stop solution for businesses that need to provide their customers with access to cash but lack the sophistication or relationship to have access to a sponsoring bank.

63.     As such, IRMS is permitted to engage in these transactions because it carries the responsibility of maintaining and protecting confidential and sensitive information of its clients, ensuring that its machines are not compromised, and confirming that the transactions IRMS facilitates comply with applicable banking and federal regulations.

64.     IRMS spent millions of dollars to develop highly specialized software to effectively facilitate the transactions and to ensure that the terminals connected to the banking system—and the transmission of ATM customers' sensitive information—is protected. The software performs several functions, which include ensuring that ATM terminals are not compromised, protecting and confirming that transactions are compliant with the agreements and regulations between and amongst the parties, tracking and monitoring payments, and counting and keeping track of the amount of cash that is held in an ATM. IRMS also ensured that a limited number of people had access to its software systems, and otherwise made efforts maintaining the secrecy and confidentiality of the computer code it developed. As a result, the source code and software are IRMS's confidential, trade-secret information.

65.     IRMS's investment in its software, which is highly specialized and subject to reasonable efforts to maintain confidentiality, plays a significant role in how it operates. In fact, IRMS had the ability to detect, down to the last dollar, the amount of money that was held in a particular ATM. This technology and software allowed IRMS and its customers to have access to more ATMs. This software has the sophistication to process all of the transactions described above in milliseconds, while keeping track of the transactions as they occur.

66.     IRMS's software and service systems are not known to the public and are the subject of its reasonable efforts to maintain confidentiality and are not generally known to the public at large. The software was also developed by Akel, who maintained it and worked as an employee of IRMS. Akel's primary responsibility was to work with IRMS and ISRs, to ensure that they are properly connected to IRMS's terminals and computer system, while preventing most ISRs from having direct access to IRMS's software.

67.    IRMS engages ISRs, or Independent Sales Representatives, to aggregate merchants and further manage ATMs and other payment terminals. The ISRs, like IRMS, also have and assume responsibility for ensuring that the transactions at issue comply with the applicable regulations and are required to ensure that all of their customers agree to and understand the requirements of being connected to IRMS's network. After all, for any ISR to sell services, it must also protect IRMS's relationship with its processing bank as it is engaged with an ISO, so that it can gain access to the sponsoring or processing bank with the ISO providing protection to users accessing the banking system.

68.    IRMS relied on its robust compliance processes and procedures and its relationships with various ISRs to work with and identify potential consumers. Prior to working with a particular ISR, IRMS spends substantial time and resources to ensure that its sponsoring banks are protected and that its sponsoring banks are provided with accurate information. However, IRMS also needed to ensure that its ISRs complied and properly reported their transactions to it, and as a result required that they exclusively and solely process transactions using IRMS' systems and processes.

69.    IRMS had a productive contractual and business relationship with its sponsoring bank, Pueblo Bank and Trust ("*Pueblo*"), and enjoyed this relationship thanks to the several years of working with it. Without its relationship with Pueblo, IRMS could not service its customers, and its customers engaged IRMS mainly for access to IRMS's security protocols and for the services that it could provide through its relationship with its sponsoring bank.

70.    IRMS's success and business model relied on the fact that it would safeguard relationships with its sponsoring banks which would provide its clients access to capital. At all times relevant to the instant case, all of the Defendants were aware of the contractual and business relationships between IRMS, Pueblo, EFT and others, and knew of the existence of its relationship

with them.

71.     IRMS's owner and the Nolte Defendants enjoyed a very close working relationship for several years and were intimately familiar with each other's businesses. IRMS's principal invested in EFT's predecessor, and ended up splitting ways from the Noltes, as a result of the Noltes' unscrupulous business practices, which included, without limitation, the conversion of client monies from highly monitored and protected accounts and the diversion of monies to affiliates of the Noltes.

72.     After IRMS and the Noltes separated, the Noltes spent years trying to develop and recreate the business model that IRMS enjoyed. However, there is no substitution for the hard work and years of effort that IRMS put into its relationships with its sponsoring banks, and the Noltes, on their own, could not gain access to a sponsoring bank that would allow them to act as an ISO.

73.     In the fall of 2017, the Noltes approached IRMS to discuss the possibility of doing business with IRMS again, because, on information and belief, the Noltes were incapable of otherwise continuing to operate their business without access to a sponsoring bank through a sponsored ISO such as IRMS.

74.     At the time that IRMS had a productive contractual and business relationship with EFT, IRMS's primary ISR, and its sponsoring bank, Pueblo Bank and Trust. Of particular importance is IRMS's relationship with Pueblo Bank and Trust, which was the key to IRMS's success and viability. IRMS's relationship with these entities and business relationships was disclosed to EFT and its principals during these negotiations, and IRMS's access to it was one of the primary driving forces behind the Noltes' decision to work with it again.

75.     The Noltes' unscrupulous business practices could have put IRMS at risk of losing its relationship with its sponsoring bank. As a result, IRMS was hesitant to work with the Noltes, but the Noltes persevered and convinced IRMS that they would be reliable and that they would otherwise take extra precautions to make sure that IRMS' relationships with its sponsoring banks and other third parties would not be jeopardized. Simply put, EFT also understood that IRMS could not provide the services contemplated under the Processing Agreement, without the assistance of EFT, and its sponsoring bank Pueblo Bank and Trust. IRMS also had productive business relationships with EFT, IRMS's primary ISR, and Pueblo Bank, its sponsoring bank.

76.     The Noltes also reassured IRMS that they would exclusively work with IRMS and that they would otherwise take reasonable steps to ensure that IRMS could properly monitor the Noltes' and their efforts to comply with applicable regulations. As a result, IRMS insisted and the Noltes agreed to certain additional protections to ensure that EFT and the Noltes would comply with the requirements of IRMS's sponsoring bank.

77.     Consistent with the parties' understanding, the Noltes, on behalf of EFT, and IRMS engaged in extensive negotiations and discussions concerning the nature and scope of their relationship. During the course of these discussions IRMS emphasized the fact that it had concerns over the Noltes' ability to strictly adhere to its requirements, but the Noltes reassured IRMS that they intended to comply with its requirements and otherwise would do everything in their power to protect IRMS' relationship with its sponsoring banks.

78.     The Noltes induced IRMS into doing business with them, by using and representing that they would be responsible, through EFT, to place ATM terminals at various locations. These terminals, according to the Noltes, would interface **exclusively and solely** with IRMS's software, but were also compatible with outdated version of IRMS's software. While IRMS was hesitant to

use the older software which did not have the same encryption features, the Noltes represented that they would ensure that IRMS's interests would be protected, and that they would properly register and record transactions.

79. However, the Noltes' statements that were made at or around the time of the execution of the Agreement, were false and the Noltes knew or should have known that they were false at or around the time that the statements were made.

80. Notwithstanding, and because IRMS was not aware of the falsity of the Noltes' representations, on or about, December 12, 2017, IRMS entered into a *PIN-Based Transaction Processing and Support Agreement* (the "***Processing Agreement***") with EFT.

81. Under the Processing Agreement, EFT served as the ISR—utilizing its voluminous merchant customer group—to exclusively route all of its customers' ATM transactions through IRMS's network of processing assets, with a contractually required transaction volume of 300,000 transactions. The Processing Agreement also required EFT to exclusively process all its customers' transactions through IRMS for a five (5) year term and would thereafter renew annually until terminated by the parties in writing.

82. For processing each transaction, IRMS was to earn a fee on each approved transaction, and an additional fee on each Emerging Market Transaction. Additionally, IRMS was to keep all interchange fees earned on each transaction. "Emerging Market" transactions were for the placement or connection of ATMs in places that did not typically already have ATMs such as smoke shops, hotels, or corporate deals. EFT agreed to aggregate these customers, cause ATMs to be placed in various locations and then connect these ATMs with IRMS for processing and payments.

83.     The Emerging Market Transactions would involve the placement of an ATM or terminal to service a common grouping of businesses that may otherwise not be able to utilize such services, and, as a result, IRMS is required as an ISO to make sure that these customers stay compliant with applicable laws. Further the terminals associated with Emerging Market Transactions were more likely to be compromised by glitching or other issues. As a result, the pricing associated with the Emerging Market Transactions was higher than traditional locations that were proven to generate enough transaction volume to pay for the risk.  Nearly every transaction EFT sent to IRMS for processing was purported to be Emerging Market ATM transactions that were subject to all three types of fees in the transaction pricing and should have amounted to a surcharge fee for IRMS on each transaction processed.

84.     The Processing Agreement further required EFT, and its affiliates using IRMS's processing assets, to exclusively process its customers' transactions through IRMS, and to use IRMS exclusively for any ATM-related services. The known Affiliates included, but were not limited to, Skylight Processing, Paybotic, LLC, Sterling Payment Solutions, LLC, and Merchant Choice LLC (together, the "*Affiliates*").  Each known affiliate is owned or controlled or associated with the Noltes. These entities were required to agree to the terms of the agreement, as part of the assurances of the Noltes that they would do everything in their power to protect IRMS and its relationships.

85.     Moreover, the processing agreement required that (i) the Noltes safeguard IRMS's confidential information, and (ii) otherwise, exclusively use IRMS systems for all prospects of the processing of payments. This would allow IRMS to monitor, through its highly specialized technology and trade secrets, the Noltes and EFT's transactions to ensure compliance. The Agreement also mandated and created an obligation by the Noltes and EFT to honestly and

completely disclose each and every transaction that was made through their systems, as well as the source or nature of those transactions.

86.     The Noltes however, ignored the provisions of the Agreement, and intended to use it to defraud, seize and otherwise misappropriate IRMS's trade secrets, while surreptitiously violating the terms of the Agreement, because they did not have a relationship with a sponsoring bank, and otherwise, on information and belief had secretly held animosity toward IRMS.

**THE PROCESSING AGREEMENT WAS A FRAUD**

87.     On information and belief, however, the Processing Agreement was nothing more than a subterfuge to allow EFT and its affiliates to use IRMS's network and the advantageous business relationships it had to process payments, while finding ways to undermine the integrity of its checks and balances.

88.     To that end, in early 2018, Zenou started working with the Noltes to develop and test software that would otherwise prevent IRMS from detecting transactions that were not compliant with the applicable regulations, and to find ways to circumvent its compliance protocols.

89.      Zenou himself attested in litigation involving EFT to being involved in creating software to make a scrip transaction appear as though it originated from one of the terminals installed by EFT, and Ron Nolte, Randy Nolte's, brother also attested to the fact that the Noltes were working with. Zenou also knew and serviced the ATM machines that were previously used by IRMS and was familiar with the systems, which further provided him with the ability to assist in these efforts.

90.     The Noltes also used their access to IRMS's team, through EFT and the Processing Agreement, to recruit Akel, who was, at the time, an employee of IRMS. Despite being subject to a confidentiality agreement and prohibited from taking on other employment, Akel worked with

the Noltes through various limited liability companies that they created, including, without limitation, Twenty Software LLC, to undermine and misappropriate IRMS's proprietary software.

91.     Sarsour, Akel, the Noltes and Zenou, spent substantial time working together to develop software that would conceal the nature of transactions and undermine IRMS's software system and encryption mechanisms, by disguising scrip transactions as those from a traditional ATM terminal.  They would test the holes and gaps in IRMS's technology to prevent IRMS from discovering that the transactions were "spoofed" which caused IRMS's technology to glitch and malfunction.

92.     Akel who was an employee of IRMS, had access to its software systems, and highly confidential information. He and the Noltes secretly spent significant time using and testing IRMS's software, while using their position of trust to prevent IRMS from discovering the significant and substantial misconduct that they had been engaged in.

93.     Aker then concealed and represented, falsely, that third party malware and hackers were responsible for the problems with the server, and in fact made these false representations consistently from 2018 through 2019. And despite the fact that he was prohibited from taking on other employment outside of his work with IRMS, Akel also worked secretly with Zenou and the Noltes, to develop technology to allow them to steal from IRMS.

94.     After developing the software which would otherwise prevent IRMS from realizing that certain transactions were fraudulent in that they misstated or misrepresented the designation or type of transaction, and completing the work of misappropriating IRMS's software systems, Aker was formally hired by the Noltes, who represented to various third parties that they "purchased" IRMS's software.

95.    Once the development of software that would permit EFT to defraud IRMS was completed, EFT entered into an agreement with Dejavoo to create and license that software, or the "***Dejavoo Masking Software***", that would disguise transactions from certain non-money dispensing terminals in cannabis stores and make these transactions appear as though scrip transactions were made from cash-dispensing ATM terminals, which, as described above, is lawful under certain circumstances.

96.    The Dejavoo Masking Software was designed and implemented to conceal transactions via the transfer of fraudulent and misleading information regarding the merchant transaction, to make it appear as though it was an ATM transaction.

97.    Shortly after developing the software, EFT and Dejavoo entered into a 5-page perpetual services and license agreement (the "***EFT Perpetual License***"), which granted and confirmed that EFT had the right to use the Dejavoo Software and license it for purposes of engaging in a series of transactions. At the time, however, it was EFT's intent to mainly use the Dejavoo Software to prevent IRMS and its sponsoring bank from discovering that it was engaging in cannabis transactions.

98.    On or about October 23, 2019, Dejavoo also entered into a service licensing agreement with Sterling Payment Solutions, LLC ("***Sterling***") to further mask its transactions from IRMS. Sterling was an affiliate of EFT, in that it was owned by Randy Nolte's brother, Ron Nolte.

99.    The Dejavoo Masking Software has no apparent lawful purpose and no legitimate purpose other than to conceal this unlawful activity from IRMS, its sponsoring banks, and the major network processors like Visa, MasterCard, and Discover. The masking and intent to use the software to conceal the nature of transactions was also intended, on information and belief, to allow the Nolte Defendants to circumvent the CSA by allowing the placement of scrip terminals

that would appear on IRMS's systems as traditional ATM Machines were dispensing cash.

100. The Dejavoo Masking Software effectively rendered IRMS's existing compliance, loss prevention, and spot check protocol, designed to identify and prevent unlawful transactions, useless, and was only able to operate as a result of the software that was misappropriated from IRMS.

101. In sum, the Dejavoo Masking Software also allowed EFT and Randy Nolte, in breach of the Processing Agreement, to input fraudulent data into IRMS's compliance protocols, that included, without limitation, changing the name of the business where non-cash dispensing ATMs were located, as well as identifying the merchant as something other than a dispensary , to mask that EFT was engaged in scrip transactions, in violation of both federal law and the Processing Agreement. The use of the Dejavoo Masking Software was not disclosed to IRMS and was intentionally concealed by EFT and the Noltes.

102. The Noltes also worked with their affiliates and other companies to sell and market the Dejavoo Masking Software, which would allow them and their affiliates to generate more revenue through illegal and highly risky transactions.

103. The Noltes also made millions of dollars in revenue using marketing and selling the Dejavoo Masking Software, in connection with Zenou, Akel and others.

### The Shvartsman Defendants Become Involved

104. On information and belief, from 2019 and onward, the Noltes and their affiliates caused EFT to continuously misrepresent the nature of the transactions that they were engaged in by using the Dejavoo Masking Software to make it appear as though scrip processes were functioning as an ATM Machine. However, the Noltes were not the only ones who were trying to undermine and/or hijack IRMS's relationship with its sponsoring bank.

105. In or around June 27, 2019, Eric Hannelius caused a company that he owned and controlled called ATM Services, LLC to become one of IRMS's ISRs. In becoming an ISR Hannelius also entered into and agreed to execute an ATM and Pin Based Transaction Processing and Support Agreement. This Agreement was similar to that of IRMS, except that it required ATM Services to register and ensure compliance with the IRMS's rules through EFT Management Services, Inc., which was a company that was owned and controlled by the Noltes.

106. As time went on Hannelius processed or attempted to process hundreds of thousands of transactions through IRMS, which put IRMS's system and its relationship with its sponsoring bank at risk. The conduct also resulted in IRMS terminating its business relationship with Hannelius and ATM Services, LLC.

107. ATM Services, LLC's termination either caused or resulted in the Shvartsman Defendants learning of the existence of the Dejavoo Masking Software, and, on information and belief the Noltes encouraged and otherwise introduced Shvartsman Defendants to the applications of the Dejavoo Masking Software. Moreover, the termination gave Hannelius insight into the business practices of IRMS and alerted him and Shvartsman of its relationship with its processing bank.

108. Moore was also intimately involved with the ATM Services, LLC transaction and falsely represented that she would ensure that the ATM machines which were being used were compliant and were properly connected to the IRMS systems, which were in fact false. Thus, Moore was clearly involved with and knew about the efforts to divert income away from IRMS.

109. In 2019, the Shvartsman Defendants discussed the application of the Dejavoo Masking Software with the Nolte Defendants and understood that it could assist them in securing a bigger share of the market, in that the Dejavoo Masking Software would allow the Shvartsman

Defendants to divert income and conceal that they were engaged in cannabis-based transactions, to create a large market share.

110.     At this time, Shvartsman also represented that he intended to secure a larger market share of the payment processing solutions. Shvartsman was also working and had known Zenou, and through his relationship with Zenou was intimately familiar with the potential applications of the Dejavoo Masking Software as it relates to the Cannabis Market and also know that Zenou was nervous and did not want to publicly be associated with cannabis related transactions.

111.     Shvartsman and Zenou knew each other for more than twenty years and Zenou had a strong desire to cease working with cannabis retailers and conveyed that information to Shvartsman.

112.     Shvartsman initially attempted to work with the Noltes to use the Dejavoo Masking software through them, but, when Schwartzman could not get the Noltes to give up control, he, on information and belief, went directly to Zenou to secure access to the Dejavoo Masking Software.

113.     Shvartsman promised Zenou that he would allow Dejavoo's existing licensees to use Dejavoo's platform under their agreements, but if they desired to sign up additional merchants they would have to execute a new licensing agreement with OPC.

114.     Shvartsman took advantage of this desire and through, OPC, a company controlled by Shvartzman and Transact First, entered into an exclusive instance user services agreement dated February 10, 2020. Under that agreement, OPC gained the exclusive right to use, sell and maintain Dejavoo's systems, and Dejavoo gave up its rights to offer its systems over years.

115.     To take over and start using the Dejavoo Masking Software and to take control of the market, Schwartzman incorporated One Pay Cloud in February 2020. One Pay Cloud was created in furtherance of the scheme to defraud and disguise illegal cannabis transactions, and,

upon on information and belief, One Pay Cloud is owned by both Rocket One Capital (with Michael Shvartsman as Manager) and the Hannelius Knight Trust (with Eric Hannelius as Trustee).

116. OPC and Dejavoo also entered into a Side Letter Agreement, which confirmed that OPC wanted to use Dejavoo's systems in the market for CBD and dispensary related products. And on February 10, 2020, OPC and Dejavoo entered into an assignment of Services and Licensing Agreement (the "*OPC-Dejavoo Assignment*"). OPC's corporate counsel later testified that the agreements were intended to distance Zenou from the illegal nature of the line of business that his software was permitting.

117. Pursuant to the Licensing Agreement, OPC received all of the rights to use certain point of banking protocols—including the Dejavoo Masking Software created for EFT—and OPC was also assigned all rights, duties, and obligations of Dejavoo and DeNovo in connection with Services and License Agreements Dejavoo and DeNovo had with third parties. At the time, OPC represented that it would not interfere with any existing relationships but also required any ISR or affiliate to agree to exclusively use it for the processing of any and all transactions, but OPC always intended to use its license with Dejavoo to obtain a larger share of the market.

118. On February 10, 2020, Dejavoo and Denovo licensed the Dejavoo Masking Software and Denovo's platform software to One Pay Cloud.

119. Around the time that Shvartsman obtained the license to use the Dejavoo Masking Software, Shvartsman advised Ryan Nolte that Dejavoo planned to sell One Pay Cloud an exclusive license to the Dejavoo Masking Software. Shvartsman also told Ryan Nolte, who was EFT's manager and the manager of Skylight Processing (an Affiliate and thus an exclusive user of IRMS under the Processing Agreement), that the Dejavoo sale to One Pay Cloud of an exclusive license for the Dejavoo Masking and Integrations software would terminate EFT's Perpetual

License.

120. In February of 2020, there was a similar conversation with Michael Shvartsman and Max Miller regarding Paybotic's perpetual license as an exclusive user of IRMS. And, as a result of the discussions with Shvartsman, Paybotic joined in EFT's lawsuit against Dejavoo for the same misconduct.

121. Shvartsman also approached Ron Nolte of Sterling Payment Solutions and advised Ron Nolte of the fact that OPC would shut down Sterling Payment Solutions unless it agreed to enter into a new licensing agreement with OPC. Sterling refused at first but was ultimately forced to enter into a Platform Licensing Agreement dated February 27, 2020, by OPC or face its own destruction.

122. Michael Shvartsman also threatened to shut down EFT and Paybotic if they did not agree to new processing agreements with One Pay Cloud, despite knowing they were contractually obligated to an exclusive agreement with IRMS per the Processing Agreement.

123. EFT and Paybotic refused at first, and on February 27, 2020, EFT and Paybotic filed a complaint in the United States District Court for the Southern District of New York against Dejavoo and DeNovo for breaches of licensing agreements with Dejavoo. After the Complaint was filed EFT obtained a temporary injunction against Dejavoo and OPC. In response, Dejavoo, Zenou and OPC submitted a series of affidavits and redacted documents that supported their contention that allowing or requiring Dejavoo to continue to operate through EFT would violate the law to prevent the public disclosure and consequences that would arise from the illegal nature of this conduct.

124. Thereafter, Schwartzman purchased EFT from the Noltes. In purchasing EFT, on information and belief, Schwartzman also agreed and understood of the relationship between the

Noltes and IRMS, and the importance of IRMS's relationships with various banking entities, and after taking control of the Dejavoo Masking Software, Schwartzman decided to try and force IRMS to be purchased.

125. Shvartsman also transferred all of his ownership interest in OPC to Transact First, Inc. and Transact First, OPC, and EFT entered into a subsequent agreement which allowed EFT to continue to defraud IRMS through its use of the Dejavoo Masking Software.

126. In 2020, Rocket One Capital, Shvartsman and Garelick also approached IRMS regarding a purchase of IRMS, and, to ascertain if IRMS knew of their pending deal with EFT, Skylight, and Paybotic, and to determine if IRMS or EFX was aware of the existence of the Dejavoo Masking Software. Shvartsman learned that IRMS was not aware of the existence of the Dejavoo Masking Software and understood that he could use it in combination with his control of EFT to convert and misappropriate monies that were due to IRMS from EFT and its other entities. Shvartsman also knew that depriving IRMS of the revenue from EFT would allow him and his entities to purchase IRMS at a lower price.

127. Prior to attacking and seeking to purchase IRMS, Ryan Nolte, Randy Nolte, Shvartsman, Hannelius, and Garelick offered to purchase all of IRMS's interests at a significant discount and threatened to divert merchant revenue if the offer was not accepted, knowing that they had the ability through the Dejavoo Masking Software to prevent IRMS from detecting their misconduct.

128. Because IRMS was not aware of the Dejavoo Masking Software, its nefarious purpose or that it was created for the explicit purpose of harming IRMS' interests, it did not consider the threat as realistic, and it considered the terms to be unreasonably low.

129. However, Schwartzman, the Noltes, Zenou, and the companies those parties worked with knew of the Noltes and Dejavoo's efforts to create software that served no purpose but to defraud IRMS and that their conduct would jeopardizing IRMS's relationship with its sponsorship bank. However, all of these defendants and their affiliated companies were aware of the fact that harming IRMS's relationship would allow them to corner the market accomplishing Shvartsman's goal of obtaining a monopoly.

130. In any case, IRMS refused the offer, which then caused Shvartsman to become more aggressive and decided to institute a new plan to prevent IRMS from operating, as Shvartsman, OPC, the Noltes and others knew that IRMS was not aware of the capabilities of the Dejavoo masking software.

### *The Conspiracy to Harm Plaintiffs by the Shvartsman Conspirators*

131. The efforts to harm IRMS commenced with EFT and OPC coming to an agreement with respect to EFT's continued use of the OPC's software, and with the purchase of EFT's assets or certain customer accounts being contemplated.

132. On April 29, 2020, EFT and OPC agreed to terms, and a new Platform License Agreement (the "EFT-OPC PLA") was signed between them. Also on April 29, 2020, EFT and OPC executed a term sheet memorializing the terms of a planned sale of EFT's assets to OPC.

133. One day after the EFT-OPC PLA was executed the litigation in the United States District Court for the Southern District of New York which was commenced by EFT and Paybotic against Dejavoo and DeNovo was terminated.

134. On August 20, 2020, OPC transferred to Transact First all of OPC's interest in the term sheet executed between OPC and EFT.

135. On November 19, 2020, Transact First executed an asset purchase agreement to purchase EFT's assets, and on November 19, 2020, Transact First closed on the purchase and sale

agreement for the assets of EFT, made between EFT, by and through Randy Nolte as Member, with Shvartsman as guarantor.

136. Upon information and belief, on or about the same time, a similar transaction to purchase the assets or ownership of Skylight was executed.

137. On information and belief financial statements from November 20, 2020, financial projections of Skylight and EFT—with the two entities merged together—to investors of PUP as part of the income.

138. The purchase of EFT and its contractual agreements by Transact First breached EFT's contact with IRMS and was not disclosed to IRMS. Nor was the purchase of Skylight, despite the fact that under the Agreement OPC, and thus Transact First as successors to EFT were required to disclose the aforementioned purchase.

139. The assignment and EFT's interactions with OPC and Transact First also caused a very significant decrease in the amount of transactions that were being run through EFT, and thus IRMS, as well as the trajectory of these sales that were being made.

140. IRMS then confronted EFT about the transaction that it had engaged in, and EFT acknowledged that it had assigned or otherwise transferred its business to OPC. However, to conceal the transaction EFT then claimed that it had a significant portion of the accounts that were transferred to OPC be returned to it. None of OPC, Transact First or EFT disclosed, however, that the transactions involved Cannabis, or that OPC and Transact First were the rightful holders of all rights under the Agreement.

141. OPC, Transact First and Shvartzman understood that they needed to conceal their involvement in these transactions. They consequently caused or permitted EFT to take possession of the some, but not all of the improperly transferred accounts, so that the payments for those

accounts could be processed through IRMS's system.

142.   In causing EFT to resume those transactions, without disclosing Dejavoo's involvement, or the other facts concerning the transaction, Shvartsman, OPC and Transact First intentionally misled and concealed the existence of the Dejavoo Masking Software. The investigation into these conducts and transactions would have revealed the fact that EFT, through OPC and the Dejavoo Software, was in fact using the Dejavoo Software to conceal Cannabis related transactions and would have allowed IRMS to take appropriate action to protect its interests or discover the fraud.

143.   In returning and admitting to the nature of these transactions, EFT and OPC, and thus Shvartsman, and the other conspirators intentionally misled and concealed the fact that the transactions were cannabis based. Had IRMS known of the EFT's involvement in the cannabis space with OPC and Transact First, it would have ensured and attempted to make sure that EFT and its customers were compliant.

144.   They also, on information and belief, intentionally continued to engage in these transactions because Shvartsman, Ryan Nolte, Transact First and OPC knew that it could jeopardize IRMS' relationship with Pueblo Bank, and cause IRMS, as a competitor, to cease operations or force it to sell itself at a steep discount.

145.   In March 2021, Michael Shvartsman, in tandem with Rocket One Capital, Eric Hannelius, the Hannelius Knight Trust, Bruce Garelick, One Pay Cloud, and Transact First, developed a plan, called Project Unicorn Payments ("*PUP*") in furtherance of their effort to consolidate and take over the Emerging Market for Payment Processors, which including cannabis and marijuana transactions.

146. This pitch deck contained the detailed list of banks targets and detailed the mechanism with which Shvartsman and his accomplices intended to take over the market. It also referenced the fact that through their efforts, and, on information and belief, through revenue generated from EFT, Skylight and Sterling, earned more than $25,000,000 in revenue in 2020, with a net income of $6,312,118. All of the aforementioned revenue was generated through and thanks to the use of IRMS' trade secrets through the Dejavoo Masking Software.

147. The pitch deck also highlighted and referenced the fact that OPC and Shvartsman had access to IRMS' technology and other information, and the fact that Transact First was entering into and intended to provide services that would otherwise compete with IRMS.

148. Unfortunately, IRMS, which at the time was still unaware of the use of the Dejavoo software or the amount of cannabis transactions that EFT had engaged in with the assistance and guidance of Transact First and Dejavoo and the other defendants and refused the offers.

149. Nonetheless, EFT and OPC, through their use of the Dejavoo software continued to decrease and divert transactions and customers where OPC had and would otherwise continue to engage in conduct that was intended to deprive IRMS of revenue.

150. Ultimately, EFT completely ceased using IRMS for services in April of 2021, Ryan Nolte offered, with, on information and belief, the support of Shvartsman, offered to purchase IRMS. In connection with the conversation, and consistent with the prior conduct, Nolte threatened to cause IRMS to suffer significant damage and losses.

151. In response, and as a result of the foregoing, in May of 2021, IRMS sent a letter to EFT to warn it of the fact that unless it provided accurate reporting and explained why there were significant discrepancies, that it would cease providing services.

152.    EFT did not respond to the correspondence, and on May 21, 2021, IRMS sent follow up correspondence demanding the EFT explain the nature of the transactions and what had occurred.

153.    Immediately after receiving that letter Rocket One Capital, One Pay Cloud and Transact First, EFT and Randy Nolte, sent demand letters to certain alleged ISO customers of EFT purportedly alleging that there were unpaid interchange fees by IRMS from EFT transactions. These letters contained material and false statements, and resulted in the customers contacting IRMS, through counsel for Dejavoo, to claim that IRMS was improperly with holding funds.

154.    As a result, with attorneys that have represented Dejavoo, OPC and Transact First and the other conspiring defendants, various third parties sent a demand letter to IRMS demanding that it immediately release all of its funds.

155.    The letters are additional evidence of an ongoing and coordinated effort by EFT, Randy Nolte, and Shvartsman, by and through the above identified attorneys, and The Stickman Company, to disparage and defame IRMS.

156.    The allegations in the letters are false, and Randy Nolte, EFT, Shvartsman, and The Stickman Company and upon information and belief, knew such statements were false at the time that they were published.

157.    Moreover, these letters and the correspondence which was transmitted were accompanied by and followed up by negative reviews on the Better Business Bureau. These reviews falsely accused and maintained that IRMS was stealing funds.

158.    As a result of the aforementioned conduct IRMS filed a lawsuit against EFT Services for breach of contract and other misconduct. However, IRMS was prevented from doing so. Thereafter, IRMS filed a separate lawsuit, but was prevented from prosecuting it by OPC's

bankruptcy filing.

159.    Sterling Payment Solutions, which was owned by Ron Nolte, Randy Nolte's brother and Ryan Nolte's uncle, also commenced a lawsuit against One Pay Cloud, LLC and obtained a judgment against OPC, and was working with IRMS at the time.

160.    Unfortunately, the litigation and the transmission of the demand letters at OPC's requests, and the bad reviews that were made as well, caused Pueblo Bank to investigate IRMS' efforts to monitor and maintain the compliance protocols for its customers. The bad reviews and publicity that was directed at IRMS at the Shvartsman Defendants' request further exacerbated the situation.

161.    Pueblo Bank then spent several months investigating and making determinations as to whether IRMS was properly monitoring its customers, and whether the customers of IRMS' ISRs were compliant with its protocols, IRMS protocols, and federal and state law. Pueblo Bank then sought to charge IRMS for the costs of these services.

162.    After conducting the audit, Pueblo Bank determined **in 2022** that nearly 65% of IRMS transactions were cannabis based, and that it would otherwise be terminating its relationship with IRMS, and as a result of the aforementioned conduct terminated its relationship with IRMS.

163.    Prior to the commencement of the aforementioned review, IRMS did not know and was not aware of the fact that it EFT and the other Conspiring Defendants were engaged in misconduct and were concealing transactions until that time.

164.    Nonetheless, and because of the aforementioned misconduct, IRMS continued to pursue its claims and engage in discovery but was prevented from obtaining documents and information concerning the matter.

165. Sterling Payment Solutions also continued to pursue claims against OPC and ultimately obtained a judgment against OPC.

166. Right before the judgment was obtained and at the same time that IRMS had began the process of prosecuting litigation against OPC, Transact First and its other affiliates, caused OPC chose to file for bankruptcy.

167. The filing of bankruptcy by OPC was an intentional and calculated tactic that prevented IRMS and Sterling, who at the time were working through a concerted effort, from learning about or otherwise discovering the transactions and other misconduct that had been engaged in.

168. Notably, on or about May 10, 2023, the OPC executed a R*esolution*, wherein the OPC forgave the $4,582.443.6 that it was owed from Transact First, on account of a $8,000,000 Promissory Note without consideration.

169. OPC also caused $9,348,825 to be diverted to Encompany, Inc. another affiliate of OPC that was controlled by the Shvartsman Defendants, that occurred on or about the dates set forth below: (i) $1,044,312.00 on  November 15, 2021; (ii) $966,711 on December 15, 2021; (iii) $1,057,520 on January 15, 2022;  (iv) $896,502 on February 20, 2022; (v) $24,879.80 on or about January 15, 2022; (vi) $997,357 on March 20, 2022; (vii) $1,151,262 on April 20, 2022; (viii) $1,191,695 on May 20, 2022; (ix) $461,692.00 on March 20, 2023; (x) $473,799.00 on or about March 20, 2023;  and (xi) $571,489.05 on April 20, 2023 and $533,138 on May 20 2023.  Each of these transfers was made during a time when OPC claims that it was otherwise insolvent and were made with the intent to hinder delay and defraud creditors. OPC also caused an additional $364,747.00 to be transferred to Encompany from Payment Solutions, LLC, d/b/a Paysol, which otherwise should have been transferred to it.

170.     The failure by OPC to disclose these transactions, and refusal to comply with its federally mandated obligations resulted in the appointment of a bankruptcy trustee. Immediately after a bankruptcy trustee was appointed, and immediately after a bankruptcy trustee was appointed OPC filed a motion to dismiss the bankruptcy case, and claimed that its assets could not be administered through a bankruptcy proceeding because **each and every transaction that it engaged in was in violation of the Controlled Substances Act.**

171.     Thereafter IRMS attempted to engage in discovery concerning OPC's contentions, and sought information from Dejavoo about the nature of its licensing agreement with OPC, Encompany concerning the millions of dollars in transfers it had received, and Transact First concerning its relationship with OPC and the source of the $8 million in money that was loaned to it.

172.     Each of these entities refused outright to engage in discovery, and instead accused IRMS of misconduct. Right before the discovery disputes were to be hard, and the defendants compelled to produce documents and materials, however, Transact First entered into an agreement with Sterling Payment Solutions where it would otherwise pay Sterling all of the money that was due and owed to it.

173.     The payment of Sterling then resulted in the bankruptcy court declining to exercise jurisdiction over the matter as a two-party dispute, and because the bankruptcy court found that it would be cost prohibitive to determine whether OPC and its co-conspirators had violated the controlled substances act.

174.     Accordingly, the filing of bankruptcy by OPC was intended to delay and prevent IRMS and other parties from learning more about OPC and the other conspiring defendants'

misconduct. In fact, shortly after a trustee was appointed, as a result of OPC's failure to comply with its bankruptcy obligations, OPC claimed, that it could not actually administer a single asset because all of its conduct and every transaction that it was engaged in violated the controlled substances act.

175.   As such, and since Transact First had paid for the bankruptcy as well as the settlement with Sterling Payment and always had the ability to pay for those costs, bankruptcy was initiated without probable cause, good cause or proper purpose.

176.   Thus, the filing of the bankruptcy lacked any merit, and otherwise was intended to prevent and otherwise delay discovery into the misconduct and illegal actions that had been engaged in.

177.   The filing of the bankruptcy otherwise caused IRMS to expend substantial legal fees in defending against the litany of attacks and baseless arguments raised by the Conspiring Defendants.

178.   The filing of the bankruptcy also constitutes a bad faith filing and was intended to continue to harm IRMS and its interests and prevent IRMS from enforcing its rights or seeking a final adjudication of its rights.

179.   All conditions precedent to the filing of the instant lawsuit have been met or waived.

180.   IRMS has retained the undersigned law firms and has agreed to pay them a reasonable fee for the services rendered or to be rendered.

### CLAIMS FOR RELIEF
### COUNT I
***Theft of Trade Secrets Pursuant To 18 U.S.C. § 1836***
(Against the Conspiring Defendants)

181.   IRMS incorporates the factual allegations set forth in paragraphs 1 through 180 as if set fully forth herein.

182.    As set forth in further detail above, IRMS had valuable trade secret information, which included, without limitation its computer programming and software systems which allowed it to expeditiously and safely connect its customers to its sponsoring bank and the other banking systems.

183.    IRMS spent time and money investing in the development of this software, and the software derives value from not being generally known to the public at large.

184.    The computer source code and other confidential information that was derived therefrom was also subject to IRMS' reasonable efforts, and IRMS in fact engaged in reasonable efforts to protect the confidentiality of its source code.

185.    Nonetheless, Akers, while working in concert with Ryan Nolte, and Zenou, misappropriated and manipulated IRMS's software systems to develop the Dejavoo Masking Software.

186.    In other words, without access to IRMS' software, and without their efforts to take and misappropriate IRMS's trade secrets, including its source code, Zenou, Akers, and Ryan Nolte misappropriated IRMS' trade secrets.

187.    Thereafter Zenou, Ryan and Akel placed and caused IRMS trade secrets to be owned by Dejavoo, which in turn provided OPC, and Transact First a perpetual license to use and otherwise license their software.

188.    Transact First, Shvartsman and OPC directed and otherwise were involved in the distribution, through their licensing agreement of the Dejavoo Masking Software, which otherwise constitutes the continued theft and usage of IRMS' trade secrets.

189.    As set forth in further detail above, the theft of IRMS' trade secrets has caused IRMS to suffer damages in that IRMS is no longer able to operate as a result of the damage and

harm that was caused to it through the use of the Dejavoo Masking Software.

190.    The aforementioned conduct has caused IRMS to suffer damages.

191.    As a result of the aforementioned conduct, IRMS has, in fact, suffered damages.

WHEREFORE Indian River Merchant Services respectfully requests that the Court enter a Judgment in its favor and against Defendants, Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that Defendants have misappropriated or otherwise engaged in the theft of IRMS' trade secrets; (ii) Awarding IRMS damages, including the disgorgement of lost profits, actual damages, lost profits as a result of the theft of trade secrets; (iii) Awarding IRMS incidental and/or resulting damages as a result of the theft and/or misappropriation of trade secrets; (iv) Awarding IRMS attorney's fees, prejudgment interest and costs; and (v) Granting such further relief as the Court deems just and proper.

## COUNT II
### *Theft of Trade Secrets – Injunctive Relief*

192.    IRMS incorporates the factual allegations set forth in paragraphs 1 through 180 as if set fully forth herein.

193.    Count II is being pled in the alternative.

194.    As set forth in further detail above, IRMS had valuable trade secret information, which included, without limitation its computer programming and software systems which allowed it to expeditiously and safely connect its customers to its sponsoring bank and the other banking systems.

195.    IRMS spent time and money in investing in the development of this software, and the software derives value from not being generally known to the public at large.

196. The computer source code and other confidential information that was derived therefrom was also subject to IRMS' reasonable efforts, and IRMS in fact engaged in reasonable efforts to protect the confidentiality of its source code.

197. Nonetheless, Akel, while working in concert with Ryan Nolte and Zenou, misappropriated and manipulated IRMS's software systems to develop the Dejavoo Masking Software.

198. In other words, without access to IRMS's software, and without their efforts to take and misappropriate IRMS's trade secrets, including its source code, Zenou, Akel, and Ryan Nolte misappropriated IRMS's trade secrets.

199. Thereafter Zenou, Ryan, and Akel, placed and caused IRMS trade secrets to be owned by Dejavoo, which in turn provided OPC, and Transact First a perpetual license to use and otherwise license their software.

200. Transact First, Shvartsman and OPC directed and otherwise were involved in distributing, through their licensing agreement, the Dejavoo Masking Software, which facilitated the continued theft and usage of IRMS's trade secrets.

201. As set forth in further detail above, the theft of IRMS's trade secrets has caused IRMS to suffer damages in that IRMS is no longer able to operate as a result of the damage and harm that was caused to it through the use of the Dejavoo Masking Software.

202. The aforementioned conduct has caused IRMS to suffer damages.

203. As a result of the aforementioned conduct, IRMS has, in fact, suffered damages that cannot be quantified, and that has caused IRMS to suffer irreparable harm.

204. IRMS has no adequate remedy at law and the public interest would be served by granting injunctive relief.

WHEREFORE Indian River Merchant Services respectfully requests that the Court enter a Judgment in its favor and against Defendants, Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) enjoining the continued use of IRMS's trade secrets; (ii) awarding IRMS its attorneys' fees and costs; and (iii) Granting such further relief as the Court deems just and proper.

## COUNT III

### *Tortious Interference with an Advantageous Business Relationship*

205. IRMS incorporates the allegations of Paragraphs 1 through 180 as if set forth in full herein.

206. A business relationship existed between EFT and IRMS under the Processing Agreement in addition to the relationship between IRMS and its processing bank, Pueblo.

207. As set forth in further detail above, the Conspiring Defendants knew of these relationships.

208. The Conspiring Defendants intentionally and without justification interfered with those relationships, by, *inter alia*, engaging in a scheme to conceal the nature of transactions to jeopardize and harm the relationships between IRMS, its customers, and its sponsoring bank.

209. IRMS was damaged as result of the Conspiring Defendants' interference.

210. IRMS was in fact damaged as a result of the Conspiring Defendants' misconduct.

WHEREFORE, IRMS demands judgment against Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring

Defendants have tortiously interfered with its business relationships with Pueblo and EFT; (ii) Awarding IRMS damages, including lost profits, as a result of the Conspiring Defendants' misconduct; (iv) Awarding IRMS prejudgment interest and costs; and (v) Granting such further relief as the Court deems just and proper.

## COUNT IV
### *Tortious Interference with a Contract*

211. IRMS incorporates the allegations of Paragraphs 1 through 180 as if set forth in full herein.

212. A valid and binding contract existed between EFT and IRMS under the Processing Agreement in addition to the relationship between IRMS and its processing bank, Pueblo.

213. As set forth in further detail above, the Conspiring Defendants knew of these relationships.

214. The Conspiring Defendants intentionally and without justification interfered with those relationships, by, *inter alia*, engaging in a scheme to conceal the nature of transactions to jeopardize and harm the relationships between IRMS, its customers, and its sponsoring bank.

215. IRMS was damaged as result of the Conspiring Defendants' interference.

216. IRMS was in fact damaged as a result of the Conspiring Defendants' misconduct.

WHEREFORE, IRMS demands judgment against Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring Defendants have tortiously interfered with its contracts with Pueblo and EFT; (ii) Awarding IRMS damages, including lost profits, as a result of the Conspiring Defendants' misconduct; (iv) Awarding IRMS prejudgment interest and costs; and (v) Granting such further relief as the Court

deems just and proper.

## COUNT V

### *Violations of Florida's Unfair and Deceptive Trade Practices Act*

217.    IRMS incorporates, by reference, the allegations of Paragraphs 1 through 180 above as if set forth in full herein.

218.    As set forth in further detail above, the Conspiring Defendants collectively engaged in the unfair and deceptive trade practice of stealing and misappropriating IRMS' computer code, using it to develop software to mask cannabis transactions and divert other transactions away from IRMS through the use of the Dejavoo Masking Software.

219.    The use of the Dejavoo Masking Software, the conversion of accounts, and the efforts to defame and otherwise harm IRMS' business interests constitutes an unfair and deceptive trade practice as well, which otherwise violates Florida's Unfair and Deceptive Trade Practices Act.

220.    All of the aforementioned conduct has caused IRMS to suffer damages.

221.    IRMS has in fact suffered damages.

WHEREFORE, IRMS demands judgment against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) finding that the Conspiring Defendants have violated Florida's Unfair and Deceptive Trade Practices Act; (ii) awarding IRMS damages, including lost profits, and resulting damages, as a result of the Conspiring Defendants' misconduct; (iv) awarding IRMS attorneys' fees, prejudgment interest and costs; and (v) granting such further relief as the Court deems just and proper.

<u>**COUNT VI**</u>
*Fraud*

222.    IRMS incorporates the allegations of Paragraphs 1 through 180 as if set forth in full herein.

223.    As set forth in further detail above, EFT, and the Noltes assigned their rights to Transact First and OPC under the Processing Agreement without authorization or authority, and as a result of the foregoing assumed responsibility for the representations that were being made by EFT to IRMS.

224.    From sometime in February 2020, through May 2021, on a monthly basis, Transact First, OPC, and Shvartsman, in concert with Ryan Nolte intentionally concealed and otherwise failed to disclose the fact that (i) EFT was using the Dejavoo Masking Software; (ii) nearly all of EFT's transactions involved or were otherwise related to Cannabis transactions in violation of the Controlled Substances Act; and (iii) concealed that a substantial number of customers and transactions were being diverted away from EFT (i.e. misrepresented that transactions were being diverted to OPC and other companies that were controlled by the Shvartsman Defendants) through the use of the Dejavoo Masking Software.

225.    These statements were made and transmitted to IRMS in monthly reports, and the involvement of these entities was otherwise concealed from IRMS. Shvartsman, OPC, Ryan Nolte and Transact First all caused these statements to be made to IRMS with knowledge that IRMS would rely on them.

226.     IRMS reasonably relied on the reports and information that was disseminated at the direction of Shvartsman, OPC, Ryan Nolte, and Transact First, and relied to its detriment in continuing or allowing EFT to secretly engage in transactions in violation of its protocols and federal law through the Dejavoo Masking Software.

227.    These statements were false and Shvartsman, OPC, and Transact First knew that all of the statements were false.

228.    As a result of the false nature of the aforementioned statements, IRMS suffered damages, and IRMS in fact suffered damages.

WHEREFORE IRMS demands judgment in its favor and against Defendants, Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; and Eric Hannelius; and Bruce Garelick: (i) Finding that these Defendants have engaged in fraudulent conduct; (ii) Awarding IRMS damages, including lost profits, as a result of the misconduct detailed herein; (iii) Awarding IRMS attorney's fees and costs as a result of the foregoing conduct; (iv) Awarding IRMS resulting damages; and (v) Granting such further relief as the Court deems just and proper.

## COUNT VII
### *Fraud by Omission*

229.    IRMS incorporates the allegations of Paragraphs 1 through 180 as if set forth in full herein.

230.    As set forth in further detail above, EFT, and the Noltes assigned their rights to Transact First and OPC under the Processing Agreement without authorization or authority, and as a result of the foregoing assumed responsibility for the representations that were being made by EFT to IRMS. As a result, the Nolte Defendants and Shvartsman Defendants had an obligation to disclose certain facts to IRMS.

231.    From sometime in February 2020, through May 2021, on a monthly basis, Transact First, OPC, and Shvartsman, in concert with Ryan Nolte intentionally concealed and otherwise failed to disclose the fact that (i) EFT was using the Dejavoo Masking Software; (ii) nearly all of

EFT's transactions involved or otherwise were implicated with a Cannabis based transaction in violation of the Controlled Substances Act; and (iii) concealed that a substantial number of customers and transactions were being diverted away from EFT, through the use of the Dejavoo Masking Software.

232.    To the extent that these statements were not made or were not misleading in and of themselves, they were otherwise required to be disclosed by each of these defendants who were under an obligation to disclose and provide transparency to IRMS with respect to the transactions that they were engaged in.

233.    These statements were made and transmitted to IRMS in monthly reports, and the involvement of these entities was otherwise concealed from IRMS. These defendants all caused these statements to be made to IRMS with knowledge that IRMS would rely on them.

234.     IRMS reasonably relied on the reports and information that was disseminated at the direction of Shvartsman, OPC, Ryan Nolte, and Transact First, and relied to its detriment in continuing or allowing EFT to secretly engage in transactions in violation of its protocols and federal law through the Dejavoo Masking Software.

235.    These statements were false and all of the Defendants involved knew that all of the statements were false.

236.    As a result of the false nature of the aforementioned statements, IRMS suffered damages, and IRMS in fact suffered damages.

WHEREFORE IRMS demands judgment in its favor and against Defendants, Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; and Eric Hannelius; and Bruce Garelick:; (i) finding that these Defendants have engaged in fraudulent

conduct; (ii) warding IRMS damages, including lost profits, as a result of the misconduct detailed herein; (iii) awarding IRMS its attorneys' fees and costs; (iv) awarding IRMS incidental and resulting damages; and (v) granting such further relief as the Court deems just and proper.

## COUNT IX
## Aiding and Abetting Fraud

237.    IRMS reincorporates by reference the allegations of Paragraphs 1 through 180 as if set forth in full herein.

238.    As set forth in further detail above, Ryan Nolte, EFT, Zenou and others worked together to misappropriate IRMS' trade secrets, and, even if they did not take its trade secrets, to infiltrate and compromise its technical systems through the development of the Dejavoo Masking Terminal.

239.    The Dejavoo Masking Terminal was used and in fact provided EFT, Schvartsman, OPC, Ryan Nolte, and Transact First in concealing and otherwise preventing the discovery of the aforementioned misconduct.

240.    As a result, Zeonu, Denovo and Dejavoo had knowledge of the fraudulent conduct that was being engaged in. Zenou even executed a side agreement to conceal his involvement in the substantial transacitons that were engaged in.

241.    Accordingly, Zenou, Denovo and iPos all provided substantial assistance in the fraud that was perpetrated by Defendants onto IRMS.

242.    Moreover, and commencing in later 2020 through 2021, Garelick also provided substantial assistance to the efforts to market and utilize the Dejavoo Masking Software to harm and hurt IRMS. He helped to raise money and prepare plans to divert income from EFT and other affiliates to OPC, Transact First and Starlight. Through this process and these concerted attacks onto IRMS, the Defendants could orchestrate a takeover of IRMS' market share.

243.    Gaerlick also attempted to purchase IRMS at a discount, and in doing so provided substantial assistance.

244.    As a result of the substantial assistance IRMS suffered damages.

245.    IRMS in fact suffered damages.

WHEREFORE, IRMS demands judgment against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring Defendants have violated Florida's Unfair and Deceptive Trade Practices Act; (ii) Awarding IRMS damages, including lost profits, and resulting damages, as a result of the Conspiring Defendants' misconduct; (iv) Awarding IRMS attorney' prejudgment interest and costs; and (v) Granting such further relief as the Court deems just and proper.

## COUNT X
### *Theft of Trade Secrets – Fla. Stat. § 688.004*

246.    IRMS incorporates the factual allegations set forth in paragraphs 1 through 180 as if set fully forth herein.

247.    As set forth in further detail above, IRMS had valuable trade secret information, which included, without limitation its computer programming and software systems which allowed it to expeditiously and safely connect its customers to its sponsoring bank and the other banking systems.

248.    IRMS spent time and money in investing in the development of this software, and the software derives value from not being generally known to the public at large.

249.    The computer source code and other confidential information that was derived therefrom was also subject to IRMS' reasonable efforts, and IRMS in fact engaged in reasonable

efforts to protect the confidentiality of its source code.

250.    Nonetheless, Akers, while working in concert with Ryan Nolte, and Zenou, misappropriated and manipulated IRMS's software systems to develop the Dejavoo Masking Software.

251.    In other words, without access to IRMS' software, and without their efforts to take and misappropriate IRMS's trade secrets, including its source code, Zenou, Akers, and Ryan Nolte misappropriated IRMS' trade secrets.

252.    Thereafter Zenou, Ryan and Akers, placed and caused IRMS trade secrets to be owned by Dejavoo, which in turn provided OPC, and Transact First a perpetual license to use and otherwise license their software.

253.    Transact First, Shvartsman and OPC directed and otherwise were involved in the distribution, through their licensing agreement of the Dejavoo Masking Software, which otherwise constitutes the continued theft and usage of IRMS' trade secrets.

254.    As set forth in further detail above, the theft of IRMS' trade secrets has caused IRMS to suffer damages in that IRMS is no longer able to operate as a result of the damage and harm that was caused to it through the use of the Dejavoo Masking Software.

255.    The aforementioned conduct has caused IRMS to suffer damages.

256.    As a result of the aforementioned conduct, IRMS has, in fact, suffered damages.

WHEREFORE IRMS respectfully requests that the Court enter a Judgment in its favor and WHEREFORE Indian River Merchant Services respectfully requests that the Court enter a Judgment in its favor and against Defendants, Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius;

Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that Defendants have misappropriated or otherwise engaged in the theft of IRMS' trade secrets; (ii) Awarding IRMS damages, including the disgorgement of lost profits, actual damages, lost profits as a result of the theft of trade secrets; (iii) Awarding IRMS incidental and/or resulting damages as a result of the theft and/or misappropriation of trade secrets; (iv) Awarding IRMS attorney's fees, prejudgment interest and costs; and (v) Granting such further relief as the Court deems just and proper.

**COUNT XI**
***Theft of Trade Secrets – Fla. Stat. § 688.003***

257.    IRMS incorporates the factual allegations set forth in paragraphs 1 through 180 as if set fully forth herein.

258.    Count IX is being pled in the alternative.

259.    As set forth in further detail above, IRMS had valuable trade secret information, which included, without limitation its computer programming and software systems which allowed it to expeditiously and safely connect its customers to its sponsoring bank and the other banking systems.

260.    IRMS spent time and money in investing in the development of this software, and the software derives value from not being generally known to the public at large.

261.    The computer source code and other confidential information that was derived therefrom was also subject to IRMS' reasonable efforts, and IRMS in fact engaged in reasonable efforts to protect the confidentiality of its source code.

262.    Nonetheless, Akers, while working in concert with Ryan Nolte, and Zenou, misappropriated and manipulated IRMS's software systems to develop the Dejavoo Masking Software.

263. In other words, without access to IRMS' software, and without their efforts to take and misappropriate IRMS's trade secrets, including its source code, Zenou, Akers, and Ryan Nolte misappropriated IRMS' trade secrets.

264. Thereafter Zenou, Ryan and Akel, placed and caused IRMS trade secrets to be owned by Dejavoo, which in turn provided OPC, and Transact First a perpetual license to use and otherwise license their software.

265. Transact First, Shvartsman and OPC directed and otherwise were involved in the distribution, through their licensing agreement of the Dejavoo Masking Software, which otherwise constitutes the continued theft and usage of IRMS' trade secrets.

266. As set forth in further detail above, the theft of IRMS' trade secrets has caused IRMS to suffer damages in that IRMS is no longer able to operate as a result of the damage and harm that was caused to it through the use of the Dejavoo Masking Software.

267. The aforementioned conduct has caused IRMS to suffer damages.

268. As a result of the aforementioned conduct, IRMS has, in fact, suffered damages that cannot be quantified, and that has caused IRMS to suffer irreparable harm.

269. IRMS has no adequate remedy at law and the public interest would be served by granting injunctive relief.

WHEREFORE Indian River Merchant Services respectfully requests that the Court enter a Judgment in its favor and against Defendants, Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring Defendants have misappropriated or otherwise engaged in the theft of IRMS' trade secrets; (ii) Finding that

Conspiring Defendants' conduct has caused IRMS to suffer irreparable harm; (iii) awarding IRMS attorney's fees and costs; and (iv) Granting such further relief as the Court deems just and proper.

**COUNT XI**
*Unjust Enrichment*

270. IRMS incorporates the factual allegations set forth in paragraphs 1 through 180 as if set fully forth herein.

271. As set forth in further detail above, IRMS had valuable trade secret information, which included, without limitation its computer programming and software systems which allowed it to expeditiously and safely connect its customers to its sponsoring bank and the other banking systems.

272. IRMS spent time and money in investing in the development of this software, and the software derives value from not being generally known to the public at large.

273. The computer source code and other confidential information that was derived therefrom was also subject to IRMS' reasonable efforts, and IRMS in fact engaged in reasonable efforts to protect the confidentiality of its source code.

274. Nonetheless, Akel, in concert with Ryan Nolte and Zenou, misappropriated and manipulated IRMS's software systems to develop the Dejavoo Masking Software.

275. In other words, without access to IRMS' software, and without their efforts to take and misappropriate IRMS's trade secrets, including its source code, Zenou, Akel, and Ryan Nolte misappropriated IRMS' trade secrets.

276. Thereafter Zenou, Ryan, and Akel, placed and caused IRMS trade secrets to be owned by Dejavoo, which in turn provided OPC, and Transact First a perpetual license to use and otherwise license their software.

277. Through the theft of this source code and the unauthorized access to IRMS' technology, IRMS was forced to confer a benefit onto the Defendants.

278. Transact First, Shvartsman, and OPC directed and otherwise were involved in the distribution, through their licensing agreement of the Dejavoo Masking Software, which otherwise constitutes the continued theft and usage of IRMS's trade secrets.

279. As set forth in further detail above, the theft of IRMS's trade secrets has caused IRMS to suffer damages in that IRMS is no longer able to operate as a result of the damage and harm that was caused to it through the use of the Dejavoo Masking Software.

280. In light of the theft of the trade secrets and intellectual property of IRMS, to the extent that it is not a trade secret,

281. The aforementioned conduct caused IRMS to suffer damages.

282. As a result of the aforementioned conduct, IRMS has, in fact, suffered damages.

WHEREFORE IRMS respectfully requests that the Court enter a Judgment in its favor and against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) finding that the Conspiring Defendants were unjustly enriched at IRMS' expense; (ii) awarding IRMS damages, including lost profits and resulting damages; and (iii) awarding IRMS prejudgment interest and costs; and (iv) granting such further relief as the Court deems just and proper.

## COUNT XII
Conversion

283. IRMS incorporates the factual allegations set forth in paragraphs 1 through 180 as if set fully forth herein.

284.     As set forth in further detail above, IRMS has an interest and owns its intellectual property, including its source code and the monies it was to receive in the settlement process.

285.     Nonetheless, Shvartsman, OPC, Transact First, and Ryan Nolte and their co-conspirators caused substantial income and monies that was due and owed and was otherwise the property of IRMS to themselves and other third parties.

286.     These Defendants, and Zenou, Dejavoo and Denovo, also engaged in the theft and misappropriation of IRMS' valuable source code and software which would also constitute conversion.

287.     As a result of the foregoing conduct IRMS suffered damages.

288.     IRMS in fact suffered damages.

WHEREFORE, IRMS respectfully requests that the Court enter Judgment IRMS respectfully requests that the Court enter a Judgment in its favor and against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring Defendants have engaged in conversion and have otherwise converted or misappropriated IRMS' property; (ii) Awarding IRMS damages as a result of the foregoing conduct; (iii) Awarding IRMS prejudgment interest and costs; and (iv) Granting such further relief as the Court deems just and proper.

## COUNT XIII
## ABUSE OF PROCESS

289.     IRMS incorporates the allegations of Paragraphs 1 through 180 above as if set forth in full herein.

290.     As set forth in further detail above, Moore, Transact First, OPC, and Shvartsman

chose to use the process of filing for bankruptcy and commencing a chapter 11 bankruptcy case for the sole purpose of harassing and wasting IRMS and Sterling, who was acting in concert with IRMS, time and money. This constitutes the use of a process for an improper purpose.

291. The bankruptcy was also filed in bad faith, and otherwise served no purpose.

292. As a result of the aforementioned improper use of a process process, which served no purpose IRMS suffered damages.

293. IRMS in fact suffered damages.

WHEREFORE, IRMS requests that the Court enter Judgment in its favor and against Defendants OPC, Shvartsman, and Transact First: (i) Finding that the Shvartsman Defendants have engaged in the abuse of process; (ii) Awarding IRMS damages, including attorney's fees incurred as special damages; (iii) Awarding IRMS attorney's fees and costs; and (iv) Granting such further relief as the Court deems just and proper.

## COUNT XIV
## MALICIOUS PROSECUTION

294. IRMS incorporates the allegations of Paragraphs 1 through 180 above as if set forth in full herein.

295. As set forth in further detail above, Transact First, OPC, and Shvartsman chose to use the process of filing for bankruptcy and commencing a chapter 11 bankruptcy case for the sole purpose of harassing and wasting IRMS and Sterling, who was acting in concert with IRMS, time and money.

296. The bankruptcy was also filed in bad faith, and otherwise served no purpose, and as a result was commenced without probable cause.

297. The bankruptcy case resulted in a bona fide termination, with the case being dismissed as a result of the Defendants inconsistent positions.

298.     As a result of the aforementioned claims and process, which served no purpose IRMS suffered damages.

299.     IRMS in fact suffered damages.

WHEREFORE, IRMS requests that the Court enter Judgment in its favor and against Schwartzman, Moore, OPC and Transact First: (i) Finding that they engaged in malicious prosecution; (ii) Awarding IRMS damages, including attorney's fees as special damages, incurred in the bankruptcy proceeding; (iii) Awarding IRMS costs and prejudgment interest; and (iv) Granting such further relief as the Court deems just and proper.

## COUNT XV
## CIVIL CONSPIRACY

300.     IRMS incorporates the allegations of Paragraphs 1 through 178 above, 182 through 191, 193 through 204, 206 through 210, 212 through 216, 218 through 221, 223 through 228, 230 through 236, 238 through 245, 247 through 256, 258 through 269, 271 through 282,  284 through 288,  290 through 293, and 295 through 299 above as if set forth in full herein.

301.     As set forth in further detail above, all of the Conspiring Defendants entered into an agreement, to engage in unlawful acts through unlawful means.

302.     Specifically, the Conspiring Defendants would misappropriate and otherwise steal IRMS' trade secrets, infiltrate its security systems and then use that to develop a software that would mask transactions.

303.     The Dejavoo Software was then used by the Conspiring Defendants as part and parcel of their scheme to misappropriate and devalue IRMS' competition and to allow them to interfere with IRMS' relationship with its sponsoring bank, if they could not purchase IRMS' business.

304.     Each Defendant took active steps in furtherance of this conspiracy.

305. The Noltes Zenou and Akel worked together to develop the Dejavoo Masking Software by testing and otherwise using IRMS' confidential and highly propriety information.

306. The Shvartsman Defendants further advanced this conspiracy by funding the use of the software, and/or purchasing opposition, offering competing services at lower rates, and by controlling and directing other misconduct to harm or destroy any of their competitors.

307. All of this conduct taken as a whole cause IRMS to suffer damages.

308. IRMS in fact suffered damages.

WHEREFORE IRMS requests that the Court enter judgment in IRMS' favor and against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring Defendants have engaged in a civil conspiracy; (ii) Awarding IRMS damages, jointly and severally, including lost profits, incidental and resulting damages as a result of this conduct; (iii) Awarding IRMS special damages, including attorney's fees incurred as a result of the abuse of process and malicious prosecution; (iv) Awarding IRMS costs and prejudgment interest; and (v) Granting such further relief as the Court deems just and proper.

## COUNT XVI
## VIOLATIONS OF THE FEDERAL RICO STATUTES

309. IRMS realleges and reincorporates the allegations in Paragraphs 1 through 180 above as if set forth in full herein.

310. As set forth in further detail above, the Conspiring Defendants engaged in conduct, by *inter alia*, stealing converting and laundering IRMS' assets, misappropriating IRMS' trade secrets, and otherwise engaging in wire fraud, that was criminal.

311. The Conspiring Defendants' conduct constituted an enterprise, because Defendants all acted with a common purpose to achieve the common goal of depriving individuals, including IRMS of its interest and ability to compete in the market.

312. Notably the Conspiring Defendants would use the Dejavoo Masking Software to depress the value of one of their targets, by causing its affiliates to divert transactions to companies they controlled, and otherwise engage in transactions that would put a victim's relationship with its sponsoring bank at risk.

313. The Conspiring Defendants would then approach a victim, such as IRMS, and attempt to purchase it. If the victim refused, the Conspiring Defendants would then engage in conduct intended to harm that victim of its value or prevent it from engaging in the market.

314. The Conspiring Defendants engaged in a pattern, in that their conduct was repeated and occurred several times during a several month period, with the intent to capitalize the cannabis payment processing market.

315. The Conspiring Defendants engaged in racketeering conduct, which included, without limitation, theft, conversion, burglary, fraud, wire fraud, bank fraud, and money laundering.

316. As a result of the Conspiring Defendants' conduct IRMS suffered damages.

317. IRMS in fact suffered damages.

WHEREFORE, IRMS demands judgment in its favor and against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC, Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: : (i) Finding that the Conspiring Defendants violated the Federal RICO Statutes; (ii) Awarding

IRMS treble damages; (iii) Awarding IRMS special damages, including lost profits, attorney's fees and costs, and other damages which may be recoverable by the law (iv) Awarding Plaintiffs attorney's fees and costs and prejudgment interest; and (v) Awarding such other and further relief as this Court may deem just and proper, both in law and in equity.

**COUNT XVII**
**VIOLATIONS OF FLORIDA RICO STATUTES**

318. IRMS realleges and reincorporates the allegations in Paragraphs 1 through 180 above as if set forth in full herein.

319. As set forth in further detail above, the Conspiring Defendants engaged in conduct, by *inter alia*, stealing converting and laundering IRMS' assets, misappropriating IRMS' trade secrets, and otherwise engaging in wire fraud, that was criminal.

320. The Conspiring Defendants' conduct constituted an enterprise, because Defendants all acted with a common purpose to achieve the common goal of depriving individuals, including IRMS of its interest and ability to compete in the market.

321. Notably the Conspiring Defendants would use the Dejavoo Masking Software to depress the value of one of their targets, by causing its affiliates to divert transactions to companies they controlled, and otherwise engage in transactions that would put a victim's relationship with its sponsoring bank at risk.

322. The Conspiring Defendants would then approach a victim, such as IRMS, and attempt to purchase it. If the victim refused, the Conspiring Defendants would then engage in conduct intended to harm that victim of its value or prevent it from engaging in the market.

323. The Conspiring Defendants engaged in a pattern, in that their conduct was repeated and occurred several times during a several month period, with the intent to capitalize the cannabis payment processing market.

324.   The Conspiring Defendants engaged in racketeering conduct, which included, without limitation, theft, conversion, burglary, fraud, wire fraud, bank fraud, and money laundering.

325.   As a result of the Conspiring Defendants' conduct IRMS suffered damages.

326.   IRMS in fact suffered damages.

WHEREFORE, IRMS demands judgment in its favor and against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC,  Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring Defendants violated the Florida RICO Statutes; (ii) Awarding IRMS treble damages; (iii) Awarding IRMS special damages, including lost profits, attorney's fees and costs, and other damages which may be recoverable by the law (iv) Awarding Plaintiffs attorney's fees and costs and prejudgment interest; and (v) Awarding such other and further relief as this Court may deem just and proper, both in law and in equity.

## COUNT XVIII
## CONSPIRACY TO VIOLATE FEDERAL RICO STATUTES

327.   IRMS realleges and reavers all of the allegations contained in 1 through 180 and 308 through 316, above as if fully set forth herein.

328.   As set forth in further detail above, the Conspiring Defendants engaged in conduct, by *inter alia*, stealing, converting, and laundering IRMS' assets, that was criminal and would otherwise constitute conversion, money laundering, wire fraud, the criminal theft of trade secrets and drug trafficking.

329.   The Conspiring Defendants' conduct constituted an enterprise, because the Conspiring Defendants all acted with a common purpose to achieve the common goal of depriving

individuals, including IRMS of its assets and money and rights through the scheme described above.

330.    The Conspiring Defendants engaged in a pattern, in that their conduct was repeated and occurred several times during a several month period.

331.    The Conspiring Defendants engaged in racketeering conduct, which included, without limitation, theft, conversion, burglary, and money laundering.

332.    Each Conspiring Defendant knew about the criminal enterprise and agreed to further advance the purpose of the criminal enterprise. They also all participated personally in the commission of predicate acts in furtherance of the RICO enterprise.

333.    As a result of Conspiring Defendants' conduct Plaintiffs suffered damages.

334.    Plaintiffs in fact suffered damages.

WHEREFORE, IRMS demands judgment in its favor and against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC,  Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou: (i) Finding that the Conspiring Defendants conspired to violate the Federal RICO Statutes; (ii) Awarding IRMS treble damages; (iii) Awarding IRMS special damages, including lost profits, attorney's fees and costs, and other damages which may be recoverable by the law (iv) Awarding Plaintiffs attorney's fees and costs and prejudgment interest; and (v) Awarding such other and further relief as this Court may deem just and proper, both in law and in equity.

## COUNT XIX
## CONSPIRACY TO VIOLATE FLORIDA RICO STATUTES

335.    IRMS realleges and reaver all of the allegations contained in 1 through 180, 182 through 191, 193 through 204, 206 through 210, 212 through 216, 218 through 221, 223 through

228, 230 through 236, 238 through 245, 247 through 256, 258 through 269, 271 through 282,  284 through 288,  290 through 293, and 295 through 299,  and 328 through 334 above as if fully set forth herein.

336.    As set forth in further detail above, the Conspiring Defendants engaged in conduct, by *inter alia*, stealing, converting, and laundering IRMS' assets, that was criminal and would otherwise constitute conversion, money laundering, wire fraud, the criminal theft of trade secrets and drug trafficking.

337.    The Conspiring Defendants' conduct constituted an enterprise, because the Conspiring Defendants all acted with a common purpose to achieve the common goal of depriving individuals, including IRMS of its assets and rights through the scheme described above.

338.    The Conspiring Defendants engaged in a pattern, in that their conduct was repeated and occurred several times during a several month period.

339.    The Conspiring Defendants engaged in racketeering conduct, which included, without limitation, theft, conversion, burglary, and money laundering.

340.    Each Conspiring Defendant knew about the criminal enterprise and agreed to further advance the purpose of the criminal enterprise. They also all participated personally in the commission of predicate acts in furtherance of the RICO enterprise.

341.    As a result of Conspiring Defendants' conduct IRMS suffered damages.

342.    IRMS in fact suffered damages.

WHEREFORE, IRMS demands judgment in its favor and against Defendants Ryan Nolte, Christopher Akel; Samantha Marton; Oksana Moore; Skylight Processing, LLC; Rocket One Capital, LLC,  Transact First, Inc.; Michael Shvartsman; Rocket One Capital, LLC; i-POS Systems, LLC *d/b/a* Dejavoo; Eric Hannelius; Bruce Garelick; Shlomo Zenou a/k/a Mony Zenou:

(i) Finding that the Conspiring Defendants conspired to violate the Florida RICO Statutes; (ii) Awarding IRMS treble damages; (iii) Awarding IRMS special damages, including lost profits, attorney's fees and costs, and other damages which may be recoverable by the law (iv) Awarding Plaintiffs attorney's fees and costs and prejudgment interest; and (v) Awarding such other and further relief as this Court may deem just and proper, both in law and in equity.

## COUNT XX
## AVOIDANCE OF FRAUDULENT TRANSFER

343.   IRMS incorporates by reference the allegations of Paragraphs 1 through 180 above as if set forth in full herein.

344.   On or about December 1, 2021, the OPC entered into a *Promissory Note* with Transact First, LLC ("***Transact First***") for $8,000,000.00.

345.   On May 10, 2023, the OPC executed a *Resolution*, wherein the OPC forgave the $4,582.443.64 balance on the Promissory Note by converting the remaining balance as a distribution to Transact First. While the OPC's corporate representative avoided many questions regarding the Promissory Note and Resolution, the corporate representative did confirm the Debtor received nothing in return for forgiving the balance on the Promissory Note.

346.   At the time when the OPC executed the aforementioned resolution, OPC was otherwise insolvent.

347.   OPC did not receive any consideration with respect to the aforementioned transaction.

348.   Transact First was an insider of OPC and controlled OPC.

349.   At the time that the aforementioned transactions occurred, IRMS was a creditor of OPC, and there were other creditors of OPC.

350. As such the transfer or forgiveness of the indebtedness to Transact First was a transfer that was intended to hinder delay and defraud creditors.

351. Accordingly, in light of the aforementioned circumstances, the forgiveness of the Promissory Note, was a fraudulent transfer that must be avoided to satisfy outstanding indebtedness.

WHEREFORE, Plaintiff IRMS respectfully requests that the Court enter judgment in its favor an against Defendant Transact First: (i) Finding that the aforementioned transfer was a fraudulent transfer; (ii) Avoiding the aforementioned transfer so that it may be used to satisfy the outstanding indebtedness of IRMS; (iii) Awarding IRMS damages as a creditor to the extent of the value of the Transfer; (iv) Awarding IRMS Prejudgment interest and costs; and (v) Granting such further relief as the Court deems just and proper.

## COUNT XXI
## AVOIDANCE OF FRAUDULENT TRANSFER

352. IRMS incorporates by reference, the allegations of Paragraphs 1 through 190 above as if set forth in full herein.

353. As set forth in further detail above, between, OPC diverted more than $9 million in revenue to Encompany.

354. Encompany was an insider of OPC in that it was under common control with OPC, and did not otherwise provide any consideration of the transfers.

355. These transfers represented significantly large portion of OPC's income, and at the time that these transfers were made OPC was otherwise insolvent.

356. At the time the transfers were made, OPC had been sued and was otherwise threatened with a lawsuit.

357. IRMS was at all times relevant to this a creditor of OPC and the other Defendants.

358. As a result of the foregoing conduct IRMS was damaged.

359. IRMS was in fact damaged.

WHEREFORE, Plaintiff IRMS respectfully requests that the Court enter judgment in its favor an against Defendant Encompany: (i) finding that the aforementioned transfer was a fraudulent transfer; (ii) avoiding the aforementioned transfer so that it may be used to satisfy the outstanding indebtedness of IRMS; (iii) awarding IRMS damages as a creditor to the extent of the value of the Transfer; (iv) awarding IRMS Prejudgment interest and costs; and (v) Granting such further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Dated this **7th** day of April, 2025

Respectfully submitted,

**MILLENNIAL LAW**
*Attorneys for Plaintiff*
320 SE 11th Street
Fort Lauderdale, Florida 33316
Phone: 954-271-2719

By: */s/ Zachary P. Hyman*
    Zachary P. Hyman
    Florida Bar No. 98581
    zach@millenniallaw.com
    jessica@millenniallaw.com
    assistant@millenniallaw.com