UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 0:2025cv60670

INDIAN RIVER MERCHANT SERVICES, LLC,

        Plaintiff,

v.

RYAN NOLTE; CHRISTOPHER AKEL; SAMANTHA
MARTON; OKSANA MOORE; TRANSACT FIRST, INC.;
ONE PAY CLOUD, LLC; SKYLIGHT PROCESSING,
LLC; ROCKET ONE  CAPITAL, LLC; I-POS SYSTEMS,
LLC d/b/a DEJAVOO; DENOVO SYSTEMS, LLC;
MICHAEL SHVARTSMAN; ERIC HANNELIUS,  BRUCE
GARELICK; SHLOMO ZENOU a/k/a   MONY ZENOU;
and ENCOMPANY INC.,

        Defendants.

_____/

## IPOS DEFENDANTS' MOTION FOR SANCTIONS

Defendants I-POS Systems LLC ("IPOS"), Denovo Systems LLC ("Denovo"), and

Shlomo "Mony" Zenou ("Zenou", and collectively with IPOS and Denovo, the "IPOS

Defendants"), through counsel, move for the imposition of monetary and nonmonetary sanctions

against Plaintiff, Indian River Merchant Services, LLC ("IRMS") and its counsel, Millennial Law,

and the firm's attorneys who signed off on the filed Complaint, pursuant to Fed. R. Civ. P. 11, 28

U.S.C. § 1927, and the Court's inherent authority to sanction[1].

### I.    INTRODUCTION AND BACKGROUND

Plaintiff, IRMS has filed a sprawling, 65-page Complaint asserting *21 causes of action*,

most of which are duplicative, conclusory, or legally unsustainable. The Complaint levels serious

and inflammatory accusations, including theft of trade secrets, RICO violations, abuse of process,

---

[1] The I-POS Defendants specifically reserve the right to challenge this Court's personal jurisdiction over them.

1

and civil conspiracy, against a broad swath of Defendants—without alleging a legally sufficient or factually plausible basis for many claims, particularly with regard to the IPOS Defendants.

The Complaint filed by IRMS is an abuse of the judicial process and constitutes harassment against the IPOS Defendants. It appears intended to harass Mr. Zenou and his companies, to relitigate settled disputes, and to pressure third-party settlements through public accusations of federal crimes. Sanctions are warranted under Federal Rule of Civil Procedure 11(b), 28 U.S.C. § 1927 and the Court's inherent authority.

What makes this particular filing even more egregious, is the fact that IRMS previously filed *two similar actions*, in both Florida state court and Federal Bankruptcy Court, both of which were ultimately dismissed as to the IPOS Defendants and other Defendants.  This is IRMS's *third filing* of its frivolous claims against these Defendants, based on substantially the same set of unsupported factual allegations concerning conduct that allegedly occurred more than *5 to 6 years ago*, and the filing of the instant action amounts to an abuse of legal process and continued harassment of these Defendants. In fact, as counsel for IRMS knows, or should know, the claims asserted by IRMS against the IPOS Defendants are barred by the applicable statutes of limitations. Ast the same time, there are numerous inconsistencies with respect to all three of the actions filed by IRMS.  This is not because IRMS is diligent and uncovering new facts, it is because IRMS and its counsel are attempting to assert causes of action that lack factual support, and IRMS is trying to "shoehorn in" allegations in support of its claims, truth be damned.  It is a continued abuse of legal process and harassment of these Defendants.  As will be demonstrated herein, the multiple dismissed filings and inconsistencies are all evidence of IRMS and its counsel's attempt to sue everyone and sort it out later, demonstrates IRMS and its counsel's bad faith harassment and abuse of legal process.  IRMS and its counsel have cost the IPOS Defendants and other parties substantial

legal costs and they should be sanctioned accordingly.

In early 2024, IRMS attempted but failed to add the IPOS Defendants to a four-year-old lawsuit against EFT Services LLC ("EFT"). In the original Complaint in that case (**Exhibit "1A")**, IRMS alleged that EFT wrongfully diverted revenue owed to IRMS, without mentioning the IPOS Defendants at all. ***Three years later***, in a proposed Second Amended Complaint (**Exhibit "2"**), IRMS claimed that the IPOS Defendants induced a breach of an agreement between IRMS and EFT. The claim was based upon IRMS's allegations that the IPOS Defendants had created the software EFT purportedly used to disguise transactions and divert revenue.

One month later, in the bankruptcy proceeding of co-Defendant One Pay Cloud LLC ("OPC"), IRMS filed an adversary complaint against IPOS and Denovo. *See* **Exhibit "4"**. This filing came just after IRMS had deceived IPOS, who was unaware of IRMS's existence until 2024, into producing documents as a nonparty/nondebtor witness.[2] In this second lawsuit, IRMS manufactured new causes of action against the IPOS Defendants for fraud and even named a new party, Pueblo Bank and Trust ("Pueblo"), whose alleged relationship with IRMS was purportedly interfered with. IRMS then dismissed its second frivolous lawsuit just before the bankruptcy court was expected to hear and grant the motion to dismiss filed by IPOS and Denovo (**Exhibit "5"**), but not before forcing the IPOS Defendants to incur over $80,000 in attorneys' fees.

Now, only months later, IRMS yet again attempts to drag the IPOS Defendants into its ongoing dispute with EFT. The present Complaint ("Complaint") is an incoherent, internally inconsistent, and factually unsupported, just as its previous filings were. It now appears that IRMS

---

[2] The IPOS Defendants first became aware of the name "IRMS" when its owner, Devin Werling, engaged in backdoor discovery by submitting a nonparty request dated January 9, 2024  *See* **Exhibit "3"** in a New York action that EFT had filed against IPOS on February 27, 2020, which was dismissed ***with prejudice*** on March 21, 2020. In the New York case, the court had ordered certain documents filed by IPOS to be placed under seal. Mr. Werling requested that the court unseal those documents, citing "the public's right of access." But failed to disclose to the New York court that IRMS intended to file a motion to amend, which it did on January 29, 2024, seeking to add the IPOS Defendants as parties to the Florida state court action.

concedes that the IPOS Defendants' alleged involvement was limited to developing and selling a software program, with no knowledge of or control over how it might later be modified or used. Although the Complaint is based on the same operative factual allegations as IRMS's previous lawsuits, it invents new causes of action, and asserts an astounding 21 Counts, with new allegations of misappropriation of trade secrets and state and federal RICO violations, despite the fact that IRMS never previously alleged the existence of any trade secrets.

Accordingly, the IPOS Defendants seek sanctions. The Complaint is devoid of factual support and legal merit and appears calculated to further harass and impose yet even more litigation costs upon the IPOS Defendants in an effort to extort a nuisance settlement or compel their cooperation in IRMS's case against EFT. The fact that IRMS filed the instant Complaint at all warrants sanctions.  In light of IRMS's repeated filing of frivolous lawsuits, and enormous costs that the IPOS Defendants have been forced to incur, with the prior suits being dismissed, nonmonetary sanctions in the form of involuntary dismissal with prejudice are appropriate here.

## II.   LEGAL STANDARD FOR SANCTIONS AND APPLICATION TO THIS CASE

### A.  Rule 11

Under Rule 11(b), an attorney's signature on a pleading certifies that: 1) The pleading is not being presented for an improper purpose (e.g., harassment or delay); 2) legal contentions are warranted by existing law or a nonfrivolous argument for its extension; and 3) Factual contentions have or will likely have evidentiary support.

Rule 11 sanctions are properly assessed when: (1) a party files a pleading that has no reasonable factual basis; (2) the party files a pleading based on a legal theory that has no reasonable chance of success and cannot be advanced as a reasonable argument to change existing law; or (3) the party files a pleading in bad faith for an improper purpose. *Thompson v. RelationServe Media,*

4

*Inc.*, 610 F.3d 628 (11th Cir. 2010). *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991).

Here, the renewed claims against the IPOS Defendants violate all three criteria. Just as the prior versions of those claims, they lack evidentiary support and factual basis. The legal theories advanced by IRMS have no reasonable chance of success and cannot be advanced as a reasonable argument to change existing law, and are filed in bad faith for the improper purposes of harassing the IPOS Defendants. None of the claims, particularly the RICO claim, is supported by existing law. Both IRMS and its counsel should be sanctioned and ordered to pay the attorneys' fees incurred by the IPOS Defendants in defending this action. Moreover, IRMS' claims against the IPOS Defendants should also be dismissed with prejudice as a nonmonetary sanction. The Court may impose monetary sanctions, including attorneys' fees, or nonmonetary sanctions against any attorney, law firm, or party responsible for the violation. Fed. R. Civ. P. 11(c).

**B.  28 U.S.C. § 1927**

Sanctions against an attorney under 28 U.S.C. § 1927 are warranted when: (1) the attorney engages in unreasonable and vexatious conduct; (2) the conduct multiplies the proceedings; and (3) the sanctions awarded do not exceed the costs occasioned by the attorney's objectionable conduct. *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1281 (11th Cir. 2010) (affirming the imposition of sanctions under Section 1927 where counsel acted with objective recklessness by submitting a 63-page errata sheet containing 868 attempted changes to deposition testimony, and continued pursuing the claims despite the impropriety of that submission). An attorney's conduct may support an award under Section 1927 when it is "tantamount to bad faith." *Id.*

IRMS has initiated a third round of frivolous litigation. It first attempted and failed to add the IPOS Defendants to its state court action. It then filed its Adversary Complaint in the bankruptcy proceeding, only to dismiss it before the court could do so. Here, it has filed yet another

meritless complaint. The Court should award the IPOS Defendants the attorneys' fees they incurred in bringing this motion. IRMS's counsel has unreasonably and vexatiously multiplied the proceedings by filing a third baseless lawsuit.

### C.  Inherent Authority

A court possesses inherent authority to award monetary and other sanctions where a party acts in bad faith, and this authority is not displaced by statute or rule-based sanctioning scheme. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–48 (1991). Bad faith includes a broad range of willful improper conduct, including reckless conduct combined with an improper purpose. *Fink v. Gomez*, 239 F.3d 989, 992–94 (9th Cir. 2001).

To say that IRMS has engaged in bad faith is a gross understatement. After years of litigation against EFT, IRMS remains unable to produce any material facts to implicate the IPOS Defendants, because there is none. Despite its lack of evidentiary support, IRMS insists on mutating its factual allegations (including facts about itself) and slinging new causes of action with no legal merit. Existing law does not penalize software developers for developing software, even if it is later sold, modified, and misused. IRMS knows it had no relationship with the IPOS Defendants, but tries to shake them down like a money tree. Both attorneys' fees and the dismissal sanction are warranted against both IRMS and its counsel under the Court's inherent sanction authority.

### III.    THE STATUTE OF LIMITATIONS BARS IRMS'S CLAIMS AGAINST IPOS DEFENDANTS

IRMS has failed to allege that it had recently discovered any new facts to justify asserting its claim for misappropriation of trade secrets which would toll the statute of limitations. The facts alleged in the Complaint largely mirror those asserted in the prior lawsuits, but with new interpretations, mischaracterizations, and outright fabrications. IRMS alleged that Zenou worked

with EFT in 2019 (Complaint ¶ 98).  Florida's three-year statute of limitations for misappropriation of trade secrets has long since expired. § 688.007, *Fla. Stat*. IRMS has also admitted that any involvement by the IPOS Defendants in the alleged tortious interference would have ended in February of 2020, when the Software was sold to OPC. Florida's four-year statute of limitations for tortious interference pursuant to § 95.11(3), *Fla. Stat.* has also expired. *King v. Bencie*, 806 F. App'x 873, 876 (11th Cir. 2020) (citing *Yusuf Mohamad Excavation, Inc. v. Ringhaver Equip. Co.*, 793 So. 2d 1127, 1128 (Fla. 5th DCA 2001)) (holding that a tortious interference claim was barred by the four-year limitations period under § 95.11(3), *Fla. Stat.*). IRMS should be sanctioned for knowingly asserting claims that are on their face barred by the statute of limitations, and its continued abuse of legal process and harassment of the IPOS Defendants.

## IV.   SANCTIONABLE CONDUCT SPECIFIC TO THE IPOS DEFENDANTS

### A.  The Complaint Mischaracterizes Prior Testimony and Repackages Allegations

Plaintiff repeatedly claims that Zenou "attested in litigation involving EFT to being involved in creating software to make a scrip transaction appear as though it originated from one of the terminals installed by EFT." *See* Complaint ¶ 89. This mischaracterizes prior sworn statements and omits context that clarifies Zenou's role as a neutral software vendor. Plaintiff's reliance on half-truths and misleading references to prior declarations or affidavits constitutes bad faith pleading. Intentional misrepresentation of legal proceedings in pleadings can support Rule 11 sanctions. *See Byrne v. Nezhat*, 261 F.3d 1075, 1118–19 (11th Cir. 2001).

### B.  There Is No Plausible Allegation of Misappropriation of Trade Secrets

Plaintiff alleges that the IPOS Defendants "created" the Dejavoo Masking Software using misappropriated trade secrets, but fails to identify: 1) What specific trade secrets were taken; 2) when and how they were allegedly acquired by the IPOS Defendants; and 3) any conduct by the

IPOS Defendants that meets the statutory definition of misappropriation under 18 U.S.C. § 1836 or Fla. Stat. § 688.002.

Instead, IRMS improperly relies on "group pleading" to imply wrongdoing based solely on Zenou's business relationships and his two companies. This falls far below federal pleading standards, especially in the context of a claim as serious as trade secret theft. See *Jacobs v. Bank of Am. Corp.*, 2017 WL 2361942, at *3 (S.D. Fla. May 31, 2017) (granting sanctions where claims were "legally and factually frivolous").

### C. RICO Counts Against the IPOS Defendants are Frivolous and Designed to Harass

Plaintiff asserts federal and state RICO claims against all Defendants, alleging a grand conspiracy involving software masking, fraudulent ATM transactions, and cannabis-related payment schemes. But the Complaint: 1) Fails to plead two predicate acts of racketeering by the IPOS Defendants; 2) does not establish the requisite continuity or enterprise; and 3) uses inflammatory rhetoric about "fraud," "illegal conduct," and "criminal enterprise" without any connection to Zenou's conduct. Bringing federal RICO claims without factual support is a classic basis for Rule 11 sanctions. *See Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649 (S.D.N.Y. 1996).

### D. Counts for Abuse of Process and Malicious Prosecution Are Legally Baseless as to the IPOS Defendants

Counts XIII and XIV allege abuse of process and malicious prosecution, based on ***a prior bankruptcy filing by One Pay Cloud, LLC***—a separate entity from Zenou's companies. The Complaint does not even allege that the IPOS Defendants initiated, participated in, or benefited from the prior proceedings. The inclusion of these claims is reckless and without legal foundation.

### E. The Complaint Lacks Any Evidence or Allegation of Improper Motive or Intent to Harm by Zenou

To state a plausible claim of conspiracy, aiding and abetting, or intentional torts, Plaintiff

8

must plead facts supporting the mental state of the alleged wrongdoer. The Complaint fails to allege that Zenou acted with the intent to harm IRMS or joined any unlawful agreement. Instead, it offers **guilt by association**, which is insufficient under Twombly/Iqbal and is sanctionable under Rule 11. See *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 650–51 (11th Cir. 2010).

## V.     IRMS'S HISTORY OF BAD FAITH FILINGS AGAINST IPOS DEFENDANTS

### A.  The Proposed Second Amended Complaint in State Court

On May 24, 2021, IRMS filed a lawsuit against its agent, EFT, in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County, Florida *Indian River Merchant Services, LLC v. EFT Services, LLC and Randy Nolte*, Case No. 21-002572-CI. *See* **Exhibit "1A"**. IRMS asserted a claim for breach of contract based upon EFT's alleged failure to maintain minimum transaction volumes, conduct business exclusively with IRMS, and pay transaction fees owed between January 2018 and March 2021. On November 4, 2021, IRMS filed an Amended Complaint.  *See* **Exhibit "1B"**. Neither the original nor the Amended Complaint contained *any mention whatsoever* of the IPOS Defendants. On January 29, 2024, nearly *four years later*, IRMS filed a Motion for Leave to Amend in order to file a Second Amended Complaint ("SAC"). *See* **Exhibit "2"**, for the first time bringing in these Defendants. Not for any alleged "newly discovered evidence", but in what in hindsight was clearly an attempt to harass and intimidate these parties.  On July 16, 2024, IRMS' Motion for Leave to Amend was denied after hearing. The proposed SAC was replete with claims that lacked any factual or legal basis, which theme has pervaded the next two filings against the IPOS Defendants.

The SAC alleged that EFT began rerouting transactions to non-IRMS processors in November 2020. *See* SAC ¶¶ 33–34. IRMS further alleged, "upon information and belief," that the IPOS Defendants participated in a conspiracy to interfere with IRMS's business relationships, devalue the company so it could be purchased at a lower price, assist EFT in avoiding its transaction fee obligations,

and redirect fees payable to IRMS. *See* SAC ¶¶ 36–38. These conclusory "upon information and belief" allegations made by IRMS were directly contradicted by IRMS's own factual assertions.

IRMS also alleged for the first time in the SAC that EFT "would input fraudulent data into IRMS's compliance protocols." *See* SAC ¶ 44. However, IRMS did not allege that any of the IPOS Defendants ***assisted*** EFT in its conduct. IRMS asserted that Dejavoo (a prior d/b/a of IPOS), created and licensed the so-called "Dejavoo Masking Software" ("Software") to EFT. According to IRMS, the Software operated exclusively on "Dejavoo Software Terminals" and was designed solely to conceal cashless ATM cannabis transactions from IRMS, its sponsoring banks, and the major card networks, including Visa, MasterCard, and Discover, by disguising such transactions as lawful, cash-based ones. IRMS further alleged that the Software rendered its existing compliance, loss prevention, and spot check protocols, which were intended to detect and prevent such unlawful transactions, ineffective. *See* SAC ¶¶ 46–50.

IRMS alleged that the false data transmitted to IRMS took one of two forms: 1) changing the name of the business where the cashless ATMs were located, or 2) identifying the merchant as something other than a cannabis dispensary. *See* SAC ¶ 44. All of IRMS' claims were false, and a logical impossibility. Before the alleged "data masking" began, IRMS already knew the identities of its own merchants and whether they operated as cannabis dispensaries. If IRMS suddenly received transaction data for a business that was not one of its merchants, or received data from a known dispensary that was now identified as a non-dispensary, this would have alerted IRMS that the data was falsified.

While claiming that the Software was designed to transmit false data, IRMS also alleged that it was intended to help EFT reroute transactions to non-IRMS processors. IRMS asserted that "[t]ransactions processed on the Dejavoo Software Terminals could not be processed through IRMS." *See* SAC ¶ 52. This allegation directly contradicts IRMS's claim that the Software was

created to disguise transaction data transmitted to IRMS. If the transactions were rerouted to other processors, no data would have been sent to IRMS, eliminating any need to mask the information. Conversely, if masked data was transmitted to IRMS, then the transactions were not rerouted. Accordingly, *the Software could not have been used to both redirect and mask the same transactions.* Transmitting data to IRMS would only have alerted it to the alleged misconduct. IRMS's allegations regarding the function and purpose of the Software are therefore fundamentally inconsistent. IRMS alleged that the Software "had no unique purpose other than to conceal [cannabis transactions] from IRMS [and other parties]" and that it caused the transmission of false data to IRMS. *See* SAC ¶ 49. Yet IRMS also alleged that "[t]ransactions processed on the Dejavoo Software Terminals could not be processed through IRMS, and EFT's use of the same deprived IRMS of revenues." *See* SAC ¶ 52. If transactions could not be processed through IRMS and were rerouted, then no data, false or otherwise, could have been transmitted to IRMS. In short, it defies logic for IRMS to allege *both* masking and redirection. The two theories are mutually exclusive. Nevertheless, IRMS, undeterred by any logical analysis, asserts both mutually exclusive theories in all three of the frivolous complaints it has filed, further evidencing its bad faith and failure to properly investigate these claims in both its prior filings and the instant Complaint.

IRMS alleged, again "upon information and belief," that the IPOS Defendants knew EFT was using the Software to disguise "illicit and fraudulent transactions" and that the IPOS Defendants licensed the Software to OPC to "insulate itself from being implicated in the illegal scheme to defraud IRMS, in violation of Federal Money Laundering Statutes." *See* SAC ¶ 57. This allegation lacked any factual support. It also contradicts the public record, where Zenou stated under penalty of perjury that he suspected EFT of misusing his company's software. *See* **Exhibit 6** at ¶ 18. Had Zenou or any of the IPOS Defendants been complicit in EFT's conduct or seeking

to conceal it, he would have had no reason to offer testimony adverse to EFT's interests.

IRMS further alleged that the "Conspiring Defendants tortiously interfered with the existing business relationship between IRMS and EFT, and IRMS's existing business relationships with banks and other intermediaries," but failed to allege that the IPOS Defendants knew of these relationships or had any intention to interfere with them.[3] Critically, IPOS pointed out during OPC's bankruptcy proceedings that IPOS had never even heard of IRMS until IRMS owner Devin Werling served a public access request to unseal IPOS's redacted documents in the New York lawsuit. IRMS served a Notice of Rule 2004 Examination on IPOS in April 2024, alerting the IPOS Defendants for the first time to IRMS's intentions as a litigant. *See* **Exhibit "7"**.

IRMS never contested the fact that it was unknown to the IPOS Defendants until 2024 in over seven months of bankruptcy proceedings or put forth any evidence that IPOS knew who IRMS was, had any relationship with IRMS, or otherwise had reason or intention to harm IRMS. IRMS claimed as a matter of fact (rather than "upon information and belief"), without any evidence or allegations in support, that the IPOS Defendants "put pressure on IRMS" to "sell [its] business to Michael Shvartsman." *See* SAC ¶ 67. If this were true, then it is inexplicable why IRMS failed to contravene IPOS's assertion that it never heard of IRMS; IRMS could have easily produced evidence of some communication from the IPOS Defendants to IRMS, but has failed to do so.

## B.  The Adversary Complaint

In January 2024, OPC petitioned for bankruptcy. In March 2024, IRMS filed a creditor's claim against OPC. In April 2024, IRMS served a Subpoena for a Rule 2004 Exam on IPOS. It was undisputed in the bankruptcy record that Zenou and the other IPOS Defendants had never even heard of the name IRMS, let alone had any interaction with it prior to 2024.

---

[3] *See* SAC ¶¶ 177-178, where IRMS's definition of "Related Defendants" omitted the IPOS Defendants.

On June 20, 2024, shortly after IPOS produced documents as a nondebtor, nonparty witness to IRMS, IRMS filed an Adversary Complaint against the IPOS Defendants (sans Zenou), OPC, and Transact First. However, IRMS did not sue any of the multitude of other defendants listed in IRMS's prior motion to amend in state court. The allegations IRMS made against IPOS in the Adversary Complaint, while substantially similar to those in the SAC, contained notable distinctions that again highlighted the falsity and frivolity of IRMS's claims in all three lawsuits.

The Adversary Complaint introduced a new third party, "Pueblo", alleged to be IRMS's sponsor bank but was never mentioned in the SAC. IRMS basically changed its entire legal theory and accused the IPOS Defendants of interfering with its business relationship with EFT *and* Pueblo. In reviewing IRMS's prior filings along with the instant Complaint, it is clear that IRMS was asserting whatever causes of actions its attorneys can dream up, without regard as to whether there was factual support for its claims.

IRMS also added claims against IPOS and Denovo for fraud, aiding and abetting fraud, and conspiracy to commit fraud and to interfere with IRMS's contract with EFT.  There were no RICO claims asserted. These new claims appeared to be based on the same set of factual allegations IRMS previously alleged, but they shoehorn in additional causes of action. The fraud claims asserted by IRMS were devoid of any particular allegations in support, in contravention of pleading rules for fraud claims, or even any allegations that satisfied the elements of fraud. The fraud claims merely concluded that the Software fraudulently represented the nature of transactions. IRMS did not allege that IPOS and Denovo made a statement to IRMS, that the statement was false, and that IPOS and Denovo knew the statement was false. Somehow, in IRMS's view, the code in the Software itself constituted a "statement" made to IRMS, even though the IPOS Defendants had no relationship with IRMS and did not even know who IRMS was.

13

Finally, and most importantly, the IRMS omitted in the Adversary Complaint any allegations that IPOS and Denovo purposefully worked in concert with any other party with an intent to harm IRMS (conspiracy). The Adversary Complaint against IPOS and Denovo was strictly based on the ***development of the Software itself*** and its alleged purpose of masking cashless cannabis transactions as cash-based ones.

## C. Inconsistencies Between the SAC and Adversary Complaint

The Adversary Complaint contained allegations that were inconsistent with those previously made by IRMS in the SAC. IRMS now alleged that the ATM terminals in question were owned by EFT. IRMS conceded that the use of cashless Scrip machines in cannabis dispensaries was a "legal gray area" under federal law, effectively undermining its earlier and unequivocal assertion in the state court Complaints that the Scrip machines in dispensaries violated federal laws. Finally, IRMS now alleged for the first time that certain Verifone terminals, which were operated by unspecified software compatible only with IRMS systems, were replaced after June 30, 2022 by Dejavoo terminals that only ran on the Software, causing funds owed to IRMS to be rerouted to OPC. This allegation was totally inconsistent with IRMS's earlier claim that the ATM terminals in question were operated by the Software long before 2022. The inconsistencies between the SAC and the Adversary Complaint cannot be reconciled, and demonstrate IRMS's bad faith and recklessness with respect to its factual allegations.

Importantly, the Adversary Complaint reinforced IRMS's earlier admissions that the decrease in transaction volume processed by IRMS started in "late 2020 or early 2021" upon the sale of EFT to Transact First, that all rights and obligations relating to the Software were fully assigned to OPC by February 2020, and that EFT started "spoofing" the transactions also in late 2020 and early 2021, when EFT licensed the Software from OPC. The salient point from these admissions is this: the alleged

14

spoofing and diverting of transactions did not begin until *long after* the IPOS Defendants had fully transferred all rights and obligations relating to the Software to OPC. IRMS never alleged that the IPOS Defendants participated in or knew about any of these events starting in late 2020.

The Adversary Complaint further admitted that "eventually all transactions (including spoofed transactions) would cease by June of 2021," and that Pueblo terminated its contract with IRMS on June 17, 2022, after investing IRMS's portfolio and discovering the disguised transmissions, for which EFT (and not the IPOS Defendants) was responsible. In short, the IPOS Defendants' role, as alleged in the Adversary Complaint, was strictly limited to the development of the Software. However, at the time the alleged malfeasance occurred, i.e. late 2020 or early 2021, *the IPOS Defendants no longer had control over the Software*, as they no longer owned it.

On July 9, 2024, IPOS and Denovo moved to dismiss the Adversary Complaint for lack of subject matter jurisdiction and failure to state a claim. *See* **Exhibit "5"**. On August 5, 2024, these Defendants also moved for Rule 11 sanctions against IRMS. *See* **Exhibit "8"**. On December 2, 2024, just before the Motion to Dismiss was set to be heard by the court, and after the bankruptcy court had voiced concerns in previous hearings about whether it had subject matter jurisdiction over the Adversary Complaint at all, IRMS announced it was voluntarily dismissing the Adversary Complaint, rendering the Motion to Dismiss moot. On December 12, 2024, the bankruptcy court entered an Order Granting IPOS and Denovo's Motion to Dismiss. However, the bankruptcy court declined to award Rule 11 sanctions. *See* **Exhibit "9"**.

### D. The Instant Complaint is Frivolous and Adds Yet More Causes of Action Without Factual Support

Without clarifying that it had somehow discovered new facts after voluntarily dismissing its Adversary Complaint, IRMS manufactures yet another new cause of action against the IPOS Defendants, for misappropriation of trade secrets. IRMS now apparently recalls that, in addition to its

15

dual existing roles as payment processor and ISO, it was also a software developer, which was not alleged previously.  IRMS now alleges, at the time the Software was created, that the IPOS Defendants misappropriated its proprietary software to develop its Software. IRMS also suggests, again, for the first time, that the ATM terminals in question were actually owned by IRMS, and not EFT.  If IRMS's continuously developing fact pattern seems hard to follow, that is because it is.

According to IRMS's new claims, Zenou's team created software for terminals that IRMS operated, that Zenou serviced and managed terminals for IRMS, and that Zenou was "intimately familiar with IRMS systems and processes." *See* Complaint at ¶ 30. IRMS now further alleges that IPOS was created to "house, misappropriate and monetize" the software "derived" from IRMS's intellectual property. *Id* at ¶ 31. IRMS now claims that it is the one who had "facilitated" the installation of ATMs.  *Id* at ¶ 62, declaring for the first time that it had spent millions on software development to facilitate these transactions. *Id* at ¶ 64.

IRMS also claims that this same "scheme" it accuses the IPOS Defendants of, was perpetrated on Sterling by the Shvartsman Defendants, who allegedly prevailed in an arbitration against Mr. Shvartsman. *See* Complaint at ¶ 42. IRMS fails to explain why Sterling did not sue any of the IPOS Defendants if they were involved in this alleged scheme, or even. why the alleged conspirators would pull this scheme on one of their own.  IRMS alleged that Sterling signed an agreement in October 2019 to mask transaction data from IRMS. *Id* at ¶ 98. These claims are at conflict with each other and are not credible.

IRMS repeats its previous claims that the Software was used to "mask" the nature of transactions that were transmitted "through IRMS" (*see* Complaint ¶¶ 31 and 35), thus jeopardizing IRMS's relationship with its sponsor bank and prevented its operation. *Id.* at ¶ 41. IRMS also alleges, for the first time, without any supporting facts, that Mr. Akel, a former IRMS

16

employee, had worked with Zenou and others to develop the Software with the express purpose of disguising cashless cannabis transactions as cash-based ones.

It is important to note that IRMS does not allege in the Complaint that Zenou was involved in the testing of "holes" in IRMS's alleged software. *See* Complaint ¶¶ 91 and 92.  IRMS also does not allege that any of the IPOS Defendants were involved in the agreement between Transact First, OPC, and EFT to defraud IRMS using the Software. *Id.* at ¶ 125.   IRMS does not allege that any of the IPOS Defendants were listed by IRMS in the alleged "Project Unicorn Payments" plan/scheme to take over and monopolize the cannabis payment processing industry. *Id.* at ¶ 145. IRMS fails to allege or explain when, or in what capacity Mr. Zenou "worked with" Mr. Akel, or why Mr. Akel was never named or mentioned in any of the previous complaints.

IRMS first claims that it was the Noltes who introduced Mr. Shvartsman to the Software. *See* Complaint at ¶ 107.   It then claims, inconsistently, that Mr. Shvartsman knew about the Software through his long-time friend Mr. Zenou. *Id.* at ¶ 110. However, IRMS had already previously alleged that the Software was created for the express purpose of facilitating the alleged conspiracy to devalue IRMS. Now, in its Complaint, IRMS concedes that Software pre-existed the alleged conspiracy. *Id.* at ¶ 109.

IRMS admits that Zenou "had a strong desire to cease working with cannabis retailers." *See* Complaint at ¶ 111.  This is true, which is why IPOS sold the Software. The IPOS Defendants' connection to cannabis is limited to the use of "Dejavoo Software Terminals" in certain dispensaries. IRMS's admission here is actually consistent with the sale of the Software to OPC in February 2020, well before the alleged rerouting of transactions and masking of cashless transactions by EFT began in "late 2020 or early 2021". IRMS grossly mispresents the New York court record in alleging that Paybotic joined EFT's lawsuit against Dejavoo "for the same

misconduct", *in February of 2020*! *See* Complaint ¶ 120. This allegation is demonstrably false; the Complaint alleges the New York lawsuit was brought due to Dejavoo's [4] termination of its agreements with Paybotic and EFT. *See* **Exhibit "10"** at pg. 1. The termination resulted from its suspicion that its software was being misused. *See* **Exhibit "6"** at ¶ 18.

IRMS was apparently able to immediately detect misconduct from ATMS. *See* Complaint at ¶¶ 105 and 106. However, IRMS completely failed to detect the same misconduct from EFT for *years*. IRMS's claims about being duped by the Software are not credible.

If the intent of masking cashless transactions was to interfere with a processor's relationship with its sponsor bank, it begs the question of how the alleged conspirators planned to prevent their own sponsor banks from detecting the disguised transactions and terminating their agreements with the conspirators, the way Pueblo had allegedly done with IRMS. IRMS fails to explain how the plan to conquer the cannabis payment industry was supposed to succeed.

As IRMS had done in its previous lawsuits, after alleging that the Software's "sole purpose" was to disguise cashless cannabis transactions, IRMS inconsistently alleges in the Complaint that the Software was used to "divert transactions from IRMS." *See* Complaint at ¶ 149. Even taking IRMS's allegations as true, there would have been no need to disguise any transactions if those transactions were being diverted away from IRMS, and likewise there would have been no need to divert transactions from IRMS if they can be disguised. IRMS's claims are not credible.

IRMS's new cause of action for misappropriation of trade secrets is also riddled with internal contradictions. IRMS is unable to describe what trade secrets were allegedly misappropriated. IRMS initially claims it was its "computer programming and software systems". *See* Complaint at ¶ 182. Later, it alleges that it was the "software" *Id.* at ¶ 183. Then, it is claimed

---

[4] In 2020, at the time the New York lawsuit was brought, IPOS used a d/b/a "Dejavoo."

18

to be the "computer source code." *Id.* at ¶ 184.

IRMS fails to identify any form of its intellectual property, such as patents, trademarks, or copyrights, that was purportedly infringed. Florida courts agree that claims for misappropriation of trade secrets must be pleaded with sufficient particularity.  "[B]efore proceeding with discovery in this kind of suit, the plaintiff must identify with reasonable particularity the nature of the trade secrets involved. The plaintiff must, as a threshold matter, establish that the trade secret exists. To do so, it must disclose the information at issue." *Revello Med. Mgmt., Inc. v. Med-Data Infotech USA, Inc.*, 50 So. 3d 678, 679-680 (Fla. Dist. Ct. App. 2010); *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1286 (S.D. Fla. 2010).

IRMS similarly struggles with the concept of "misappropriation." After first alleging that Zenou [and others] "misappropriated and manipulated IRMS's software systems"  *See* Complaint at ¶ 185, IRMS alleges that Zenou [and others] somehow misappropriated IRMS's trade secrets even though they were "without access to IRMS's software" *Id.* at ¶ 186. If Zenou and his alleged co-conspirators were without access to IRMS's software, it simply does not follow that he can be held liable for misappropriation of IRMS's trade secrets.

IRMS previously voluntarily dismissed its Adversary Complaint for fraud and fraud by omission against the IPOS Defendants and has not realleged those claims here; instead, IRMS now asserts an "aiding and abetting fraud" claim against the IPOS Defendants *See* Complaint, Count IX. IRMS now alleges that "even if they did not take its trade secrets" or "infiltrate and compromise its technical system," Zenou nevertheless signed a "side agreement" (not attached) to "conceal" his involvement and therefore "provided substantial assistance" to the other Defendants' alleged fraud. According to IRMS's faulty logic, Zenou is somehow liable for aiding and abetting fraud simply by ***selling*** the Software. Sale of the Software to a third party cannot possibly

19

constitute fraudulent concealment, and IRMS fails to allege with particularity how, in fact, the sale of the Software to a third party would constitute aiding and abetting fraud.

Importantly, IRMS never explains what possible motivation or benefit to the IPOS Defendants would receive to cause harm to IRMS, an entity whom they had never even heard of until April 2024, many years after the alleged misconduct had taken place. IRMS has failed to allege any explanation as to what benefit the IPOS Defendants would receive from OPC's alleged scheme to carve out a cannabis payment processing empire. The Software had already been sold to OPC in February 2020, and the IPOS Defendants had not expressed any interest in buying IRMS. Claims like fraud and interference with contract require an element of intent. IRMS cannot plead intent without providing some plausible allegation of intent.

IRMS's elaborate conspiracy theory, much like many conspiracy theories, is filled with inconsistencies and contradictions, and keeps mutating. IRMS's constant rewriting of the various causes of action against the IPOS Defendants is a telltale sign that none of its claims have any legal or factual merit. After five years of litigation, the only material fact IRMS can establish as undisputed with respect to the IPOS Defendants is that Denovo developed software which was sold to OPC in 2020, prior to the events complained of. None of IRMS's allegations have any factual support that makes sense. IRMS's admissions that Zenou played no role in misappropriation demonstrates the frivolity of its misappropriation claim.

## VII.   CONCLUSION

For the foregoing reasons, the IPOS Defendants respectfully request that the Court impose monetary sanctions against both IRMS and its counsel of record, including the attorneys' fees and costs incurred by the IPOS Defendants in bringing this Motion, and further request that the Court dismiss IRMS's renewed frivolous claims against them with prejudice as a nonmonetary sanction,

and such other relief as the Court deems appropriate.

/s/ Anthony Aragona III
Anthony Aragona, III, Esq.
Florida Bar No. 36676
Global Legal Law Firm PLLC
200 W Palmetto Park Rd., Suiter 302
Boca Raton, FL 33432
Telephone: (858) 283-7056
Email: aaragona@attorneygl.com

**CERTIFICATE OF SERVICE**

I, Anthony Aragona, hereby certify that I served the foregoing via the CM/ECF on May 14, 2025, which automatically sends notice of an electronic filing to all counsel and registered users of record.

By:   /s/ Anthony Aragona III
Anthony Aragona, III

# EXHIBIT "1A"

Filing # 127429023 E-Filed 05/24/2021 05:32:25 PM

IN THE CIRCUIT COURT, SIXTH JUDICIAL CIRCUIT IN AND FOR PINELLAS COUNTY, FLORIDA

CASE NO.:

INDIAN RIVER MERCHANT
SERVICES LLC,

       Plaintiff,

v.

EFT SERVICES LLC; and
RANDY NOLTE, individually,

       Defendants.

_____/

### COMPLAINT FOR DECLARATORY
### JUDGMENT AND BREACH OF CONTRACT

Plaintiff, Indian River Merchant Services LLC ("IRMS"), by and through its undersigned counsel, sues EFT Services LLC ("EFT Services") and Randy Nolte, individually (where appropriate, the foregoing defendants shall be referred to herein collectively as "Defendants"), and states:

### PARTIES, JURISDICTION AND VENUE

1. This is an action for declaratory relief and money damages that exceed $30,000.00, exclusive of attorneys' fees, interest, and costs.

2. IRMS is a Florida limited liability company with its principal place of business in Largo, Florida. IRMS is authorized to do and is doing business in Pinellas County, Florida.

3. EFT Services is a Florida limited liability company with its principal place of business in Cooper City, Florida. EFT Services is authorized to do and is doing business in Pinellas County, Florida.

***ELECTRONICALLY FILED 05/24/2021 05:32:21 PM: KEN BURKE, CLERK OF THE CIRCUIT COURT, PINELLAS COUNTY***

4. Randy Nolte is an individual residing in Davie, Florida.

5. This Court has jurisdiction over the subject matter and the parties and venue is proper in Pinellas County, Florida, because: (i) IRMS and Defendants contracted within Pinellas County; and (ii) the causes of action accrued in Pinellas County, Florida.

## GENERAL ALLEGATIONS

6. IRMS is a payment processor and provides merchants and companies, like EFT Services, with access to various payment processing and ATM services.

7. EFT Services is an independent sales representative that acquires customers and routes such customers' merchant and ATM transactions through IRMS's processing assets.

8. On or about December 12, 2017, IRMS entered into that certain PIN-Based Transaction Processing and Support Agreement (the "Processing Agreement") with EFT Services, and with Randy Nolte as guarantor of EFT Services' obligations. A true and correct copy of the Processing Agreement is attached hereto and incorporated herein as **Exhibit "1."**

9. The Processing Agreement had a five (5) year term that began on November 1, 2017, with successive one (1) year automatic renewals unless terminated by the parties in writing.

10. Under the Processing Agreement, EFT Services was required to pay IRMS for, among other things, Transaction Processing Fees for Approved Transactions, Emerging Market Transactions and ATM Transactions (as those terms are defined in the Processing Agreement).

11. Further, the Processing Agreement required EFT Services and its affiliates to "exclusively process all of its transaction processing customer's transactions with IRMS for the duration of the [Processing Agreement]" and to "use IRMS exclusively for any ATM related services as to any device that is the subject of th[e] [Processing Agreement]" (collectively, the "Exclusivity Requirement").

12.     EFT Services has not exclusively used IRMS for processing customer's transactions and for ATM related services.

13.     EFT Services use of other processors is in violation of the Exclusivity Requirement and Processing Agreement.

14.     Because of EFT Services' violation of the Exclusivity Requirement, IRMS has been deprived of transaction fees and profits to which IRMS was entitled to receive pursuant to the Processing Agreement.

15.     EFT Services has also failed regularly to meet the monthly minimum transaction volume of 300,000 approved transactions as set forth in the Processing Agreement.

16.     EFT Services' failure to meet minimum transaction volume has resulted in a loss of fees and damages to IRMS in an amount to be proven at trial.

17.     Additionally, IRMS has recently determined that EFT Services has failed to pay or substantially underpaid IRMS for various Transaction Fees under the Processing Agreement.

18.     Between January 2018 and March 2021, EFT Services failed to pay or underpaid IRMS for Transaction Fees in an amount equal to or exceeding $15,506,460.28.

19.     The underpayments or non-payments identified herein do not include amounts that EFT Services failed to pay to IRMS due to EFT Services' violation of the Exclusivity Requirements, which IRMS asserts is in excess of $5 million.

20.     During the week of May 17, 2021, IRMS began withholding all Transaction Fee payment files otherwise payable to EFT Services.

21.     IRMS has demanded EFT Services repay IRMS for all Transaction Fees owed by EFT Services to IRMS or to otherwise propose a plan to resolve EFT Services' failure to pay the Transaction Fees owed to IRMS.

22.     To date, EFT Services has refused to repay IRMS or to propose any reasonable solution.

23.     IRMS has retained the undersigned law firm and is obligated to pay a reasonable fee for the firm's services in this action.  Pursuant to the terms of the Processing Agreement, IRMS is entitled to an award of costs and attorneys' fees incurred by IRMS in bringing this action and enforcing the terms of the Processing Agreement.

24.     All conditions precedent to the filing of this action have been satisfied, performed or have occurred.

<u>**COUNT I**</u>
**(Declaratory Judgment against EFT Services)**

25.     This is an action pursuant to Chapter 86, Florida Statutes, for a declaratory judgment by this Court with respect to IRMS and EFT Services' rights and obligations under the Processing Agreement.

26.     IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 24 above.

27.     There is a bona fide, actual, present, and practical need for a declaration by this Court with respect to IRMS and EFT Services' rights and obligations under the Processing Agreement.  Specifically, IRMS seeks a declaratory judgment concerning its ability to continue to hold all Transaction Fees in its (or that come into its) possession until or unless EFT Services has fully compensated IRMS for amounts owed under the Processing Agreement.

28.     IRMS believes the Processing Agreement affords it the right to continue to hold all Transaction Fees in its (or that come into its) possession until or unless EFT Services has fully compensated IRMS for amounts owed under the Processing Agreement.

29.     EFT Services and certain independent sales organizations ("ISO") of EFT Services

4

claim that certain Transaction Fees are owed to EFT Services pursuant to the Processing Agreement and that IRMS is wrongfully withholding those certain Transaction Fees.

WHEREFORE, IRMS requests judgment against EFT Services:

a. declaring and adjudging that IRMS may hold any and all transaction fees in IRMS's possession that would otherwise be payable to EFT Services until such amounts fully reimburse IRMS for amounts owed by EFT Services;

b. awarding IRMS its attorneys' fees and costs pursuant to Processing Agreement;

c. awarding IRMS its reasonable costs of suit pursuant to Chapter 86, Florida Statutes; and

d. awarding such other relief as the Court deems equitable and just to IRMS.

## COUNT II
### (Breach of Processing Agreement Against EFT Services)

30. This is an action for damages against EFT Services for breach of the Processing Agreement.

31. IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 24 above.

32. The Processing Agreement requires EFT Services to exclusively use IRMS for processing services.

33. EFT Services has not exclusively used IRMS for processing services.

34. EFT Services failure to exclusively use IRMS for processing services has deprived IRMS of Transaction Fees and profits owed to IRMS.

35. EFT Services' failure to exclusively use IRMS for processing services has resulted in lost payments and damages of at least $5 million owed to IRMS.

36. EFT Services has also failed to process and pay IRMS for a monthly minimum of 300,000 approved transactions as required by the Processing Agreement.

5

37.     Further, EFT Services was obligated to pay, among other things, Transaction Fees to IRMS for all transactions described in the Processing Agreement.

38.     EFT Services has not paid IRMS for all transactions processed.

39.     EFT Services has wrongfully withheld payment of these Transaction Fees owed to IRMS in an amount equal to or exceeding $15,506,460.28.

40.     As a result, EFT Services has breached the Processing Agreement and caused IRMS more than $20,000,000.00 in damages.

WHEREFORE, IRMS demands judgment against EFT Services for damages, together with interest, costs, expenses, attorneys' fees, and such other relief as the Court deems just and proper.

## **COUNT III**
### **(Breach of Processing Agreement Against Randy Nolte, as Guarantor)**

41.     This is an action for damages against Randy Nolte, as guarantor, for breach of the Processing Agreement.

42.     IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 24 above.

43.     As a condition of entering into the Processing Agreement, IRMS required Randy Nolte to execute the Processing Agreement as guarantor in favor of IRMS, whereby Randy Nolte guaranteed prompt and full payment of all liabilities and obligations of EFT Services pursuant to the Processing Agreement.

44.     EFT Services has breached the Processing Agreement because it has wrongfully withheld payment of Transaction Fees owed to IRMS in an amount equal to or exceeding $15,506,460.28 and failed to exclusively use IRMS for processing services which has resulted in lost payments and damages of at least $5 million owed to IRMS.

45.     Those amounts are due and owing by EFT Services to IRMS.

6

46.     As guarantor, Randy Nolte is liable to IRMS for the amounts due IRMS from EFT Services under the Processing Agreement.

47.     Randy Nolte's failure to make prompt and full payment of all liabilities and obligations of EFT Services pursuant to the Processing Agreement is a breach of the Processing Agreement and Randy Nolte's guaranty.

WHEREFORE, IRMS demands judgment against Randy Nolte for all sums due under the Processing Agreement, together with interest, costs, expenses, attorneys' fees, and such other relief as the Court deems just and proper.

Respectfully submitted this 24th day of May, 2021.

ADAMS AND REESE LLP

By: _____

John T. Rogerson, III
Florida Bar No. 832839
john.rogerson@arlaw.com
richene.oliver@arlaw.com
dana.tompkins@arlaw.com
**James N. Floyd, Jr.**
Florida Bar No. 0114216
james.floyd@arlaw.com
megan.farmer@arlaw.com
501 Riverside Avenue, Suite 601
Jacksonville, Florida  32202
(904) 355-1700
(904) 355-1797 (fax)
*Attorneys for Plaintiff Indian River*
*Merchant Services LLC*

7

# EXHIBIT 1

# PIN-Based Transaction Processing and Support Agreement

AGREEMENT between Indian River Merchant Services LLC, or its designee and/or assignee herein known as "IRMS LLC," and_EFT Services LLC, an Independent Sales Representative herein known as "ISR."

## RECITALS

WHEREAS, IRMS LLC, provides access to processing, bank sponsorship, settlement and/or customer services to merchants, banks and Independent Sales Representatives (ISRs) in connection with the terminals and transaction types that are subject to this agreement, which merchants are identified either in a data file supplied by ISR contemporaneously with this agreement or in an exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR into which program the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHEREAS, ISR, is principally a sales and support organization, responsible for managing and supporting its clients, including settling all financial and settlement obligations of its clients. The ISR provides and shall continue to provide marketing, sales and support to merchants who are or will become members of one or more banking network systems in connection with the terminals and transaction types that are subject to this agreement, which merchants are identified in an Exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR Into which program, the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHERAS, IRMS, LLC and ISR are completely and entirely separate entities operating their respective separate businesses, and own their respective and separate assets. Neither party has any claim upon the other party for any intellectual property, software licenses, or financial, technical, infrastructure or personnel resources.

WHEREAS, ISR has complied and registered with appropriate networks for access to those networks for transaction processing, or will provide such documentation as is necessary to comply with reasonable requirements of the Sponsor Bank of IRMS LLC or ISR, and

WHEREAS, the Description of Locations" shall be amended from time to time by the registration or deletion of terminal locations, and

WHEREAS, IRMS LLC, and ISR desire to enter into an agreement whereby IRMS LLC will provide Electronic Funds Transfer (EFT) services for ISRs programs and equipment as necessary to enable various terminals to operate as described in a data file or an Exhibit to this Agreement entitled "Description of Terminals", and

WHEREAS ISR agrees to exercise due diligence and care in the implementation of the provisions of this agreement;

NOW THEREFORE, in consideration of the foregoing, and for mutual promises and premises set forth herein, the parties hereby agree as follows:

### Article 1
### Defined Terms; Rules of Construction

**1.1 Defined Terms**

As used in the Plan the following terms (which appear in the Plan as capitalized Terms) shall have the meanings set forth below:

"**ACH**" means Automated Clearinghouse Transaction. ACH transactions are aggregated for the day and sent out to the Federal Reserve through a Fed member bank. IRMS LLC initiates said ACH file transmission and ISR herewith authorizes IRMS LLC or its designees and agents to perform all such transactions as are reasonably related or required within the scope of services in this agreement or any addendums hereto.

"**ACH Fee**" means all the services and costs associated with settlement of principal, surcharge, rebates, withdrawals, and adjustments. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements.

3/22/21, 16:00

## Processing and Service Agreement with ISRs

"**Acquirer Transaction**" means a transaction initiated at a Merchant establishment in whose location an EFT device or terminal is located.

"**Business Day**" means any day other than a Saturday, Sunday or "legal holiday" (as such term is defined in applicable rules, regulations or policies, as the same may be amended from time to time, which incorporate requirements from third party government and quasi-governmental units and such third parties (Gateway provider, network and account processors) as may be involved in the processing and settlement of EFT transactions in the ordinary course of events.

"**Card Services**" shall mean the facilitation of Customer's cardholder transactions regardless of transaction type or authorization method (e.g., on-line to Customer's applications processor, using a cardholder database on Vendor's system, using defined limits, etc.). Any Card Services provided through or under this Agreement shall be identified by either an addendum to this agreement or such other document with an established vendor or alliance partner of IRMS LLC in which the ISR sells, designs, provides or otherwise participates in a proprietary, open system or hybrid card service program including but not limited to Payroll Cards, Gift Cards or other prepaid or funded card system or card service.

"**Cash**" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtors or the Unsecured Creditors Trust, as the case may be, drawn on a domestic bank or in such digital or other lawful form as to reasonably construed as cash under this paragraph.

"**Customer**" means the ISR under this agreement. The parties understand and acknowledged that third parties are involved in the scope of the services provided under this agreement both as vendors and as clients including but not limited to merchants, salespeople, service personnel, banks and financial data processors and networks; however, it is understood that "Customer" as used in this agreement refers, as the context requires, to the ISR that executes this agreement and that the ISR includes those third parties under ISRs control, direction or affiliation, and that to the extent required, said third parties shall be registered, disclosed and qualified as required by network rules, the policies of the Sponsor Bank or the policies of IRMS LLC.

"**Emerging Market**" means non-traditional or products and services.

"**Gateway Provider**" also referred to as Gateway, Gateway link, Gateway Processor, means a financial data processor that provides access to one or more EFT networks, whether owned by an association of banks or otherwise providing interchange and switching services so that the cardholder of one bank can access his/her account using the EFT, ATM or other device or terminal operated by another bank or sponsored entity of a bank or other member institution or non-member institution qualified to provide sponsorship. It provides IRMS LLC with network access through Gateway links. Those "links" are communication links through which the information regarding each transaction is transmitted from the IRMS LLC intercept processors and the Gateway and then forwarded to the appropriate EFT network and then the EFT network sends the transaction data to the card-issuing financial institution for approval of the transaction. IRMS LLC maintains said links through its processors. Both links may be referred to as other acronyms but nonetheless refer to the same processing systems.

"**Gateway Services**" shall mean the facilitation of Customer's cardholder and/or Terminal transactions in each Network in which Customer participates and/or is a member. A Gateway transaction shall mean any receipt, transmission or exchange of data, whether completed or not.

2

Initial

Initial

## Processing and Service Agreement with ISRs

"Governmental Authority" means any agency, board, bureau, executive, court, commission, department, legislature, tribunal, instrumentality or administration of the United States, a foreign country or any state, or any provincial, territorial, municipal, state, local or other governmental Entity in the United States or a foreign country. Government Authority includes but is not limited to the United States Federal Reserve regional and central banks and the rules, regulations and definitions continued within the publications of the Federal Reserve.

3

Initial

Initial

3/22/21, 16:00

## Processing and Service Agreement with ISRs

"**Independent Sales Representative**" (ISR) means "Customer" which is an organization or entity that serves as the sales channel and/or primary service provider to merchants in whose commercial establishments EFT devices or terminals are located (Acquirer), or who serve as the sales channel and service provider for card issuance programs (Issuer). There are Master ISRs and Primary ISRs. The Master ISR is one selected by IRMS LLC to be the exclusive provider of services in a particular industry or geographical location. The Master ISR and Primary ISR are either already sponsored under a third party sponsorship bank with a qualified financial institution or are sponsored by IRMS LLC by virtue of its powers and discretion conferred through its contracts that provide Gateway Processing and Bank Sponsorship. If no third party sponsorship agreement exists for ISR, ISR shall bear the costs of sponsorship fees as they apply to the Customer under this agreement. As to the convenience fee or surcharge, Customer instructs IRMS LLC to distribute portion of the revenue to specific people or entities who serve as salesmen, locators, service providers, lenders, investors or other third party with interests in a particular merchant location or group of merchant locations.

"**Insurance Coverage**" means any insurance coverage under any Insurance Policy which is available for the payment of liability or damages arising from or related to Tort Claims.

"**Interchange**" means the fee charged by the Network switch for providing a common financial data processor by which the customers of one bank can electronically access their bank accounts at electronic funds transfer devices owned, operated or sponsored by another bank. In Acquirer transactions, transactions are separated first into two categories --- ATM and POS. In ATM transactions, the Interchange is charged to the bank that issued the ATM or debit card that was issued. In Point of Banking transactions (primarily the NYCE network) the interchange cost structure is lower than other networks. In Electronic Benefit Transactions (primarily the Quest network) the interchange cost structure is lower than other networks and there are certain rules, some of which are copied from national or regional networks that restrict certain types of convenience fees charged to cardholders in operating a terminal. In POS transactions, the interchange is charged to the merchant or operator of the terminal. Issuers in ATM transactions pay the Interchange fee which is then distributed to the network, gateway processor and intercept processor. Issuers share in the interchange fee charged to the merchant or operator of the terminal in POS Debit transactions such that there is a net income to the issuer when the card is utilized for a POS Debit transaction rather than as an ATM. The Interchange is not be confused with Surcharge or Convenience Fee, which is a separate fee handled in a different way. Interchange is also not to be confused with the Processing Fee charged by the Intercept processor (IRMS LLC) or Gateway fee which is also handled in a different way. Interchange should also not be confused with the Account Access Fee charged by the Issuing Bank to its cardholder, usually for using "foreign" ATMs (i.e., ATMs not operated by the issuing bank; the account access fee is a bank fee and a matter strictly between the cardholder and his depository bank that issued him the ATM or POS Debit Card. Interchange in POS Credit transactions is usually charged directly to the merchant as a transaction charge plus a percentage of sale fee.

"**Issuer**" means a bank that issues a card for use at an ATM, POS Debit, Point of Banking, POS Credit or other EFT terminal or device for access to the cardholder's account. Issuers issue cards to either direct account holders who maintain standard demand deposit or savings account at the Issuer Bank or an indirect account managed through a proprietary or Network approved card issuance program.

"**Liabilities**" means any and all liabilities, obligations (except for the Assumed Obligations), judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to a party or any Affiliate, Subsidiary, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence.

4 _____

Initial

_Kw_

Initial

_Ov_

## Processing and Service Agreement with ISRs

**"Lien"** means, with respect to any asset or Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such asset or Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

**"Management Company"** means the entity designated at will by IRMS LLC for security and administrative purposes in whose name the IRMS LLC designated depository institution (Settlement Bank) receives the Master Settlement. The management company has no possessory rights to any money received from IRMS LLC transactions and acts strictly as a conduit, management and reporting entity in consideration of its receipt of a Management Fee. The current management company is IRMS LLC (IRMS LLC) which provides the direct processing for intercept, gateway, and sponsorship and settlement services.

**"Management Fee"** means the fee paid by IRMS LLC to the entity designated to receive Master Settlement. The amount of the management fee is determined on a month to month basis after deduction of expenses directed to be paid by IRMS LLC, in accordance with industry standards and prior conduct of normal operations of the Management Company. These fees include fees for transaction processing, terminal registration and support, settlement and related services.

**"Master Settlement"** means the ACH settlement to the depository bank designated by IRMS LLC (Settlement Bank) to receive the gross amount of principal withdrawals approved during the previous banking day and the gross amount of surcharge revenue and interchange revenue for the same period. Master Settlement represents entirely third party funds, to wit: IRMS LLC and IRMS LLC' customers and IRMS LLC' vendors. Master Settlement is then broken down into individual ACH settlements generated by the processor which are processed through the Federal Reserve on behalf of IRMS LLC through the respective designated depository banks accounts (Settlement Bank Accounts). Master Settlement is received by the IRMS LLC' designated depository institution into the name of the management company designated by IRMS LLC, i.e. IRMS LLC.

**"Merchant"** means a retail or professional establishment doing business with the consumer public and which has signed up with a regional or national electronic network through IRMS LLC to be a sponsored retail merchant permitted to offer electronic banking services to its customers and who can receive compensation and reimbursement for advancing funds to its customers in an ATM, ATM Scrip, Point of Banking, Point of Sale or other electronic funds transaction. Merchants are signed up by IRMS LLC channels which are usually ISRs. ISRs maintain the exclusive relationship with the merchant except for certain customer service activities provided by IRMS LLC through IRMS LLC, and GES. The devices in the Merchant establishments are operated by the merchant but usually initiated by their customer. Said devices or terminals are owned by either the merchant, the ISR or a third party investor or lender.

**"Network"** means any financial data processing switch connecting two or more unrelated financial institutions such that the holders of cards issued from institution can access their financial accounts at another unrelated financial institution through electronic funds transfer devices including but not limited to ATM, Point of Sale (POS), Point of Banking (POB), Electronic Benefits Transfer (EBT), payroll cards, prepaid debit cards, gift cards etc. By way of example, such networks may include but are not limited to MasterCard, Cirrus, Maestro, Visa, Plus, Interlink, Discover, Pulse, NYCE, AMEX, STAR, Jeannie, Shazaam, Quest and other regional, national and international networks. Network also includes associations of financial institutions and/or non financial institutions. Some networks require sponsorship while others do not. All require some written documentation and agreements with the Gateway processor and/or the intercept processor. Networks connect to EFT devices and terminals through Gateway processors which in turn connect through intercept processors. The intercept processors, also known as indirect processors, connect directly with the EFT devices or terminals.

**"Network Compliance Claim"** means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity) against the Debtor, its successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, arising out of, or related to, any rules of the United States Federal Reserve, any enforceable rule of a participating network for electronic

5 ____

Initial                                                         Initial

## Processing and Service Agreement with ISRs

funds transfer and settlement, or any other Federal, State or Local Laws, including any Claim or demand: (a) to restrict or enjoin, or recover damages, costs or expenses to remedy, any alleged violation, or to require the Debtor to remedy or to reimburse, pay or incur costs to remedy any violation, (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin, any violation of or alleged violation of any such rules or Laws, (c) to pay any contractual claim with respect to any such rules or Laws, or (d) to pay or reimburse any Person or Entity for financial injury, whether or not contemplated in subparagraphs (a) through (c) above, or whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was known, unknown, diagnosable, undiagnosable, detectable or undetectable before the Confirmation of the Plan or before the Final Decree Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Network Compliance Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the U.S. Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the U.S. Bankruptcy Code. Customer shall pay all fees, fines, assessments, penalties and other amounts in effect or assessed by each Network, which may change from time to time. IRMS LLC may allocate any such fees, fines, assessments and penalties in such manner, as it deems advisable in its sole discretion. Customer assumes all responsibility for collecting any amounts arising in connection with the use of Customer's cardholders' cards and/or Terminals, including but not limited to transaction amounts, fraud or other losses. Customer is solely responsible for all costs directly or indirectly associated with any system upgrades required by Customer or Vendor as a result of changes in the Network Documentation and/or any Network standards or requirements. In the event of any changes or modifications to the Network Documentation, which affect the responsibilities of a Network Participant or any processor in such Network, Vendor may amend this Agreement and/or change the applicable Service upon 30 days prior written notice to Customer.

"**Network Documentation**" shall mean the published Network by-laws, operating rules, identification standards manual, and such other rules, regulations, manuals, policies and procedures (including Vendor's standards), as may be amended from time to time, as published by the appropriate network. Network documentation includes documents required by the Network as well as Network published by the Network or association operating the Network.

"**NETWORK MEMBERSHIP:**" Customer shall indicate below the Network(s) in which Customer is a Network Participant. In the event for any reason Customer participates in a Network which Customer has not indicated below, Customer agrees that all of Customer's obligations in the Agreement and this Addendum shall apply with respect to such Network as if Customer had indicated such Network effective the date Customer begins participating in such Network. Customer agrees to abide by and fully comply with the Network Documentation as may be in effect from time to time and to perform and fulfill any and all obligations and responsibilities related thereto, including, if requested by the Network, execution of additional documentation or agreements. Customer, or its agents or nominees (but not Vendor), will provide all necessary Network, federal, state and/or local regulatory sponsorship, membership or other applicable approvals in order to receive the Services, unless otherwise specifically agreed to in writing in the form of an Amendment to the Agreement or in another contract signed by an authorized officer of Vendor. Notwithstanding the fact that a specific Network is listed below, Customer acknowledges and agrees that Vendor shall only be obligated to provide access to the Networks actually supported by Vendor and for only so long as such Networks are supported by Vendor.

### Gateway Services/Networks May Include and are not limited to:

Cirrus® Corresponding Member
(Issuer & Acquirer)
Cirrus Terminal Only
Quest (EBT transactions)
Corresponding Member (Acquirer Only)
Maestro®

6 _____

Initial

Initial

## Processing and Service Agreement with ISRs

NYCE
American Express® ATM Network Member
Automated Clearinghouse Network(ACH)
Co-Op Network
Presto
Star®
Axcess America
Allpoint Network
Online Resources
Plus Sponsored Member(Issuer & Acquirer)
Plus ATM Category B Member(Acquirer Only)
Visa ATM Acquirer Member
Interlink
Discover Card Sponsored ATM
Acquirer Member
Armed Forces Financial (AFFN)
Credit Union (CU24)
Pulse

Debit Card Services/Networks

MC Debit Card
VISA Checkcard


**"Network Participant"** shall mean any financial institution such as a bank, thrift, credit union, or other entity, such as a merchant or Independent Sales Representative (ISR), which is a member of and/or is otherwise participating in a Network. In certain networks a non-network participant may nonetheless qualify as a sponsoring financial institution subject to the applicable network rules; in such cases the published rules of the network shall apply and the definitions therein shall take precedence over the definitions in this paragraph.

**"Network Registration Fee"** means the expenses incurred by IRMS LLC in registering the ISR with a particular Network. Each network registration fee generally varies from $1500-$5,000.

**"Network Settlement"** means the settlement through the United States Federal Reserve System of net debits and net credits to issuing and acquiring banks based upon EFT transactions of the day. These settlements are usually processed at midnight of the end of the banking day. The cutoff for the banking day for posting of electronic funds transfer transactions is usually 7:30 P.M. In its simplest form, if the cardholder from one bank, takes money from the ATM of an unrelated bank, then the money is transferred from the "issuer" (i.e., the bank that issued the cardholder the ATM or debit card he/she used in initiating the transaction) to the "acquiring bank" (i.e., the bank that owns, operates, sponsors or settles transactions on behalf of the operator of the terminal). In Network Settlement, a bulk settlement occurs to the credit of the bank for the Gateway processor. Hence in this case for transactions processed on the FIS gateway link, are combined with all other processors and deposited in bulk to an account designated by the Gateway processor at the depository institution utilized by the gateway processor to receive such deposits. This deposit is usually an ACH deposit but it can be wire transfer, depending upon the option of IRMS LLC and exigencies of the situation. The Gateway processor then separates out the deposits for each processor and sends a Master Settlement to the depository institution designated by its customer. The Network makes a deposit to the FIS (or subsequent gateway) account at the Master Settlement Bank (i.e., the Settlement Bank of the Gateway Service Provider). The Gateway Service Provider then prepares the ACH data file for Master Settlement to the depository institution designated by IRMS LLC. IRMS LLC then prepares the ACH data files for transmission to the Federal Reserve to deduct the

7 _____

Initial                                                               Initial

## Processing and Service Agreement with ISRs

money from the Settlement Bank Accounts for individual settlements to the depository institutions selected by each merchant for receipt of these funds and the same for the revenue disbursements or rebates for each depository institution for the ISRs, other third parties who share in the revenue, and vendors who provide telecommunications, processing or other services to the IRMS LLC Venture. Network fees are subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements

"Person" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including but not limited to any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

"Pro Rata Share" means, with respect to any distribution under the ISR or other properly designated third party, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims (computed by pro rating days or other reasonable formula).

"Processing" means the actual receipt of data, logging of the data, and sending of data, whether encrypted or not, in accordance with industry standards for electronic funds transfer and all applicable laws, rules and regulations of the Federal Reserve System, networks, and contracts governing the conduct of the parties to the entire processing system by which the terminals or devices placed in merchant establishments are utilized by cardholders to access their bank accounts and perform financial or non-financial transactions. Processing includes intercept or indirect processing which involves the capture of data from the terminal or device, Gateway, which involves the capture of data from the intercept or indirect processor, Network, which involves the capture of data from the Gateway, Account Processor which involves the capture of data from the Network, and the return of data (authorization of transaction) through those same parties in reverse order back to the terminal.

"Processing Fee" means the fee charged by IRMS LLC for the processing of a transaction. Said fee is not subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements. ISR will be given as much notice as is reasonable and possible by IRMS LLC or IRMS LLC of any increases in fees resulting from said changes. No such changes are currently known beyond those provided in this agreement. However this is not a warranty that no such changes are in the publication or otherwise in process.

"Property" means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

"Registration" mean the process by which an ISR is entered into the IRMS LLC database and/or the process by which a Merchant or Merchant Terminal or Device is entered into the IRMS LLC database. Registration is a condition precedent to processing transactions on behalf of any ISR, Merchant, or Terminal. Registration is performed by EFT Management Services, Inc. Registration is not the same as Download.

"Registration Fee" means the fee charged by IRMS LLC for initiating an ISR, Merchant or Terminal into the IRMS LLC system for access to the FIS Gateway or any successor or substitute Gateway utilized by IRMS LLC. Registration fee is not the same as Download Fee or Monthly Fee.

"Settlement Bank" means the depository institution selected and designated by IRMS LLC to receive deposits of the proceeds of principal withdrawals and revenue from transactions that were processed through the IRMS LLC intercept processor, the Gateway Processor and the appropriate EFT network to which the issuing financial institution is a member. IRMS LLC or its contracted agents, for purposes of security and administration, may order the deposits to be made at the depository in the name of a designated surrogate who serves at the will and discretion of IRMS LLC, and serves as a transparent conduit for movement of funds initiated or to be initiated by a IRMS LLC processor for transactions on the current Gateway link(s) or its successor. The Settlement Bank is also an Automated Clearinghouse (ACH) service provider that allows IRMS LLC and IRMS LLC access to the accounts through electronic means for electronic transmission of funds through the United

8 . .. ..

Initial

Initial

## Processing and Service Agreement with ISRs

States Federal Reserve System. The settlement Bank may be one of several financial institutions that have agreed to provide ACH services.

"**Sponsor Bank**" (also referred to herein as sponsor or sponsorship) means a bank or other financial institution that is a member of, or has non-member rights to vouch for the transactions of a processor, ISR or encryption organization. The sponsor bank assumes all liability associated with all transactions of every type, nature and kind covered within the scope of its agreement for sponsorship, whether in writing (three-part agreement between Gateway, Sponsor and third party ISR or intercept processor), orally, or by operation of law. The parties agree that the sponsored entity (ies) may include IRMS LLC, IRMS LLC or a third party designee including but not limited to specific qualifying ISRs, the gateway provider or other vendors. Changes in fees from the sponsoring entities and agents will be passed through to the ISR who may pass through the expenses to either the merchant or cardholder.

"**Sponsorship Fee**" means the fees earned or incurred by IRMS LLC for a financial institution to provide sponsorship for the transactions covered by the scope for this agreement. Said fee is subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements.

"**Surcharge**" or "**Convenience Fee**" means the fee charged by the operator of an EFT terminal for the use and convenience of the terminal or device in a merchant establishment. This amount is collected by the Management Company and distributed to third parties in accordance with the instructions of the ISR or Merchant. Some networks through which a transaction is routed do not permit surcharge transactions including but limited to Cirrus International, Plus International, Axcess America, All Points, and certain other Associations of community banks and credit unions. IRMS LLC makes no warranty of receipt of surcharge income on transactions routed through those networks.

"**Telecommunications Fees**" means the costs and expenses of all aspects of the transmission of data from and to an EFT terminal, the intercept processor, the gateway processor, the network, the account processor and back through the loop and any intermediary parties therein. Said fee is subject to changes in third party service companies, network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. ISR bears the entire expense of connection from the terminal to the intercept processor and together with the merchant is solely responsible for the quality, consistency or availability of that connection.

"**Terminal**" means an ATM, POB, POS, or other electronic funds transfer device which is or which may be supported directly or indirectly by Vendor in accordance with its Standards, as certified through the Gateway processor(s) and network(s) as may be required by IRMS LLC, IRMS LLC or network documentation to perform transaction sets within the industry definitions of ATM, POB, POS, POS Scrip as the case may be, and as the same is amended by documentation or conduct of the applicable networks.

"**Terminal Services**" means the facilitation, processing and/or settlement of transactions at Customer's Terminals or within Customer's IRMS LLC-approved programs.

"**Terminal Software**" means the operating system, encryption, communications protocol and merchant data compliant with IRMS LLC host (server) requirements. IRMS LLC shall provide such software as is available through any means to IRMS LLC, but dos not guarantee the functioning of terminal software. Each ISR/Customer is responsible for development or improvement of terminal software as may be required from time to time in such manner that same can be certified through all host processors, networks and account processors in the EFT system utilized for authorization and completion of transactions. In all cases where the ISR has created terminal software for any EFT terminal, said software shall be made available in machine language and object code in executable form such that it can be downloaded and fully perform all expected functions by IRMS LLC information technology employees or representatives. IRMS LLC shall not provide access to said software to any third party for any purpose other than providing customer service. The delivery of the terminal code and all documentation reasonably requested by IRMS LLC shall never be construed as a conveyance of title or license to the code, except for the purposes expressed in this Agreement and more specifically in this paragraph.

9

Initial

Initial

3/22/21, 16:00

## Processing and Service Agreement with ISRs

"**Third Party Fees**" means any fees attributable to ISR's operations from third parties, affiliates, or other entities or persons which are billed or billable to the ISR. Customer shall pay all third party fees, costs, expenses and assessments in connection with the Services, which may change from time to time, whether incurred directly or indirectly by Customer, Vendor and/or its affiliates. Third party fees include, but shall not be limited to, all communications expenses (e.g. equipment, lines, drop charges, access charges, long distance, etc.); all hardware costs (e.g. the cost of individual Terminals, modems, upgrades, modem sharing devices, etc. and any expenses associated therewith (e.g. setups, maintenance, etc.); all Network fees; all miscellaneous fees associated with the Services (e.g. mailing expenses, overnight courier expenses, plastics, etc.); and all costs associated with maintaining and implementing all software and hardware necessary for any interface affecting the Services.

"**Tort Claim**" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity), their predecessors, successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, for, relating to, or arising from any death, personal injury, damage or loss (whether physical, emotional or otherwise) to any Person or Property, including any Claim or demand for compensatory damages (such as loss of consortium, wrongful death, unearned wages, survivorship, proximate, consequential, general, and special damages) and punitive damages, and any products liability claim, in each case for any act or event occurring on or prior to the Effective Date, whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was diagnosable, undiagnosable, detectable or undetectable before the Effective Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Tort Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

"**United States**" (U.S.) means the United States of America.

"**Vault Cash**" refers to the established local currency in the individual vaults of individual ATM terminals which may be subject to a separate service agreement with IRMS LLC or an affiliated entity. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. Under no circumstances shall IRMS LLC be considered the owner of said currency or any other contents of the vault, nor shall IRMS LLC be responsible or liable for any event, management, claim or handling of said currency. Any parties that elects to be involved in the servicing of cash vaults assumes full responsibilities for the vault, shall have adequate and appropriate insurance pursuant to industry standards, and shall have adequate and appropriate maintenance arrangements pursuant to industry standards. Fees charged by third parties in connection with vault cash, cash management or armored car services will be passed through to ISR if invoiced to IRMS LLC.

"**IRMS LLC Vendors**" means all third party entities that provide services to IRMS LLC, as they may be modified, changed or replaced from time to time by IRMS LLC. IRMS LLC acknowledges and represents that it is the duty of IRMS LLC to provide said gateway services through the Master Services Gateway Provider Agreement executed with such third party (ies) as deemed appropriate by IRMS LLC management.

Any capitalized term used in the Agreement that is not defined in the Agreement but that is defined in industry standard rules, regulations, laws or policies shall have the meaning ascribed to that term in the EFT industry with IRMS LLC rules policies controlling in the case of a conflict or ambiguity.

1.2    **Rules of Construction.**

10 _____

Initial                                                                                          Initial

## Processing and Service Agreement with ISRs

For purposes of this Agreement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references to Articles and Exhibits are references to Articles and Exhibits of this Agreement; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to this Agreement in its entirety rather than to a particular Article or section or subsection of the Agreement; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Agreement shall be deemed incorporated herein by such reference and made a part hereof for all purposes; and (i) if necessary, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 1.2.

## Article 2

## TERMS

I.    **ENTITLEMENTS & RESPONSIBILITIES**

A.    **IRMS LLC**

**IRMS LLC Requirements:**
- a)    IRMS LLC and its affiliates agree to not, without written authorization from ISR, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with ISR for processing services.

**IRMS LLC Responsibilities:**
- b)    Honor and protect the confidentiality of information provided by ISR and its clients.
- c)    Transmit Settlement and Surcharge funds to the bank accounts designated by ISR, via Automated Clearing House transfers, on the same day the funds are made available to IRMS from the participating networks.
- d)    ISR will be responsible for all bank relationships, operational and processing costs associated with distribution of funds to its customers
- e)    Provide ATM Transaction processing and managed services.
- f)    Provide Terminal Transaction reports on a basis agreed in the terms and provisions of this agreement.
- g)    Provide routing and gateway to a majority of all major and minor national and regional EFT networks for ATM and POS devices as defined by IRMS LLC network, the proprietary EFT banking network hosted for IRMS LLC, as amended from time to time.
- h)    Will not disparage ISR to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of ISR in any way.
- i)    Will represent its relationship with the ISR as that of a vendor to the ISR, and will keep all elements of this agreement confidential for two years after the termination of the agreement

B.    **ISR**

IT_____

Initial                                                                                                          Initial

11 of 18                                                                                          3/22/21, 16:00

## Processing and Service Agreement with ISRs

1. **Requirements:**
   a) ISR shall provide IRMS LLC with all information requested on the ISR Registration form and any other information reasonably requested by IRMS LLC from time to time. ISR warrants that all said information is true and that ISR shall immediately notify IRMS LLC of any change in status or information The Registration form must specifically state if the Merchant is participating in Emerging Markets. If IRMS determines a Registration form submitted by ISR did not correctly specify a Merchant as participating in Emerging Markets, IRMS may, at its sole discretion, terminate the Merchant's ability to process transactions through IRMS and assess a fine against ISR of $ 5,000, which will paid by a reduction in Surcharge payments to ISR.
   b) ISR and its affiliates will submit updated Registration forms for all currently active Merchant locations specifically indicate if the Merchant is participating in Emerging Markets.
   c) ISR and its affiliates will convert all of its customer's terminals to be directly connected to IRMS' selected processor. The process must be completed on a timely basis. If the process involves a manual process then the target date for completion is June 30th, 2017.
   d) ISR and its affiliates will exclusively process all of its transaction processing customer's transactions with IRMS for the duration of this agreement.
   e) ISR and its affiliates agree to not, without written authorization from IRMS, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with IRMS for processing services.
   f) ISR agrees to provide IRMS full physical and communications access to all of ISR's transaction processing environment, including but not limited to firewalls, switches, servers and databases.
   g) Provide telephone or other communications services at its expense for ATM or arrange for same with location.
   h) Provide shipping at its own expense to and from location of the ATM.
   i) Create all hard copy and digital files with correct data for registration including but not limited to a signed merchant service application.

2. **Responsibilities:**
   a) Honor and protect the confidentiality of information provided by IRMS LLC and its clients and prospective clients, including but not limited business methods, software for download, encryption, registration, reporting, analysis, management, processing, switching of any ATM, POS, EBT or other EFT device that ISR ever receives information on that relates to IRMS LLC, its affiliates, alliance partners or vendors.
   b) Ensure accuracy and thoroughness of information provided IRMS LLC (its equipment suppliers and service providers).
   c) Ensure the merchant has provided proper and complete site preparation, adequate signage and appropriate promotion of the terminal.
   d) Continually monitor each and every merchant on at least a weekly basis to determine if the merchant is adequately trained in the use of the terminal, has maintained adequate signage and appropriate promotion and that the merchant has adequate supplies for the terminal.
   e) Promptly inform IRMS LLC of any delays (included but not limited to settlement of principal or rebate) or specification changes.
   f) Promptly inform IRMS LLC of any changes in registration data
   g) To use IRMS LLC exclusively for any ATM related services as to any device that is the subject of this agreement.

12

Initial

Initial

## Processing and Service Agreement with ISRs

h) Will not disparage IRMS, LLC to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of IRMS LLC in any way.

i) ISR will specifically refer all inquiries from ACE Cash Express personnel to IRMS LLC or its designee.

j) Will represent its relationship with IRMS LLC as that of a customer of IRMS, LLC and keep all elements of this agreement confidential for two years after the termination of the agreement. Additionally, ISR and its employees and affiliates will not engage in any oral, written or electronic form of communications with any party or parties which is defamatory in nature in regards to IRMS LLC or its affiliates. Failure to comply with these requirements will cause the agreement to be terminated immediately and without notice. ISR understands termination of processing services does not adequately compensate IRMS for any or all damages from defamatory communications and IRMS does not waive its right for further legal recourse.

k) Has full and complete responsibility for accuracy of its transaction processing, settlement calculations, settlement routing and reporting to its clients.

## II.   TRANSACTION PRICING

A.   Pricing of IRMS LLC services are as stated in **Exhibit A**, attached hereto "Managed and Processing Services Pricing". Processing services are priced on a per transaction/per terminal basis. Other pricing is on a per service charge and may or may not be applicable with the specific services provided to an ISR or merchant under this agreement.

## III.   ISR / MERCHANT COMPENSATION

A.   ISR COMPENSATION: ISR compensation is derived from the charges negotiated with the merchant where the terminal is located. ISR compensation can include sharing in Merchant surcharge income. Net compensation is the amount the ISR receives, after all expenses and processing charges payable to IRMS LLC If daily settlement is required (and accepted by IRMS LLC Inc), the full principal will be settled to the Merchant (dispenser of cash) and a portion of the surcharge will be settled. The balance of the surcharge (convenience fee) settlement will be paid and reconciled on the 15th day of the close of the previous calendar month. Any other fees or charges against merchants or ATM customer (or their bank) will be disbursed on the 15th day of the month following receipt.

B.   FEES BASED ON CURRENT INTERCHANGE LEVELS: The various fees for transaction processing and associated servicing under this agreement are not subject to change by either party to this agreement without express written consent of both parties.

C.   ISR shall provide such services as indicated above or otherwise reasonably required by its merchants on a timely and expeditious basis; in the event that IRMS LLC determines that it is necessary to retain the services of additional personnel to provide said services, the cost of said additional personnel shall be deducted from the ISR's income and/or the merchant's income.

D.   ISR hereby grants IRMS LLC or its designee full power of attorney for electronic access (ACH) to the ISRs account and the merchant's account for deposits and withdrawals under this agreement on behalf of himself and all merchants signed up under the scope and terms of this agreement.

E.   MERCHANT COMPENSATION: Merchant compensation is derived from charges the merchant levies on customers using the terminal in their location and any other per transaction amounts negotiated between the ISR and Merchant

13_____...

Initial                                                                                   Initial

13 of 18                                                                           3/22/21, 16:00

## Processing and Service Agreement with ISRs

**IV.    NOTICES**

A.    DELIVERY OF NOTICES.  All notices required hereunder shall be in writing and delivered in person or by certified or registered mail, return receipt requested, postage prepaid.  Such notices shall be addressed as follows:

| Indian River Merchant Services LLC | ISR: EFT Services LLC |
|---|---|
| 22101 US HWY 19 North<br>Clearwater, FL 33765 | 4801 S University Drive #303<br>Davie, FL 33328 |

**V.    MISCELLANEOUS**

A.    IRMS LLC wherever used in this agreement means any one of a number of entities or persons designated by IRMS LLC to act as agent for Indian River Merchant Services LLC pursuant to the requirements, terms and conditions of this agreement. Each of said companies has authority to do business as IRMS LLC.

B.    SUPERSEDE.  This Agreement and the Exhibits hereto contain the entire understanding of the parties hereto and supersedes all prior written or oral agreements with respect to the subject and scope contained within this Agreement.

C.    SEVERABILITY. The illegality, invalidity or if unenforceable of any provision, Article or Exhibit of this Agreement shall not affect the remainder of this Agreement. In any proceeding involving the construction of this agreement, neither party shall be presumed to be drafter of the agreement; any provisions that are unenforceable for any reason shall be amended automatically to allow for enforcement of the remainder of the agreement and of the specific provision, if possible.

D.    **GOVERNING LAW.  This Agreement shall be governed, construed and interpreted under the laws of the State of Florida. The sole and exclusive venue for raising any dispute or claim brought by ISR shall be  Pinellas County, Florida.**

E.    HEADINGS.  The heading contained herein is used for convenience and ease of reference and do not limit the scope, intent or interpretation of the Article headings or their subheadings.

F.    PERSONS BOUND: This agreement is binding upon the parties hereto and any person or entity claiming through them including but not limited to any and all heirs, successors, assigns (if expressly permitted in writing by IRMS LLC), affiliates, agents, servants or employees and/or any entity in which any signatory or party hereto has any material ownership interest or business relationship.

G.    LIMITS ON LIABILITY -- EXCEPT THOSE EXPRESS WARRANTIES MADE IN THIS AGREEMENT, IRMS LLC DISCLAIMS ALL WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  Without limiting the foregoing, IRMS LLC and IRMS LLC shall not be liable for lost profits, lost business or any incidental, special, consequential or punitive damages (whether or not arising out of circumstances known or foreseeable by IRMS LLC or IRMS LLC) suffered by Customer, its customers or any third party in connection with the Services provided by IRMS LLC or IRMS LLC hereunder.  IRMS LLC or IRMS LLC liability hereunder shall in no event exceed an amount equal to the lesser of (i) actual monetary damages incurred by Customer or (ii) fees paid for the particular Services in question for the calendar month immediately preceding the date on which IRMS LLC and IRMS LLC received Customer's notice of nonperformance as set forth in this Agreement.  In no event shall IRMS LLC or IRMS LLC be liable for any matter beyond its reasonable control, or for damages or losses wholly or partially caused by the Customer, or its employees or agents, or for any damages or losses which could have been avoided or limited by Customer giving notice to IRMS LLC and IRMS LLC as provided in Section 7.  No cause of action, regardless of form, shall be brought by either party more than

14

Initial

Initial

14 of 18

3/22/21, 16:00

## Processing and Service Agreement with ISRs

1 year after the cause of action arose, other than one for the nonpayment of fees and other amounts, including any damages, due IRMS LLC under this Agreement.

H.   Other Agreements. IRMS LLC reserves the right to enter into other agreements pertaining to the Services with others including but not limited to without limitation banks, savings and loan associations, credit unions and other financial institutions and non-financial institutions, Independent Sales Representatives, indirect financial processors, gateway processors, or other parties that may or may not offer the same or similar services to those offered by Customer.

I.   Taxes. Any sales, use, excise or other taxes (other than IRMS LLC income taxes) payable in connection with or attributable to the Services shall be paid by Customer. IRMS LLC may, but shall not have the obligation to pay such taxes if Customer fails to do so. In the event IRMS LLC pays such taxes, Customer shall immediately reimburse IRMS LLC upon demand and at the interest rate applicable for delinquent amounts as set forth in Section 4 hereof.

J.   Violation of Applicable Laws and Regulations. IRMS LLC may cease providing any Service if such Service, in IRMS LLC opinion, violates any federal, state or local statute or ordinance or any regulation, order or directive of any governmental agency or court, or any published policy of IRMS LLC, related sponsoring bank, related settlement bank, federal, state or local agency, or proprietary or public network offering switching services for electronic funds transfer.

K.   No Intended Benefit to Third Party Beneficiary and No Right of Action to Third Party Beneficiary. This Agreement is for the benefit of, and may be enforced only by, IRMS LLC and Customer and their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party, including but not limited to those third parties whose existence is disclosed, directly or indirectly to IRMS LLC.

L.   Waiver of Trial by Jury: Both Parties waives trial by jury on any issue triable of right by jury.

M.   Attorney's fees: Customer agrees it shall be liable for any and all attorney's fees incurred by IRMS LLC or IRMS LLC whether or not in a formal proceeding, including appeals, administrative actions or quasi judicial or quasi administrative actions where such fees are incurred by IRMS LLC or IRMS LLC as a consequence or related to the scope of this agreement or any addenda hereto.

N.   Authorization. Each of the parties hereto represents and warrants on behalf of itself that it has full power and authority to enter into this Agreement; that the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or partnership or other appropriate authorizing actions; that the execution, delivery and performance of this Agreement will not contravene any applicable by-law, corporate charter, partnership or joint venture agreement, law, regulation, order or judgment; that execution, delivery and performance of this Agreement will not contravene any provision or constitute a default under any other agreement, license or contract which such party is bound; and, that this Agreement is valid and enforceable in accordance with its terms.

O.   Counterparts. This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original.

P.   Drafting. This Agreement has been drafted by IRMS LLC as a matter of convenience only and shall not be construed in favor of either party on that account. Each party acknowledges that it has had adequate opportunity to seek the services of independent counsel, accountants and/or other professionals prior to execution of this agreement and as such, each party acknowledges that they have full knowledge, authorization, comprehension and intent with respect to each and every provision of this agreement and any addenda hereto.

## VI.   AMENDMENTS

A.   AMENDMENTS.

1.   Any enforceable change in rules, regulations, bylaws, statutes, ordinances or other policies or laws properly passed and published by any governing body of any government, quasi-government or private association to which IRMS LLC or IRMS LLC is a member or otherwise affected shall

15

Initial

Initial

## Processing and Service Agreement with ISRs

automatically amend the provisions of this Agreement to the extent of the change that is published. IRMS LLC will make every good faith effort within its resources to assure that no such proposed rule infringes on the contractual rights of IRMS LLC or any of its customers or vendors.

2. IRMS LLC reserves the right to unilaterally amend this Agreement from time to time as reasonably required as exigencies of business dictate. Any party affected by such amendments shall have a period of fifteen (15) calendar days from the date the amendment was first put into effect to state objections and request renegotiation of terms. At all times unless otherwise stated, the amended terms of the agreement shall be in full force and effect. In the event the parties fail to reach agreement, either party may apply for arbitration under the rules of the American Arbitration Association. Both parties agree to submit any such dispute to binding arbitration and/or mediation as the circumstances suggest or require.

B. MODIFICATIONS. Except as otherwise provided herein, this Agreement may not be amended, altered or otherwise modified except in writing executed by all parties hereto.

C. ASSIGNMENTS: This Agreement may not be assigned by any ISR to any party or entity except upon written consent and permission of IRMS LLC which shall not be unreasonably withheld only in the event that the holders of equity and the management structure of the assignee are virtually identical to the original ISR. Transfers of equity or title that are strictly for estate tax purposes will be allowed. All other transfers shall be construed as prohibited Assignments.

## VII. TERM AND TERMINATION

A. TERM. The term of this Agreement shall begin on November 1st, 2017, and will continue for a period of five (5) years, provided however that IRMS may terminate this agreement anytime with or without cause.

B. RENEWAL. With respect to the end of each term of this agreement, unless ISR gives written notice by Certified Mail not later than three (3) months prior to the expiration of this agreement, this agreement shall automatically renew for one (1) additional year, subject to the then prevailing charges, rules and regulations of IRMS LLC.

C. EFFECT OF TERMINATION. Upon termination of this agreement the ISR shall only be entitled to receive compensation for all installed units earned under this agreement only to the date of this termination in accordance with the payment schedule as set forth in **Exhibit B.**

## VIII. ENTIRE AGREEMENT

A. This document constitutes the entire agreement between IRMS LLC and ISR. It supersedes any oral or written prior or contemporaneous negotiations or representations between the parties.

## IX. AGREEMENT DATE

A. DATE OF COMMENCEMENT. It is mutually agreed to by all parties that the Date of Commencement of this Agreement shall commence as of _12/29_17.

Executed this _12_ day of _December_ , 2017 in agreement by all parties hereto to this Agreement

16_____

Initial

Initial

## Processing and Service Agreement with ISRs

| Indian River Merchant Services LLC (IRMS LLC) | Guarantor (Randy Nolte)<br>EFT Services LLC |
|---|---|
| 22101 US HWY 19 North<br>Clearwater, Fl 33765<br><br>Phone: 1866-515-4767<br>Email: deven@irmsfl.net | 4801 S University Drive #303<br>Davie, FL 33328<br><br>Phone: 1888-324-1954<br>Email: randy@efte-solutions.com |
| BY: _Deven W. Wenling_<br>Signature: _____<br>Official Capacity: _President_ | BY: _Randy Nolte_<br>Signature _____<br>Official Capacity: _Manager_ |
| Printed Name:<br>_Deven W. Wenling_ | Printed Name<br>_Randy Nolte_ |
| Date:<br>_12/29/17_ | Date:<br>_10/21/17_ |
| Indian River Merchant Services LLC (IRMS LLC) | ISR: EFT Services LLC |

17_____

Initial

Initial

## Processing and Service Agreement with ISRs

Indian River Merchant Services LLC

### EXHIBIT A

PIN Based Transaction Pricing

1) Processing Costs:

   a. **Interchange:** IRMS will retain 100% of all interchange earned on all eligible transactions

   b. **Transaction Processing Fees:** IRMS will be paid a transaction processing fee in accordance with the pricing defined below. These fees will be deducted from Surcharge settlement to ISR and settled directly to IRMS via ACH.

   c. **Transaction Fee per Approved Transaction: $ .15  (for each 12 month period and adjust if market allows)**

   d. **Transaction Fee per Approved Emerging Market (includes POB Fee): $1.50**

   e. **Transaction Fee per Approved Cash ATM Transaction Fee: $ .05**

2) Minimums: ISR agrees to a minimum monthly transaction volume of 300,000 approved transactions. Should the ISR fail to meet the minimum during any month during the team of this agreement, IRMS LLC will calculate the average Interchange and exact Surcharge fees based on 250,000 approved transactions, subtract the Interchange and Surcharge amount of the actual number of approved transactions for the current period and deduct the resulting unmet minimum from ISR's surcharge funding. Notwithstanding the foregoing, if the monthly transaction volume derived from Emerging Markets drops by 50% of it's previous three (3) months average monthly volume, both parties agree the new minimum for all monthly transactions will be 175,000 transactions per month and the transaction volume basis for calculating the fees due to IRMS will be 125,000 transactions per month.

18

Initial

Initial

# EXHIBIT "1B"

Filing # 137944951 E-Filed 11/04/2021 05:02:32 PM

IN THE CIRCUIT COURT, SIXTH
JUDICIAL CIRCUIT, IN AND FOR
PINELLAS COUNTY, FLORIDA

CASE NO.:    21-002572-CI

INDIAN RIVER MERCHANT
SERVICES LLC,

        Plaintiff,

v.

EFT SERVICES LLC; and
RANDY NOLTE, individually,

        Defendants.

_____/

EFT SERVICES LLC,

        Counterclaim Plaintiff,

v.

INDIAN RIVER MERCHANT
SERVICES LLC,

        Counterclaim Defendant.

_____/

**AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND BREACH OF CONTRACT**

Plaintiff, Indian River Merchant Services LLC ("IRMS"), by and through its undersigned

counsel, sues EFT Services LLC ("EFT Services") and Randy Nolte, individually (where

appropriate, the foregoing defendants shall be referred to herein collectively as "Defendants"), and

states:

**PARTIES, JURISDICTION AND VENUE**

1.     This is an action for declaratory relief and money damages that exceed $30,000.00,

exclusive of attorneys' fees, interest, and costs.

2.      IRMS is a Florida limited liability company with its principal place of business in Largo, Florida.  IRMS is authorized to do and is doing business in Pinellas County, Florida.

3.      EFT Services is a Florida limited liability company with its principal place of business in Cooper City, Florida.  EFT Services is authorized to do and is doing business in Pinellas County, Florida.

4.      Randy Nolte is an individual residing in Davie, Florida.

5.      This Court has jurisdiction over the subject matter and the parties and venue is proper in Pinellas County, Florida, because: (i) IRMS and Defendants contracted within Pinellas County; and (ii) the causes of action accrued in Pinellas County, Florida.

## GENERAL ALLEGATIONS

6.      IRMS is an Independent Sales Organization sponsored into national and regional ATM Networks through multiple financial institutions.

7.      EFT Services is a sub-independent sales representative that acquires customers and routes such customers' merchant and ATM transactions through IRMS's processing assets.

8.      On or about December 12, 2017, IRMS entered into that certain PIN-Based Transaction Processing and Support Agreement (the "Processing Agreement") with EFT Services, and with Randy Nolte as guarantor of EFT Services' obligations.  A true and correct copy of the Processing Agreement is attached hereto and incorporated herein as **Exhibit "1**."

9.      The Processing Agreement had a five (5) year term that began on November 1, 2017, with successive one (1) year automatic renewals unless terminated by the parties in writing.

10.      Upon information and belief, EFT Services has transferred or assigned its rights under the Processing Agreement to a third party without IRMS's consent.

## I.      Transaction Fees

11.      Under the Processing Agreement, EFT Services was required to pay IRMS, among other things, a Transaction Fee per Approved Transaction, a Transaction Fee per Approved Emerging Market transaction and a Transaction Fee per Approved Cash ATM Transaction (as those terms are more particularly defined in the Processing Agreement).

12.      IRMS has determined that EFT Services has failed to pay or substantially underpaid IRMS for various transaction fees under the Processing Agreement, including but not limited to, the $0.15 Transaction Fee per Approved Transaction and $1.50 Transaction Fee per Emerging Market transaction.

13.      From January 2018 through May 2021, EFT Services failed to pay or underpaid IRMS for transaction fees in an amount exceeding $16,000,000.00.

14.      IRMS has demanded EFT Services repay IRMS for all transaction fees owed by EFT Services to IRMS or to otherwise propose a plan to resolve EFT Services' failure to pay the transaction fees owed to IRMS.

15.      To date, EFT Services has refused to repay IRMS or to propose any reasonable solution.

16.      During the week of May 17, 2021, IRMS began withholding all transaction fee payment files otherwise payable to EFT Services.

## II.      Exclusivity Requirement

17.      Further, the Processing Agreement required EFT Services and its affiliates to "exclusively process all of its transaction processing customer's transactions with IRMS for the duration of the [Processing Agreement]" and to "use [IRMS] exclusively for any ATM related

3

services as to any device that is the subject of th[e] [Processing Agreement]" (collectively, the "Exclusivity Requirement").

18.   EFT Services has not exclusively used IRMS for processing customer's transactions and for ATM related services.

19.   EFT Services use of third-party processors is in violation of the Exclusivity Requirement and Processing Agreement.

20.   The underpayments or non-payments identified herein do not include amounts that EFT Services failed to pay to IRMS due to EFT Services' violation of the Exclusivity Requirements, which caused IRMS damages it believes exceed $3,000,000.00.

21.   Because of EFT Services' violation of the Exclusivity Requirement, IRMS has been deprived of transaction fees and profits to which IRMS was entitled to receive pursuant to the Processing Agreement.

### III.   Minimum Transaction Volume

22.   The Processing Agreement also requires that EFT Services have a monthly minimum transaction volume of 300,000 approved transactions.

23.   EFT Services has failed at certain times to meet the monthly minimum transaction volume of 300,000 approved transactions as set forth in the Processing Agreement.

24.   EFT Services' failure to meet minimum transaction volume has resulted in a loss of fees and damages to IRMS in an amount to be proven at trial.

### IV.   Interchange Fees

25.   The Processing Agreement also provides that "IRMS will retain 100% of all interchange [fees] earned on all eligible transactions."

26.   EFT Services is in possession of the interchange fees (in an amount exceeding

$700,000.00) owed to IRMS.

27.     IRMS has demanded that EFT Services return the interchange fees to IRMS, as those interchange fees are properly IRMS's pursuant to the Processing Agreement.

28.     To date, EFT Services has refused to return those interchange fees to IRMS.

29.     IRMS has retained the undersigned law firm and is obligated to pay a reasonable fee for the firm's services in this action.  Pursuant to the terms of the Processing Agreement, IRMS is entitled to an award of costs and attorneys' fees incurred by IRMS in bringing this action and enforcing the terms of the Processing Agreement.

30.     All conditions precedent to the filing of this action have been satisfied, performed or have occurred.

## COUNT I
### (Declaratory Judgment against EFT Services)

31.     This is an action pursuant to Chapter 86, Florida Statutes, for a declaratory judgment by this Court with respect to IRMS and EFT Services' rights and obligations under the Processing Agreement.

32.     IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 30 above.

33.     There is a bona fide, actual, present, and practical need for a declaration by this Court with respect to IRMS and EFT Services' rights and obligations under the Processing Agreement.  Specifically, IRMS seeks a declaratory judgment concerning its ability to continue to hold all transaction fees in its (or that come into its) possession until or unless EFT Services has fully compensated IRMS for amounts owed under the Processing Agreement.

5

34.     IRMS believes the Processing Agreement affords it the right to continue to hold all transaction fees in its (or that come into its) possession until or unless EFT Services has fully compensated IRMS for amounts owed under the Processing Agreement.

35.     EFT Services and certain independent sales organizations ("ISO") of EFT Services claim that certain transaction fees are owed to EFT Services pursuant to the Processing Agreement and that IRMS is wrongfully withholding those certain transaction fees.

WHEREFORE, IRMS requests judgment against EFT Services:

   a.  declaring and adjudging that IRMS may hold any and all transaction fees in IRMS's possession that would otherwise be payable to EFT Services until such amounts fully reimburse IRMS for amounts owed by EFT Services;

   b.  awarding IRMS its attorneys' fees and costs pursuant to Processing Agreement;

   c.  awarding IRMS its reasonable costs of suit pursuant to Chapter 86, Florida Statutes; and

   d.  awarding such other relief as the Court deems equitable and just to IRMS.

## COUNT II
### (Breach of Processing Agreement Against EFT Services)

36.     This is an action for damages against EFT Services for breach of the Processing Agreement.

37.     IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 24 and 29 through 30, above.

38.     The Processing Agreement requires EFT Services to exclusively use IRMS for processing services.

39.     EFT Services has not exclusively used IRMS for processing services.

40.     EFT Services' failure to exclusively use IRMS for processing services has deprived IRMS of transaction fees and profits owed to IRMS.

41. EFT Services' failure to exclusively use IRMS for processing services has resulted in lost payments and damages in excess of $3,000,000.00 owed to IRMS.

42. EFT Services has also failed to process and pay IRMS for a monthly minimum of 300,000 approved transactions as required by the Processing Agreement.

43. Upon information and belief, EFT Services has transferred or assigned its rights under the Processing Agreement to a third party without IRMS's consent.

44. Finally, EFT Services was obligated to pay, among other things, transaction fees to IRMS for all transactions described in the Processing Agreement.

45. EFT Services has not paid IRMS for all transactions processed or has underpaid IRMS for certain transactions, including but not limited to, the $0.15 Transaction Fee per Approved Transaction and $1.50 Transaction Fee per Emerging Market transaction.

46. EFT Services has wrongfully withheld payment of these transaction fees owed to IRMS in an amount exceeding $16,000,000.00.

47. As a result, EFT Services has breached the Processing Agreement and damaged IRMS.

WHEREFORE, IRMS demands judgment against EFT Services for damages, together with interest, costs, expenses, attorneys' fees pursuant to the Processing Agreement, and such other relief as the Court deems just and proper.

### <u>COUNT III</u>
**(Breach of Processing Agreement Against EFT Services – Interchange Fees)**

48. This is an action for damages against EFT Services for breach of the Processing Agreement.

49. IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 9 and 25 through 30, above.

7

50.     The Processing Agreement provides that IRMS will retain 100% of all interchange fees earned on all eligible transactions.

51.     EFT Services is in possession of the interchange fees earned on eligible transactions.

52.     IRMS has demanded that EFT Services return the interchange fees to IRMS.

53.     EFT Services has refused to return the interchange fees to IRMS.

54.     As a result, EFT Services has breached the Processing Agreement and caused IRMS damage.

WHEREFORE, IRMS demands judgment against EFT Services for damages, together with interest, costs, expenses, attorneys' fees pursuant to the Processing Agreement, and such other relief as the Court deems just and proper

## COUNT IV
### (Conversion Against EFT Services)

55.     This is an action for conversion against EFT Services, brought in the alternative to Count III.

56.     IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 9 and 25 through 30, above.

57.     The Processing Agreement provides that IRMS will retain 100% of all interchange fees earned on all eligible transactions.

58.     EFT Services is in possession of the interchange fees earned on eligible transactions.

59.     The interchange fees are IRMS's property.

60.     IRMS has demanded that EFT Services return the interchange fees to IRMS.

61.     EFT Services has refused to return the interchange fees to IRMS.

62.     EFT Services' wrongful retention of the interchange fees is inconsistent with IRMS and EFT Services' rights pursuant to the Processing Agreement.

63.     As a result, EFT Services is wrongfully in possession of the interchange fees and has deprived IRMS of the interchange fees owed to IRMS.

WHEREFORE, IRMS demands judgment against EFT Services for damages, together with interest, costs, expenses, attorneys' fees pursuant to the Processing Agreement, and such other relief as the Court deems just and proper.

## COUNT V
**(Breach of Processing Agreement Against Randy Nolte, as Guarantor)**

64.     This is an action for damages against Randy Nolte, as guarantor, for breach of the Processing Agreement.

65.     IRMS realleges and incorporates by reference the allegations of paragraphs 1 through 30 above.

66.     As a condition of entering into the Processing Agreement, IRMS required Randy Nolte to execute the Processing Agreement as guarantor in favor of IRMS, whereby Randy Nolte guaranteed prompt and full payment of all liabilities and obligations of EFT Services pursuant to the Processing Agreement.

67.     EFT Services has breached the Processing Agreement because it has: i) wrongfully withheld payment of various transaction fees owed to IRMS in an amount exceeding $16,000,000.00; ii) failed to exclusively use IRMS for processing services which has resulted in lost payments and damages in excess of $3,000,000.00 owed to IRMS; iii) failed to meet the Processing Agreement's monthly minimum transaction volume; and iv) wrongfully withheld the interchange fees (in an amount exceeding $700,000.00) owed to IRMS.

68.     Those amounts are due and owing by EFT Services to IRMS.

9

69.     As guarantor, Randy Nolte is liable to IRMS for the amounts due IRMS from EFT Services under the Processing Agreement.

70.     Randy Nolte's failure to make prompt and full payment of all liabilities and obligations of EFT Services pursuant to the Processing Agreement is a breach of the Processing Agreement and Randy Nolte's guaranty.

WHEREFORE, IRMS demands judgment against Randy Nolte for all sums due under the Processing Agreement, together with interest, costs, expenses, attorneys' fees pursuant to the Processing Agreement, and such other relief as the Court deems just and proper.

Respectfully submitted this 4th day of November, 2021.

**ADAMS AND REESE LLP**

By: _____ */s/ James N. Floyd, Jr.* _____
**John T. Rogerson, III**
Florida Bar No. 832839
john.rogerson@arlaw.com
dana.tompkins@arlaw.com
**James N. Floyd, Jr.**
Florida Bar No. 0114216
james.floyd@arlaw.com
richene.oliver@arlaw.com
501 Riverside Avenue, Suite 601
Jacksonville, Florida 32202
(904) 355-1700
(904) 355-1797 (fax)

*Attorneys for Plaintiff Indian River Merchant Services LLC*

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of November, 2021, a true and correct copy of the foregoing was served via e-mail to Eric S. Koenig, Esq., ekoenig@trenam.com, ranctil@trenam.com, Trenam, Kemker, Scharf, Barkin, Frey, O'Neill & Mullis, P.A., Post Office Box 1102, Tampa, FL 33601, Counsel for Defendants/Counterclaim Plaintiff.

/s/ James N. Floyd, Jr.
Attorney

11

# EXHIBIT 1

# PIN-Based Transaction Processing and Support Agreement

AGREEMENT between Indian River Merchant Services LLC, or its designee and/or assignee herein known as "IRMS LLC," and_EFT Services LLC, an Independent Sales Representative herein known as "ISR."

## RECITALS

WHEREAS, IRMS LLC, provides access to processing, bank sponsorship, settlement and/or customer services to merchants, banks and Independent Sales Representatives (ISRs) in connection with the terminals and transaction types that are subject to this agreement, which merchants are identified either in a data file supplied by ISR contemporaneously with this agreement or in an exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR into which program the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHEREAS, ISR, is principally a sales and support organization, responsible for managing and supporting its clients, including settling all financial and settlement obligations of its clients. The ISR provides and shall continue to provide marketing, sales and support to merchants who are or will become members of one or more banking network systems in connection with the terminals and transaction types that are subject to this agreement, which merchants are identified in an Exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR into which program, the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHERAS, IRMS, LLC and ISR are completely and entirely separate entities operating their respective separate businesses, and own their respective and separate assets. Neither party has any claim upon the other party for any intellectual property, software licenses, or financial, technical, infrastructure or personnel resources.

WHEREAS, ISR has complied and registered with appropriate networks for access to those networks for transaction processing, or will provide such documentation as is necessary to comply with reasonable requirements of the Sponsor Bank of IRMS LLC or ISR, and

WHEREAS, the Description of Locations" shall be amended from time to time by the registration or deletion of terminal locations, and

WHEREAS, IRMS LLC, and ISR desire to enter into an agreement whereby IRMS LLC will provide Electronic Funds Transfer (EFT) services for ISRs programs and equipment as necessary to enable various terminals to operate as described in a data file or an Exhibit to this Agreement entitled "Description of Terminals", and

WHEREAS ISR agrees to exercise due diligence and care in the implementation of the provisions of this agreement;

NOW THEREFORE, in consideration of the foregoing, and for mutual promises and premises set forth herein, the parties hereby agree as follows:

### Article 1
### Defined Terms; Rules of Construction

#### 1.1 Defined Terms

As used in the Plan the following terms (which appear in the Plan as capitalized Terms) shall have the meanings set forth below:

"ACH" means Automated Clearinghouse Transaction. ACH transactions are aggregated for the day and sent out to the Federal Reserve through a Fed member bank. IRMS LLC initiates said ACH file transmission and ISR herewith authorizes IRMS LLC or its designees and agents to perform all such transactions as are reasonably related or required within the scope of services in this agreement or any addendums hereto.

"ACH Fee" means all the services and costs associated with settlement of principal, surcharge, rebates, withdrawals, and adjustments. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements.

## Processing and Service Agreement with ISRs

"**Acquirer Transaction**" means a transaction initiated at a Merchant establishment in whose location an EFT device or terminal is located.

"**Business Day**" means any day other than a Saturday, Sunday or "legal holiday" (as such term is defined in applicable rules, regulations or policies, as the same may be amended from time to time, which incorporate requirements from third party government and quasi-governmental units and such third parties (Gateway provider, network and account processors) as may be involved in the processing and settlement of EFT transactions in the ordinary course of events.

"**Card Services**" shall mean the facilitation of Customer's cardholder transactions regardless of transaction type or authorization method (e.g., on-line to Customer's applications processor, using a cardholder database on Vendor's system, using defined limits, etc.). Any Card Services provided through or under this Agreement shall be identified by either an addendum to this agreement or such other document with an established vendor or alliance partner of IRMS LLC in which the ISR sells, designs, provides or otherwise participates in a proprietary, open system or hybrid card service program including but not limited to Payroll Cards, Gift Cards or other prepaid or funded card system or card service.

"**Cash**" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtors or the Unsecured Creditors Trust, as the case may be, drawn on a domestic bank or in such digital or other lawful form as to reasonably construed as cash under this paragraph.

"**Customer**" means the ISR under this agreement. The parties understand and acknowledged that third parties are involved in the scope of the services provided under this agreement both as vendors and as clients including but not limited to merchants, salespeople, service personnel, banks and financial data processors and networks; however, it is understood that "Customer" as used in this agreement refers, as the context requires, to the ISR that executes this agreement and that the ISR includes those third parties under ISRs control, direction or affiliation, and that to the extent required, said third parties shall be registered, disclosed and qualified as required by network rules, the policies of the Sponsor Bank or the policies of IRMS LLC.

"**Emerging Market**" means non-traditional or products and services.

"**Gateway Provider**" also referred to as Gateway, Gateway link, Gateway Processor, means a financial data processor that provides access to one or more EFT networks, whether owned by an association of banks or otherwise providing interchange and switching services so that the cardholder of one bank can access his/her account using the EFT, ATM or other device or terminal operated by another bank or sponsored entity of a bank or other member institution or non-member institution qualified to provide sponsorship. It provides IRMS LLC with network access through Gateway links. Those "links" are communication links through which the information regarding each transaction is transmitted from the IRMS LLC intercept processors and the Gateway and then forwarded to the appropriate EFT network and then the EFT network sends the transaction data to the card-issuing financial institution for approval of the transaction. IRMS LLC maintains said links through its processors. Both links may be referred to as other acronyms but nonetheless refer to the same processing systems.

"**Gateway Services**" shall mean the facilitation of Customer's cardholder and/or Terminal transactions in each Network in which Customer participates and/or is a member. A Gateway transaction shall mean any receipt, transmission or exchange of data, whether completed or not.

2 _____

Initial

Initial

## Processing and Service Agreement with ISRs

"**Governmental Authority**" means any agency, board, bureau, executive, court, commission, department, legislature, tribunal, instrumentality or administration of the United States, a foreign country or any state, or any provincial, territorial, municipal, state, local or other governmental Entity in the United States or a foreign country. Government Authority includes but is not limited to the United States Federal Reserve regional and central banks and the rules, regulations and definitions continued within the publications of the Federal Reserve.

3

Initial

Initial

## Processing and Service Agreement with ISRs

"**Independent Sales Representative**" (ISR) means "Customer" which is an organization or entity that serves as the sales channel and/or primary service provider to merchants in whose commercial establishments EFT devices or terminals are located (Acquirer), or who serve as the sales channel and service provider for card issuance programs (Issuer). There are Master ISRs and Primary ISRs. The Master ISR is one selected by IRMS LLC to be the exclusive provider of services in a particular industry or geographical location. The Master ISR and Primary ISR are either already sponsored under a third party sponsorship bank with a qualified financial institution or are sponsored by IRMS LLC by virtue of its powers and discretion conferred through its contracts that provide Gateway Processing and Bank Sponsorship. If no third party sponsorship agreement exists for ISR, ISR shall bear the costs of sponsorship fees as they apply to the Customer under this agreement. As to the convenience fee or surcharge, Customer instructs IRMS LLC to distribute portion of the revenue to specific people or entities who serve as salesmen, locators, service providers, lenders, investors or other third party with interests in a particular merchant location or group of merchant locations.

"**Insurance Coverage**" means any insurance coverage under any Insurance Policy which is available for the payment of liability or damages arising from or related to Tort Claims.

"**Interchange**" means the fee charged by the Network switch for providing a common financial data processor by which the customers of one bank can electronically access their bank accounts at electronic funds transfer devices owned, operated or sponsored by another bank. In Acquirer transactions, transactions are separated first into two categories --- ATM and POS. In ATM transactions, the Interchange is charged to the bank that issued the ATM or debit card that was issued. In Point of Banking transactions (primarily the NYCE network) the interchange cost structure is lower than other networks. In Electronic Benefit Transactions (primarily the Quest network) the interchange cost structure is lower than other networks and there are certain rules, some of which are copied from national or regional networks that restrict certain types of convenience fees charged to cardholders in operating a terminal. In POS transactions, the interchange is charged to the merchant or operator of the terminal. Issuers in ATM transactions pay the Interchange fee which is then distributed to the network, gateway processor and intercept processor. Issuers share in the interchange fee charged to the merchant or operator of the terminal in POS Debit transactions such that there is a net income to the issuer when the card is utilized for a POS Debit transaction rather than as an ATM. The Interchange is not be confused with Surcharge or Convenience Fee, which is a separate fee handled in a different way. Interchange is also not to be confused with the Processing Fee charged by the Intercept processor (IRMS LLC) or Gateway fee which is also handled in a different way. Interchange should also not be confused with the Account Access Fee charged by the Issuing Bank to its cardholder, usually for using "foreign" ATMs (i.e., ATMs not operated by the issuing bank; the account access fee is a bank fee and a matter strictly between the cardholder and his depository bank that issued him the ATM or POS Debit Card. Interchange in POS Credit transactions is usually charged directly to the merchant as a transaction charge plus a percentage of sale fee.

"**Issuer**" means a bank that issues a card for use at an ATM, POS Debit, Point of Banking, POS Credit or other EFT terminal or device for access to the cardholder's account. Issuers issue cards to either direct account holders who maintain standard demand deposit or savings account at the Issuer Bank or an indirect account managed through a proprietary or Network approved card issuance program.

"**Liabilities**" means any and all liabilities, obligations (except for the Assumed Obligations), judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to a party or any Affiliate, Subsidiary, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence.

4

Initial

Initial

## Processing and Service Agreement with ISRs

"**Lien**" means, with respect to any asset or Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such asset or Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

"**Management Company**" means the entity designated at will by IRMS LLC for security and administrative purposes in whose name the IRMS LLC designated depository institution (Settlement Bank) receives the Master Settlement. The management company has no possessory rights to any money received from IRMS LLC transactions and acts strictly as a conduit, management and reporting entity in consideration of its receipt of a Management Fee. The current management company is IRMS LLC (IRMS LLC) which provides the direct processing for intercept, gateway, and sponsorship and settlement services.

"**Management Fee**" means the fee paid by IRMS LLC to the entity designated to receive Master Settlement. The amount of the management fee is determined on a month to month basis after deduction of expenses directed to be paid by IRMS LLC, in accordance with industry standards and prior conduct of normal operations of the Management Company. These fees include fees for transaction processing, terminal registration and support, settlement and related services.

"**Master Settlement**" means the ACH settlement to the depository bank designated by IRMS LLC (Settlement Bank) to receive the gross amount of principal withdrawals approved during the previous banking day and the gross amount of surcharge revenue and interchange revenue for the same period. Master Settlement represents entirely third party funds, to wit: IRMS LLC and IRMS LLC' customers and IRMS LLC' vendors. Master Settlement is then broken down into individual ACH settlements generated by the processor which are processed through the Federal Reserve on behalf of IRMS LLC through the respective designated depository banks accounts (Settlement Bank Accounts). Master Settlement is received by the IRMS LLC' designated depository institution into the name of the management company designated by IRMS LLC, i.e. IRMS LLC.

"**Merchant**" means a retail or professional establishment doing business with the consumer public and which has signed up with a regional or national electronic network through IRMS LLC to be a sponsored retail merchant permitted to offer electronic banking services to its customers and who can receive compensation and reimbursement for advancing funds to its customers in an ATM, ATM Scrip, Point of Banking, Point of Sale or other electronic funds transaction. Merchants are signed up by IRMS LLC channels which are usually ISRs. ISRs maintain the exclusive relationship with the merchant except for certain customer service activities provided by IRMS LLC through IRMS LLC, and GES. The devices in the Merchant establishments are operated by the merchant but usually initiated by their customer. Said devices or terminals are owned by either the merchant, the ISR or a third party investor or lender.

"**Network**" means any financial data processing switch connecting two or more unrelated financial institutions such that the holders of cards issued from institution can access their financial accounts at another unrelated financial institution through electronic funds transfer devices including but not limited to ATM, Point of Sale (POS), Point of Banking (POB), Electronic Benefits Transfer (EBT), payroll cards, prepaid debit cards, gift cards etc. By way of example, such networks may include but are not limited to MasterCard, Cirrus, Maestro, Visa, Plus, Interlink, Discover, Pulse, NYCE, AMEX, STAR, Jeannie, Shazaam, Quest and other regional, national and international networks. Network also includes associations of financial institutions and/or non financial institutions. Some networks require sponsorship while others do not. All require some written documentation and agreements with the Gateway processor and/or the intercept processor. Networks connect to EFT devices and terminals through Gateway processors which in turn connect through intercept processors. The intercept processors, also known as indirect processors, connect directly with the EFT devices or terminals.

"**Network Compliance Claim**" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity) against the Debtor, its successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, arising out of, or related to, any rules of the United States Federal Reserve, any enforceable rule of a participating network for electronic

5 _____

Initial                                                                              Initial

## Processing and Service Agreement with ISRs

funds transfer and settlement, or any other Federal, State or Local Laws, including any Claim or demand: (a) to restrict or enjoin, or recover damages, costs or expenses to remedy, any alleged violation, or to require the Debtor to remedy or to reimburse, pay or incur costs to remedy any violation, (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin, any violation of or alleged violation of any such rules or Laws, (c) to pay any contractual claim with respect to any such rules or Laws, or (d) to pay or reimburse any Person or Entity for financial injury, whether or not contemplated in subparagraphs (a) through (c) above, or whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was known, unknown, diagnosable, undiagnosable, detectable or undetectable before the Confirmation of the Plan or before the Final Decree Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Network Compliance Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the U.S. Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the U.S. Bankruptcy Code. Customer shall pay all fees, fines, assessments, penalties and other amounts in effect or assessed by each Network, which may change from time to time. IRMS LLC may allocate any such fees, fines, assessments and penalties in such manner, as it deems advisable in its sole discretion. Customer assumes all responsibility for collecting any amounts arising in connection with the use of Customer's cardholders' cards and/or Terminals, including but not limited to transaction amounts, fraud or other losses. Customer is solely responsible for all costs directly or indirectly associated with any system upgrades required by Customer or Vendor as a result of changes in the Network Documentation and/or any Network standards or requirements. In the event of any changes or modifications to the Network Documentation, which affect the responsibilities of a Network Participant or any processor in such Network, Vendor may amend this Agreement and/or change the applicable Service upon 30 days prior written notice to Customer.

"**Network Documentation**" shall mean the published Network by-laws, operating rules, identification standards manual, and such other rules, regulations, manuals, policies and procedures (including Vendor's standards), as may be amended from time to time, as published by the appropriate network. Network documentation includes documents required by the Network as well as Network published by the Network or association operating the Network.

"**NETWORK MEMBERSHIP:**" Customer shall indicate below the Network(s) in which Customer is a Network Participant. In the event for any reason Customer participates in a Network which Customer has not indicated below, Customer agrees that all of Customer's obligations in the Agreement and this Addendum shall apply with respect to such Network as if Customer had indicated such Network effective the date Customer begins participating in such Network. Customer agrees to abide by and fully comply with the Network Documentation as may be in effect from time to time and to perform and fulfill any and all obligations and responsibilities related thereto, including, if requested by the Network, execution of additional documentation or agreements. Customer, or its agents or nominees (but not Vendor), will provide all necessary Network, federal, state and/or local regulatory sponsorship, membership or other applicable approvals in order to receive the Services, unless otherwise specifically agreed to in writing in the form of an Amendment to the Agreement or in another contract signed by an authorized officer of Vendor. Notwithstanding the fact that a specific Network is listed below, Customer acknowledges and agrees that Vendor shall only be obligated to provide access to the Networks actually supported by Vendor and for only so long as such Networks are supported by Vendor.

### Gateway Services/Networks May Include and are not limited to:

Cirrus® Corresponding Member
(Issuer & Acquirer)
Cirrus Terminal Only
Quest (EBT transactions)
Corresponding Member (Acquirer Only)
Maestro®

6 _____

Initial                                                            Initial

## Processing and Service Agreement with ISRs

NYCE
American Express® ATM Network Member
Automated Clearinghouse Network(ACH)
Co-Op Network
Presto
Star®
Axcess America
Allpoint Network
Online Resources
Plus Sponsored Member(Issuer & Acquirer)
Plus ATM Category B Member(Acquirer Only)
Visa ATM Acquirer Member
Interlink
Discover Card Sponsored ATM
Acquirer Member
Armed Forces Financial (AFFN)
Credit Union (CU24)
Pulse

Debit Card Services/Networks

MC Debit Card
VISA Checkcard

"**Network Participant**" shall mean any financial institution such as a bank, thrift, credit union, or other entity, such as a merchant or Independent Sales Representative (ISR), which is a member of and/or is otherwise participating in a Network. In certain networks a non-network participant may nonetheless qualify as a sponsoring financial institution subject to the applicable network rules; in such cases the published rules of the network shall apply and the definitions therein shall take precedence over the definitions in this paragraph.

"**Network Registration Fee**" means the expenses incurred by IRMS LLC in registering the ISR with a particular Network. Each network registration fee generally varies from $1500-$5,000.

"**Network Settlement**" means the settlement through the United States Federal Reserve System of net debits and net credits to issuing and acquiring banks based upon EFT transactions of the day. These settlements are usually processed at midnight of the end of the banking day. The cutoff for the banking day for posting of electronic funds transfer transactions is usually 7:30 P.M. In its simplest form, if the cardholder from one bank, takes money from the ATM of an unrelated bank, then the money is transferred from the "issuer" (i.e., the bank that issued the cardholder the ATM or debit card he/she used in initiating the transaction) to the "acquiring bank" (i.e., the bank that owns, operates, sponsors or settles transactions on behalf of the operator of the terminal). In Network Settlement, a bulk settlement occurs to the credit of the bank for the Gateway processor. Hence in this case for transactions processed on the FIS gateway link, are combined with all other processors and deposited in bulk to an account designated by the Gateway processor at the depository institution utilized by the gateway processor to receive such deposits. This deposit is usually an ACH deposit but it can be wire transfer, depending upon the option of IRMS LLC and exigencies of the situation. The Gateway processor then separates out the deposits for each processor and sends a Master Settlement to the depository institution designated by its customer. The Network makes a deposit to the FIS (or subsequent gateway) account at the Master Settlement Bank (i.e., the Settlement Bank of the Gateway Service Provider). The Gateway Service Provider then prepares the ACH data file for Master Settlement to the depository institution designated by IRMS LLC. IRMS LLC then prepares the ACH data files for transmission to the Federal Reserve to deduct the

7 _____

Initial

Initial

## Processing and Service Agreement with ISRs

money from the Settlement Bank Accounts for individual settlements to the depository institutions selected by each merchant for receipt of these funds and the same for the revenue disbursements or rebates for each depository institution for the ISRs, other third parties who share in the revenue, and vendors who provide telecommunications, processing or other services to the IRMS LLC Venture. Network fees are subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements

"**Person**" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including but not limited to any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

"**Pro Rata Share**" means, with respect to any distribution under the ISR or other properly designated third party, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims (computed by pro rating days or other reasonable formula).

"**Processing**" means the actual receipt of data, logging of the data, and sending of data, whether encrypted or not, in accordance with industry standards for electronic funds transfer and all applicable laws, rules and regulations of the Federal Reserve System, networks, and contracts governing the conduct of the parties to the entire processing system by which the terminals or devices placed in merchant establishments are utilized by cardholders to access their bank accounts and perform financial or non-financial transactions. Processing includes intercept or indirect processing which involves the capture of data from the terminal or device, Gateway, which involves the capture of data from the intercept or indirect processor, Network, which involves the capture of data from the Gateway, Account Processor which involves the capture of data from the Network, and the return of data (authorization of transaction) through those same parties in reverse order back to the terminal.

"**Processing Fee**" means the fee charged by IRMS LLC for the processing of a transaction. Said fee is not subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements. ISR will be given as much notice as is reasonable and possible by IRMS LLC or IRMS LLC of any increases in fees resulting from said changes. No such changes are currently known beyond those provided in this agreement. However this is not a warranty that no such changes are in the publication or otherwise in process.

"**Property**" means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

"**Registration**" mean the process by which an ISR is entered into the IRMS LLC database and/or the process by which a Merchant or Merchant Terminal or Device is entered into the IRMS LLC database. Registration is a condition precedent to processing transactions on behalf of any ISR, Merchant, or Terminal. Registration is performed by EFT Management Services, Inc. Registration is not the same as Download.

"**Registration Fee**" means the fee charged by IRMS LLC for initiating an ISR, Merchant or Terminal into the IRMS LLC system for access to the FIS Gateway or any successor or substitute Gateway utilized by IRMS LLC. Registration fee is not the same as Download Fee or Monthly Fee.

"**Settlement Bank**" means the depository institution selected and designated by IRMS LLC to receive deposits of the proceeds of principal withdrawals and revenue from transactions that were processed through the IRMS LLC intercept processor, the Gateway Processor and the appropriate EFT network to which the issuing financial institution is a member. IRMS LLC or its contracted agents, for purposes of security and administration, may order the deposits to be made at the depository in the name of a designated surrogate who serves at the will and discretion of IRMS LLC, and serves as a transparent conduit for movement of funds initiated or to be initiated by a IRMS LLC processor for transactions on the current Gateway link(s) or its successor. The Settlement Bank is also an Automated Clearinghouse (ACH) service provider that allows IRMS LLC and IRMS LLC access to the accounts through electronic means for electronic transmission of funds through the United

8

Initial

Initial

## Processing and Service Agreement with ISRs

States Federal Reserve System. The settlement Bank may be one of several financial institutions that have agreed to provide ACH services.

"**Sponsor Bank**" (also referred to herein as sponsor or sponsorship) means a bank or other financial institution that is a member of, or has non-member rights to vouch for the transactions of a processor, ISR or encryption organization. The sponsor bank assumes all liability associated with all transactions of every type, nature and kind covered within the scope of its agreement for sponsorship, whether in writing (three-part agreement between Gateway, Sponsor and third party ISR or intercept processor), orally, or by operation of law. The parties agree that the sponsored entity (ies) may include IRMS LLC, IRMS LLC or a third party designee including but not limited to specific qualifying ISRs, the gateway provider or other vendors. Changes in fees from the sponsoring entities and agents will be passed through to the ISR who may pass through the expenses to either the merchant or cardholder.

"**Sponsorship Fee**" means the fees earned or incurred by IRMS LLC for a financial institution to provide sponsorship for the transactions covered by the scope for this agreement. Said fee is subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements.

"**Surcharge**" or "**Convenience Fee**" means the fee charged by the operator of an EFT terminal for the use and convenience of the terminal or device in a merchant establishment. This amount is collected by the Management Company and distributed to third parties in accordance with the instructions of the ISR or Merchant. Some networks through which a transaction is routed do not permit surcharge transactions including but limited to Cirrus International, Plus International, Axcess America, All Points, and certain other Associations of community banks and credit unions. IRMS LLC makes no warranty of receipt of surcharge income on transactions routed through those networks.

"**Telecommunications Fees**" means the costs and expenses of all aspects of the transmission of data from and to an EFT terminal, the intercept processor, the gateway processor, the network, the account processor and back through the loop and any intermediary parties therein. Said fee is subject to changes in third party service companies, network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. ISR bears the entire expense of connection from the terminal to the intercept processor and together with the merchant is solely responsible for the quality, consistency or availability of that connection.

"**Terminal**" means an ATM, POB, POS, or other electronic funds transfer device which is or which may be supported directly or indirectly by Vendor in accordance with its Standards, as certified through the Gateway processor(s) and network(s) as may be required by IRMS LLC, IRMS LLC or network documentation to perform transaction sets within the industry definitions of ATM, POB, POS, POS Scrip as the case may be, and as the same is amended by documentation or conduct of the applicable networks.

"**Terminal Services**" means the facilitation, processing and/or settlement of transactions at Customer's Terminals or within Customer's IRMS LLC-approved programs.

"**Terminal Software**" means the operating system, encryption, communications protocol and merchant data compliant with IRMS LLC host (server) requirements. IRMS LLC shall provide such software as is available through any means to IRMS LLC, but dos not guarantee the functioning of terminal software. Each ISR/Customer is responsible for development or improvement of terminal software as may be required from time to time in such manner that same can be certified through all host processors, networks and account processors in the EFT system utilized for authorization and completion of transactions. In all cases where the ISR has created terminal software for any EFT terminal, said software shall be made available in machine language and object code in executable form such that it can be downloaded and fully perform all expected functions by IRMS LLC information technology employees or representatives. IRMS LLC shall not provide access to said software to any third party for any purpose other than providing customer service. The delivery of the terminal code and all documentation reasonably requested by IRMS LLC shall never be construed as a conveyance of title or license to the code, except for the purposes expressed in this Agreement and more specifically in this paragraph.

9

Initial

Initial

## Processing and Service Agreement with ISRs

"**Third Party Fees**" means any fees attributable to ISR's operations from third parties, affiliates, or other entities or persons which are billed or billable to the ISR. Customer shall pay all third party fees, costs, expenses and assessments in connection with the Services, which may change from time to time, whether incurred directly or indirectly by Customer, Vendor and/or its affiliates. Third party fees include, but shall not be limited to, all communications expenses (e.g. equipment, lines, drop charges, access charges, long distance, etc.); all hardware costs (e.g. the cost of individual Terminals, modems, upgrades, modem sharing devices, etc. and any expenses associated therewith (e.g. setups, maintenance, etc.); all Network fees; all miscellaneous fees associated with the Services (e.g. mailing expenses, overnight courier expenses, plastics, etc.); and all costs associated with maintaining and implementing all software and hardware necessary for any interface affecting the Services.

"**Tort Claim**" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity), their predecessors, successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, for, relating to, or arising from any death, personal injury, damage or loss (whether physical, emotional or otherwise) to any Person or Property, including any Claim or demand for compensatory damages (such as loss of consortium, wrongful death, unearned wages, survivorship, proximate, consequential, general, and special damages) and punitive damages, and any products liability claim, in each case for any act or event occurring on or prior to the Effective Date, whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was diagnosable, undiagnosable, detectable or undetectable before the Effective Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Tort Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

"**United States**" (U.S.) means the United States of America.

"**Vault Cash**" refers to the established local currency in the individual vaults of individual ATM terminals which may be subject to a separate service agreement with IRMS LLC or an affiliated entity. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. Under no circumstances shall IRMS LLC be considered the owner of said currency or any other contents of the vault, nor shall IRMS LLC be responsible or liable for any event, management, claim or handling of said currency. Any parties that elects to be involved in the servicing of cash vaults assumes full responsibilities for the vault, shall have adequate and appropriate insurance pursuant to industry standards, and shall have adequate and appropriate maintenance arrangements pursuant to industry standards. Fees charged by third parties in connection with vault cash, cash management or armored car services will be passed through to ISR if invoiced to IRMS LLC.

"**IRMS LLC Vendors**" means all third party entities that provide services to IRMS LLC, as they may be modified, changed or replaced from time to time by IRMS LLC. IRMS LLC acknowledges and represents that it is the duty of IRMS LLC to provide said gateway services through the Master Services Gateway Provider Agreement executed with such third party (ies) as deemed appropriate by IRMS LLC management.

Any capitalized term used in the Agreement that is not defined in the Agreement but that is defined in industry standard rules, regulations, laws or policies shall have the meaning ascribed to that term in the EFT industry with IRMS LLC rules policies controlling in the case of a conflict or ambiguity.

1.2     **Rules of Construction.**

10_____

Initial                                                                                          Initial

## Processing and Service Agreement with ISRs

For purposes of this Agreement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references to Articles and Exhibits are references to Articles and Exhibits of this Agreement; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to this Agreement in its entirety rather than to a particular Article or section or subsection of the Agreement; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Agreement shall be deemed incorporated herein by such reference and made a part hereof for all purposes; and (i) if necessary, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 1.2.

### Article 2

### TERMS

I.    ENTITLEMENTS & RESPONSIBILITIES

A.    IRMS LLC

**IRMS LLC Requirements:**

a)    IRMS LLC and its affiliates agree to not, without written authorization from ISR, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with ISR for processing services.

**IRMS LLC Responsibilities:**

b)    Honor and protect the confidentiality of information provided by ISR and its clients.

c)    Transmit Settlement and Surcharge funds to the bank accounts designated by ISR, via Automated Clearing House transfers, on the same day the funds are made available to IRMS from the participating networks.

d)    ISR will be responsible for all bank relationships, operational and processing costs associated with distribution of funds to its customers

e)    Provide ATM Transaction processing and managed services.

f)    Provide Terminal Transaction reports on a basis agreed in the terms and provisions of this agreement.

g)    Provide routing and gateway to a majority of all major and minor national and regional EFT networks for ATM and POS devices as defined by IRMS LLC network, the proprietary EFT banking network hosted for IRMS LLC, as amended from time to time.

h)    Will not disparage ISR to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of ISR in any way.

i)    Will represent its relationship with the ISR as that of a vendor to the ISR, and will keep all elements of this agreement confidential for two years after the termination of the agreement

B.    ISR

U_____

Initial

Initial

## Processing and Service Agreement with ISRs

1. **Requirements:**

   a) ISR shall provide IRMS LLC with all information requested on the ISR Registration form and any other information reasonably requested by IRMS LLC from time to time. ISR warrants that all said information is true and that ISR shall immediately notify IRMS LLC of any change in status or information The Registration form must specifically state if the Merchant is participating in Emerging Markets. If IRMS determines a Registration form submitted by ISR did not correctly specify a Merchant as participating in Emerging Markets, IRMS may, at its sole discretion, terminate the Merchant's ability to process transactions through IRMS and assess a fine against ISR of $ 5,000, which will paid by a reduction in Surcharge payments to ISR.

   b) ISR and its affiliates will submit updated Registration forms for all currently active Merchant locations specifically indicate if the Merchant is participating in Emerging Markets.

   c) ISR and its affiliates will convert all of its customer's terminals to be directly connected to IRMS' selected processor. The process must be completed on a timely basis. If the process involves a manual process then the target date for completion is June 30th, 2017.

   d) ISR and its affiliates will exclusively process all of its transaction processing customer's transactions with IRMS for the duration of this agreement.

   e) ISR and its affiliates agree to not, without written authorization from IRMS, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with IRMS for processing services.

   f) ISR agrees to provide IRMS full physical and communications access to all of ISR's transaction processing environment, including but not limited to firewalls, switches, servers and databases.

   g) Provide telephone or other communications services at its expense for ATM or arrange for same with location.

   h) Provide shipping at its own expense to and from location of the ATM.

   i) Create all hard copy and digital files with correct data for registration including but not limited to a signed merchant service application.

2. **Responsibilities:**

   a) Honor and protect the confidentiality of information provided by IRMS LLC and its clients and prospective clients, including but not limited business methods, software for download, encryption, registration, reporting, analysis, management, processing, switching of any ATM, POS, EBT or other EFT device that ISR ever receives information on that relates to IRMS LLC, its affiliates, alliance partners or vendors.

   b) Ensure accuracy and thoroughness of information provided IRMS LLC (its equipment suppliers and service providers).

   c) Ensure the merchant has provided proper and complete site preparation, adequate signage and appropriate promotion of the terminal.

   d) Continually monitor each and every merchant on at least a weekly basis to determine if the merchant is adequately trained in the use of the terminal, has maintained adequate signage and appropriate promotion and that the merchant has adequate supplies for the terminal.

   e) Promptly inform IRMS LLC of any delays (included but not limited to settlement of principal or rebate) or specification changes.

   f) Promptly inform IRMS LLC of any changes in registration data

   g) To use IRMS LLC exclusively for any ATM related services as to any device that is the subject of this agreement.

12_____

Initial                                                     Initial

## Processing and Service Agreement with ISRs

h)     Will not disparage IRMS, LLC to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of IRMS LLC in any way.

i)     ISR will specifically refer all inquiries from ACE Cash Express personnel to IRMS LLC or its designee.

j)     Will represent its relationship with IRMS LLC as that of a customer of IRMS, LLC and keep all elements of this agreement confidential for two years after the termination of the agreement. Additionally, ISR and its employees and affiliates will not engage in any oral, written or electronic form of communications with any party or parties which is defamatory in nature in regards to IRMS LLC or its affiliates. Failure to comply with these requirements will cause the agreement to be terminated immediately and without notice. ISR understands termination of processing services does not adequately compensate IRMS for any or all damages from defamatory communications and IRMS does not waive its right for further legal recourse.

k)     Has full and complete responsibility for accuracy of its transaction processing, settlement calculations, settlement routing and reporting to its clients.

**II.    TRANSACTION PRICING**

A.     Pricing of IRMS LLC services are as stated in **Exhibit A**, attached hereto "Managed and Processing Services Pricing". Processing services are priced on a per transaction/per terminal basis. Other pricing is on a per service charge and may or may not be applicable with the specific services provided to an ISR or merchant under this agreement.

**III.   ISR / MERCHANT COMPENSATION**

A.     ISR COMPENSATION: ISR compensation is derived from the charges negotiated with the merchant where the terminal is located. ISR compensation can include sharing in Merchant surcharge income. Net compensation is the amount the ISR receives, after all expenses and processing charges payable to IRMS LLC If daily settlement is required (and accepted by IRMS LLC Inc), the full principal will be settled to the Merchant (dispenser of cash) and a portion of the surcharge will be settled. The balance of the surcharge (convenience fee) settlement will be paid and reconciled on the 15th day of the close of the previous calendar month. Any other fees or charges against merchants or ATM customer (or their bank) will be disbursed on the 15th day of the month following receipt.

B.     FEES BASED ON CURRENT INTERCHANGE LEVELS: The various fees for transaction processing and associated servicing under this agreement are not subject to change by either party to this agreement without express written consent of both parties.

C.     ISR shall provide such services as indicated above or otherwise reasonably required by its merchants on a timely and expeditious basis; in the event that IRMS LLC determines that it is necessary to retain the services of additional personnel to provide said services, the cost of said additional personnel shall be deducted from the ISR's income and/or the merchant's income.

D.     ISR hereby grants IRMS LLC or its designee full power of attorney for electronic access (ACH) to the ISRs account and the merchant's account for deposits and withdrawals under this agreement on behalf of himself and all merchants signed up under the scope and terms of this agreement.

E.     MERCHANT COMPENSATION: Merchant compensation is derived from charges the merchant levies on customers using the terminal in their location and any other per transaction amounts negotiated between the ISR and Merchant

13_____

Initial

Initial

**Processing and Service Agreement with ISRs**

IV.   **NOTICES**

    A.     DELIVERY OF NOTICES. All notices required hereunder shall be in writing and delivered in person or by certified or registered mail, return receipt requested, postage prepaid. Such notices shall be addressed as follows:

| Indian River Merchant Services LLC | ISR: EFT Services LLC |
|---|---|
| 22101 US HWY 19 North<br>Clearwater, FL 33765 | 4801 S University Drive #303<br>Davie, FL 33328 |

V.    **MISCELLANEOUS**

    A.     IRMS LLC wherever used in this agreement means any one of a number of entities or persons designated by IRMS LLC to act as agent for Indian River Merchant Services LLC pursuant to the requirements, terms and conditions of this agreement. Each of said companies has authority to do business as IRMS LLC.

    B.     SUPERSEDE. This Agreement and the Exhibits hereto contain the entire understanding of the parties hereto and supersedes all prior written or oral agreements with respect to the subject and scope contained within this Agreement.

    C.     SEVERABILITY. The illegality, invalidity or if unenforceable of any provision, Article or Exhibit of this Agreement shall not affect the remainder of this Agreement. In any proceeding involving the construction of this agreement, neither party shall be presumed to be drafter of the agreement; any provisions that are unenforceable for any reason shall be amended automatically to allow for enforcement of the remainder of the agreement and of the specific provision, if possible.

    D.     **GOVERNING LAW. This Agreement shall be governed, construed and interpreted under the laws of the State of Florida. The sole and exclusive venue for raising any dispute or claim brought by ISR shall be Pinellas County, Florida.**

    E.     HEADINGS. The heading contained herein is used for convenience and ease of reference and do not limit the scope, intent or interpretation of the Article headings or their subheadings.

    F.     PERSONS BOUND: This agreement is binding upon the parties hereto and any person or entity claiming through them including but not limited to any and all heirs, successors, assigns (if expressly permitted in writing by IRMS LLC), affiliates, agents, servants or employees and/or any entity in which any signatory or party hereto has any material ownership interest or business relationship.

    G.     LIMITS ON LIABILITY -- EXCEPT THOSE EXPRESS WARRANTIES MADE IN THIS AGREEMENT, IRMS LLC DISCLAIMS ALL WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Without limiting the foregoing, IRMS LLC and IRMS LLC shall not be liable for lost profits, lost business or any incidental, special, consequential or punitive damages (whether or not arising out of circumstances known or foreseeable by IRMS LLC or IRMS LLC) suffered by Customer, its customers or any third party in connection with the Services provided by IRMS LLC or IRMS LLC hereunder. IRMS LLC or IRMS LLC liability hereunder shall in no event exceed an amount equal to the lesser of (i) actual monetary damages incurred by Customer or (ii) fees paid for the particular Services in question for the calendar month immediately preceding the date on which IRMS LLC and IRMS LLC received Customer's notice of nonperformance as set forth in this Agreement. In no event shall IRMS LLC or IRMS LLC be liable for any matter beyond its reasonable control, or for damages or losses wholly or partially caused by the Customer, or its employees or agents, or for any damages or losses which could have been avoided or limited by Customer giving notice to IRMS LLC and IRMS LLC as provided in Section 7. No cause of action, regardless of form, shall be brought by either party more than

14

Initial                                              Initial

## Processing and Service Agreement with ISRs

1 year after the cause of action arose, other than one for the nonpayment of fees and other amounts, including any damages, due IRMS LLC under this Agreement.

H.    Other Agreements. IRMS LLC reserves the right to enter into other agreements pertaining to the Services with others including but not limited to without limitation banks, savings and loan associations, credit unions and other financial institutions and non-financial institutions, Independent Sales Representatives , indirect financial processors, gateway processors, or other parties that may or may not offer the same or similar services to those offered by Customer.

I.    Taxes. Any sales, use, excise or other taxes (other than IRMS LLC income taxes) payable in connection with or attributable to the Services shall be paid by Customer. IRMS LLC may, but shall not have the obligation to pay such taxes if Customer fails to do so. In the event IRMS LLC pays such taxes, Customer shall immediately reimburse IRMS LLC upon demand and at the interest rate applicable for delinquent amounts as set forth in Section 4 hereof.

J.    Violation of Applicable Laws and Regulations. IRMS LLC may cease providing any Service if such Service, in IRMS LLC opinion, violates any federal, state or local statute or ordinance or any regulation, order or directive of any governmental agency or court, or any published policy of IRMS LLC, related sponsoring bank, related settlement bank, federal, state or local agency, or proprietary or public network offering switching services for electronic funds transfer.

K.    **No Intended Benefit to Third Party Beneficiary and No Right of Action to Third Party Beneficiary.** This Agreement is for the benefit of, and may be enforced only by, IRMS LLC and Customer and their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party, including but not limited to those third parties whose existence is disclosed, directly or indirectly to IRMS LLC.

L.    **Waiver of Trial by Jury: Both Parties waives trial by jury on any issue triable of right by jury.**

M.    **Attorney's fees: Customer agrees it shall be liable for any and all attorney's fees incurred by IRMS LLC or IRMS LLC whether or not in a formal proceeding, including appeals, administrative actions or quasi judicial or quasi administrative actions where such fees are incurred by IRMS LLC or IRMS LLC as a consequence or related to the scope of this agreement or any addenda hereto.**

N.    Authorization. Each of the parties hereto represents and warrants on behalf of itself that it has full power and authority to enter into this Agreement; that the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or partnership or other appropriate authorizing actions; that the execution, delivery and performance of this Agreement will not contravene any applicable by-law, corporate charter, partnership or joint venture agreement, law, regulation, order or judgment; that execution, delivery and performance of this Agreement will not contravene any provision or constitute a default under any other agreement, license or contract which such party is bound; and, that this Agreement is valid and enforceable in accordance with its terms.

O.    Counterparts. This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original.

P.    Drafting. This Agreement has been drafted by IRMS LLC as a matter of convenience only and shall not be construed in favor of either party on that account. Each party acknowledges that it has had adequate opportunity to seek the services of independent counsel, accountants and/or other professionals prior to execution of this agreement and as such, each party acknowledges that they have full knowledge, authorization, comprehension and intent with respect to each and every provision of this agreement and any addenda hereto.

## VI.    AMENDMENTS

A.    AMENDMENTS.

1.    Any enforceable change in rules, regulations, bylaws, statutes, ordinances or other policies or laws properly passed and published by any governing body of any government, quasi-government or private association to which IRMS LLC or IRMS LLC is a member or otherwise affected shall

15

Initial                                                                                              Initial

## Processing and Service Agreement with ISRs

automatically amend the provisions of this Agreement to the extent of the change that is published. IRMS LLC will make every good faith effort within its resources to assure that no such proposed rule infringes on the contractual rights of IRMS LLC or any of its customers or vendors.

2.     IRMS LLC reserves the right to unilaterally amend this Agreement from time to time as reasonably required as exigencies of business dictate. Any party affected by such amendments shall have a period of fifteen (15) calendar days from the date the amendment was first put into effect to state objections and request renegotiation of terms. At all times unless otherwise stated, the amended terms of the agreement shall be in full force and effect. In the event the parties fail to reach agreement, either party may apply for arbitration under the rules of the American Arbitration Association. Both parties agree to submit any such dispute to binding arbitration and/or mediation as the circumstances suggest or require.

B.     MODIFICATIONS. Except as otherwise provided herein, this Agreement may not be amended, altered or otherwise modified except in writing executed by all parties hereto.

C.     ASSIGNMENTS: This Agreement may not be assigned by any ISR to any party or entity except upon written consent and permission of IRMS LLC which shall not be unreasonably withheld only in the event that the holders of equity and the management structure of the assignee are virtually identical to the original ISR. Transfers of equity or title that are strictly for estate tax purposes will be allowed. All other transfers shall be construed as prohibited Assignments.

## VII. TERM AND TERMINATION

A.     TERM. The term of this Agreement shall begin on November 1st, 2017, and will continue for a period of five (5) years, provided however that IRMS may terminate this agreement anytime with or without cause.

B.     RENEWAL. With respect to the end of each term of this agreement, unless ISR gives written notice by Certified Mail not later than three (3) months prior to the expiration of this agreement, this agreement shall automatically renew for one (1) additional year, subject to the then prevailing charges, rules and regulations of IRMS LLC.

C.     EFFECT OF TERMINATION. Upon termination of this agreement, the ISR shall only be entitled to receive compensation for all installed units earned under this agreement only to the date of this termination in accordance with the payment schedule as set forth in **Exhibit B.**

## VIII. ENTIRE AGREEMENT

A.     This document constitutes the entire agreement between IRMS LLC and ISR. It supersedes any oral or written prior or contemporaneous negotiations or representations between the parties.

## IX. AGREEMENT DATE

A.     DATE OF COMMENCEMENT. It is mutually agreed to by all parties that the Date of Commencement of this Agreement shall commence as of _12/29_ 17.

Executed this _12_ day of _December_, 2017 in agreement by all parties hereto to this Agreement

16_____

Initial                                                       Initial

## Processing and Service Agreement with ISRs

| Indian River Merchant Services LLC (IRMS LLC) | Guarantor (Randy Nolte) EFT Services LLC |
|---|---|
| 22101 US HWY 19 North Clearwater, Fl 33765 | 4801 S University Drive #303 Davie, FL 33328 |
| Phone: ████4767 Email: d████.net | Phone: ████1954 Email: ████com |
| BY: *Deven W. Wenling* Signature: Official Capacity: President | BY: *Randy Nolte* Signature: Official Capacity: Manager |
| Printed Name: Deven W. Wenling | Printed Name Randy Nolte |
| Date: 12/29/17 | Date: 10/21/17 |
| Indian River Merchant Services LLC (IRMS LLC) | ISR: EFT Services LLC |

17

Initial

Initial

## Processing and Service Agreement with ISRs

Indian River Merchant Services LLC

### EXHIBIT A

PIN Based Transaction Pricing

1) Processing Costs:

   a. **Interchange:** IRMS will retain 100% of all interchange earned on all eligible transactions

   b. **Transaction Processing Fees:** IRMS will be paid a transaction processing fee in accordance with the pricing defined below. These fees will be deducted from Surcharge settlement to ISR and settled directly to IRMS via ACH.

   c. **Transaction Fee per Approved Transaction: $ .15  (for each 12 month period and adjust if market allows)**

   d. **Transaction Fee per Approved Emerging Market (includes POB Fee): $1.50**

   e. **Transaction Fee per Approved Cash ATM Transaction Fee: $ .05**

2) Minimums: ISR agrees to a minimum monthly transaction volume of 300,000 approved transactions.  Should the ISR fail to meet the minimum during any month during the team of this agreement, IRMS LLC will calculate the average Interchange and exact Surcharge fees based on 250,000 approved transactions, subtract the Interchange and Surcharge amount of the actual number of approved transactions for the current period and deduct the resulting unmet minimum from ISR's surcharge funding. Notwithstanding the foregoing, if the monthly transaction volume derived from Emerging Markets drops by 50% of it's previous three (3) months average monthly volume, both parties agree the new minimum for all monthly transactions will be 175,000 transactions per month and the transaction volume basis for calculating the fees due to IRMS will be 125,000 transactions per month.

18 _____

Initial

Initial

# EXHIBIT "2"

Filing # 190704349 E-Filed 01/29/2024 09:53:26 AM

# IN THE CIRCUIT COURT, SIXTH JUDICIAL CIRCUIT,
# IN AND FOR PINELLAS COUNTY, FLORIDA

**INDIAN RIVER MERCHANT
SERVICES LLC,**                                      **CASE NO.:    21-002572-CI**

        **Plaintiff,**

**v.**

**EFT SERVICES LLC; and
RANDY NOLTE, individually,**

        **Defendants.**

_____/

## PLAINTIFF, INDIAN RIVER MERCHANT SERVICES LLC'S
## MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiff, Indian River Merchant Services LLC ("IRMS" or "Plaintiff"), by and through its undersigned counsel and pursuant to Rule 1.190(a), *Florida Rules of Civil Procedure* and other applicable Florida law, hereby files this *Motion For Leave to File Second Amended Complaint*, and as grounds therefore would state as follows:

1.  Pursuant to Rule 1.190(a), *Florida Rules of Civil Procedure* "leave of court shall be given freely when justice so requires" to a party that files a motion to amend a pleading.

2.  Scott Lilly, Esq., lead counsel in this cause, and suddenly and unexpectedly passed away on June 20, 2023, and since that time, undersigned counsel has required time to become familiar with the issues involved in this matter, the difficulty of which was compounded by the need to address the other cases and issues relating to the operation of the Gionis, Lilly & Romero, PLLC law firm upon Mr. Lilly's passing.

3.  The public policy of the State of Florida favors liberality in permitting amendments to pleadings, such that resolution of disputes associated therewith will be conducted on the merits

thereof.[1]

4. According to the Supreme Court of Florida, the trial court "should assume a generous attitude in allowing amendments so that the true facts may be bared and a just decision reached."[2]

5. Additionally, Rule 1.190(c), Fla. R. Civ. P., states that:

> When the claim … asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth in or attempted to be set forth in the original pleading, **the amendment *shall relate back* to the date of the original pleading**.[2] (emphasis added).

6. When determining whether a motion for leave to amend should be granted, the primary consideration for the trial court—and, thus, the applicable test that is to be applied—is whether prejudice would result to the opposing party.[3]

7. The general rule in Florida is that amendments to pleadings should be allowed where the basic cause of action is not changed[4], and should be disallowed where amendments would change the basic issue in dispute, or would vary the grounds for relief.[5]

8. The Defendants herein would not be prejudiced, upon this Court granting Plaintiff's leave to amend its Complaint, because:

    (a) This action has yet to advance past the discovery phase, meaning that Defendants would have no shortage of time to respond to Plaintiff's amended allegations;

    (b) There has been no abuse of the privilege to amend the complaint;

    (c) Plaintiff's second amended complaint allegations are based upon the same specific conduct, transaction, or occurrence between the parties, upon which

---

[1] See *Leavitt v. Garson*, 528 So.2d 108, 110 (Fla. 4th DCA 1988) (noting that leave to amend should not be denied unless the privilege has been abused, the pleading is clearly not amendable, or prejudice would result).
[2] See *Walker Fertilizer Co. v. Cole*, 197 So. 777 (Fla. 1940), rehearing denied.

[3] See *Leavitt v. Garson*, 528 So.2d 108, 110 (Fla. 4th DCA 1988) (noting that leave to amend should not be denied unless the privilege has been abused, the pleading is clearly not amendable, or prejudice would result).
[4] See *McNayr v. Cranbrook Investments, Inc.*, 158 So.2d 129 (Fla. 1963).
[5] See *Warfield v. Drawdy*, 41 So.2d 877 (Fla. 1949).

2

the Plaintiff initially filed its complaint. Defendants have been fully apprised of Plaintiff's contentions and there can be no surprise of the factual or legal recitations or requested relief presented in Plaintiff's amended pleading.

(d) The amendment sought seeks to add necessary parties to the action which were identified during the course of discovery.

8. The case style should be amended to accurately reflect the Defendants named in the Draft Second Amended Complaint.

9. Allowing Plaintiff to amend the Complaint would not be contrary to the public policy of the State of Florida, which favors liberality in permitting amendments to pleadings, and would allow Plaintiff to resolve its disputes with Defendants on the merits thereof.

10. Plaintiffs have attached a copy of the *Second Amended Complaint for Declaratory Judgment and Breach of Contract* as Exhibit "A" hereto.

WHEREFORE, Plaintiff, INDIAN RIVER MERCHANT SERVICES LLC, respectfully requests that this Honorable Court to enter an Order granting leave for the Plaintiff to file the Second Amended Complaint, and deem the attached Second Amended Complaint filed as of the date this Motion was filed.

Respectfully submitted,

*/s/Paul A. Gionis*
**PAUL A. GIONIS, ESQUIRE**
Florida Bar No.: 0560243
**GIONIS, LILLY & ROMERO, PLLC**
1299 Main Street, Suite C
Dunedin, Florida 34698
Telephone: (727) 446-3333
Facsimile: (727) 446-3311
Primary E-Mail: pgionis@gionislilly.com
Secondary E-Mail: eroy@gionislilly.com
*Attorneys for Plaintiff, Indian River Merchant Services, LLC*

3

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically

filed with the Clerk of Court through the Florida Courts' E-filing Portal, and has been served

electronically to all parties and counsel of record on this 29th day of January, 2024.

/s/ Paul A. Gionis_____
**PAUL A. GIONIS, ESQUIRE**

4

Case 0:25-cv-60630-DAM-Document 43 Entered on FLSD Docket 05/02/2024 Page 85 of 344

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT,
IN AND FOR PINELLAS COUNTY, FLORIDA

INDIAN RIVER MERCHANT
SERVICES, LLC,

     **Plaintiff,**

v.                                   **Case No: 21-002572-CI**

EFT SERVICES, LLC; RANDY
NOLTE, individually; TRANSACT FIRST,
INC.; ONE PAY CLOUD, LLC; SKYLIGHT
PROCESSING, LLC; ROCKET ONE
CAPITAL, LLC; I-POS SYSTEMS, LLC, d/b/a
DEJAVOO, DENOVO SYSTEMS, LLC, HANNELIUS
KNIGHT TRUST, MICHAEL SHVARTSMAN, Individually;
ERIC HANNELIUS, individually; ERIC HANNELIUS, AS TRUSTEE
OF THE HANNELIUS KNIGHT TRUST; BRUCE GARELICK,
individually; and RYAN NOLTE, Individually,
SHLOMO ZENOU, a/k/a MONY ZENOU, individually,
SAMANTHA MORTON, individually.

     **Defendants.**

_____/

## SECOND AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT AND BREACH OF CONTRACT

Plaintiff, Indian River Merchant Services, LLC, by and through its undersigned counsel,

sues EFT Services, LLC, Randy Nolte, individually, Transact First, Inc., One Pay Cloud, LLC,

Rocket One Capital, LLC, Skylight Processing, LLC, Michael Shvartsman, individually, Eric

Hannelius, individually, Eric Hannelius, as Trustee of the Hannelius Knight Trust, Bruce Garelick,

individually, and Ryan Nolte, individually, and in support thereof states as follows:

### PARTIES, JURISDICTION AND VENUE

1.     This is an action for declaratory relief and money damages that exceed fifty

thousand dollars ($50,000.00), exclusive of attorneys' fees, interest, and costs.

2.     Plaintiff, Indian River Merchant Services, LLC ("IRMS" or "Plaintiff") is a Florida

1

**EXHIBIT "A"**

limited liability company with its principal place of business in Largo, Florida.

3. Defendant, EFT Services, LLC ("EFT") is a Florida limited liability company with its principal place of business in Hollywood, Florida. Defendant, Randy Nolte (further defined herein), was Manager of EFT during times material hereto. Defendant, EFT and Plaintiff, IRMS entered into a contractual agreement titled the PIN-Based Processing Agreement (further defined herein). Defendant, Transact First, LLC (further defined below), upon information and belief, purchased the assets of EFT on or about November of 2020.

4. Defendant, Randy Nolte, is an individual, *sui juris*, who resides in Davie, Florida. Defendant, Randy Nolte, is identified as the Manager of EFT, per the Florida Secretary of State website.

5. Defendant, Michael Shvartsman, is an individual, *sui juris,* who, upon information and belief, resides in Miami, Florida. Defendant, Michael Shvartsman is also the Manager of Defendant Rocket One Capital, LLC (further defined below), the Manager of Defendant One Pay Cloud, LLC (further defined below), and at times relevant hereto, was the President of Defendant Transact First, Inc. (further defined below).

6. Defendant, Transact First, Inc. ("Transact First"), is a Delaware corporation, authorized to do business in Florida as a foreign corporation during times material hereto, and upon information and belief, was converted from Transact First, LLC, a Delaware Limited Liability Company, during times material hereto. Eric Hannelius (further identified below), is currently the President of Transact First. Upon information and belief, Transact First, LLC, purchased the assets of Defendant EFT on or about November of 2020.

7. One Pay Cloud, LLC ("One Pay Cloud"), is a Delaware limited liability company, that during times relevant to this action, maintained its principal place of business in Aventura,

2

Florida as a foreign limited liability company authorized to do business in Florida during times relevant to this action.[1] Defendant, Michael Shvartsman (further identified herein), was Manager of One Pay Cloud at times relevant to this action. One Pay Cloud has currently filed an action for Bankruptcy in the Southern District of Florida.

8.      Rocket One Capital, LLC ("Rocket One Capital") is a Florida limited liability company with its principal place of business in Miami, Florida.  Defendant, Michael Shvartsman (further identified herein), is the Manager of Rocket One Capital.  Bruce Garelick (further identified herein), is the Chief Strategy Officer ("CSO") of Rocket One Capital, and upon information and belief, the Hannelius Knight Trust, by and through its trustee, Eric Hannelius, is an equity holder of Rocket One Capital.

9.      Defendant, Bruce Garelick, is an individual, *sui juris*, who upon information and belief, resides in Miami, Florida.  Bruce Garelick is the Chief Strategy Office of Rocket One Capital.

10.      Defendant, Eric Hannelius, is an individual, *sui juris*, who, upon information and belief, resides in Studio City, California.  Eric Hannelius is the current president of Transact First.

11.      Defendant, Eric Hannelius is the Trustee of the Defendant, Hannelius Knight Trust. Upon information and belief, Defendant, Hannelius Knight Trust is an equity owner of Defendant, Rocket One Capital.

12.      Defendant, Eric Hannelius is the managing member of Pepper Pay, LLC, a Nevada limited liability company, authorized to do business in Florida, with a principal place of business in Aventura, Florida.  Upon information and belief, Pepper Pay, LLC, is, at least in part, the

---

[1] One Pay Cloud filed a certificate of withdrawal of authority to do business in Florida on June 8, 2023 with the Florida Secretary of State, by and through its manager, Michael Shvartsman.

3

successor in interest to Transact First.

13.     Defendant, the Hannelius Knight Trust, upon information and belief, purchased Defendant, Skylight Processing, LLC (further defined herein), or, alternatively, its assets.

14.     Defendant, Ryan Nolte, is an individual, *sui juris*, who, upon information and belief, resides in Davie, Florida.  Defendant, Ryan Nolte, is the Manager of Defendant, Skylight Processing, LLC (further defined below).  Defendant, Ryan Nolte, is the son of Defendant, Randy Nolte, who is the manager of Defendant, EFT.  Upon information and belief, Skylight Processing was purchased by the Hannelius Knight Trust and Rocket One Capital, although Defendant Ryan Nolte remains the manager.

15.     Skylight Processing, LLC ("Skylight Processing") is a Florida limited liability company with its principal place of business in Davie, Florida.  Upon information and belief, Skylight Processing, at times material hereto, operated as an agreed upon Affiliate, and subject to the PIN Based Processing Agreement  (further defined herein).  Defendant, Ryan Nolte, is the manager of Skylight Processing.

16.     Defendant, Shlomo Zenou, also known as Mony Zenou (herein "Mony Zenou"), is an individual, *sui juris*, who, upon information and belief, resides in San Juan, Puerto Rico.  Mony Zenou, employs a team of software engineers and staff, and did so during times material hereto, and is the manager of Defendant, I-POS Systems LLC, a New York limited liability company, doing business as Dejavoo ("Defendant Dejavoo"), and is also the manager of Defendant, Denovo Systems, LLC ("Denovo").

17.     Defendant Dejavoo is a Delaware limited liability company, that creates software for processing terminals, and its principal place of business in Wilmington, Delaware.

18.     Defendant DeNovo, is a Puerto Rico limited liability company, that creates

4

reporting platforms for the processing terminals using Defendant Dejavoo's software (further explained below), and its principal place of business is in San Juan, Puerto

19. Defendant, Samantha Morton, is the daughter of Randy Nolte, who was an employee of EFT at times material hereto.

20. This Court has jurisdiction over the subject matter and the parties and venue is proper in Pinellas County, Florida, because: (i) IRMS and EFT contracted within Pinellas County; and (ii) the causes of action accrued in Pinellas County, Florida.

## FACTUAL BACKGROUND

### SECTION I

21. IRMS is an Independent Sales Organization ("ISO"), that is an intermediary sponsored through banking institutions, and working under both national and regional electronic payment processing networks.

22. IRMS, as an ISO, provides Independent Sales Representatives ("ISRs") with access to payment processing, bank sponsorship, settlement, and/or customer services in connection with ATM terminals and other electronic transactions.

23. An ISR assembles groups of merchants with electronic payment processing or ATM machines at their stores into customer groups, and routes the customer groups electronic merchant and ATM transactions through an ISO's processing assets.

24. EFT, an ISR with an assembled customer group, routed its customers' merchant and ATM transactions through IRMS's processing assets, and IRMS was EFT's exclusive ISO, per the *PIN-Based Transaction Processing and Support Agreement* (the "Processing Agreement") they entered into on December 12, 2017.

25. Per the Processing Agreement, EFT agreed to exclusively process all of its

5

customers' transactions through IRMS, for a five (5) year term, that was to renew annually, unless terminated by the parties in writing. A true and correct copy of the Processing Agreement is attached hereto as Exhibit "A."

26. An electronic PIN-based transaction is an ATM transaction, that requires a PIN number to be typed into the keypad for the dispensing of monies, unrelated to a merchant transaction. A non-ATM electronic transaction, known as a "Script Transaction," is an electronic payment to a merchant, pursuant to which, monies are also dispensed.

27. The Processing Agreement set a schedule of fees to be paid by EFT to IRMS, as IRMS was entitled to a portion of the transaction or processing fees earned on certain ATM transactions, and IRMS was entitled to a portion of interchange fees on the Script Transactions (together the "Processing Fees").

28. The Processing Fees were to be deducted from EFT's surcharge assigned to each transaction, and paid directly to IRMS via ACH.

29. The Processing Agreement further required EFT, and its known Affiliates using IRMS's processing assets, to exclusively process its customers transactions through IRMS, and to use IRMS exclusively for any ATM related services.

30. EFT made representations that the known Affiliates included, but were not limited to, Skylight Processing, Sterling Payment Solutions, LLC (further defined herein), and Merchant Choice LLC (further defined herein) (together the "Known Affiliates"). As previously identified, Randy Nolte was the Manager of EFT.

31. The Known Affiliates were owned and operated by the immediate family members of Randy Nolte, EFT's manager, who were aware of and agreed to the terms and conditions including the exclusivity clause both verbally and contractually with EFT.

6

32. As further explained herein, EFT breached the Processing Agreement by intentionally redirecting transactions, converting fees payable to IRMS, and breaching the exclusivity terms that require EFT to use IRMS for processing customers' transactions.

33. In November of 2020, EFT, while still a party to the Processing Agreement with IRMS and all obligations associated therewith, EFT, was, upon information and belief, sold to Transact First.

34. Thereafter, transactions were rerouted in violation of the Processing Agreement, to multiple third-party ATM processors, in breach of the Processing Agreement, including, without limitation, Transact First, One Pay Cloud and Skylight Processing.

35. Upon information and belief, Transact First, One Pay Cloud, Dejavoo, and Skylight Processing were aware that EFT was in breach of the Processing Agreement by rerouting the transactions and fees to them.

36. Upon information and belief EFT, Randy Nolte, Ryan Nolte, Michael Shvartsman, Eric Hannelius, Mony Zenou, Bruce Garelick, the Hannelius Knight Trust, Transact First, Once Pay Cloud, Rocket One Capital, Skylight Processing, Dejavoo, and Denovo (together, the "Conspiring Defendants") conspired to effectuate said breach, and otherwise tortiously interfere with IRMS's lawful business and advantageous business relationships.

36. Upon information and belief, the Conspiring Defendants engaged in a conspiracy to harm and devalue IRMS, so that Michael Schvartsman, and/or Eric Hannelius, (either individually or through a designated entity), could purchase IRMS at a fraction of its value.

37. Upon information and belief, the effort to tortiously circumvent the Processing Agreement, and breach its exclusivity provisions regarding transaction fee obligations without IRMS consent, was a joint effort undertaken by the Conspiring Defendants.

7

38.     Upon information and belief, the Conspiring Defendants acted together to unlawfully redirect fees otherwise payable to IRMS under the terms of the Processing Agreement.

39.     Upon information and belief, One Pay Cloud, its members, and/or their agents, solicited the largest merchants of EFT and Paybotic (further identified herein), another ISR, with false information regarding the status of their platform license agreements, directly interfering with the contractual relationships between EFT and IRMS, and in furtherance of the conspiracy to harm IRMS explained herein.

40.     As a result of the concealed and redirected transactions, EFT also failed to meet the monthly minimum transaction volume approved transactions, in violation of the Processing Agreement.

41.     EFT's intentional failure to meet minimum transaction volume has resulted in damages to IRMS, as IRMS has been deprived of transaction fees and profits to which IRMS was entitled to receive pursuant to the Processing Agreement.

**SECTION II**

42.     Cash dispensing ATM terminals are lawful within state licensed cannabis dispensaries (SLCDs), however, to be lawfully operated, it requires, inter alia, that the cash within the ATM is not self-loaded by the merchant with the cash derived from cannabis related sales (requiring that the cash come from Loomis, Wells Fargo, or some other third-party).

43.     Alternatively, non-cash dispensing terminals, Script Machines, are not allowed at the SLCDs per both Federal Law and the Processing Agreement.

44.     During times material hereto, EFT and Randy Nolte, in breach of the Processing Agreement, would input fraudulent data into IRMS's compliance protocols, that included, without limitation, changing the name of the business where non-cash dispensing ATMs were located, as

8

well as identifying the merchant as something other than a SLCD, to mask that EFT was operating non-cash dispensing ATMs at "("SLCDs"), in violation of both Federal Law, and the Processing Agreement.

45. Upon information and belief, in 2019, EFT and Randy Nolte determined EFT's existing software application used to process sales could no longer support continuing expansion because of IRMS's increased compliance requirements, that added additional scrutiny upon EFT, to ensure that non-cash dispensing terminals were not operated within SLCDs.

46. Upon information and belief, in an effort to circumvent IRMS' increased compliance requirements, EFT, entered into an agreement with Dejavoo, to create and license to EFT, special software ("Dejavoo Masking Software") that would disguise transactions from certain non-money dispensing terminals in cannabis stores ("Dejavoo Software Terminals"), which is unlawful, and make these transactions appear as though they were made to be from cash dispensing ATM terminals in cannabis stores, which is lawful.

47. The Dejavoo Masking Software was only designed to work on the Dejavoo Software Terminals.

48. Upon information and belief, the Dejavoo Masking Software was designed and implemented to conceal cannabis transactions via the transfer of fraudulent information regarding the merchant transaction, to make it appear as though it was an ATM transaction.

49. It appears, on its face, that the Dejavoo Masking Software has no apparent lawful purpose, and further, it had no unique purpose other than to conceal this unlawful activity from IRMS, its sponsoring banks, and the major network processors like Visa, MasterCard, and Discover.

50. The Dejavoo Masking Software effectively rendered IRMS' existing compliance,

9

loss prevention, and spot check protocol, designed to identify and prevent such unlawful transactions, useless.

51.     Through discovery received to date, on or about March 11, 2019, EFT and Dejavoo entered into a 5-page perpetual services and license agreement (the "EFT Perpetual License") to develop and license integration software for use with the Dejavoo Software Terminals ("Dejavoo Integration Software") purchased by EFT, that in part, and without limitation, directed merchant transactions that EFT was contractually obligated to process through IRMS, to third parties, in breach of the Processing Agreement between EFT and IRMS.

52.     Transactions processed on the Dejavoo Software Terminals could not be processed through IRMS, and EFT's use of same deprived IRMS of revenues to which they were contractually entitled.

53.     On September 12, 2019, approximately six months after the EFT Perpetual License was signed, the DeNovo Systems, Limited Liability Company was formed in Puerto Rico.

54.     Four days later, Dejavoo, a limited liability company that was first formed in Delaware on September 21, 2006, registered to do business in Puerto Rico on September 16, 2019, doing business as Dejavoo.

55.     Upon information and belief, IRMS believes the Dejavoo Masking Software was in whole or in part designed for the purpose of disguising cannabis and marijuana transactions, to knowingly circumvent and purposely transmit fraudulent report information on such transactions to IRMS via false wire transmission, using the Dejavoo Masking Software and  subsequently reported to IRMS by DeNovo's related transaction reporting platform.

56.     Upon information and belief, on or about February 10, 2020, Dejavoo and DeNovo entered into an Assignment of Services and License Agreement with One Pay Cloud, of which

10

Michael Shvartsman was the Manager at the time, whereby Dejavoo and Denovo licensed to One Pay Cloud all right and obligations in connection with certain point of banking protocols, believed by IRMS to include the Dejavoo Masking Software created for EFT, and to assign to One Pay Cloud all rights, duties, and obligations of Dejavoo and DeNovo in connection with Services and License Agreements with third parties.

57.     Upon information and belief, Dejavoo and DeNovo knew that EFT was using the Dejavoo Masking Software to disguise illicit and fraudulent transactions, so Dejavoo and Denovo licensed same to One Pay Cloud to insulate itself from being implicated in the illegal scheme to defraud IRMS, in violation of Federal Money Laundering Statues (18 USC 1956, and 1957) and its participation in potential wire fraud, bank fraud, and money laundering.

58.     Upon information and belief, Michael Shvartsman and Mony Zenou have been long time friends and associates.

59.     Upon information and belief, IRMS believes One Pay Cloud, Michael Shvartsman, its Manager at the time, and Rocket One Capital, the majority member of One Pay Cloud, along with Mony Zenou, and thereby Dejavoo and Denovo, knew EFT was using the Dejavoo Masking Software to disguise illicit and fraudulent transactions, and knowingly and intentionally entered into the Assignment of Services and License Agreement with such knowledge.

60.     Upon One Pay Cloud closing on the Assignment of Services and License Agreement from Dejavoo and Denovo, One Pay Cloud, by and through Michael Shvartsman, its Manager, sought to force various third parties in contractual privity with IRMS, to renegotiate their existing license agreements with IRMS, in an attempt to extort and consolidate the SLCD market, that included the disguised cannabis and marijuana transactions.

61.     Per the scheme to disguise cannabis and marijuana transactions using the Dejavoo

11

Masking Software developed by Dejavoo and DeNovo, the Conspiring Defendants tortiously interfered with the existing business relationship between IRMS and EFT, and IRMS's existing business relationships with banks and other intermediaries through the reporting of false information using integration software.

62. The use of the Dejavoo Masking Software and Dejavoo Software Terminals was used to spoof and disguise transactions at or near marijuana and cannabis distribution locations, so that they would instead appear as cash ATM transactions at or near the locations of the merchant using the Script Machines, to circumvent reporting requirements, and their use, for the fraudulent purposes described herein, is in violation of the Processing Agreement by, without limitation, failing to provide IRMS full physical and communications access to all of IRMS's transaction processing environment, including, but not limited to firewalls, switches, servers, and databases, failing to create all hard copy and digital files with correct data, and failing to ensure accuracy and thoroughness of information provided to IRMS.

63. The use of the Dejavoo Masking Software to disguise cannabis and marijuana transactions further significantly damaged existing relations IRMS maintained with participating banks and intermediaries, as a result of the reporting of false information, resulting in lost relationships and lost transactions as a result of these wrongful acts.

64. Upon information and belief, in furtherance of their effort to consolidate and take over the SLCD market, including cannabis and marijuana transactions, Michael Shvartsman, in connection with Rocket One Capital, Eric Hannelius, the Hannelius Knight Trust, Bruce Garelick, One Pay Cloud, and Transact First, developed a plan, called Project Unicorn Payment, or PUP ("PUP") (to be later registered as Encompany, upon information and belief).

65. Upon information and belief, the initial strategy and purpose behind the creation of

12

PUP was to pressure EFT and IPN, LLC doing business as Paybotic ("Paybotic") (further identified herein) out of the SLCD market developed by EFT, and to lay the groundwork for a future market monopoly for Michael Shvartsman and/or Eric Hannelius, or their controlled entities, including, without limitation, Rocket One Capital, One Pay Cloud and Transact First.

66. Paybotic, was also an ISR, operating within the SLCD market, but that did not use IRMS as its ISO.

67. Leading up to the assignment of the Dejavoo Masking Software to One Pay Cloud, Dejavoo, DeNovo, Mony Zenou pressured EFT and Paybotic to negotiate new license agreements with restrictive terms, and also put pressure on IRMS, EFT, and Skylight Processing to sell their businesses to Michael Shvartsman.

68. During times material hereto, EFT failed to pay or substantially underpaid IRMS for various transaction fees, and in some cases intentionally failed to bill merchants, without the knowledge or consent of IRMS, for monies to which IRMS was entitled under the Processing Agreement.

69. Upon information and belief, in furtherance of the scheme by EFT and Randy Nolte to breach contractual obligations, tortuously interfere with IRMS and EFT business relationships, and in furtherance of the scheme to pressure IRMS to sell its business for an artificially reduced amount to Shvartsman, in a coordinated effort, Rocket One Capital, One Pay Cloud and Transact First, EFT and Randy Nolte, sent demand letters to certain alleged ISO customers of EFT purportedly alleging that there were unpaid interchange fees by IRMS from EFT transactions.

70. On May 20, 2021, IRMS received demand letters for alleged unpaid interchange fees from EFT transactions from Global Legal Law Firm, the Law Office of Neil D. Kodsi, and

13

Feldman Law. The letters appear to be coordinated between the above identified attorneys, and upon information and belief, all of the above identified law firms had previously represented Shvartsman or his companies in the past.

71. On the following day, May 21, 2021, IRMS received another demand letter from Bravo Law, that, upon information and belief, also appears to have been a coordinated letter.

72. On August 2, 2021, IRMS received a fifth letter from an individual purporting to be operating as "The Stickman Company," that made false and defamatory claims regarding alleged unpaid interchange fees from EFT transactions.

73. The Stickman Company advised that this false and defamatory information was provided by Randy Nolte and EFT.

74. The letters are additional evidence of an ongoing and coordinated effort by EFT, Randy Nolte, and Shvartsman, by and through the above identified attorneys, and The Stickman Company, to disparage and defame IRMS.

75. The allegations in the letters are false, and Randy Nolte, EFT, Shvartsman, and The Stickman Company and upon information and belief, knew such statements were false at the time that they were published.

76. Upon information and belief, on or about October 23, 2019, Dejavoo entered into a service licensing agreement ("SLA") with Sterling Payment Solutions, LLC ("Sterling") a Known Affiliate of EFT, and therefore and exclusive user of EFT and IRMS, per the terms of the Processing Agreement.

77. Sterling is a Florida limited liability company, with a principal place of business in Davie, Florida, and its Manager is Ross Nolte, the son of Ron Nolte, and nephew of Randy Nolte, and the first cousin to Ryan Nolte.

14

78. Upon information and belief, Paybotic, by and through its manager, Max Miller, entered into a Perpetual License with Dejavoo in November of 2019.

79. Upon information and belief, on January 23, 2020, Sterling entered into an updated license agreement as requested by Dejavoo.

80. Upon information and belief, on or about January of 2020, Dejavoo sent notice to EFT and Paybotic regarding alleged compliance concerns and the need to update the license agreement to verify EFT's continued use would be compliant.

81. Dejavoo, as the precipitator of these compliance issues, used the manufactured compliance concerns as a predicate, together with Michael Shvartsman and One Pay Cloud, to pressure Paybotic and EFT needed to sign new, updated Services and Licensing Agreements with Dejavoo.

82. Upon information and belief, same was done in furtherance of the scheme to force EFT and Paybotic to sign new agreements with One Pay Cloud, as part of the ongoing effort to force EFT and Paybotic out of the SLCD market, to further advance PUP, and to take over all of EFT's and Paybotic's transactions, including the transactions IRMS serviced for EFT under the Processing Agreement.

83. Upon information and belief, this was an attempt by Mony Zenou to disguise actual intent of the Conspiring Defendants to seize the market for such transactions and deprive IRMS of their due and just revenues.

84. Dejavoo and Mony Zenou, through One Pay Cloud, Transact First, Rocket One Capital, Hannelius Knight Trust, Shvartsman, Hannelius, and Garelick renegotiated agreements to direct EFT, Sterling, Paybotic, and Skylight Processing to use the Dejavoo Masking Software to disguise SLCD, marijuana, and cannabis script transactions.

15

85. The Dejavoo Masking Software was used to disguise marijuana and cannabis transactions by disguising illegal transactions processed through Dejavoo Sofware Terminals in violation of the *Federal Controlled Substances Act* (*18 USC 1956 and 1957*), via money laundering and wire fraud, damaging IRMS's reputation and its existing IRMS business relationships with banks, processors and ISO's.

86. On February 4, 2020, One Pay Cloud was formed, in furtherance of the scheme to defraud and disguise illegal cannabis transactions, and, upon on information and belief, One Pay Cloud is owned by both Rocket One Capital (with Michael Shvartsman as Manager) and the Hannelius Knight Trust (with Eric Hannelius as Trustee),

87. On February 10, 2020, Dejavoo and Denovo licensed the Dejavoo Masking Software and Denovo's platform software to One Pay Cloud, as evidenced by an Assignment of Services and License Agreement between DeNovo, Dejavoo, and One Pay Cloud.

88. Upon information and belief, on or about February 12, 2020, Shvartsman advised Ryan Nolte that Dejavoo planned to sell One Pay Cloud an exclusive license to the Dejavoo Masking Software.

89. Upon information and belief, on February 19, 2020, in a call between Shvartsman and Ryan Nolte, Shvartsman told Ryan Nolte, manager of Skylight Processing (an exclusive user of IRMS per the Processing Agreement), that the Dejavoo sale to One Pay Cloud of an exclusive license for the Dejavoo Masking and Integrations software, would terminate EFT's Perpetual License.

90. In February of 2020, there was a similar conversation with Michael Shvartsman and Max Miller regarding Paybotic's perpetual license an exclusive user of IRMS.

91. Via the licensing of the Dejavoo Masking Software to One Pay Cloud, by and

16

through its manager, Michael Shvartsman, was empowered to shut down EFT and Paybotic, if they did not agree to new processing agreements with One Pay Cloud, despite knowing they were contractually obligated to an exclusive agreement with IRMS per the Processing Agreement.

92. Later in 2020, Rocket One Capital, Shvartsman and Garelick approached IRMS regarding a purchase of IRMS, and, upon information and belief, to ascertain if IRMS knew of the pending deal with EFT, Skylight, and Paybotic, and to determine if IRMS or EFX was aware of the existence of the Dejavoo Masking Software.

93. Ryan Nolte, Randy Nolte, Michael Shvartsman, Eric Hannelius, and Bruce Garelick made a purchase price offer of fourteen million dollars ($14,000,000), coupled with other conditions.

94. There was also a threat to intentionally divert merchant revenues, if the offer was not accepted.

95. It appears clear that Michael Shvartsman, Eric Hannelus, Bruc Garelick, together with the other identified Defendants had actual knowledge of the Processing Agreement between EFT and IRMS, and the beneficial business relationship.

96. Upon information and belief, Skylight and Paybotic knew of, and ratified the Processing Agreement as Known Affiliates.

97. On February 27, 2020, EFT and Paybotic filed a complaint against DeNovo and Dejavoo in Federal District Court in and for the Southern District of New York, pursuant to which, One Pay Cloud confirmed its ownership of the software.

98. Upon information and belief, on or around this time, One Pay Cloud was soliciting EFT's and Paybotic's largest ISR customers, who rely on perpetual licenses on Dejavoo terminals.

99. The actions of Dejavoo and One Pay Cloud show Dejavoo and One Pay Cloud

17

interfering with business relationships, and show the ongoing efforts to extort and pressure EFT and Paybotic to renegotiate and execute new agreements with One Pay Cloud to allow for One Pay Cloud to consolidate SLCD market shares by threats and intimidation, in the execution of the plan by Michael Shvartsman, Eric Hannelius and Bruce Garelick to monopolize the SLCD market, and force EFT and Paybotic to renegotiate or be shut down, and further utilize the Dejavoo Masking Software to capture the SLCD market, including CBD, cannabis, and marijuana sales.

100. Upon information and belief, on March 4, 2020, Mony Zenou claimed EFT Services had violated card brand and network rules, for using the software designed to mask cannabis based transactions, at his direction.

101. DeNovo sent notice of termination to EFT and Paybotic of previous agreements, even after the assignment of the agreements to One Pay Cloud, in an effort to further the pressure on them to sign new agreements in furtherance of the scheme to conspire to deprive IRMS of its rights, despite the assignment and DeNovo's lack of legal authority to terminate the assigned agreements.

102. On April 9, 2020, One Pay Cloud registered to do business in Florida, as a foreign limited liability company with a principal place of business in Delaware.

103. In June 2023, after being sued, One Pay Cloud withdrew their authority to do business in Florida, and have currently filed bankruptcy in the Southern District of Florida.

104. On April 29, 2020, EFT and One Pay Cloud agreed to terms, and a new Platform License Agreement ("PLA") was signed between them.

105. On June 12, 2020, Transact First LLC ("Transact First") converted to Transact First, Inc. ("Transact First")

106. On August 20, 2020, One Pay Cloud and Transact First executed an asset purchase

agreement to purchase EFT's assets, and on November 19, 2020, Transact First closed on the purchase and sale agreement for the assets of EFT, made between EFT, by and through Randy Nolte as Member, and Shvartsman as guarantor.

107. The PLA was assigned to Transact First as part of an Asset Purchase Agreement on November 19, 2020.

108. Upon information and belief, on or about the same time, a similar transaction to purchase the assets or ownership of Skylight was executed.

109. Financial statements from November 20, 2020 show Merger and acquisition projections of Skylight and EFT to investors of PUP, with an estimated revenue increase from $1.8 million in 2020 to $44 million in 2021.

110. The purchase of EFT and its contractual agreements by Transact First breached EFT's contact with IRMS.

111. It is clear from the March 2021 PUP investor documents, that there was a calculated scheme by Rocket One Capital, the Hannelius Knight Trust, Eric Hannelius, Shvartsman and Garelick to purchase and acquire a monopoly market serving the legal cannabis industry, with the ownership, assignments, and purchases and acquisitions of Transact First, One Pay Cloud, EFT , and Skylight Processing in furtherance of same.

112. PUP was a pseudonym for the development of a leading payment processing platform serving the "legal" cannabis industry which included integration software used to processes illegal CBD, cannabis, and marijuana transactions via the Dejavoo terminals and to report those transactions with disinformation via DeNovo systems to IRMS, its Processors, Sponsoring Banks, and Networks.

113. The PUP platform's implementation was begun through Dejavoo and One Pay

19

Cloud, utilizing the integration software to disguise transactions to defraud IRMS, banks, and other intermediaries in the payment industry and to conceal CBD, cannabis, and marijuana transactions, resulting in money laundering and wire fraud via the federal banking system, in violation of the Controlled Substances Act.

114. In furtherance of the scheme, PUP attempted to raise funds from third party investors in an effort to attempt to cash out/sell the high market share of the CBD, cannabis, and marijuana money transmission business in violation of the securities fraud provisions of the Securities Act of 1933.

115. Upon information and belief, the defendants perpetuated a scheme that financially benefitted the Conspiring Defendants in violation of the Controlled Substance Act, via money laundering and wire fraud, in the use of the integration software designed to disguise the processing of CBD, cannabis, and marijuana transactions and PUP established an ongoing conspiracy by the Defendants to defraud and launder money through wire fraud.

116. The development of the Dejavoo Masking Software, the continued tortious interference with existing contracts, and the continued fraudulent misrepresentations by the Defendants show an ongoing intent to defraud and a pattern of racketeering activity for the purpose of illegal activities via interstate commerce and bank wires.

117. The actions of Rocket One Capital and the Defendants along with Encompany (PUP) represent the requisite enterprise through a pattern of racketeering activities and the predicate acts of wire fraud and bank fraud, in furtherance of the money laundering scheme.

118. It is unlawful for any person to receive income derived, directly or indirectly, from a pattern of such racketeering activity.

## COUNT I
*Declaratory Judgment against EFT*

20

119. This is an action brought by Plaintiff against defendant, EFT, sounding in declaratory judgment.

120. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

121. Upon becoming aware of the EFT's breach of the Processing Agreement, IRMS held funds that would have contractually have been distributed to IRMS under the terms of the Processing Agreement.

122. Plaintiff is seeking a declaratory judgement to declare that the IRMS funds held was the sole property of IRMS under the terms of the Processing agreement.

123. There is a bona fide, actual, present, and practical need for a declaration by this Court with respect to IRMS and EFT's rights and obligations under the Processing Agreement. Specifically, IRMS seeks a declaratory judgment concerning its ability to continue to hold all transaction fees in its (or that come into it) possession until or unless EFT has fully compensated IRMS for amounts owed under the Processing Agreement.

124. IRMS believes the Processing Agreement affords it the right to continue to hold all transaction fees in its (or that come into its) possession until or unless EFT has fully compensated IRMS for amounts owed under the Processing Agreement.

125. EFT claims (and, possibly third parties claim), that certain transaction fees are owed to EFT pursuant to the Processing Agreement and that IRMS is wrongfully withholding those certain transaction fees.

WHEREFORE, IRMS requests judgment against EFT:

a. Declaring and adjudging that IRMS may hold any and all transaction fees in IRMS's possession that would otherwise be payable to EFT until such amounts are fully

21

reimbursed to IRMS for amounts owned by EFT; b) awarding IRMS its attorney's fees and costs pursuant to the Processing Agreement; c) awarding IRMS its reasonable costs of suit pursuant to Chapter 86, Florida Statutes; and d) awarding such other relief as the Court deems equitable and just to IRMS.

## COUNT II
*Breach of Processing Agreement – Exclusivity against EFT*

126.    This is an action brought by Plaintiff, IRMS, against Defendant, EFT, sounding in breach of the Processing Agreement.

127.    Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

128.    The Processing Agreement requires EFT to exclusively use IRMS for processing services.

129.    EFT has not exclusively used IRMS for processing services, and this failure to exclusively use IRMS for processing services has deprived IRMS of transaction fees and profits owed to IRMS.

130.    EFT has also failed to process and pay IRMS for failing to meet the monthly minimum of three hundred thousand (300,000) approved transactions as required by the Processing Agreement.

131.    EFT's failure to exclusively use IRMS for processing services has resulted in lost payments and damages in excess of fifty thousand dollars ($50,000) owed to IRMS.

132.    Upon information and belief, EFT has transferred or assigned its right under the Processing Agreement to Transact First, without first obtaining IRMS's consent in violation of the Processing Agreement, resulting in the diversion of transactions and the related fees from IRMS.

133.    EFT was obligated to pay, among other things, the Processing Fees to IRMS for all

22

transactions described in the Processing Agreement, and EFT has not paid IRMS for all transactions processed, and/or has underpaid IRMS for certain transactions.

134. EFT has wrongfully withheld payment of these transaction fees owed to IRMS in an amount exceeding fifty thousand dollars ($50,000).

135. As a result, EFT has breached the Processing Agreement and damaged IRMS.

WHEREFORE, IRMS demands judgment against EFT for damages, together with interest, costs, expenses, attorneys' fees pursuant to the Processing Agreement, prejudgment interest, and all such other relief as the Court deems just and proper.

**<u>COUNT III</u>**

*Breach of Processing Agreement —Failure to Pay IRMS Interchange Fees by EFT*

136. This is an action brought by Plaintiff against defendant, EFT, sounding in breach of processing agreement regarding interchange fees.

137. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

138. Defendant EFT contractually agreed that all Interchange fees received and/or owed were the sole property of IRMS, however Defendant EFT withheld, diverted, underpaid, or didn't pay, interchange fees by attempting to disguise the true nature, ownership, and other material information requiring payment to IRMS.

139. The Processing Agreement provides that IRMS will retain 100% of all interchange fees earned on all eligible transactions.

140. EFT is in possession of interchange fees earned on eligible transactions, IRMS has demanded that EFT pay the interchange fees to IRMS, and EFT has refused to pay the interchange fees to IRMS.

141. As a result, EFT has breached the Processing Agreement and caused IRMS damage.

23

WHEREFORE, IRMS demands judgment against EFT for damages, together with prejudgment interest, costs, expenses, and attorneys' fees pursuant to the Processing Agreement, and all such other relief as the Court deems just and proper.

## COUNT IV
### *Conversion against EFT*

142. This is an action brought by Plaintiff against defendant, EFT Services, sounding in conversion.

143. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

144. Upon Information and belief, Defendant EFT Services, together with Randy Nolte, and/or Ryan Nolte, and/or Samantha Mortan converted funds belonging to IRMS by: 1) Temporarily and/or permanently moving merchants on and off IRMS' platform; 2) Temporarily switching the bank account numbers, thereby redirecting payments owed to IRMS to accounts controlled by the principals of EFT, its principals, and their affiliated entities and principals; 3) intentionally underpaying agreed upon transaction fees and retaining said monies; 4) copying proprietary software to be reengineered for the Defendant's use; 5) Selling converted IRMS Software to third parties; 6) Converting Interchange fees; 7) Not initially charging transaction fees to certain clients, but later billing for same on a different platform, and retaining all of those fees.

145. The foregoing is not a complete list of converted property to be revisited upon receipt of discovery.

146. The retained fees are IRMS's property, IRMS has demanded that EFT pay the fees to IRMS, but EFT has refused to return the fees.

147. As a result, EFT is wrongfully in possession of the fees and has deprived IRMS of

24

the interchange fees owed to IRMS.

WHEREFORE, IRMS demands judgment against EFT for damages, together with prejudgment interest, costs, expenses, and attorney's fees pursuant to the Processing Agreement, and all such other relief as the Court deems just and proper.

**COUNT V**

*Breach of Processing Agreement – Guarantor against Randy Nolte*

148.    This is an action brought by Plaintiff against defendant, Randy Nolte, sounding in breach of processing agreement regarding guarantor.

149.    Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

150.    Randy Nolte breached the agreement by failing to fulfill his obligation as a guarantor, and allowing the breaches by EFT.

151.    As a condition of entering into the Processing Agreement, IRMS required Randy Nolte to execute the Processing Agreement as guarantor in favor of IRMS, whereby Randy Nolte guaranteed prompt and full payment of all liabilities and obligations of EFT pursuant to the Processing Agreement.

152.    EFT has breached the Processing Agreement because it has: 1) wrongfully withheld payment of various transaction fees owed to IRMS; 2) failed to exclusively use IRMS for processing services, which has resulted in lost payments and damages to IRMS; 3) failed to meet the Processing Agreement's monthly minimum transaction volume; 4) wrongfully withheld the interchange fees owed to IRMS; and 5) upon information and belief, authorized the transfer or assignment of EFT's rights under the Processing Agreement to Transact First without IRMS's consent, resulting in the diversion of transactions and the related fees from IRMS.

153.    Those amounts are due and owing by EFT to IRMS, and, as guarantor, Randy Nolte

25

is liable to IRMS for the amounts due IRMS from EFT under the Processing Agreement.

154. Randy Nolte's failure to make prompt and full payment of all liabilities and obligations of EFT pursuant to the Processing Agreement is a breach of the Processing Agreement and Randy Nolte's guaranty.

WHEREFORE, IRMS demands judgment against Randy Nolte for all sums due under the Processing Agreement, together with prejudgment interest, costs, expenses, and attorneys' fees pursuant to the Processing Agreement, and all such other relief as the Court deems just and proper.

## COUNT VI
*Breach of Processing Agreement – Exclusivity against Transact First, Inc.*

155. This is an action brought by Plaintiff against defendant, Transact First, sounding in breach of processing agreement regarding exclusivity.

156. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

157. EFT improperly assigned the Processing Agreement to Transact First.

158. Transact First, by and through its principals, knew that the assignment of the Processing Agreement was in violation of the Processing Agreement.

159. To the extent Transact First thereafter acted for EFT and redirected transactions and conducted itself as EFT, Transact First was obligated to comply with the terms of the Processing Agreement.

160. Upon assignment of the Processing Agreement, Transact First was required to exclusively use IRMS for processing services, but has failed to do so, and Transact First's failure to exclusively use IRMS for processing services has deprived IRMS of fees to which it is otherwise entitled.

161. Transact First has also failed to process and pay IRMS for a monthly minimum of

26

300,000 approved transactions as required by the Processing Agreement, and has wrongfully withheld payment of these transaction fees.

162.	Transact First was obligated to pay, among other things, transaction fees to IRMS for all transactions described in the Processing Agreement, and Transact First has not paid IRMS for all transactions processed or has underpaid IRMS for certain transactions.

163.	As a result, Transact First has breached the Processing Agreement and damaged IRMS.

WHEREFORE, IRMS demands judgment against Transact First for damages, together with interest, costs, expenses, and attorneys' fees pursuant to the Processing Agreement, and such other relief as the Court deems just and proper.

**COUNT VII**

*Breach of Processing Agreement – Interchange Fees against Transact First, Inc.*

164.	This is an action brought by Plaintiff against defendant, Transact First, sounding in breach of processing agreement regarding interchange fees.

165.	Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

166.	EFT improperly assigned the Processing Agreement to Transact First.

167.	To the extent Transact First thereafter acted for EFT and redirected transactions and conducted itself as EFT, Transact First was obligated to comply with the terms of the Processing Agreement.

168.	The Processing Agreement provides that IRMS will retain one hundred percent (100%) of all interchange fees earned on all eligible transactions.

169.	Transact First is in possession of interchange fees earned on eligible transactions.

170.	As a result, Transact First has breached the Processing Agreement and caused

IRMS damage.

WHEREFORE, IRMS demands judgment against Transact First for damages, together with prejudgment interest, costs, expenses, and attorneys' fees pursuant to the Processing Agreement, and such other relief as the Court deems just and proper.

## COUNT VIII
### *Tortious Interference with advantageous business relationship*

171. This is an action brought by Plaintiff against the Conspiring Defendants sounding in tortious interference with advantageous business relationship.

172. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

173. A business relationship existed between EFT and IRMS, that afforded IRMS existing or prospective legal rights, pursuant to the Processing Agreement, and the Conspiring Defendants knew of this relationship. Irrespective of same, the Conspiring Defendants intentionally and without justification interfered with that relationship, IRMS was damaged as result of the Conspiring Defendants' interference.

174. IRMS had a valid contract with EFT Services, to wit: the Processing Agreement, and the Conspiring Defendants knew of the Processing Agreement, but the Conspiring Defendants intentionally and without justification interfered with the Processing Agreement, and induced or otherwise caused the Processing Agreement's breach, and IRMS was damaged as result of the Conspiring Defendants' interference.

175. The Conspiring Defendants, in furtherance of Transact First's principals Michael Shvartsman and Eric Hannelius, together with their solicited assistance of Bruce Garelickm, manifested a specific intent to interfere with the Processing Agreement, and directly interfered with the purpose of bringing the PUP goals and objectives of creating a monopoly over electronic

28

SLCD transactions, through purchases, threats, intimidation, and other actions in violation of the covenant of Good Faith and Fair Dealing.

176. With the intent to achieve those goals without regards to IRMS's right, Network rules, or Federal law, the gang banded together, purposely knowingly that their ongoing scheme was both unlawful, improper, and injurious. The Conspiring Defendants sought to advance, through ongoing criminal actions contrary to social interest in protecting freedom of action and contractual interests of the other party, proximity, or remoteness of the Conspiring Defendants' conduct to the interference, relations between the parties, FinCen, nonparties such as Visa Card, Master Card, Discover, Sponsoring Banks, Upline Processors.

177. IRMS maintains business relationships with processors, banks, merchants, ISR's and ISO's in connection with processing ATM terminals and transactions that afford IRMS existing or prospective legal rights. Transact First and the Related Defendants knew of these relationships. Transact First and the Related Defendants, intentionally and without justification, purposely interfered with these relationships by utilizing integration software to purposely disguise transactions being processed through existing IRMS business relationships, and IRMS's relationships were damaged as a result of Transact First's and the Related Defendant's interference.

WHEREFORE, IRMS demands judgment against Transact First and Related Defendants for damages, together with interest, cost, expenses, and attorney's fees pursuant to the Tortious Interference with advantageous business relationship, and such other relief as the Court deems just and proper.

## COUNT IX
*Tortious Interference with Contract*

178. This is an action brought by Plaintiff against defendants, Transact First and related

defendants One Pay Cloud, Rocket One Capital, Shvartsman, Hannelius, Garelick ("Related Defendants"), Mony Zenou, Dejavoo, iPos LLX, DeNovo, sounding in tortious interference with contract.

179.    Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

180.    The Processing Agreement was a valid contract between IRMS and EFT, the Conspiring Defendants knew of the contract, but the Conspiring Defendants intentionally and without justification interfered with Processing Agreement and induced or otherwise caused the contractual breach of the Processing Agreement, and IRMS was damaged because of the interference.

181.    Furthermore, upon information and belief the Conspiring Defendants tortuously interfered by conspiring with Mony Zenou, Dejavoo and Denovo, to create software to emulate a cash dispensing ATM for their Dejavoo Script machines for the purpose of defrauding IRMS, Sponsor banks, upline processors, Networks as they knew or should have known the devastating effect theses tortious actions would cost and did cost in excess of fifty thousand dollars ($50,000) in value.

182.    In fact, there is no known lawful or legitimate reason for this spoofing software to Plaintiff's knowledge but to perpetrate an ongoing fraud against P, Banks, upline processors, networks, and the US Government.

183.    The Processing Agreement was a valid contract between IRMS and EFT, the Conspiring Defendants knew of the contract, and the Conspiring Defendants intentionally and without justification interfered with the Processing Agreement and induced or otherwise caused the Processing Agreement's breach, and IRMS suffered damages because of the interference.

30

184.    Transact First and the Related Defendants knew of the Processing Agreement between IRMS and EFT.

185.    Transact First and the Related Defendants intentionally and without justification interfered with the Processing Agreement and induced or otherwise caused a breach of the Processing Agreement.

186.    IRMS was damaged as result of Transact First's interference and the interference by the Related Defendants.

WHEREFORE, IRMS demands judgment against Transact First and Related Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Tortious Interference with contract, and such other relief as the Court deems just and proper.

## COUNT X
*Federal Racketeer Influenced and Corrupt Organizations Act (RICO) against the Conspiring Defendants*

187.    This is an action brought by Plaintiff against the Conspiring Defendants.

188.    Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

189.    Defendants, upon information and belief, have combined in excess of four thousand (4000) cannabis dispensaries transacting millions of transactions monthly at an average of three-dollar transaction fee prior to any split, and the Defendants have conspired to develop and implement an ongoing fraud program that each wire transmission is a separate criminal act which has been ongoing and developing since prior to 2017. These criminal acts are related, being perpetrated by the Defendants on a daily, and they pose a threat of continued criminal activity to IRMS and the general public.

190.    This cause of action arises as a result of the financial benefit from income derived

31

directly or indirectly by the Conspiring Defendants, each from their role in illegal activities.

191. The illegal activities consist of the use of the Dejavoo Masking Software, coupled with the Denovo reporting platform, designed to disguise cannabis related transactions, processed through IRMS, and the resulting laundering of money in such transactions and the adding and abetting of each Defendant in financial transactions in cannabis and marijuana transactions through interstate commerce and the federal banking system.

192. The Defendants established a pattern of racketeering activities via the financial threats and tortious interference in existing contracts in their efforts to consolidate payment transactions in the SLCD business, including the disguising of illegal cannabis and marijuana transactions, such acts qualifying as racketeering activity due to the acts involving controlled substances under the Controlled Substance Act.

193. The Conspiring Defendants each participated in the pattern of racketeering activity, using or investing the income derived from the illegal activities to establish and operate an enterprise engaged in interstate commerce, seeking to capture a monopoly on the market for SLCD business through fraud and tortious interference with contracts and business relationships.

194. The racketeering activity involved dealing in transactions with controlled substance listed under the Controlled Substance Act.

195. Such racketeering activity damaged IRMS banking relationships due to the risk that banks providing cannabis related business may face money laundering charges or charges of aiding and abetting and conspiracy.

196. Any transaction over ten thousand dollars ($10,000), run through a financial institution where funds are from criminal activity, also constitutes requisite criminal activity.

197. Financial transactions, including profit sharing between companies and regulated

32

cannabis businesses violate federal money laundering law

198.    Upon information and belief, the Defendants conducted this scheme over the course of more than one year, involved multiple transactions, and is a continuing criminal operation.

199.    Defendants knew the money involved in transactions were proceeds of a specified unlawful activity and intended to either promote the unlawful activity or had knowledge that the transaction was designed to conceal elements of origin or ownership with respect to the proceeds of the unlawful activity.

WHEREFORE, IRMS demands judgment against the Conspiring Defendants, for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Racketeering Activities, and such other relief as the Court deems just and proper.

## COUNT XI
*Defamation against EFT*

200.    This is an action brought by Plaintiff against defendant, EFT, sounding in defamation.

201.    Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through xx, above, as though more fully set forth herein.

202.    Upon information and belief, EFT made statements to third parties and banks that IRMS was in breach of the Processing Agreement

203.    Some of EFT's statements were false, and some of EFT's statements were true with respect to withholding fees but designed to mislead and create a false impression because IRMS was entitled to withhold such funds, resulting in defamation by implication against IRMS.

204.    EFT false and misleading statements were done intentionally, with the purpose of defaming IRMS.

205.    EFT's statements caused damages to IRMS through lost banking relationships and

33

damage to reputation.

206. EFT's statements were defamatory and prejudiced IRMS by affecting IRMS's business relationship.

WHEREFORE, IRMS demands judgment against EFT for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Defamation, and such other relief as the Court deems just and proper.

## COUNT XII
*Injurious Falsehood, Disparagement of Title, and Slander of Title against EFT*

207. This is an action brought by Plaintiff against defendant, EFT, sounding in injurious falsehood, disparagement of title, and slander of title.

208. Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 118, above, as though more fully set forth herein.

209. EFT made false statement about IRMS's processing service, to EFT customers and to banks.

210. EFT knew or reasonably should have known that the statement would likely result damage the relationship between the customers and banks, causing a termination of these relationships.

211. The false statements played a material and substantial part in inducing customers and banks to not process transactions with IRMS.

212. IRMS suffered special damages that were proximately caused by the false statements, which shall be determined upon further discovery. EFT falsely and maliciously disparaged the title of IRMS to banks, causing special pecuniary loss or damage.

WHEREFORE, IRMS demands judgment against EFT for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Injurious Falsehood,

34

Disparagement of Title, and Slander of Title, and such other relief as the Court deems just and proper.

Respectfully submitted this 29th day of January, 2024.

> /s/Paul A. Gionis
> **PAUL A. GIONIS, ESQUIRE**
> Florida Bar No.: 0560243
> **GIONIS, LILLY & ROMERO, PLLC**
> 1299 Main Street, Suite C
> Dunedin, Florida 34698
> Telephone: (727) 446-3333
> Facsimile: (727) 446-3311
> Primary E-Mail: pgionis@gionislilly.com
> Secondary E-Mail: eroy@gionislilly.com
> *Attorneys for Plaintiff, Indian River Merchant Services, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed with the Clerk of Court through the Florida Courts' E-filing Portal, and has been served electronically to all parties and counsel of record on this 29th day of January, 2024.

> /s/ Paul A. Gionis_____
> **PAUL A. GIONIS, ESQUIRE**

# Exhibit "A"

## PIN-Based Transaction Processing and Support Agreement

AGREEMENT between Indian River Merchant Services LLC, or its designee and/or assignee herein known as "IRMS LLC," and_EFT Services LLC, an Independent Sales Representative herein known as "ISR."

### RECITALS

WHEREAS, IRMS LLC, provides access to processing, bank sponsorship, settlement and/or customer services to merchants, banks and Independent Sales Representatives (ISRs) In connection with the terminals and transaction types that are subject to this agreement, which merchants are identified either in a data file supplied by ISR contemporaneously with this agreement or in an exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR into which program the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHEREAS, ISR, is principally a sales and support organization, responsible for managing and supporting its clients, including settling all financial and settlement obligations of its clients. The ISR provides and shall continue to provide marketing, sales and support to merchants who are or will become members of one or more banking network systems in connection with the terminals and transaction types that are subject to this agreement, which merchants are identified in an Exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR into which program, the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHERAS, IRMS, LLC and ISR are completely and entirely separate entities operating their respective separate businesses, and own their respective and separate assets. Neither party has any claim upon the other party for any intellectual property, software licenses, or financial, technical, infrastructure or personnel resources.

WHEREAS, ISR has complied and registered with appropriate networks for access to those networks for transaction processing, or will provide such documentation as is necessary to comply with reasonable requirements of the Sponsor Bank of IRMS LLC or ISR, and

WHEREAS, the Description of Locations" shall be amended from time to time by the registration or deletion of terminal locations, and

WHEREAS, IRMS LLC, and ISR desire to enter into an agreement whereby IRMS LLC will provide Electronic Funds Transfer (EFT) services for ISRs programs and equipment as necessary to enable various terminals to operate as described in a data file or an Exhibit to this Agreement entitled "Description of Terminals", and

WHEREAS ISR agrees to exercise due diligence and care in the implementation of the provisions of this agreement;

NOW THEREFORE, in consideration of the foregoing, and for mutual promises and premises set forth herein, the parties hereby agree as follows:

### Article 1
### Defined Terms; Rules of Construction

**1.1 Defined Terms**

As used in the Plan the following terms (which appear in the Plan as capitalized Terms) shall have the meanings set forth below:

"**ACH**" means Automated Clearinghouse Transaction. ACH transactions are aggregated for the day and sent out to the Federal Reserve through a Fed member bank. IRMS LLC initiates said ACH file transmission and ISR herewith authorizes IRMS LLC or its designees and agents to perform all such transactions as are reasonably related or required within the scope of services in this agreement or any addendums hereto.

"**ACH Fee**" means all the services and costs associated with settlement of principal, surcharge, rebates, withdrawals, and adjustments. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements.

EFT000041

## Processing and Service Agreement with ISRs

"**Acquirer Transaction**" means a transaction initiated at a Merchant establishment in whose location an EFT device or terminal is located.

"**Business Day**" means any day other than a Saturday, Sunday or "legal holiday" (as such term is defined in applicable rules, regulations or policies, as the same may be amended from time to time, which incorporate requirements from third party government and quasi-governmental units and such third parties (Gateway provider, network and account processors) as may be involved in the processing and settlement of EFT transactions in the ordinary course of events.

"**Card Services**" shall mean the facilitation of Customer's cardholder transactions regardless of transaction type or authorization method (e.g., on-line to Customer's applications processor, using a cardholder database on Vendor's system, using defined limits, etc.). Any Card Services provided through or under this Agreement shall be identified by either an addendum to this agreement or such other document with an established vendor or alliance partner of IRMS LLC in which the ISR sells, designs, provides or otherwise participates in a proprietary, open system or hybrid card service program including but not limited to Payroll Cards, Gift Cards or other prepaid or funded card system or card service.

"**Cash**" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtors or the Unsecured Creditors Trust, as the case may be, drawn on a domestic bank or in such digital or other lawful form as to reasonably construed as cash under this paragraph.

"**Customer**" means the ISR under this agreement. The parties understand and acknowledged that third parties are involved in the scope of the services provided under this agreement both as vendors and as clients including but not limited to merchants, salespeople, service personnel, banks and financial data processors and networks; however, it is understood that "Customer" as used in this agreement refers, as the context requires, to the ISR that executes this agreement and that the ISR includes those third parties under ISRs control, direction or affiliation, and that to the extent required, said third parties shall be registered, disclosed and qualified as required by network rules, the policies of the Sponsor Bank or the policies of IRMS LLC.

"**Emerging Market**" means non-traditional or products and services.

"**Gateway Provider**" also referred to as Gateway, Gateway link, Gateway Processor, means a financial data processor that provides access to one or more EFT networks, whether owned by an association of banks or otherwise providing interchange and switching services so that the cardholder of one bank can access his/her account using the EFT, ATM or other device or terminal operated by another bank or sponsored entity of a bank or other member institution or non-member institution qualified to provide sponsorship. It provides IRMS LLC with network access through Gateway links. Those "links" are communication links through which the information regarding each transaction is transmitted from the IRMS LLC intercept processors and the Gateway and then forwarded to the appropriate EFT network and then the EFT network sends the transaction data to the card-issuing financial institution for approval of the transaction. IRMS LLC maintains said links through its processors. Both links may be referred to as other acronyms but nonetheless refer to the same processing systems.

"**Gateway Services**" shall mean the facilitation of Customer's cardholder and/or Terminal transactions in each Network in which Customer participates and/or is a member. A Gateway transaction shall mean any receipt, transmission or exchange of data, whether completed or not.

2 _____

Initial

Initial

EFT000042

## Processing and Service Agreement with ISRs

"Governmental Authority" means any agency, board, bureau, executive, court, commission, department, legislature, tribunal, instrumentality or administration of the United States, a foreign country or any state, or any provincial, territorial, municipal, state, local or other governmental Entity in the United States or a foreign country. Government Authority includes but is not limited to the United States Federal Reserve regional and central banks and the rules, regulations and definitions continued within the publications of the Federal Reserve.

3

Initial

Initial

## Processing and Service Agreement with ISRs

"**Independent Sales Representative**" (ISR) means "Customer" which is an organization or entity that serves as the sales channel and/or primary service provider to merchants in whose commercial establishments EFT devices or terminals are located (Acquirer), or who serve as the sales channel and service provider for card issuance programs (Issuer). There are Master ISRs and Primary ISRs. The Master ISR is one selected by IRMS LLC to be the exclusive provider of services in a particular industry or geographical location. The Master ISR and Primary ISR are either already sponsored under a third party sponsorship bank with a qualified financial institution or are sponsored by IRMS LLC by virtue of its powers and discretion conferred through its contracts that provide Gateway Processing and Bank Sponsorship. If no third party sponsorship agreement exists for ISR, ISR shall bear the costs of sponsorship fees as they apply to the Customer under this agreement. As to the convenience fee or surcharge, Customer instructs IRMS LLC to distribute portion of the revenue to specific people or entities who serve as salesmen, locators, service providers, lenders, investors or other third party with interests in a particular merchant location or group of merchant locations.

"**Insurance Coverage**" means any insurance coverage under any Insurance Policy which is available for the payment of liability or damages arising from or related to Tort Claims.

"**Interchange**" means the fee charged by the Network switch for providing a common financial data processor by which the customers of one bank can electronically access their bank accounts at electronic funds transfer devices owned, operated or sponsored by another bank. In Acquirer transactions, transactions are separated first into two categories --- ATM and POS. In ATM transactions, the Interchange is charged to the bank that issued the ATM or debit card that was issued. In Point of Banking transactions (primarily the NYCE network) the interchange cost structure is lower than other networks. In Electronic Benefit Transactions (primarily the Quest network) the interchange cost structure is lower than other networks and there are certain rules, some of which are copied from national or regional networks that restrict certain types of convenience fees charged to cardholders in operating a terminal. In POS transactions, the interchange is charged to the merchant or operator of the terminal. Issuers in ATM transactions pay the Interchange fee which is then distributed to the network, gateway processor and intercept processor. Issuers share in the interchange fee charged to the merchant or operator of the terminal in POS Debit transactions such that there is a net income to the issuer when the card is utilized for a POS Debit transaction rather than as an ATM. The Interchange is not be confused with Surcharge or Convenience Fee, which is a separate fee handled in a different way. Interchange is also not to be confused with the Processing Fee charged by the Intercept processor (IRMS LLC) or Gateway fee which is also handled in a different way. Interchange should also not be confused with the Account Access Fee charged by the Issuing Bank to its cardholder, usually for using "foreign" ATMs (i.e., ATMs not operated by the issuing bank; the account access fee is a bank fee and a matter strictly between the cardholder and his depository bank that issued him the ATM or POS Debit Card. Interchange in POS Credit transactions is usually charged directly to the merchant as a transaction charge plus a percentage of sale fee.

"**Issuer**" means a bank that issues a card for use at an ATM, POS Debit, Point of Banking, POS Credit or other EFT terminal or device for access to the cardholder's account. Issuers issue cards to either direct account holders who maintain standard demand deposit or savings account at the Issuer Bank or an indirect account managed through a proprietary or Network approved card issuance program.

"**Liabilities**" means any and all liabilities, obligations (except for the Assumed Obligations), judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to a party or any Affiliate, Subsidiary, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence.

4 _____
_____

Initial _____

Initial _____

EFT000044

## Processing and Service Agreement with ISRs

"Lien" means, with respect to any asset or Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such asset or Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

"Management Company" means the entity designated at will by IRMS LLC for security and administrative purposes in whose name the IRMS LLC designated depository institution (Settlement Bank) receives the Master Settlement. The management company has no possessory rights to any money received from IRMS LLC transactions and acts strictly as a conduit, management and reporting entity in consideration of its receipt of a Management Fee. The current management company is IRMS LLC (IRMS LLC) which provides the direct processing for intercept, gateway, and sponsorship and settlement services.

"Management Fee" means the fee paid by IRMS LLC to the entity designated to receive Master Settlement. The amount of the management fee is determined on a month to month basis after deduction of expenses directed to be paid by IRMS LLC, in accordance with industry standards and prior conduct of normal operations of the Management Company. These fees include fees for transaction processing, terminal registration and support, settlement and related services.

"Master Settlement" means the ACH settlement to the depository bank designated by IRMS LLC (Settlement Bank) to receive the gross amount of principal withdrawals approved during the previous banking day and the gross amount of surcharge revenue and interchange revenue for the same period. Master Settlement represents entirely third party funds, to wit: IRMS LLC and IRMS LLC' customers and IRMS LLC' vendors. Master Settlement is then broken down into individual ACH settlements generated by the processor which are processed through the Federal Reserve on behalf of IRMS LLC through the respective designated depository banks accounts (Settlement Bank Accounts). Master Settlement is received by the IRMS LLC' designated depository institution into the name of the management company designated by IRMS LLC, i.e. IRMS LLC.

"Merchant" means a retail or professional establishment doing business with the consumer public and which has signed up with a regional or national electronic network through IRMS LLC to be a sponsored retail merchant permitted to offer electronic banking services to its customers and who can receive compensation and reimbursement for advancing funds to its customers in an ATM, ATM Scrip, Point of Banking, Point of Sale or other electronic funds transaction. Merchants are signed up by IRMS LLC channels which are usually ISRs. ISRs maintain the exclusive relationship with the merchant except for certain customer service activities provided by IRMS LLC through IRMS LLC, and GES. The devices in the Merchant establishments are operated by the merchant but usually initiated by their customer. Said devices or terminals are owned by either the merchant, the ISR or a third party investor or lender.

"Network" means any financial data processing switch connecting two or more unrelated financial institutions such that the holders of cards issued from institution can access their financial accounts at another unrelated financial institution through electronic funds transfer devices including but not limited to ATM, Point of Sale (POS), Point of Banking (POB), Electronic Benefits Transfer (EBT), payroll cards, prepaid debit cards, gift cards etc. By way of example, such networks may include but are not limited to MasterCard, Cirrus, Maestro, Visa, Plus, Interlink, Discover, Pulse, NYCE, AMEX, STAR, Jeannie, Shazaam, Quest and other regional, national and international networks. Network also includes associations of financial institutions and/or non financial institutions. Some networks require sponsorship while others do not. All require some written documentation and agreements with the Gateway processor and/or the intercept processor. Networks connect to EFT devices and terminals through Gateway processors which in turn connect through intercept processors. The intercept processors, also known as indirect processors, connect directly with the EFT devices or terminals.

"Network Compliance Claim" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity) against the Debtor, its successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, arising out of, or related to, any rules of the United States Federal Reserve, any enforceable rule of a participating network for electronic

5 _____

Initial

Initial

## Processing and Service Agreement with ISRs

funds transfer and settlement, or any other Federal, State or Local Laws, including any Claim or demand: (a) to restrict or enjoin, or recover damages, costs or expenses to remedy, any alleged violation, or to require the Debtor to remedy or to reimburse, pay or incur costs to remedy any violation, (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin, any violation of or alleged violation of any such rules or Laws, (c) to pay any contractual claim with respect to any such rules or Laws, or (d) to pay or reimburse any Person or Entity for financial injury, whether or not contemplated in subparagraphs (a) through (c) above, or whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was known, unknown, diagnosable, undiagnosable, detectable or undetectable before the Confirmation of the Plan or before the Final Decree Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Network Compliance Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the U.S. Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the U.S. Bankruptcy Code. Customer shall pay all fees, fines, assessments, penalties and other amounts in effect or assessed by each Network, which may change from time to time. IRMS LLC may allocate any such fees, fines, assessments and penalties in such manner, as it deems advisable in its sole discretion. Customer assumes all responsibility for collecting any amounts arising in connection with the use of Customer's cardholders' cards and/or Terminals, including but not limited to transaction amounts, fraud or other losses. Customer is solely responsible for all costs directly or indirectly associated with any system upgrades required by Customer or Vendor as a result of changes in the Network Documentation and/or any Network standards or requirements. In the event of any changes or modifications to the Network Documentation, which affect the responsibilities of a Network Participant or any processor in such Network, Vendor may amend this Agreement and/or change the applicable Service upon 30 days prior written notice to Customer.

"Network Documentation" shall mean the published Network by-laws, operating rules, identification standards manual, and such other rules, regulations, manuals, policies and procedures (including Vendor's standards), as may be amended from time to time, as published by the appropriate network. Network documentation includes documents required by the Network as well as Network published by the Network or association operating the Network.

"NETWORK MEMBERSHIP:" Customer shall indicate below the Network(s) in which Customer is a Network Participant. In the event for any reason Customer participates in a Network which Customer has not indicated below, Customer agrees that all of Customer's obligations in the Agreement and this Addendum shall apply with respect to such Network as if Customer had indicated such Network effective the date Customer begins participating in such Network. Customer agrees to abide by and fully comply with the Network Documentation as may be in effect from time to time and to perform and fulfill any and all obligations and responsibilities related thereto, including, if requested by the Network, execution of additional documentation or agreements. Customer, or its agents or nominees (but not Vendor), will provide all necessary Network, federal, state and/or local regulatory sponsorship, membership or other applicable approvals in order to receive the Services, unless otherwise specifically agreed to in writing in the form of an Amendment to the Agreement or in another contract signed by an authorized officer of Vendor. Notwithstanding the fact that a specific Network is listed below, Customer acknowledges and agrees that Vendor shall only be obligated to provide access to the Networks actually supported by Vendor and for only so long as such Networks are supported by Vendor.

Gateway Services/Networks May Include and are not limited to:

Cirrus® Corresponding Member
(Issuer & Acquirer)
Cirrus Terminal Only
Quest (EBT transactions)
Corresponding Member (Acquirer Only)
Maestro®

6 _____

Initial

Initial

EFT000046

## Processing and Service Agreement with ISRs

NYCE
American Express® ATM Network Member
Automated Clearinghouse Network(ACH)
Co-Op Network
Presto
Star®
Axcess America
Allpoint Network
Online Resources
Plus Sponsored Member(Issuer & Acquirer)
Plus ATM Category B Member(Acquirer Only)
Visa ATM Acquirer Member
Interlink
Discover Card Sponsored ATM
Acquirer Member
Armed Forces Financial (AFFN)
Credit Union (CU24)
Pulse

Debit Card Services/Networks

MC Debit Card
VISA Checkcard

"**Network Participant**" shall mean any financial institution such as a bank, thrift, credit union, or other entity, such as a merchant or Independent Sales Representative (ISR), which is a member of and/or is otherwise participating in a Network. In certain networks a non-network participant may nonetheless qualify as a sponsoring financial institution subject to the applicable network rules; in such cases the published rules of the network shall apply and the definitions therein shall take precedence over the definitions in this paragraph.

"**Network Registration Fee**" means the expenses incurred by IRMS LLC in registering the ISR with a particular Network. Each network registration fee generally varies from $1500-$5,000.

"**Network Settlement**" means the settlement through the United States Federal Reserve System of net debits and net credits to issuing and acquiring banks based upon EFT transactions of the day. These settlements are usually processed at midnight of the end of the banking day. The cutoff for the banking day for posting of electronic funds transfer transactions is usually 7:30 P.M. In its simplest form, if the cardholder from one bank, takes money from the ATM of an unrelated bank, then the money is transferred from the "issuer" (i.e., the bank that issued the cardholder the ATM or debit card he/she used in initiating the transaction) to the "acquiring bank" (i.e., the bank that owns, operates, sponsors or settles transactions on behalf of the operator of the terminal). In Network Settlement, a bulk settlement occurs to the credit of the bank for the Gateway processor. Hence in this case for transactions processed on the FIS gateway link, are combined with all other processors and deposited in bulk to an account designated by the Gateway processor at the depository institution utilized by the gateway processor to receive such deposits. This deposit is usually an ACH deposit but it can be wire transfer, depending upon the option of IRMS LLC and exigencies of the situation. The Gateway processor then separates out the deposits for each processor and sends a Master Settlement to the depository institution designated by its customer. The Network makes a deposit to the FIS (or subsequent gateway) account at the Master Settlement Bank (i.e., the Settlement Bank of the Gateway Service Provider). The Gateway Service Provider then prepares the ACH data file for Master Settlement to the depository institution designated by IRMS LLC. IRMS LLC then prepares the ACH data files for transmission to the Federal Reserve to deduct the

7 _____

Initial

Initial

## Processing and Service Agreement with ISRs

money from the Settlement Bank Accounts for individual settlements to the depository institutions selected by each merchant for receipt of these funds and the same for the revenue disbursements or rebates for each depository institution for the ISRs, other third parties who share in the revenue, and vendors who provide telecommunications, processing or other services to the IRMS LLC Venture. Network fees are subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements

"**Person**" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including but not limited to any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

"**Pro Rata Share**" means, with respect to any distribution under the ISR or other properly designated third party, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims (computed by pro rating days or other reasonable formula).

"**Processing**" means the actual receipt of data, logging of the data, and sending of data, whether encrypted or not, in accordance with industry standards for electronic funds transfer and all applicable laws, rules and regulations of the Federal Reserve System, networks, and contracts governing the conduct of the parties to the entire processing system by which the terminals or devices placed in merchant establishments are utilized by cardholders to access their bank accounts and perform financial or non-financial transactions. Processing includes intercept or indirect processing which involves the capture of data from the terminal or device, Gateway, which involves the capture of data from the intercept or indirect processor, Network, which involves the capture of data from the Gateway, Account Processor which involves the capture of data from the Network, and the return of data (authorization of transaction) through those same parties in reverse order back to the terminal.

"**Processing Fee**" means the fee charged by IRMS LLC for the processing of a transaction. Said fee is not subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements. ISR will be given as much notice as is reasonable and possible by IRMS LLC or IRMS LLC of any increases in fees resulting from said changes. No such changes are currently known beyond those provided in this agreement. However this is not a warranty that no such changes are in the publication or otherwise in process.

"**Property**" means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

"**Registration**" mean the process by which an ISR is entered into the IRMS LLC database and/or the process by which a Merchant or Merchant Terminal or Device is entered into the IRMS LLC database. Registration is a condition precedent to processing transactions on behalf of any ISR, Merchant, or Terminal. Registration is performed by EFT Management Services, Inc. Registration is not the same as Download.

"**Registration Fee**" means the fee charged by IRMS LLC for initiating an ISR, Merchant or Terminal into the IRMS LLC system for access to the FIS Gateway or any successor or substitute Gateway utilized by IRMS LLC. Registration fee is not the same as Download Fee or Monthly Fee.

"**Settlement Bank**" means the depository institution selected and designated by IRMS LLC to receive deposits of the proceeds of principal withdrawals and revenue from transactions that were processed through the IRMS LLC intercept processor, the Gateway Processor and the appropriate EFT network to which the issuing financial institution is a member. IRMS LLC or its contracted agents, for purposes of security and administration, may order the deposits to be made at the depository in the name of a designated surrogate who serves at the will and discretion of IRMS LLC, and serves as a transparent conduit for movement of funds initiated or to be initiated by a IRMS LLC processor for transactions on the current Gateway link(s) or its successor. The Settlement Bank is also an Automated Clearinghouse (ACH) service provider that allows IRMS LLC and IRMS LLC access to the accounts through electronic means for electronic transmission of funds through the United

8

Initial

Initial

EFT000048

## Processing and Service Agreement with ISRs

States Federal Reserve System. The settlement Bank may be one of several financial institutions that have agreed to provide ACH services.

"**Sponsor Bank**" (also referred to herein as sponsor or sponsorship) means a bank or other financial institution that is a member of, or has non-member rights to vouch for the transactions of a processor, ISR or encryption organization. The sponsor bank assumes all liability associated with all transactions of every type, nature and kind covered within the scope of its agreement for sponsorship, whether in writing (three-part agreement between Gateway, Sponsor and third party ISR or intercept processor), orally, or by operation of law. The parties agree that the sponsored entity (ies) may include IRMS LLC, IRMS LLC or a third party designee including but not limited to specific qualifying ISRs, the gateway provider or other vendors. Changes in fees from the sponsoring entities and agents will be passed through to the ISR who may pass through the expenses to either the merchant or cardholder.

"**Sponsorship Fee**" means the fees earned or incurred by IRMS LLC for a financial institution to provide sponsorship for the transactions covered by the scope for this agreement. Said fee is subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements.

"**Surcharge**" or "**Convenience Fee**" means the fee charged by the operator of an EFT terminal for the use and convenience of the terminal or device in a merchant establishment. This amount is collected by the Management Company and distributed to third parties in accordance with the instructions of the ISR or Merchant. Some networks through which a transaction is routed do not permit surcharge transactions including but limited to Cirrus International, Plus International, Axcess America, All Points, and certain other Associations of community banks and credit unions. IRMS LLC makes no warranty of receipt of surcharge income on transactions routed through those networks.

"**Telecommunications Fees**" means the costs and expenses of all aspects of the transmission of data from and to an EFT terminal, the intercept processor, the gateway processor, the network, the account processor and back through the loop and any intermediary parties therein. Said fee is subject to changes in third party service companies, network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. ISR bears the entire expense of connection from the terminal to the intercept processor and together with the merchant is solely responsible for the quality, consistency or availability of that connection.

"**Terminal**" means an ATM, POB, POS, or other electronic funds transfer device which is or which may be supported directly or indirectly by Vendor in accordance with its Standards, as certified through the Gateway processor(s) and network(s) as may be required by IRMS LLC, IRMS LLC or network documentation to perform transaction sets within the industry definitions of ATM, POB, POS, POS Scrip as the case may be, and as the same is amended by documentation or conduct of the applicable networks.

"**Terminal Services**" means the facilitation, processing and/or settlement of transactions at Customer's Terminals or within Customer's IRMS LLC-approved programs.

"**Terminal Software**" means the operating system, encryption, communications protocol and merchant data compliant with IRMS LLC host (server) requirements. IRMS LLC shall provide such software as is available through any means to IRMS LLC, but dos not guarantee the functioning of terminal software. Each ISR/Customer is responsible for development or improvement of terminal software as may be required from time to time in such manner that same can be certified through all host processors, networks and account processors in the EFT system utilized for authorization and completion of transactions. In all cases where the ISR has created terminal software for any EFT terminal, said software shall be made available in machine language and object code in executable form such that it can be downloaded and fully perform all expected functions by IRMS LLC information technology employees or representatives. IRMS LLC shall not provide access to said software to any third party for any purpose other than providing customer service. The delivery of the terminal code and all documentation reasonably requested by IRMS LLC shall never be construed as a conveyance of title or license to the code, except for the purposes expressed in this Agreement and more specifically in this paragraph.

9 _____

Initial

Initial

# Processing and Service Agreement with ISRs

"**Third Party Fees**" means any fees attributable to ISR's operations from third parties, affiliates, or other entities or persons which are billed or billable to the ISR. Customer shall pay all third party fees, costs, expenses and assessments in connection with the Services, which may change from time to time, whether incurred directly or indirectly by Customer, Vendor and/or its affiliates. Third party fees include, but shall not be limited to, all communications expenses (e.g. equipment, lines, drop charges, access charges, long distance, etc.); all hardware costs (e.g. the cost of individual Terminals, modems, upgrades, modem sharing devices, etc. and any expenses associated therewith (e.g. setups, maintenance, etc.); all Network fees; all miscellaneous fees associated with the Services (e.g. mailing expenses, overnight courier expenses, plastics, etc.); and all costs associated with maintaining and implementing all software and hardware necessary for any interface affecting the Services.

"**Tort Claim**" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity), their predecessors, successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, for, relating to, or arising from any death, personal injury, damage or loss (whether physical, emotional or otherwise) to any Person or Property, including any Claim or demand for compensatory damages (such as loss of consortium, wrongful death, unearned wages, survivorship, proximate, consequential, general, and special damages) and punitive damages, and any products liability claim, in each case for any act or event occurring on or prior to the Effective Date, whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was diagnosable, undiagnosable, detectable or undetectable before the Effective Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Tort Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

"**United States**" (U.S.) means the United States of America.

"**Vault Cash**" refers to the established local currency in the individual vaults of individual ATM terminals which may be subject to a separate service agreement with IRMS LLC or an affiliated entity. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. Under no circumstances shall IRMS LLC be considered the owner of said currency or any other contents of the vault, nor shall IRMS LLC be responsible or liable for any event, management, claim or handling of said currency. Any parties that elects to be involved in the servicing of cash vaults assumes full responsibilities for the vault, shall have adequate and appropriate insurance pursuant to industry standards, and shall have adequate and appropriate maintenance arrangements pursuant to industry standards. Fees charged by third parties in connection with vault cash, cash management or armored car services will be passed through to ISR if invoiced to IRMS LLC.

"**IRMS LLC Vendors**" means all third party entities that provide services to IRMS LLC, as they may be modified, changed or replaced from time to time by IRMS LLC. IRMS LLC acknowledges and represents that it is the duty of IRMS LLC to provide said gateway services through the Master Services Gateway Provider Agreement executed with such third party (ies) as deemed appropriate by IRMS LLC management.

Any capitalized term used in the Agreement that is not defined in the Agreement but that is defined in industry standard rules, regulations, laws or policies shall have the meaning ascribed to that term in the EFT industry with IRMS LLC rules policies controlling in the case of a conflict or ambiguity.

## 1.2    Rules of Construction.

10

Initial

Initial

EFT000050

# Processing and Service Agreement with ISRs

For purposes of this Agreement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references to Articles and Exhibits are references to Articles and Exhibits of this Agreement; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to this Agreement in its entirety rather than to a particular Article or section or subsection of the Agreement; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Agreement shall be deemed incorporated herein by such reference and made a part hereof for all purposes; and (i) if necessary, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 1.2.

## Article 2

### TERMS

I.    **ENTITLEMENTS & RESPONSIBILITIES**

A.    **IRMS LLC**

**IRMS LLC Requirements:**

a)    IRMS LLC and its affiliates agree to not, without written authorization from ISR, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with ISR for processing services.

**IRMS LLC Responsibilities:**

b)    Honor and protect the confidentiality of information provided by ISR and its clients.

c)    Transmit Settlement and Surcharge funds to the bank accounts designated by ISR, via Automated Clearing House transfers, on the same day the funds are made available to IRMS from the participating networks.

d)    ISR will be responsible for all bank relationships, operational and processing costs associated with distribution of funds to its customers

e)    Provide ATM Transaction processing and managed services.

f)    Provide Terminal Transaction reports on a basis agreed in the terms and provisions of this agreement.

g)    Provide routing and gateway to a majority of all major and minor national and regional EFT networks for ATM and POS devices as defined by IRMS LLC network, the proprietary EFT banking network hosted for IRMS LLC, as amended from time to time.

h)    Will not disparage ISR to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of ISR in any way.

i)    Will represent its relationship with the ISR as that of a vendor to the ISR, and will keep all elements of this agreement confidential for two years after the termination of the agreement

B.    **ISR**

11

Initial

Initial

## Processing and Service Agreement with ISRs

1.  **Requirements:**

    a)  ISR shall provide IRMS LLC with all information requested on the ISR Registration form and any other information reasonably requested by IRMS LLC from time to time. ISR warrants that all said information is true and that ISR shall immediately notify IRMS LLC of any change in status or information The Registration form must specifically state if the Merchant is participating in Emerging Markets. If IRMS determines a Registration form submitted by ISR did not correctly specify a Merchant as participating in Emerging Markets, IRMS may, at its sole discretion, terminate the Merchant's ability to process transactions through IRMS and assess a fine against ISR of $ 5,000, which will paid by a reduction in Surcharge payments to ISR.

    b)  ISR and its affiliates will submit updated Registration forms for all currently active Merchant locations specifically indicate if the Merchant is participating in Emerging Markets.

    c)  ISR and its affiliates will convert all of its customer's terminals to be directly connected to IRMS' selected processor. The process must be completed on a timely basis. If the process involves a manual process then the target date for completion is June 30th, 2017.

    d)  ISR and its affiliates will exclusively process all of its transaction processing customer's transactions with IRMS for the duration of this agreement.

    e)  ISR and its affiliates agree to not, without written authorization from IRMS, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with IRMS for processing services.

    f)  ISR agrees to provide IRMS full physical and communications access to all of ISR's transaction processing environment, including but not limited to firewalls, switches, servers and databases.

    g)  Provide telephone or other communications services at its expense for ATM or arrange for same with location.

    h)  Provide shipping at its own expense to and from location of the ATM.

    i)  Create all hard copy and digital files with correct data for registration including but not limited to a signed merchant service application.

2.  **Responsibilities:**

    a)  Honor and protect the confidentiality of information provided by IRMS LLC and its clients and prospective clients, including but not limited business methods, software for download, encryption, registration, reporting, analysis, management, processing, switching of any ATM, POS, EBT or other EFT device that ISR ever receives information on that relates to IRMS LLC, its affiliates, alliance partners or vendors.

    b)  Ensure accuracy and thoroughness of information provided IRMS LLC (its equipment suppliers and service providers).

    c)  Ensure the merchant has provided proper and complete site preparation, adequate signage and appropriate promotion of the terminal.

    d)  Continually monitor each and every merchant on at least a weekly basis to determine if the merchant is adequately trained in the use of the terminal, has maintained adequate signage and appropriate promotion and that the merchant has adequate supplies for the terminal.

    e)  Promptly inform IRMS LLC of any delays (included but not limited to settlement of principal or rebate) or specification changes.

    f)  Promptly inform IRMS LLC of any changes in registration data

    g)  To use IRMS LLC exclusively for any ATM related services as to any device that is the subject of this agreement.

12_____

Initial

Initial

EFT000052

## Processing and Service Agreement with ISRs

h) Will not disparage IRMS, LLC to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of IRMS LLC in any way.

i) ISR will specifically refer all inquiries from ACE Cash Express personnel to IRMS LLC or its designee.

j) Will represent its relationship with IRMS LLC as that of a customer of IRMS, LLC and keep all elements of this agreement confidential for two years after the termination of the agreement. Additionally, ISR and its employees and affiliates will not engage in any oral, written or electronic form of communications with any party or parties which is defamatory in nature in regards to IRMS LLC or its affiliates. Failure to comply with these requirements will cause the agreement to be terminated immediately and without notice. ISR understands termination of processing services does not adequately compensate IRMS for any or all damages from defamatory communications and IRMS does not waive its right for further legal recourse.

k) Has full and complete responsibility for accuracy of its transaction processing, settlement calculations, settlement routing and reporting to its clients.

## II.   TRANSACTION PRICING

A. Pricing of IRMS LLC services are as stated in **Exhibit A**, attached hereto "Managed and Processing Services Pricing". Processing services are priced on a per transaction/per terminal basis. Other pricing is on a per service charge and may or may not be applicable with the specific services provided to an ISR or merchant under this agreement.

## III.   ISR / MERCHANT COMPENSATION

A. ISR COMPENSATION: ISR compensation is derived from the charges negotiated with the merchant where the terminal is located. ISR compensation can include sharing in Merchant surcharge income. Net compensation is the amount the ISR receives, after all expenses and processing charges payable to IRMS LLC If daily settlement is required (and accepted by IRMS LLC Inc), the full principal will be settled to the Merchant (dispenser of cash) and a portion of the surcharge will be settled. The balance of the surcharge (convenience fee) settlement will be paid and reconciled on the 15th day of the close of the previous calendar month. Any other fees or charges against merchants or ATM customer (or their bank) will be disbursed on the 15th day of the month following receipt.

B. FEES BASED ON CURRENT INTERCHANGE LEVELS: The various fees for transaction processing and associated servicing under this agreement are not subject to change by either party to this agreement without express written consent of both parties.

C. ISR shall provide such services as indicated above or otherwise reasonably required by its merchants on a timely and expeditious basis; in the event that IRMS LLC determines that it is necessary to retain the services of additional personnel to provide said services, the cost of said additional personnel shall be deducted from the ISR's income and/or the merchant's income.

D. ISR hereby grants IRMS LLC or its designee full power of attorney for electronic access (ACH) to the ISRs account and the merchant's account for deposits and withdrawals under this agreement on behalf of himself and all merchants signed up under the scope and terms of this agreement.

E. MERCHANT COMPENSATION: Merchant compensation is derived from charges the merchant levies on customers using the terminal in their location and any other per transaction amounts negotiated between the ISR and Merchant

13_____

Initial

Initial

EFT000053

## Processing and Service Agreement with ISRs

IV. **NOTICES**

   A.  DELIVERY OF NOTICES. All notices required hereunder shall be in writing and delivered in person or by certified or registered mail, return receipt requested, postage prepaid. Such notices shall be addressed as follows:

| Indian River Merchant Services LLC | ISR: EFT Services LLC |
|---|---|
| 22101 US HWY 19 North<br>Clearwater, FL 33765 | 4801 S University Drive #303<br>Davie, FL 33328 |

V. **MISCELLANEOUS**

   A.  IRMS LLC wherever used in this agreement means any one of a number of entities or persons designated by IRMS LLC to act as agent for Indian River Merchant Services LLC pursuant to the requirements, terms and conditions of this agreement. Each of said companies has authority to do business as IRMS LLC.

   B.  SUPERSEDE. This Agreement and the Exhibits hereto contain the entire understanding of the parties hereto and supersedes all prior written or oral agreements with respect to the subject and scope contained within this Agreement.

   C.  SEVERABILITY. The illegality, invalidity or if unenforceable of any provision, Article or Exhibit of this Agreement shall not affect the remainder of this Agreement. In any proceeding involving the construction of this agreement, neither party shall be presumed to be drafter of the agreement; any provisions that are unenforceable for any reason shall be amended automatically to allow for enforcement of the remainder of the agreement and of the specific provision, if possible.

   D.  GOVERNING LAW. **This Agreement shall be governed, construed and interpreted under the laws of the State of Florida. The sole and exclusive venue for raising any dispute or claim brought by ISR shall be Pinellas County, Florida.**

   E.  HEADINGS. The heading contained herein is used for convenience and ease of reference and do not limit the scope, intent or interpretation of the Article headings or their subheadings.

   F.  PERSONS BOUND: This agreement is binding upon the parties hereto and any person or entity claiming through them including but not limited to any and all heirs, successors, assigns (if expressly permitted in writing by IRMS LLC), affiliates, agents, servants or employees and/or any entity in which any signatory or party hereto has any material ownership interest or business relationship.

   G.  **LIMITS ON LIABILITY -- EXCEPT THOSE EXPRESS WARRANTIES MADE IN THIS AGREEMENT, IRMS LLC DISCLAIMS ALL WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.** Without limiting the foregoing, IRMS LLC and IRMS LLC shall not be liable for lost profits, lost business or any incidental, special, consequential or punitive damages (whether or not arising out of circumstances known or foreseeable by IRMS LLC or IRMS LLC) suffered by Customer, its customers or any third party in connection with the Services provided by IRMS LLC or IRMS LLC hereunder. IRMS LLC or IRMS LLC liability hereunder shall in no event exceed an amount equal to the lesser of (i) actual monetary damages incurred by Customer or (ii) fees paid for the particular Services in question for the calendar month immediately preceding the date on which IRMS LLC and IRMS LLC received Customer's notice of nonperformance as set forth in this Agreement. In no event shall IRMS LLC or IRMS LLC be liable for any matter beyond its reasonable control, or for damages or losses wholly or partially caused by the Customer, or its employees or agents, or for any damages or losses which could have been avoided or limited by Customer giving notice to IRMS LLC and IRMS LLC as provided in Section 7. No cause of action, regardless of form, shall be brought by either party more than

14

Initial

Initial

EFT000054

## Processing and Service Agreement with ISRs

1 year after the cause of action arose, other than one for the nonpayment of fees and other amounts, including any damages, due IRMS LLC under this Agreement.

H. Other Agreements. IRMS LLC reserves the right to enter into other agreements pertaining to the Services with others including but not limited to without limitation banks, savings and loan associations, credit unions and other financial institutions and non-financial institutions, Independent Sales Representatives, indirect financial processors, gateway processors, or other parties that may or may not offer the same or similar services to those offered by Customer.

I. Taxes. Any sales, use, excise or other taxes (other than IRMS LLC income taxes) payable in connection with or attributable to the Services shall be paid by Customer. IRMS LLC may, but shall not have the obligation to pay such taxes if Customer fails to do so. In the event IRMS LLC pays such taxes, Customer shall immediately reimburse IRMS LLC upon demand and at the interest rate applicable for delinquent amounts as set forth in Section 4 hereof.

J. **Violation of Applicable Laws and Regulations.** IRMS LLC may cease providing any Service if such Service, in IRMS LLC opinion, violates any federal, state or local statute or ordinance or any regulation, order or directive of any governmental agency or court, or any published policy of IRMS LLC, related sponsoring bank, related settlement bank, federal, state or local agency, or proprietary or public network offering switching services for electronic funds transfer.

K. **No Intended Benefit to Third Party Beneficiary and No Right of Action to Third Party Beneficiary.** This Agreement is for the benefit of, and may be enforced only by, IRMS LLC and Customer and their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party, including but not limited to those third parties whose existence is disclosed, directly or indirectly to IRMS LLC.

L. **Waiver of Trial by Jury: Both Parties waives trial by jury on any issue triable of right by jury.**

M. **Attorney's fees: Customer agrees it shall be liable for any and all attorney's fees incurred by IRMS LLC or IRMS LLC whether or not in a formal proceeding, including appeals, administrative actions or quasi judicial or quasi administrative actions where such fees are incurred by IRMS LLC or IRMS LLC as a consequence or related to the scope of this agreement or any addenda hereto.**

N. **Authorization.** Each of the parties hereto represents and warrants on behalf of itself that it has full power and authority to enter into this Agreement; that the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or partnership or other appropriate authorizing actions; that the execution, delivery and performance of this Agreement will not contravene any applicable by-law, corporate charter, partnership or joint venture agreement, law, regulation, order or judgment; that execution, delivery and performance of this Agreement will not contravene any provision or constitute a default under any other agreement, license or contract which such party is bound; and, that this Agreement is valid and enforceable in accordance with its terms.

O. **Counterparts.** This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original.

P. **Drafting.** This Agreement has been drafted by IRMS LLC as a matter of convenience only and shall not be construed in favor of either party on that account. Each party acknowledges that it has had adequate opportunity to seek the services of independent counsel, accountants and/or other professionals prior to execution of this agreement and as such, each party acknowledges that they have full knowledge, authorization, comprehension and intent with respect to each and every provision of this agreement and any addenda hereto.

## VI. AMENDMENTS

A. AMENDMENTS.

1. Any enforceable change in rules, regulations, bylaws, statutes, ordinances or other policies or laws properly passed and published by any governing body of any government, quasi-government or private association to which IRMS LLC or IRMS LLC is a member or otherwise affected shall

15

Initial

Initial

## Processing and Service Agreement with ISRs

automatically amend the provisions of this Agreement to the extent of the change that is published. IRMS LLC will make every good faith effort within its resources to assure that no such proposed rule infringes on the contractual rights of IRMS LLC or any of its customers or vendors.

2. IRMS LLC reserves the right to unilaterally amend this Agreement from time to time as reasonably required as exigencies of business dictate. Any party affected by such amendments shall have a period of fifteen (15) calendar days from the date the amendment was first put into effect to state objections and request renegotiation of terms. At all times unless otherwise stated, the amended terms of the agreement shall be in full force and effect. In the event the parties fail to reach agreement, either party may apply for arbitration under the rules of the American Arbitration Association. Both parties agree to submit any such dispute to binding arbitration and/or mediation as the circumstances suggest or require.

B. MODIFICATIONS. Except as otherwise provided herein, this Agreement may not be amended, altered or otherwise modified except in writing executed by all parties hereto.

C. ASSIGNMENTS: This Agreement may not be assigned by any ISR to any party or entity except upon written consent and permission of IRMS LLC which shall not be unreasonably withheld only in the event that the holders of equity and the management structure of the assignee are virtually identical to the original ISR. Transfers of equity or title that are strictly for estate tax purposes will be allowed. All other transfers shall be construed as prohibited Assignments.

## VII. TERM AND TERMINATION

A. TERM. The term of this Agreement shall begin on November 1st, 2017, and will continue for a period of five (5) years, provided however that IRMS may terminate this agreement anytime with or without cause.

B. RENEWAL. With respect to the end of each term of this agreement, unless ISR gives written notice by Certified Mail not later than three (3) months prior to the expiration of this agreement, this agreement shall automatically renew for one (1) additional year, subject to the then prevailing charges, rules and regulations of IRMS LLC.

C. EFFECT OF TERMINATION. Upon termination of this agreement, the ISR shall only be entitled to receive compensation for all installed units earned under this agreement only to the date of this termination in accordance with the payment schedule as set forth in **Exhibit B.**

## VIII. ENTIRE AGREEMENT

A. This document constitutes the entire agreement between IRMS LLC and ISR. It supersedes any oral or written prior or contemporaneous negotiations or representations between the parties.

## IX. AGREEMENT DATE

A. DATE OF COMMENCEMENT. It is mutually agreed to by all parties that the Date of Commencement of this Agreement shall commence as of /2/29/17.

Executed this 29 day of Dec , 2017 in agreement by all parties hereto to this Agreement

16

Initial

Initial

## Processing and Service Agreement with ISRs

| Indian River Merchant Services LLC (IRMS LLC) | Guarantor (Randy Nolte)<br>EFT Services LLC |
|---|---|
| 22101 US HWY 19 North<br>Clearwater, Fl 33765<br><br>Phone: 1866-515-4767<br>Email: deven@irmsfl.net | 4801 S University Drive #303<br>Davie, FL 33328<br><br>Phone: 1888-324-1954<br>Email: randy@efte-solutions.com |
| BY:<br>Signature:<br>Official Capacity: *Florida* | BY: *Randy Nolte*<br>Signature<br>Official Capacity: *Manager* |
| Printed Name:<br>*Deven Wenlini* | Printed Name<br>*Randy Nolte* |
| Date:<br>12/29/17 | Date:<br>10/21/17 |
| Indian River Merchant Services LLC (IRMS LLC) | ISR: EFT Services LLC |

17_____

Initial

Initial

EFT000057

## Processing and Service Agreement with ISRs

Indian River Merchant Services LLC

### EXHIBIT A

PIN Based Transaction Pricing

1) Processing Costs:

    a. **Interchange:** IRMS will retain 100% of all interchange earned on all eligible transactions

    b. **Transaction Processing Fees:** IRMS will be paid a transaction processing fee in accordance with the pricing defined below. These fees will be deducted from Surcharge settlement to ISR and settled directly to IRMS via ACH.

    c. **Transaction Fee per Approved Transaction: $ .15** (for each 12 month period and adjust if market allows)

    d. **Transaction Fee per Approved Emerging Market (includes POB Fee): $1.50**

    e. **Transaction Fee per Approved Cash ATM Transaction Fee: $ .05**

2) Minimums: ISR agrees to a minimum monthly transaction volume of 300,000 approved transactions. Should the ISR fail to meet the minimum during any month during the team of this agreement, IRMS LLC will calculate the average Interchange and exact Surcharge fees based on 250,000 approved transactions, subtract the Interchange and Surcharge amount of the actual number of approved transactions for the current period and deduct the resulting unmet minimum from ISR's surcharge funding. Notwithstanding the foregoing, if the monthly transaction volume derived from Emerging Markets drops by 50% of it's previous three (3) months average monthly volume, both parties agree the new minimum for all monthly transactions will be 175,000 transactions per month and the transaction volume basis for calculating the fees due to IRMS will be 125,000 transactions per month.

18

Initial

Initial

## NOTICE AND RESERVATION OF RIGHTS

By counsel, Indian River Merchant Services ("IRMS" or "Claimant") hereby files its proof of claim and notes the following reservation of rights. As noted in the *Motion for Relief from the Automatic Stay to Pursue Claims Against One Pay Cloud, LLC* in State Court (Doc. 51), IRMS seeks to pursue, try, and liquidate its claims against the Debtor in State Court. The Debtor is one of numerous defendants for which IRMS asserts claims against and to pursue by jury trial. IRMS has filed its Motion but the Motion is not set for hearing prior to the claims deadline and IRMS is unaware if the Debtor consents to or objects to the relief requested therein. As such, IRMS provides as follows:

1.      This Proof of Claim is filed to protect the Claimant from forfeiture of the Claim. The filing of this Proof of Claim is not: (a) a waiver or release of the Claimant's rights against any person, entity or property; (b) a consent by the Claimant to the jurisdiction of the Bankruptcy Court with respect to the underlying litigation of the Claim; (c) a waiver of the right to move to withdraw the reference or otherwise to challenge the jurisdiction of this reference or otherwise challenge the jurisdiction of the Bankruptcy Court; (d) an election of remedy; or (e) a waiver of any rights or claims the Claimant has against the Debtor or any person or entity with respect to any pending or future litigation or to any matters related to such litigation.

4873-8433-4513, v. 1

# EXHIBIT "3"

UNITED STATES DISTRICT COURT SOUTHERN OF NEW YORK

EFT Services LLC and IPN LLC d/b/a Paybotic          Case No. 20 CV 01757

Plaintiff,

v.

i-POS Systems LLC d/b/a Dejavoo and DeNovo Systems, LLC,

Defendant.


LETTER MOTION TO ORDER UNREDACTED FILINGS


Re: EFT Business Services, LLC et al, v. Dejavoo, et al,
Letter Motion to unredacted and Unseal Documents


Dear Judge, Koeltl:


My name is Deven Werling I am the Owner of Indian River Merchant Services in Pinellas, County, Florida I am currently and for more than two years been in state litigation with EFT, and Randy Nolte in many same or similar facts, and conduct that was involved in your case cited above under Florida State case in and for Pinellas County Circuit Civil case number: 21-002572-CI

 Your Honor In your case Defendant Dejavoo by and through their attorney asked the court to allow the filing of redacted pleadings, affidavits, and other normally public accessible court records. Defendant filed in an abundance of caution the filings redacted, some filings were so redacted that they made no sense.  Defendant never did file a formal motion, set for hearing for relief sought or fulfill their burden to satisfy you and the case precedent that they were entitled to such relief.

Your Honor never granted the relief sought however in that the attorney filed redacted that is all that is publicly available through Pacer. To refresh your Honors recollection Dejavoo plead that they were an incorrect party in that a third-party Michael Shvartsman d/b/a One Pay Cloud was assigned all rights, privileges, and obligations to both the contracts at Bar and the software platform represented in the Exclusive Platform Licensing Agreements.

Information and Belief is that Software in your case is a emulation platform which via wire Dejavoo Script Terminals fraudulently  transmit it as it is a Cash dispensing ATM of another brand (Genera) to Indian River Merchant Services, Our Sponsored Banks, and Card Networks this is done as its unlawful under Federal Law to utilize Dejavoo type scrip machines and Credit/Debit Cards to Purchase Marijuana a Schedule I narcotic in fact to have a Cash dispensing ATM inside a Cannabis related business it must be cash loaded by a third party vendor such as Brinks, Wells Fargo or like business in that proceeds from Marijuana sales cannot be utilized in the ATM cash vault. We have received several legal Opinions that EFT who is now Owned by Shvartsman or his enterprise is Violating numerous Federal Laws including but

not limited to 18 US Code 1956, 1957, money laundering, Bank, and Wire Fraud to name a few all while out on federal pretrial release on Securities Fraud and Inside Trading.

IRMS has been damaged to the point its almost being put out of business due to the Platform in connection with the above-referenced matter. EFT was under exclusive contract with IRMS at the time of your case. If the information that was redacted was public IRMS would have been able to mitigate the damages caused by EFT and Shvartsman as the program in question makes both IRMS, and its banks, upline processors, and networks compliance, and loss prevention protocols near useless.

I Submit that Public interest in this case far out weighs the Defendants wanting to redact and/or seal filings to protect themselves from disclosing company protocols that are now public knowledge and to information and belief in furtherance of federal criminal activity. Alternatively in the instant cause Defendant failed to meet their burden to proof in order for justification to redact or seal (See Grymberg vs. BP P.L.C. 205 F.Supp.3d 1,3  D.D.C. 2016) Where the **Court ruled the moving party needed to bring forward specific reasons why the Court should grant any seal or redaction they** relied in part on Freidman V. Sebelius , 672 F.Supp2nd54,58 (D.D.C. 2009) ( quoting Johnson 951 F.2nd at 1278) Please also see McCormick Co. Inc , 275 F.Supp.3rd 218 (D.D.C. 2017) where the **Court ruled Public Access to Judicial Records outweigh McCormick's interest in avoiding reputational harm**. Furthermore, most Federal Courts have come to rely on the Hubbard test (US V Hubbard 650 F,2d 293 (D.C. 1980) which considers six factors 1) Need for Public Access 2) extent of public documents 3) fact that someone objected to disclosure 4) strength of property or privacy interest asserted (None formally asserted) 5) possibility of prejudice to opposing party 6) purpose the documents were offered.

WHEREFORE the Court never ordered that the filings be sealed or allowed to be broadly filed redacted and in accordance with well settled case law in favor of this motion and finally that the Defendants failure to bring forth specific reasons for the redactions/seal of said filings respectfully submits this letter motion requesting that all redacted filings including Pleadings, declarations, exhibits filed with this Honorable Court be ordered that the clerk to replace the redacted filings with unredacted versions contained in the court file for public access.

If this request is acceptable to the Court, we respectfully request that Your Honor so order.
That the Clerk file in public record (Pacer) the unredacted and unsealed filing by endorsing this Motion letter.


Respectfully submitted,

___S__Deven Werling_____

Deven Werling. Pro Se:
1875 Indian Rocks Rd.
Largo, Fl   33774
Islandhoppero17@gmail.com
305-494-4954

# EXHIBIT "4"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

ONE PAY CLOUD, LLC,

      Debtor.

INDIAN RIVER MERCHANT SERVICES, LLC

      Plaintiff,

v.

ONE PAY CLOUD, LLC,
TRANSACT FIRST, INC.,
I-POS SYSTEMS, LLC, and
DENOVO SYSTEMS, LLC.

      Defendants.

_____/

Case No. 24-10349-LMI

Chapter 11

Adv. Pro. No.:

## **COMPLAINT**

Plaintiff, Indian River Merchant Services, LLC ("IRMS") by counsel hereby files this *Complaint* against One Pay Cloud, LLC (the "Debtor"), Transact First, Inc. ("Transact First"), I-Pos Systems, LLC, d/b/a Dejavoo ("Dejavoo"), and Denovo Systems, LLC ("Denovo") (collectively, the "Defendants"). IRMS seeks damages for tortious interference of contract, tortious interference of business relationship, fraud, aiding and abetting fraud, and conspiracy. In support thereof, IRMS alleges as follows:

## **PARTIES, JURISDICTION, AND VENUE**

1. IRMS is a Florida limited liability company with its principal place of business in Largo, Florida.

2. The Debtor is a Delaware limited liability company, that during times relevant to this action, maintained its principal place of business in Aventura, Florida as a foreign limited

liability company authorized to do business in Florida.[1]

3.      Transact First, is a Delaware corporation, authorized to do business in Florida as a foreign corporation during times material hereto, and upon information and belief, was converted from Transact First, LLC, a Delaware Limited Liability Company, during times material hereto.

4.      Defendant Dejavoo is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.

5.      Defendant DeNovo is a Puerto Rico limited liability company, with its principal place of business is in San Juan, Puerto Rico.

6.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 157, 1332, and 1334.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## **PRELIMINARY INTRODUCTION**

8.      IRMS is a payment processor that facilitates payments between a customer using ATMs at a merchant and the upstream bank. Such entities are a necessary part of the financial plumbing that allow merchants to offer electronic payment systems to their customers. In exchange for processing such transactions, IRMS receives a portion of the fee charged on such agreements and earns its revenue by processing hundreds of thousands of such transactions through its platforms.

9.      IRMS does not process customers' requests for electronic payments alone. IRMS utilizes sponsoring banks which are required to process such transactions, and downstream merchant aggregators or brokers, also known as "ISRs" (defined below) who direct groups of merchants to process their electronic transactions through IRMS's platform. Relationships with

---

[1] The Debtor filed a certificate of withdrawal of authority to do business in Florida on June 8, 2023, with the Florida Secretary of State.

both the ISR and sponsoring banks are both necessary for IRMS's business. Without banks and networks, transactions would not be executed. Without the ISRs, IRMS would need to gather and solicit its own customers.

10. IRMS had productive contractual and business relations with both its primary ISR, EFT Services, LLC ("EFT"), and its sponsoring bank, Pueblo Bank and Trust ("Pueblo"). However, the Defendants, along with other persons or entities, conspired to interfere with IRMS's banking and ISR relationships. As part of this conspiracy, the Defendants routed illegal and fraudulent unapproved cannabis related transactions through IRMS's processing platform and through the federal banking system, resulting in IRMS forever losing its agreement with its sponsoring bank, Pueblo. Further, the Defendants worked to divert transactions (and the ensuing fee revenue) away from IRMS's platform. The diversion of transactions, and offloading merchants contractually scheduled to be processed through IRMS occurred at the same times as the Debtor and Transact First's common manager and member, Michael Shvartsman was making offers for the purchases of IRMS's business.

11. While the diversion of assets greatly decreased IRMS's revenue and viability as a company, the impairment and interference of its business relationships with Pueblo and EFT forecloses IRMS from replacing and regenerating the lost fee revenue as it can no longer process transactions without its sponsoring bank.

## FACTUAL ALLEGATIONS

### I.  IRMS's Contract and Business Relationship with EFT.

#### A.  Payment Systems Background.

12. IRMS is an Independent Sales Organization ("ISO"). An ISO is a payment intermediaries sponsored through banking institutions which facilitate the acceptance of

electronic payment from a merchant to the accepting bank. ISOs operate under both national and regional electronic payment processing networks.

13. ISOs operate independently but have established business relationships with banks, payment gateways and merchants. An ISO refers merchants to payment service providers so that merchants may accept credit, debit, or other forms of electronic payments.

14. Once an ISO has signed up a business to accept electronic payments on behalf of a bank, an ISO will typically get an interchange fee from the transaction with the bank. An ISO may also charge either customers or the business a percentage or fee of each transaction, otherwise known as surcharge. This fee is earned for the ISO facilitating the processing of the electronic payment at the merchant level through the sponsoring or accepting bank while meeting the regulatory and compliance requirements of the electronic payment industry. This compliance includes various regulatory requirements, applying and paying for sponsorship fees, and the sponsoring banks individualized compliance requirements.

15. While an ISO may interface with merchants directly, many utilize Independent Sales Representatives ("ISRs"). An ISR acts as brokers that give groups of merchants access to payment processing, bank sponsorship, settlement, and/or customer services in connection with ATM terminals and other hardware for processing of electronic transactions. Typically, an ISR assembles groups of merchants with electronic payment processing or ATM machines at their stores or locations into customer groups and routes the customer groups electronic merchant and ATM transactions through an ISO's processing assets.

16. Thus, while an ISO owns processing software and platforms and actively helps to facilitate the processing of electronic transactions through its systems, an ISR acts as a sales broker or support organization, assembling groups of merchants to use the ISO's services and

4876-7165-8697, v. 1

providing direct support to merchants.

17. Although much simpler than the actual process, the processing of an electronic payment from a customer to their bank may be understood as follows:



## B. IRMS's Contract with EFT Services, LLC

18. On December 12, 2017, IRMS entered into the *PIN-Based Transaction Processing and Support Agreement* (the "Processing Agreement[2]") with EFT. Under the Processing Agreement, EFT was to act as the ISR and exclusively route it and its affiliates' customers' ATM transactions through the IRMS's processing assets. Under the agreement, any operator of an EFT terminal or ATM machine would charge a surcharge (the "Surcharge"). *See* Processing Agreement, pg. 9.

19. For processing each transaction, IRMS was to earn $.05 on each approved transaction, $.15 on approved cash transactions, and $1.50 on each Emerging Market Transaction. *See* Processing Agreement, pg. 18, Exhibit A, the "Transaction Pricing". Additionally, IRMS was to keep all interchange fees earned on each transaction. Below is a representative copy of the Transaction Pricing.

---

[2] Attached hereto as **Exhibit "A."**

1) Processing Costs;

  a. **Interchange:** IRMS will retain 100% of all interchange earned on all eligible transactions

  b. **Transaction Processing Fees:** IRMS will be paid a transaction processing fee in accordance with the pricing defined below. These fees will be deducted from Surcharge settlement to ISR and settled directly to IRMS via ACH.

  c. **Transaction Fee per Approved Transaction: $.15 (for each 12 month period and adjust if market allows)**

  d. **Transaction Fee per Approved Emerging Market (includes POB Fee): $1.50**

  e. **Transaction Fee per Approved Cash ATM Transaction Fee: $.05**

20.     "Emerging Market" transactions were for the placement or connection of ATMs in places that did not typically already have ATMs such as vape shops, hotels, or corporate deals. EFT would aggregate these customers and then connect these ATMs with IRMS for processing.

21.     While the Transaction Pricing lays out three separate types of fees, the vast majority of transactions EFT sent to IRMS for processing were purported to be Emerging Market ATM transactions, that, once approved, were subject to all three types of fees in the Transaction Pricing, leading to $1.70 surcharge fee for IRMS on each transaction processed.

22.     In short, a customer would use an ATM in EFT's network which would charge a surcharge. In exchange for processing the transaction from the ATM to a bank, IRMS would earn a portion of the surcharge pursuant to the Transaction Pricing, and EFT would collect and pay same to IRMS. IRMS would also be entitled to the interchange fee on each transaction directly from the bank or network (collectively, the interchange and surcharge are the "Processing Fees").

23.     Per the Processing Agreement, EFT and its affiliates agreed to exclusively process all its customers' transactions through IRMS, for a five (5) year term, that was to renew annually, unless terminated by the parties in writing. *See Processing Agreement*, pg. 12, 16.

Further, under the Processing Agreement EFT agreed to a monthly minimum transaction volume of 300,000 approved transactions. *See* Id.

24. While the Emerging Market transactions were for "non-traditional" locations, EFT and IRMS did not consider the placement of ATMs in cannabis dispensaries. Cannabis dispensaries have significant legal and regulatory impediments to access modern electronic payment systems as many credit card companies view cannabis sales as illegal transactions. Because of these impediments, dispensaries may place a cash ATM within the dispensary (as described below) or oftentimes operate a cashless ATM also known as a "Scrip machine." However, these placement and use of the machines at dispensaries has significant issues as further described below.

25. Traditional cash ATMs could be operated lawfully in cannabis dispensaries so long as **(1)** SAR[3] reporting requirements were met, **(2)** the machine was not self-loaded by the dispensary, and **(3)** not owned by the dispensary.

26. This use of cash ATMs is separate from the use of cashless ATMs, also known as Scrip machines, in cannabis dispensaries which is contrary to the Network Rules which IRMS (and all ISOs) are subject to by its sponsoring bank and network agreements. The operation of Scip machines in dispensaries is a legal gray area that facilitates billions of dollars in revenue for dispensaries each year. Card networks such as Visa and MasterCard warn against such operation which can result in substantial penalties or fines to the ISO/Processor or even termination of access to the sponsoring bank and card network.

27. As the ISR, EFT was responsible for collecting and reporting the location and transaction type for the transactions EFT sent to IRMS for processing. *See*, Processing Agreement, pg. 1 ("merchants are identified either in a data file supplied by [EFT]

---

[3] FinCEN Suspicious Activity Reporting.

contemporaneously with this agreement in an exhibit to this agreement entitled 'Description of Locations' . . . into which program the [EFT] has correctly input all data relayed to his/hers/its locations and terminals for the purposed od registration of such terminals and locations.")

28.   Both cash ATM transactions and Scrip machines transactions, where the customer gets a receipt in lieu of cash are considered, "PIN based" transactions.

29.   EFT provided and reported information to IRMS that reflected almost all transactions were ATM transactions that met the Emerging Market definition under the Processing Agreement. However, an investigation by IRMS revealed many of these transactions were actually transactions on "Scrip Machines"[4], disguised as regular ATM transactions.

30.   The disguising of Scrip transactions as ATM transactions was contrary to the Processing Agreement, violated IRMS's agreement with its sponsoring bank, Pueblo, and was against card networks rules and regulations.

31.   While it is disputed whether the use of Scrip machines in dispensaries is legal under federal law, many card companies such as VISA have issued memorandums[5] against this use as this violates banks or cards companies own internal regulations.

C.   **Breach of Processing Agreement**

32.   IRMS and EFT's business pursuant to the Processing Agreement operated normally for a period of years, with EFT collecting and aggregating merchants' and/or groups of cash ATM's pin-based transaction to be sent to IRMS to be processed. IRMS's primary business was the processing of ATM transactions for which it would earn $1.70 per transaction. While

---

[4] ATM SCRIP works similar to a standard atm machine, except there is no cash inside. When a customer uses an ATM SCRIP machine they swipe their card & enter their PIN as they normally would, but the machine prints out a scrip receipt of the transaction, instead of dispensing cash. The customer then gives the scrip receipt to the cashier, to pay for whatever products or services that are rendered.

[5]   https://www.marijuanamoment.net/visa-warns-against-misuse-of-cashless-atms-used-by-cannabis-retailers-to-skirt-restrictions/

IRMS did operate a limited number of scrip machines in locations such as check cashing stores, it never agreed to or knowingly processed Scrip transactions in cannabis dispensaries. At $1.70 per transaction, and for hundreds of thousands of transactions a month, IRMS derived significant revenue from its operations as an ISO.

33.     In or around late 2020 or early 2021, significant issues and deviations with the volume of monthly transactions processed and the surcharge earned on those transactions started. The overall volume of transactions decreased with large groups of ATMs leaving the IRMS network and sometimes returning after an unexplained absence. Further, some transactions would be processed without showing the interchange fee that was typically charged or with a surcharge different than those ATMs were typically charging. The decrease in fees charged and transactions processed led to a decline in revenue and directly correlates with the creation, operation, and activities of the Debtor.

34.     On February 4, 2020, the Debtor was formed in the state of Delaware. The Debtor is 100% owned by Transact First, LLC ("Transact First") an entity owned and operated by Eric Hannelius and Michael Shvartsman.  Messrs. Hannelius and Shvartsman were also the signatory and all transactions of the Debtor at times relevant to this Complaint.[6]

35.     On February 10, 2020, the Debtor and Denovo entered into two agreements for certain software, more thoroughly explained in Section II of this Complaint below. The first agreement, the *Services Agreement*[7] assigned certain software and programs to the Debtor for the operation and processing of certain ATM or other transactions (the "Protocols"). Pursuant to the Services Agreement, Denovo agreed it would no longer provide other entities with access to these Protocols. In exchange, the Debtor agreed to pay Denovo $3,125,000.00 for the Protocols

---

[6] The Debtor would eventually appoint Oksana Moore as its manager immediately preceding the Petition Date.

[7] The "Services Agreement," attached hereto, with the "Side Letter" as **Composite Exhibit "B."**

4876-7165-8697, v. 1

and a maintenance fee of $30,000.00 a month to Denovo thereafter for the exclusive use of the Protocols. *See* Servies Agreement. The Debtor also had the option to purchase the Protocols original source code for another $2,000,000.00.

36.     A *Side Letter* to the Services Agreement states that the Debtor intended to use the software for the cannabis dispensary market, and that the exclusive use of the software developed by Denovo was strictly for the cannabis market and would not include any PIN based transactions outside of the cannabis market.

37.     In addition to the Services Agreement and Side Letter, the Debtor entered into a separate agreement on February 20, 2020, with Denovo and Dejavoo, the *Assignment of Services and License Agreements*.[8] Pursuant to the Assignment Agreement, all rights, rights, duties, and obligations under the Services Agreement were assigned from Denovo to the Debtor.

38.     That same day, the Debtor entered into a *Platform License Agreement*[9] (a "PLA") with its parent company, Transact First, for Transact First's use of a "proprietary platform" for the processing of electronic payment services. The PLA explicitly states it will provide debit, credit, and other payment services for the cannabis dispensary market.

39.     Another sub licensee of the software/Protocols now assigned to the Debtor was EFT itself, which on April 29, 2020, signed a similar PLA with the Debtor for the same use of the Denovo Protocols.

40.     On April 9, 2020, the Debtor registered in the state of Florida, and on April 23, 2020, the Debtor opened a bank account at Optimum Bank.

41.     Sub-licensees such as EFT would use their licenses of the Protocols to process ATM, Scrip machine and other electronic payment transactions at cannabis dispensaries. This

---

[8] The "Assignment Agreement," attached hereto as **Exhibit "C."**

[9] The "PLA," attached hereto with EFT's PLA as **Composite Exhibit "D."**

use of the Protocols allowed sub-licensees to disguise and send transactions to IRMS or other ISOs for processing as non-compliant transactions would be reflected as cash ATM transactions at non cannabis entities such as a nearby Burger King or as generated by a compliant cash ATM transaction at a dispensary.

42.     The Debtor itself was not a licensed or registered processor of transactions itself. To spoof and complete transactions the Debtor charged sublicensees between $1.00 and $3.50 to mask cannabis transactions, adding another layer in the processing chain. After charging these fees, the sublicensees would then upstream the disguised transactions to a processing ISO who would have no idea these transactions violated their respective bank, credit card network, and contractual regulations. The Debtor thus made its money licensing out the Protocols and other software from Denovo, and then either the Debtor or the sublicensee would use a registered ISO such as IRMS entity to actually have such transactions processed.

43.     The Debtor and Dejavoo were integral in allowing EFT or other ISRs to send non-compliant transactions to IRMS for processing.  However, after the late 2020 sale of EFT to the Debtor/Transact First, these transactions along with likely compliant were sent to other large ISOs. The rotation of processing to other ISOs was twofold: **(i)** a new ISO would likely use a different processor, reducing the risk of the Defendants non-compliant transactions Defendants being detected and **(ii)** to divert legal transactions away from IRMS to reduce IRMS's revenue and drive down the potential offer price Mr. Shvartsman and other individuals made for the purchase of IRMS's business as further discussed below.

44.     The Debtor and Transact First interfered with IRMS's relationship with EFT by forcing EFT to divert transactions away from IRMS, and to other entities or itself for processing.

In exchange the Debtor, now the sole holder of the Protocols, would then agree to process EFT's cannabis related transaction.

45.     On August 20, 2020, Debtor and Transact First executed the *Asset Purchase Agreement* (the "APA") of EFT. At the time of execution of the APA, EFT was and remains subject to the exclusivity provisions of the Processing Agreement with IRMS. IRMS was not informed that EFT had been sold to Transact First/and or the Debtor.

46.     Around this time, a separate individual, Bruce Garelick, began conversations with IRMS's owner for the sale of IRMS business. While general conversations continued throughout 2020, the first call IRMS had regarding the potential terms of a sale included both Mr. Garelick and Mr. Shvartsman, IRMS's first introduction to Mr. Shvartsman. As detailed above, Mr. Shvartsman is both the manager and owner of both Transact First and the Debtor and has further involvement with other entities and payment processors.

47.     On November 19, 2020, the sale of EFT to Transact First was closed. Almost immediately after the November 2020 closing of EFT's sale to Transact, there was a significant decrease in the number of transactions sent from EFT to IRMS. EFT, now under the direct control of Transact and its manager, Mr. Shvartsman, breached the Processing Agreement by intentionally redirecting ATM transactions to the Debtor or other similarly owned entities, converting fees payable to IRMS, and breaching the exclusivity terms that require EFT and its affiliates to use IRMS for processing customers' transactions.

48.     Sometime in the end of 2020 or beginning of 2021, the Debtor began soliciting the largest merchants and customers of EFT with false information, directly interfering with the contractual relationships between EFT and IRMS, and in furtherance of the conspiracy and scheme to harm IRMS, which was now an acquisition target of Transact or another Mr.

Shvartsman controlled entity.

49. As a direct result of the Debtor and Transact First's interference with the Processing Agreement, EFT failed to meet the minimum transaction volume situated in the Processing Agreement, further damaging IRMS. In addition to the interference with diverting transactions, the processing of disguised transactions was only possible through the software and Protocols the Debtor had exclusive license for. By June 2021, the Processing Agreement was effectively worthless as EFT, which was now controlled by the Debtor/Transact First, had cut off all transactions and refused to perform under the agreement. In less than a year terminal transaction had fallen from hundreds of thousands a month to zero, effectively ending the contractual and business relationship with EFT and jeopardizing IRMS's relation with its sponsoring bank, Pueblo.

50. Further evidencing this scheme is the Debtor and Denovo executing the *Addendum to Software Development Agreement*[10] on June 30, 2022. Pursuant to the Addendum, the Debtor agreed to remove "Verifone terminals" at the request of Denovo. Verifone terminals were terminals used by IRMS's clients in check cashing stores in accordance with the Processing Agreement. These Verifone terminals ran a special type of encryption software that was capable of working with only IRMS's systems. The removal of these terminals was for the exchange of Dejavoo' own terminals, so that the Debtor would replace the network previously in place under EFT and IRMS's processing agreement, to now generate funds for the Debtor instead of IRMS.

## II. Defendants' development and use of fraudulent masking software interfered with IRMS relationship with IRMS's sponsoring bank.

51. In addition to actively diverting and/or receiving fees for processing EFT's ATM transactions the Debtor used certain masking software to upstream cannabis related transaction

---

[10] Attached hereto as "**Exhibit "E."**"

4876-7165-8697, v. 1

that were illegal or violated bank and processor rules. Such fraudulent activity violated numerous provisions of the Controlled Substance Acts and federal banking laws, and this unjustified interference led to the termination of IRMS's banking relations with its sponsoring bank, Pueblo. Even if IRMS were able to retain a new ISR or platform merchants itself, it cannot do so without a sponsoring bank.

52.     As discussed above, cash dispensing ATMs are only allowed at state licensed cannabis dispensaries ("SLCD's") if they meet certain reporting requirements, and they cannot be owned or operated by the dispensary itself.

53.     Non-cash dispensing terminals, Scrip machines, are not allowed at the SLCDs under the card network processing rules such as Visa and Mastercard.  The Defendants operations of Dejavoo's terminals by emulating and fraudulently transmitting false data in order to deceive IRMS, sponsoring banks, and the network is itself a violation of federal law[11]. As such, processing Scrip machine transactions was excluded from the use in cannabis related businesses as it would be contrary to network rules and jeopardize IRMS's ability to access the national banking system through its sponsoring banks.

54.     To facilitate the spoofing or disguise of transactions, Dejavoo and Denovo had created a special software (the "Denovo Masking Software") that would disguise transactions from Dejavoo's terminals in cannabis stores and fraudulently make these transactions appear as though they were made to be from cash dispensing ATM terminals in cannabis stores, which is lawful.

55.     The Denovo Masking Software was included in the software licensed and assigned to the Debtor under the Services Agreement and Assignment Agreement discussed

---

[11] See 18 U.S.C. 1956-57; 21 U.S.C. §§ 801-971.  18 U.S.C. § 1956-57 criminalizes monetary transactions involving the proceeds of any transaction that violates the Controlled Substances Act, or "Specified Unlawful Activity."

Page **14** of **20**

4876-7165-8697, v. 1

above. The Debtor would then license this to entities such as EFT, who now had a way to process electronic payments at cannabis stores that were not lawful cash ATM transactions.

56.     In late 2020 and/or early 2021, EFT would process these transactions through IRMS by inputting fraudulent data into IRMS's compliance protocols, that included, without limitation, changing the name of the business where non-cash dispensing ATMs were located, as well as identifying the merchant as something other than a SLCD, to mask that EFT was operating non-cash dispensing ATMs at SLCD's in violation of both Federal Law and the Processing Agreement.

57.     The fraudulent and disguised transmission of data and information through the Denovo Masking Software made it impossible for IRMS or any processor to detect the processing of non-compliant and illegal transactions through its platform. It also rendered IRMS's compliance and detection protocols useless, which would serve to degrade and ultimately destroy IRMS's relations with sponsoring banks.

58.     The Dejavoo Masking Software was only designed to work on the Dejavoo Software Terminals and has no apparent lawful purpose as it only exists to conceal this unlawful activity from IRMS/other processors, their sponsoring banks, and the major network processors like Visa, MasterCard, and Discover.

59.     After the Debtor's purchase of EFT, eventually all transactions (including spoofed transactions) would cease by June of 2021, however this was not until after many such illegal cannabis transactions were processed and eventually up streamed to the sponsoring banks.

60.     Ultimately, on June 17, 2022, Pueblo sent the *Notice of Teremiantion*[12] informing IRMS it would be terminating its relationship as IRMS's sponsoring bank. The Notice of Termination Letter stated that after an investigation into the IRMS portfolio of ATMs, IRMS's

---

[12] Attached hereto as **Exhibit "F."**

4876-7165-8697, v. 1

"terminal locations are falsely transmitting transaction information to the card processing Networks. In particular, the Terminal ID, Merchant Category Code, Merchant Name, Merchant Address and Merchant State are all falsified."

61.     As the ISR, EFT was the entity responsible for collecting and transmitting the above information to IRMS so IRMS could send it to its Sponsoring Bank. EFT was able to falsify such data by licensing Dejavoo's spoofing software from the Debtor.

## COUNT I:
*Tortious Interference with advantageous business relationship*

62.     This is an action brought by IRMS against the Defendants for tortious interference with advantageous business relationship.

63.     Plaintiff hereby realleges and fully incorporates the allegations contained in paragraphs 1 through 61 above, as though fully set forth herein.

64.     A business relationship existed between EFT and IRMS that afforded IRMS existing or prospective legal rights, pursuant to the Processing Agreement.

65.     Further, IRMS had or maintained business relationships with processors, banks, merchants, ISRs and other ISOs in connection with processing ATM terminals and transactions that afford IRMS existing or prospective benefits and legal rights.

66.      The Defendants knew of the relationship between EFT and IRMS.

67.     The Defendants knew of the relationship between IRMS and processors, banks, merchants, ISRs and other ISOs

68.     The Defendants intentionally and without justification interfered with those relationships by utilizing integration software to purposely disguise transactions being processed through existing IRMS business relationships and through the diversion of lawful transactions that should have been processed by IRMS.

4876-7165-8697, v. 1

69.     IRMS was damaged as result of the Defendants interference.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with interest, cost, expenses, and attorney's fees and such further relief as the Court deems just and proper.

## COUNT II:
### *Tortious Interference with Contract*

70.     This is an action brought by Plaintiff against the Defendants for tortious interference with contract.

71.     Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 61 above, as though fully set forth herein.

72.     The Processing Agreement was a valid contract between IRMS and EFT.

73.     IRMS had an additional valid contract with Pueblo.

74.      The Defendants knew of these contracts, but intentionally and without justification interfered with Processing Agreement and banking contract and induced or otherwise caused the contractual breach of the Processing Agreement and banking contract, and IRMS was damaged because of the interference.

75.     IRMS was damaged as result of the Defendants interference.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Tortious Interference of Contract and for such further relief as this Court deems just and proper.

## COUNT III:
### *Fraud*

76.     This is an action brought by Plaintiff against the Defendants for fraud.

77.     Plaintiff hereby realleges and incorporates the allegations contained in paragraphs

4876-7165-8697, v. 1

1 through 61, above, as though fully set forth herein.

**78.** The Denovo software licensed by the Debtor fraudulently represented the nature of transactions.

**79.** The disguise of the nature of these transactions was a false and material representation.

**80.** The Defendants were aware of the false nature of this representation and intended IRMS to rely on this representation to process transactions.

**81.** The Defendants directed, facilitated, or caused these fraudulently concealed transactions to be processed utilizing IRMS's business.

**82.** IRMS relied on this representation in allowing the transaction to be processed.

**83.** IRMS was damaged as result of the Defendants fraud.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the Fraud and for such further relief as this Court deems just and proper.

## COUNT IV:
### *Aiding And Abetting Fraud*

**84.** This is an action brought by Plaintiff against the Defendants for aiding and abetting fraud.

**85.** Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 61, and 76 through 83 above, as though fully set forth herein.

**86.** Defendants aided and abetted the fraudulent use of the Denovo masking software to send disguised transactions to IRMS for processing.

**87.** Defendants had knowledge of the underlying fraud.

**88.** Defendants provided substantial assistance in the commission of the fraud.

4876-7165-8697, v. 1

89.     IRMS was damaged as result of the Defendants aiding and abetting fraud.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the aiding and abetting of fraud and for such further relief as this Court deems just and proper.

## COUNT V:
### *Conspiracy To Tortiously Interfere With Contract And Business Relationship*

90.     This is an action brought by Plaintiff against the Defendants for conspiracy to commit tortious interference with contract and tortious interference of business relationship.

91.     Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 75, above, as though fully set forth herein.

92.     The Processing Agreement was a valid contract and business relationship between IRMS and EFT. The agreement IRMS had with its bank was a valid contract and business relationship.

93.      The Defendants knew of the contract and business relationship and tortiously interfered with same.

94.     The defendants by agreement conspired to and took acts in furtherance of tortiously interfering with IRMS's contractual and business relationships.

95.     IRMS was damaged as result of the Defendant's conspiracy to tortiously interfere.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the aiding and abetting fraud and for such further relief as this Court deems just and proper.

## COUNT VI:
### *Conspiracy To Commit Fraud*

96.     This is an action brought by Plaintiff against the Defendants for conspiracy to

Page **19** of **20**

commit fraud.

97.     Plaintiff hereby realleges and incorporates the allegations contained in paragraphs 1 through 61, and 76 through 89 above, as though fully set forth herein.

98.     The Defendants had an agreement to commit fraud and committed acts in furtherance and pursuit of this conspiracy.

99.     Plaintiff was damaged as a result of this conspiracy.

**WHEREFORE**, IRMS demands entry of a judgment against the Defendants for damages, together with prejudgment interest, cost, expenses, and attorney's fees pursuant to the aiding and abetting fraud and for such further relief as this Court deems just and proper.

Respectfully submitted this 20th day of June 2024.

Respectfully submitted,

/s/ *Michael A. Stavros*
Michael Stavros FBN: 1033851
David S. Jennis / FBN: 775940
Jennis Morse
606 East Madison Street
Tampa, Florida 33602
Phone: (813) 229-2800
E-Mail:     djennis@jennislaw.com
                mstavros@jennislaw.com
                ecf@jennislaw.com

4876-7165-8697, v. 1

EXHIBIT "A"

# PIN-Based Transaction Processing and Support Agreement

AGREEMENT between Indian River Merchant Services LLC, or its designee and/or assignee herein known as "IRMS LLC," and_EFT Services LLC, an Independent Sales Representative herein known as "ISR."

## RECITALS

WHEREAS, IRMS LLC, provides access to processing, bank sponsorship, settlement and/or customer services to merchants, banks and Independent Sales Representatives (ISRs) in connection with the terminals and transaction types that are subject to this agreement, which merchants are identified either in a data file supplied by ISR contemporaneously with this agreement or in an exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR into which program the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHEREAS, ISR, is principally a sales and support organization, responsible for managing and supporting its clients, including settling all financial and settlement obligations of its clients. The ISR provides and shall continue to provide marketing, sales and support to merchants who are or will become members of one or more banking network systems in connection with the terminals and transaction types that are subject to this agreement, which merchants are identified in an Exhibit to this agreement entitled "Description of Locations" and which are all contained in the database program that has been provided by IRMS LLC to ISR into which program, the ISR has correctly input all data related to his/her/its locations and terminals for the purpose of registration of said terminals and locations; and

WHERAS, IRMS, LLC and ISR are completely and entirely separate entities operating their respective separate businesses, and own their respective and separate assets. Neither party has any claim upon the other party for any intellectual property, software licenses, or financial, technical, infrastructure or personnel resources.

WHEREAS, ISR has complied and registered with appropriate networks for access to those networks for transaction processing, or will provide such documentation as is necessary to comply with reasonable requirements of the Sponsor Bank of IRMS LLC or ISR, and

WHEREAS, the Description of Locations" shall be amended from time to time by the registration or deletion of terminal locations, and

WHEREAS, IRMS LLC, and ISR desire to enter into an agreement whereby IRMS LLC will provide Electronic Funds Transfer (EFT) services for ISRs programs and equipment as necessary to enable various terminals to operate as described in a data file or an Exhibit to this Agreement entitled "Description of Terminals", and

WHEREAS ISR agrees to exercise due diligence and care in the implementation of the provisions of this agreement;

NOW THEREFORE, in consideration of the foregoing, and for mutual promises and premises set forth herein, the parties hereby agree as follows:

### Article 1
### Defined Terms; Rules of Construction

#### 1.1 Defined Terms

As used in the Plan the following terms (which appear in the Plan as capitalized Terms) shall have the meanings set forth below:

"ACH" means Automated Clearinghouse Transaction. ACH transactions are aggregated for the day and sent out to the Federal Reserve through a Fed member bank. IRMS LLC initiates said ACH file transmission and ISR herewith authorizes IRMS LLC or its designees and agents to perform all such transactions as are reasonably related or required within the scope of services in this agreement or any addendums hereto.

"ACH Fee" means all the services and costs associated with settlement of principal, surcharge, rebates, withdrawals, and adjustments. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements.

EFT000041

## Processing and Service Agreement with ISRs

"**Acquirer Transaction**" means a transaction initiated at a Merchant establishment in whose location an EFT device or terminal is located.

"**Business Day**" means any day other than a Saturday, Sunday or "legal holiday" (as such term is defined in applicable rules, regulations or policies, as the same may be amended from time to time, which incorporate requirements from third party government and quasi-governmental units and such third parties (Gateway provider, network and account processors) as may be involved in the processing and settlement of EFT transactions in the ordinary course of events.

"**Card Services**" shall mean the facilitation of Customer's cardholder transactions regardless of transaction type or authorization method (e.g., on-line to Customer's applications processor, using a cardholder database on Vendor's system, using defined limits, etc.). Any Card Services provided through or under this Agreement shall be identified by either an addendum to this agreement or such other document with an established vendor or alliance partner of IRMS LLC in which the ISR sells, designs, provides or otherwise participates in a proprietary, open system or hybrid card service program including but not limited to Payroll Cards, Gift Cards or other prepaid or funded card system or card service.

"**Cash**" means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from the Reorganized Debtors or the Unsecured Creditors Trust, as the case may be, drawn on a domestic bank or in such digital or other lawful form as to reasonably construed as cash under this paragraph.

"**Customer**" means the ISR under this agreement. The parties understand and acknowledged that third parties are involved in the scope of the services provided under this agreement both as vendors and as clients including but not limited to merchants, salespeople, service personnel, banks and financial data processors and networks; however, it is understood that "Customer" as used in this agreement refers, as the context requires, to the ISR that executes this agreement and that the ISR includes those third parties under ISRs control, direction or affiliation, and that to the extent required, said third parties shall be registered, disclosed and qualified as required by network rules, the policies of the Sponsor Bank or the policies of IRMS LLC.

"**Emerging Market**" means non-traditional or products and services.

"**Gateway Provider**" also referred to as **Gateway, Gateway link, Gateway Processor,** means a financial data processor that provides access to one or more EFT networks, whether owned by an association of banks or otherwise providing interchange and switching services so that the cardholder of one bank can access his/her account using the EFT, ATM or other device or terminal operated by another bank or sponsored entity of a bank or other member institution or non-member institution qualified to provide sponsorship. It provides IRMS LLC with network access through Gateway links. Those "links" are communication links through which the information regarding each transaction is transmitted from the IRMS LLC intercept processors and the Gateway and then forwarded to the appropriate EFT network and then the EFT network sends the transaction data to the card-issuing financial institution for approval of the transaction. IRMS LLC maintains said links through its processors. Both links may be referred to as other acronyms but nonetheless refer to the same processing systems.

"**Gateway Services**" shall mean the facilitation of Customer's cardholder and/or Terminal transactions in each Network in which Customer participates and/or is a member. A Gateway transaction shall mean any receipt, transmission or exchange of data, whether completed or not.

2 _____

Initial

Initial

## Processing and Service Agreement with ISRs

"**Governmental Authority**" means any agency, board, bureau, executive, court, commission, department, legislature, tribunal, instrumentality or administration of the United States, a foreign country or any state, or any provincial, territorial, municipal, state, local or other governmental Entity in the United States or a foreign country. Government Authority includes but is not limited to the United States Federal Reserve regional and central banks and the rules, regulations and definitions continued within the publications of the Federal Reserve.

3 ————

Initial

Initial

EFT000043

## Processing and Service Agreement with ISRs

"Independent Sales Representative" (ISR) means "Customer" which is an organization or entity that serves as the sales channel and/or primary service provider to merchants in whose commercial establishments EFT devices or terminals are located (Acquirer), or who serve as the sales channel and service provider for card issuance programs (Issuer). There are Master ISRs and Primary ISRs. The Master ISR is one selected by IRMS LLC to be the exclusive provider of services in a particular industry or geographical location. The Master ISR and Primary ISR are either already sponsored under a third party sponsorship bank with a qualified financial institution or are sponsored by IRMS LLC by virtue of its powers and discretion conferred through its contracts that provide Gateway Processing and Bank Sponsorship. If no third party sponsorship agreement exists for ISR, ISR shall bear the costs of sponsorship fees as they apply to the Customer under this agreement. As to the convenience fee or surcharge, Customer instructs IRMS LLC to distribute portion of the revenue to specific people or entities who serve as salesmen, locators, service providers, lenders, investors or other third party with interests in a particular merchant location or group of merchant locations.

"Insurance Coverage" means any insurance coverage under any Insurance Policy which is available for the payment of liability or damages arising from or related to Tort Claims.

"Interchange" means the fee charged by the Network switch for providing a common financial data processor by which the customers of one bank can electronically access their bank accounts at electronic funds transfer devices owned, operated or sponsored by another bank. In Acquirer transactions, transactions are separated first into two categories --- ATM and POS. In ATM transactions, the Interchange is charged to the bank that issued the ATM or debit card that was issued. In Point of Banking transactions (primarily the NYCE network) the interchange cost structure is lower than other networks. In Electronic Benefit Transactions (primarily the Quest network) the interchange cost structure is lower than other networks and there are certain rules, some of which are copied from national or regional networks that restrict certain types of convenience fees charged to cardholders in operating a terminal. In POS transactions, the interchange is charged to the merchant or operator of the terminal. Issuers in ATM transactions pay the Interchange fee which is then distributed to the network, gateway processor and intercept processor. Issuers share in the interchange fee charged to the merchant or operator of the terminal in POS Debit transactions such that there is a net income to the issuer when the card is utilized for a POS Debit transaction rather than as an ATM. The Interchange is not be confused with Surcharge or Convenience Fee, which is a separate fee handled in a different way. Interchange is also not to be confused with the Processing Fee charged by the Intercept processor (IRMS LLC) or Gateway fee which is also handled in a different way. Interchange should also not be confused with the Account Access Fee charged by the Issuing Bank to its cardholder, usually for using "foreign" ATMs (i.e., ATMs not operated by the issuing bank; the account access fee is a bank fee and a matter strictly between the cardholder and his depository bank that issued him the ATM or POS Debit Card. Interchange in POS Credit transactions is usually charged directly to the merchant as a transaction charge plus a percentage of sale fee.

"Issuer" means a bank that issues a card for use at an ATM, POS Debit, Point of Banking, POS Credit or other EFT terminal or device for access to the cardholder's account. Issuers issue cards to either direct account holders who maintain standard demand deposit or savings account at the Issuer Bank or an indirect account managed through a proprietary or Network approved card issuance program.

"Liabilities" means any and all liabilities, obligations (except for the Assumed Obligations), judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to a party or any Affiliate, Subsidiary, predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence.

4

Initial

Initial

## Processing and Service Agreement with ISRs

"**Lien**" means, with respect to any asset or Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such asset or Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

"**Management Company**" means the entity designated at will by IRMS LLC for security and administrative purposes in whose name the IRMS LLC designated depository institution (Settlement Bank) receives the Master Settlement. The management company has no possessory rights to any money received from IRMS LLC transactions and acts strictly as a conduit, management and reporting entity in consideration of its receipt of a Management Fee. The current management company is IRMS LLC (IRMS LLC) which provides the direct processing for intercept, gateway, and sponsorship and settlement services.

"**Management Fee**" means the fee paid by IRMS LLC to the entity designated to receive Master Settlement. The amount of the management fee is determined on a month to month basis after deduction of expenses directed to be paid by IRMS LLC, in accordance with industry standards and prior conduct of normal operations of the Management Company. These fees include fees for transaction processing, terminal registration and support, settlement and related services.

"**Master Settlement**" means the ACH settlement to the depository bank designated by IRMS LLC (Settlement Bank) to receive the gross amount of principal withdrawals approved during the previous banking day and the gross amount of surcharge revenue and interchange revenue for the same period. Master Settlement represents entirely third party funds, to wit: IRMS LLC and IRMS LLC' customers and IRMS LLC' vendors. Master Settlement is then broken down into individual ACH settlements generated by the processor which are processed through the Federal Reserve on behalf of IRMS LLC through the respective designated depository banks accounts (Settlement Bank Accounts). Master Settlement is received by the IRMS LLC' designated depository institution into the name of the management company designated by IRMS LLC, i.e. IRMS LLC.

"**Merchant**" means a retail or professional establishment doing business with the consumer public and which has signed up with a regional or national electronic network through IRMS LLC to be a sponsored retail merchant permitted to offer electronic banking services to its customers and who can receive compensation and reimbursement for advancing funds to its customers in an ATM, ATM Scrip, Point of Banking, Point of Sale or other electronic funds transaction. Merchants are signed up by IRMS LLC channels which are usually ISRs. ISRs maintain the exclusive relationship with the merchant except for certain customer service activities provided by IRMS LLC through IRMS LLC, and GES. The devices in the Merchant establishments are operated by the merchant but usually initiated by their customer. Said devices or terminals are owned by either the merchant, the ISR or a third party investor or lender.

"**Network**" means any financial data processing switch connecting two or more unrelated financial institutions such that the holders of cards issued from institution can access their financial accounts at another unrelated financial institution through electronic funds transfer devices including but not limited to ATM, Point of Sale (POS), Point of Banking (POB), Electronic Benefits Transfer (EBT), payroll cards, prepaid debit cards, gift cards etc. By way of example, such networks may include but are not limited to MasterCard, Cirrus, Maestro, Visa, Plus, Interlink, Discover, Pulse, NYCE, AMEX, STAR, Jeannie, Shazaam, Quest and other regional, national and international networks. Network also includes associations of financial institutions and/or non financial institutions. Some networks require sponsorship while others do not. All require some written documentation and agreements with the Gateway processor and/or the intercept processor. Networks connect to EFT devices and terminals through Gateway processors which in turn connect through intercept processors. The intercept processors, also known as indirect processors, connect directly with the EFT devices or terminals.

"**Network Compliance Claim**" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity) against the Debtor, its successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, arising out of, or related to, any rules of the United States Federal Reserve, any enforceable rule of a participating network for electronic

5 _____

Initial _____

Initial _____

EFT000045

## Processing and Service Agreement with ISRs

funds transfer and settlement, or any other Federal, State or Local Laws, including any Claim or demand: (a) to restrict or enjoin, or recover damages, costs or expenses to remedy, any alleged violation, or to require the Debtor to remedy or to reimburse, pay or incur costs to remedy any violation, (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin, any violation of or alleged violation of any such rules or Laws, (c) to pay any contractual claim with respect to any such rules or Laws, or (d) to pay or reimburse any Person or Entity for financial injury, whether or not contemplated in subparagraphs (a) through (c) above, or whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was known, unknown, diagnosable, undiagnosable, detectable or undetectable before the Confirmation of the Plan or before the Final Decree Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Network Compliance Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the U.S. Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the U.S. Bankruptcy Code. Customer shall pay all fees, fines, assessments, penalties and other amounts in effect or assessed by each Network, which may change from time to time. IRMS LLC may allocate any such fees, fines, assessments and penalties in such manner, as it deems advisable in its sole discretion. Customer assumes all responsibility for collecting any amounts arising in connection with the use of Customer's cardholders' cards and/or Terminals, including but not limited to transaction amounts, fraud or other losses. Customer is solely responsible for all costs directly or indirectly associated with any system upgrades required by Customer or Vendor as a result of changes in the Network Documentation and/or any Network standards or requirements. In the event of any changes or modifications to the Network Documentation, which affect the responsibilities of a Network Participant or any processor in such Network, Vendor may amend this Agreement and/or change the applicable Service upon 30 days prior written notice to Customer.

"**Network Documentation**" shall mean the published Network by-laws, operating rules, identification standards manual, and such other rules, regulations, manuals, policies and procedures (including Vendor's standards), as may be amended from time to time, as published by the appropriate network. Network documentation includes documents required by the Network as well as Network published by the Network or association operating the Network.

"**NETWORK MEMBERSHIP:**" Customer shall indicate below the Network(s) in which Customer is a Network Participant. In the event for any reason Customer participates in a Network which Customer has not indicated below, Customer agrees that all of Customer's obligations in the Agreement and this Addendum shall apply with respect to such Network as if Customer had indicated such Network effective the date Customer begins participating in such Network. Customer agrees to abide by and fully comply with the Network Documentation as may be in effect from time to time and to perform and fulfill any and all obligations and responsibilities related thereto, including, if requested by the Network, execution of additional documentation or agreements. Customer, or its agents or nominees (but not Vendor), will provide all necessary Network, federal, state and/or local regulatory sponsorship, membership or other applicable approvals in order to receive the Services, unless otherwise specifically agreed to in writing in the form of an Amendment to the Agreement or in another contract signed by an authorized officer of Vendor. Notwithstanding the fact that a specific Network is listed below, Customer acknowledges and agrees that Vendor shall only be obligated to provide access to the Networks actually supported by Vendor and for only so long as such Networks are supported by Vendor.

**Gateway Services/Networks May Include and are not limited to:**

Cirrus® Corresponding Member
(Issuer & Acquirer)
Cirrus Terminal Only
Quest (EBT transactions)
Corresponding Member (Acquirer Only)
Maestro®

6 _____

Initial

Initial

EFT000046

## Processing and Service Agreement with ISRs

NYCE
American Express® ATM Network Member
Automated Clearinghouse Network(ACH)
Co-Op Network
Presto
Star®
Axcess America
Allpoint Network
Online Resources
Plus Sponsored Member(Issuer & Acquirer)
Plus ATM Category B Member(Acquirer Only)
Visa ATM Acquirer Member
Interlink
Discover Card Sponsored ATM
Acquirer Member
Armed Forces Financial (AFFN)
Credit Union (CU24)
Pulse

Debit Card Services/Networks

MC Debit Card
VISA Checkcard

"**Network Participant**" shall mean any financial institution such as a bank, thrift, credit union, or other entity, such as a merchant or Independent Sales Representative (ISR), which is a member of and/or is otherwise participating in a Network. In certain networks a non-network participant may nonetheless qualify as a sponsoring financial institution subject to the applicable network rules; in such cases the published rules of the network shall apply and the definitions therein shall take precedence over the definitions in this paragraph.

"**Network Registration Fee**" means the expenses incurred by IRMS LLC in registering the ISR with a particular Network. Each network registration fee generally varies from $1500-$5,000.

"**Network Settlement**" means the settlement through the United States Federal Reserve System of net debits and net credits to issuing and acquiring banks based upon EFT transactions of the day. These settlements are usually processed at midnight of the end of the banking day. The cutoff for the banking day for posting of electronic funds transfer transactions is usually 7:30 P.M. In its simplest form, if the cardholder from one bank, takes money from the ATM of an unrelated bank, then the money is transferred from the "issuer" (i.e., the bank that issued the cardholder the ATM or debit card he/she used in initiating the transaction) to the "acquiring bank" (i.e., the bank that owns, operates, sponsors or settles transactions on behalf of the operator of the terminal). In Network Settlement, a bulk settlement occurs to the credit of the bank for the Gateway processor. Hence in this case for transactions processed on the FIS gateway link, are combined with all other processors and deposited in bulk to an account designated by the Gateway processor at the depository institution utilized by the gateway processor to receive such deposits. This deposit is usually an ACH deposit but it can be wire transfer, depending upon the option of IRMS LLC and exigencies of the situation. The Gateway processor then separates out the deposits for each processor and sends a Master Settlement to the depository institution designated by its customer. The Network makes a deposit to the FIS (or subsequent gateway) account at the Master Settlement Bank (i.e., the Settlement Bank of the Gateway Service Provider). The Gateway Service Provider then prepares the ACH data file for Master Settlement to the depository institution designated by IRMS LLC. IRMS LLC then prepares the ACH data files for transmission to the Federal Reserve to deduct the

7 _____

Initial

Initial

EFT000047

## Processing and Service Agreement with ISRs

money from the Settlement Bank Accounts for individual settlements to the depository institutions selected by each merchant for receipt of these funds and the same for the revenue disbursements or rebates for each depository institution for the ISRs, other third parties who share in the revenue, and vendors who provide telecommunications, processing or other services to the IRMS LLC Venture. Network fees are subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements

**"Person"** means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including but not limited to any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

**"Pro Rata Share"** means, with respect to any distribution under the ISR or other properly designated third party, a fraction, the numerator of which shall be the amount of such Holder's Allowed Claim and the denominator of which shall be the sum of all Allowed Claims (computed by pro rating days or other reasonable formula).

**"Processing"** means the actual receipt of data, logging of the data, and sending of data, whether encrypted or not, in accordance with industry standards for electronic funds transfer and all applicable laws, rules and regulations of the Federal Reserve System, networks, and contracts governing the conduct of the parties to the entire processing system by which the terminals or devices placed in merchant establishments are utilized by cardholders to access their bank accounts and perform financial or non-financial transactions. Processing includes intercept or indirect processing which involves the capture of data from the terminal or device, Gateway, which involves the capture of data from the intercept or indirect processor, Network, which involves the capture of data from the Gateway, Account Processor which involves the capture of data from the Network, and the return of data (authorization of transaction) through those same parties in reverse order back to the terminal.

**"Processing Fee"** means the fee charged by IRMS LLC for the processing of a transaction. Said fee is not subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements. ISR will be given as much notice as is reasonable and possible by IRMS LLC or IRMS LLC of any increases in fees resulting from said changes. No such changes are currently known beyond those provided in this agreement. However this is not a warranty that no such changes are in the publication or otherwise in process.

**"Property"** means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

**"Registration"** mean the process by which an ISR is entered into the IRMS LLC database and/or the process by which a Merchant or Merchant Terminal or Device is entered into the IRMS LLC database. Registration is a condition precedent to processing transactions on behalf of any ISR, Merchant, or Terminal. Registration is performed by EFT Management Services, Inc. Registration is not the same as Download.

**"Registration Fee"** means the fee charged by IRMS LLC for initiating an ISR, Merchant or Terminal into the IRMS LLC system for access to the FIS Gateway or any successor or substitute Gateway utilized by IRMS LLC. Registration fee is not the same as Download Fee or Monthly Fee.

**"Settlement Bank"** means the depository institution selected and designated by IRMS LLC to receive deposits of the proceeds of principal withdrawals and revenue from transactions that were processed through the IRMS LLC intercept processor, the Gateway Processor and the appropriate EFT network to which the issuing financial institution is a member. IRMS LLC or its contracted agents, for purposes of security and administration, may order the deposits to be made at the depository in the name of a designated surrogate who serves at the will and discretion of IRMS LLC, and serves as a transparent conduit for movement of funds initiated or to be initiated by a IRMS LLC processor for transactions on the current Gateway link(s) or its successor. The Settlement Bank is also an Automated Clearinghouse (ACH) service provider that allows IRMS LLC and IRMS LLC access to the accounts through electronic means for electronic transmission of funds through the United

8 _____
_____

Initial

Initial

States Federal Reserve System. The settlement Bank may be one of several financial institutions that have agreed to provide ACH services.

"**Sponsor Bank**" **(also referred to herein as sponsor or sponsorship)** means a bank or other financial institution that is a member of, or has non-member rights to vouch for the transactions of a processor, ISR or encryption organization. The sponsor bank assumes all liability associated with all transactions of every type, nature and kind covered within the scope of its agreement for sponsorship, whether in writing (three-part agreement between Gateway, Sponsor and third party ISR or intercept processor), orally, or by operation of law. The parties agree that the sponsored entity (ies) may include IRMS LLC, IRMS LLC or a third party designee including but not limited to specific qualifying ISRs, the gateway provider or other vendors. Changes in fees from the sponsoring entities and agents will be passed through to the ISR who may pass through the expenses to either the merchant or cardholder.

"**Sponsorship Fee**" means the fees earned or incurred by IRMS LLC for a financial institution to provide sponsorship for the transactions covered by the scope for this agreement. Said fee is subject to changes in network, gateway and sponsor bank charges and changes in compliance requirements.

"**Surcharge**" **or** "**Convenience Fee**" means the fee charged by the operator of an EFT terminal for the use and convenience of the terminal or device in a merchant establishment. This amount is collected by the Management Company and distributed to third parties in accordance with the instructions of the ISR or Merchant. Some networks through which a transaction is routed do not permit surcharge transactions including but limited to Cirrus International, Plus International, Axcess America, All Points, and certain other Associations of community banks and credit unions. IRMS LLC makes no warranty of receipt of surcharge income on transactions routed through those networks.

"**Telecommunications Fees**" means the costs and expenses of all aspects of the transmission of data from and to an EFT terminal, the intercept processor, the gateway processor, the network, the account processor and back through the loop and any intermediary parties therein. Said fee is subject to changes in third party service companies, network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. ISR bears the entire expense of connection from the terminal to the intercept processor and together with the merchant is solely responsible for the quality, consistency or availability of that connection.

"**Terminal**" means an ATM, POB, POS, or other electronic funds transfer device which is or which may be supported directly or indirectly by Vendor in accordance with its Standards, as certified through the Gateway processor(s) and network(s) as may be required by IRMS LLC, IRMS LLC or network documentation to perform transaction sets within the industry definitions of ATM, POB, POS, POS Scrip as the case may be, and as the same is amended by documentation or conduct of the applicable networks.

"**Terminal Services**" means the facilitation, processing and/or settlement of transactions at Customer's Terminals or within Customer's IRMS LLC-approved programs.

"**Terminal Software**" means the operating system, encryption, communications protocol and merchant data compliant with IRMS LLC host (server) requirements. IRMS LLC shall provide such software as is available through any means to IRMS LLC, but dos not guarantee the functioning of terminal software. Each ISR/Customer is responsible for development or improvement of terminal software as may be required from time to time in such manner that same can be certified through all host processors, networks and account processors in the EFT system utilized for authorization and completion of transactions. In all cases where the ISR has created terminal software for any EFT terminal, said software shall be made available in machine language and object code in executable form such that it can be downloaded and fully perform all expected functions by IRMS LLC information technology employees or representatives. IRMS LLC shall not provide access to said software to any third party for any purpose other than providing customer service. The delivery of the terminal code and all documentation reasonably requested by IRMS LLC shall never be construed as a conveyance of title or license to the code, except for the purposes expressed in this Agreement and more specifically in this paragraph.

9 _____

_____

Initial

Initial

EFT000049

## Processing and Service Agreement with ISRs

"**Third Party Fees**" means any fees attributable to ISR's operations from third parties, affiliates, or other entities or persons which are billed or billable to the ISR. Customer shall pay all third party fees, costs, expenses and assessments in connection with the Services, which may change from time to time, whether incurred directly or indirectly by Customer, Vendor and/or its affiliates. Third party fees include, but shall not be limited to, all communications expenses (e.g. equipment, lines, drop charges, access charges, long distance, etc.); all hardware costs (e.g. the cost of individual Terminals, modems, upgrades, modem sharing devices, etc. and any expenses associated therewith (e.g. setups, maintenance, etc.); all Network fees; all miscellaneous fees associated with the Services (e.g. mailing expenses, overnight courier expenses, plastics, etc.); and all costs associated with maintaining and implementing all software and hardware necessary for any interface affecting the Services.

"**Tort Claim**" means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity), their predecessors, successors or assigns, Subsidiaries or Affiliates, or their present or former officers, directors or employees, for, relating to, or arising from any death, personal injury, damage or loss (whether physical, emotional or otherwise) to any Person or Property, including any Claim or demand for compensatory damages (such as loss of consortium, wrongful death, unearned wages, survivorship, proximate, consequential, general, and special damages) and punitive damages, and any products liability claim, in each case for any act or event occurring on or prior to the Effective Date, whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury, loss or damage giving rise to such Claim or demand was diagnosable, undiagnosable, detectable or undetectable before the Effective Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Tort Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

"**United States**" (U.S.) means the United States of America.

"**Vault Cash**" refers to the established local currency in the individual vaults of individual ATM terminals which may be subject to a separate service agreement with IRMS LLC or an affiliated entity. Said fee is subject to changes in network, gateway, settlement bank and sponsor bank charges and changes in compliance requirements. Under no circumstances shall IRMS LLC be considered the owner of said currency or any other contents of the vault, nor shall IRMS LLC be responsible or liable for any event, management, claim or handling of said currency. Any parties that elects to be involved in the servicing of cash vaults assumes full responsibilities for the vault, shall have adequate and appropriate insurance pursuant to industry standards, and shall have adequate and appropriate maintenance arrangements pursuant to industry standards. Fees charged by third parties in connection with vault cash, cash management or armored car services will be passed through to ISR if invoiced to IRMS LLC.

"**IRMS LLC Vendors**" means all third party entities that provide services to IRMS LLC, as they may be modified, changed or replaced from time to time by IRMS LLC. IRMS LLC acknowledges and represents that it is the duty of IRMS LLC to provide said gateway services through the Master Services Gateway Provider Agreement executed with such third party (ies) as deemed appropriate by IRMS LLC management.

Any capitalized term used in the Agreement that is not defined in the Agreement but that is defined in industry standard rules, regulations, laws or policies shall have the meaning ascribed to that term in the EFT industry with IRMS LLC rules policies controlling in the case of a conflict or ambiguity.

1.2     **Rules of Construction.**

10

Initial

Initial

EFT000050

## Processing and Service Agreement with ISRs

For purposes of this Agreement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references to Articles and Exhibits are references to Articles and Exhibits of this Agreement; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to this Agreement in its entirety rather than to a particular Article or section or subsection of the Agreement; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Agreement shall be deemed incorporated herein by such reference and made a part hereof for all purposes; and (i) if necessary, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 1.2.

### Article 2

### TERMS

I.   ENTITLEMENTS & RESPONSIBILITIES

A.   IRMS LLC

IRMS LLC Requirements:

a)   IRMS LLC and its affiliates agree to not, without written authorization from ISR, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with ISR for processing services.

IRMS LLC Responsibilities:

b)   Honor and protect the confidentiality of information provided by ISR and its clients.

c)   Transmit Settlement and Surcharge funds to the bank accounts designated by ISR, via Automated Clearing House transfers, on the same day the funds are made available to IRMS from the participating networks.

d)   ISR will be responsible for all bank relationships, operational and processing costs associated with distribution of funds to its customers

e)   Provide ATM Transaction processing and managed services.

f)   Provide Terminal Transaction reports on a basis agreed in the terms and provisions of this agreement.

g)   Provide routing and gateway to a majority of all major and minor national and regional EFT networks for ATM and POS devices as defined by IRMS LLC network, the proprietary EFT banking network hosted for IRMS LLC, as amended from time to time.

h)   Will not disparage ISR to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of ISR in any way.

i)   Will represent its relationship with the ISR as that of a vendor to the ISR, and will keep all elements of this agreement confidential for two years after the termination of the agreement

B.   ISR

11

Initial

Initial

EFT000051

## Processing and Service Agreement with ISRs

1. **Requirements:**

   a) ISR shall provide IRMS LLC with all information requested on the ISR Registration form and any other information reasonably requested by IRMS LLC from time to time. ISR warrants that all said information is true and that ISR shall immediately notify IRMS LLC of any change in status or information The Registration form must specifically state if the Merchant is participating in Emerging Markets. If IRMS determines a Registration form submitted by ISR did not correctly specify a Merchant as participating in Emerging Markets, IRMS may, at its sole discretion, terminate the Merchant's ability to process transactions through IRMS and assess a fine against ISR of $ 5,000, which will paid by a reduction in Surcharge payments to ISR.

   b) ISR and its affiliates will submit updated Registration forms for all currently active Merchant locations specifically indicate if the Merchant is participating in Emerging Markets.

   c) ISR and its affiliates will convert all of its customer's terminals to be directly connected to IRMS' selected processor. The process must be completed on a timely basis. If the process involves a manual process then the target date for completion is June 30th, 2017.

   d) ISR and its affiliates will exclusively process all of its transaction processing customer's transactions with IRMS for the duration of this agreement.

   e) ISR and its affiliates agree to not, without written authorization from IRMS, offer, promote or propose any processing services as defined in this agreement, to a merchant which is currently under a processing agreement with any other ISR or its affiliates, which is under a contract with IRMS for processing services.

   f) ISR agrees to provide IRMS full physical and communications access to all of ISR's transaction processing environment, including but not limited to firewalls, switches, servers and databases.

   g) Provide telephone or other communications services at its expense for ATM or arrange for same with location.

   h) Provide shipping at its own expense to and from location of the ATM.

   i) Create all hard copy and digital files with correct data for registration including but not limited to a signed merchant service application.

2. **Responsibilities:**

   a) Honor and protect the confidentiality of information provided by IRMS LLC and its clients and prospective clients, including but not limited business methods, software for download, encryption, registration, reporting, analysis, management, processing, switching of any ATM, POS, EBT or other EFT device that ISR ever receives information on that relates to IRMS LLC, its affiliates, alliance partners or vendors.

   b) Ensure accuracy and thoroughness of information provided IRMS LLC (its equipment suppliers and service providers).

   c) Ensure the merchant has provided proper and complete site preparation, adequate signage and appropriate promotion of the terminal.

   d) Continually monitor each and every merchant on at least a weekly basis to determine if the merchant is adequately trained in the use of the terminal, has maintained adequate signage and appropriate promotion and that the merchant has adequate supplies for the terminal.

   e) Promptly inform IRMS LLC of any delays (included but not limited to settlement of principal or rebate) or specification changes.

   f) Promptly inform IRMS LLC of any changes in registration data

   g) To use IRMS LLC exclusively for any ATM related services as to any device that is the subject of this agreement.

12

Initial

Initial

## Processing and Service Agreement with ISRs

    h)    Will not disparage IRMS, LLC to any bank or financial institution processing gateways, ATM networks, or any other Person, nor will it interfere with the customers of IRMS LLC in any way;

    i)    ISR will specifically refer all inquiries from ACE Cash Express personnel to IRMS LLC or its designee.

    j)    Will represent its relationship with IRMS LLC as that of a customer of IRMS, LLC and keep all elements of this agreement confidential for two years after the termination of the agreement. Additionally, ISR and its employees and affiliates will not engage in any oral, written or electronic form of communications with any party or parties which is defamatory in nature in regards to IRMS LLC or its affiliates. Failure to comply with these requirements will cause the agreement to be terminated immediately and without notice. ISR understands termination of processing services does not adequately compensate IRMS for any or all damages from defamatory communications and IRMS does not waive its right for further legal recourse.

    k)    Has full and complete responsibility for accuracy of its transaction processing, settlement calculations, settlement routing and reporting to its clients.

## II.    TRANSACTION PRICING

A.    Pricing of IRMS LLC services are as stated in **Exhibit A**, attached hereto "Managed and Processing Services Pricing". Processing services are priced on a per transaction/per terminal basis. Other pricing is on a per service charge and may or may not be applicable with the specific services provided to an ISR or merchant under this agreement.

## III.    ISR / MERCHANT COMPENSATION

A.    ISR COMPENSATION: ISR compensation is derived from the charges negotiated with the merchant where the terminal is located. ISR compensation can include sharing in Merchant surcharge income. Net compensation is the amount the ISR receives, after all expenses and processing charges payable to IRMS LLC If daily settlement is required (and accepted by IRMS LLC Inc), the full principal will be settled to the Merchant (dispenser of cash) and a portion of the surcharge will be settled. The balance of the surcharge (convenience fee) settlement will be paid and reconciled on the 15th day of the close of the previous calendar month. Any other fees or charges against merchants or ATM customer (or their bank) will be disbursed on the 15th day of the month following receipt.

B.    FEES BASED ON CURRENT INTERCHANGE LEVELS: The various fees for transaction processing and associated servicing under this agreement are not subject to change by either party to this agreement without express written consent of both parties.

C.    ISR shall provide such services as indicated above or otherwise reasonably required by its merchants on a timely and expeditious basis; in the event that IRMS LLC determines that it is necessary to retain the services of additional personnel to provide said services, the cost of said additional personnel shall be deducted from the ISR's income and/or the merchant's income.

D.    ISR hereby grants IRMS LLC or its designee full power of attorney for electronic access (ACH) to the ISRs account and the merchant's account for deposits and withdrawals under this agreement on behalf of himself and all merchants signed up under the scope and terms of this agreement.

E.    MERCHANT COMPENSATION: Merchant compensation is derived from charges the merchant levies on customers using the terminal in their location and any other per transaction amounts negotiated between the ISR and Merchant

13

Initial

Initial

EFT000053

## Processing and Service Agreement with ISRs

### IV. NOTICES

**A.** DELIVERY OF NOTICES. All notices required hereunder shall be in writing and delivered in person or by certified or registered mail, return receipt requested, postage prepaid. Such notices shall be addressed as follows:

| Indian River Merchant Services LLC | ISR: EFT Services LLC |
|---|---|
| 22101 US HWY 19 North<br>Clearwater, FL 33765 | 4801 S University Drive #303<br>Davie, FL 33328 |

### V. MISCELLANEOUS

**A.** IRMS LLC wherever used in this agreement means any one of a number of entities or persons designated by IRMS LLC to act as agent for Indian River Merchant Services LLC pursuant to the requirements, terms and conditions of this agreement. Each of said companies has authority to do business as IRMS LLC.

**B.** SUPERSEDE. This Agreement and the Exhibits hereto contain the entire understanding of the parties hereto and supersedes all prior written or oral agreements with respect to the subject and scope contained within this Agreement.

**C.** SEVERABILITY. The illegality, invalidity or if unenforceable of any provision, Article or Exhibit of this Agreement shall not affect the remainder of this Agreement. In any proceeding involving the construction of this agreement, neither party shall be presumed to be drafter of the agreement; any provisions that are unenforceable for any reason shall be amended automatically to allow for enforcement of the remainder of the agreement and of the specific provision, if possible.

**D.** GOVERNING LAW. This Agreement shall be governed, construed and interpreted under the laws of the State of Florida. The sole and exclusive venue for raising any dispute or claim brought by ISR shall be Pinellas County, Florida.

**E.** HEADINGS. The heading contained herein is used for convenience and ease of reference and do not limit the scope, intent or interpretation of the Article headings or their subheadings.

**F.** PERSONS BOUND: This agreement is binding upon the parties hereto and any person or entity claiming through them including but not limited to any and all heirs, successors, assigns (if expressly permitted in writing by IRMS LLC), affiliates, agents, servants or employees and/or any entity in which any signatory or party hereto has any material ownership interest or business relationship.

**G.** LIMITS ON LIABILITY – EXCEPT THOSE EXPRESS WARRANTIES MADE IN THIS AGREEMENT, IRMS LLC DISCLAIMS ALL WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Without limiting the foregoing, IRMS LLC and IRMS LLC shall not be liable for lost profits, lost business or any incidental, special, consequential or punitive damages (whether or not arising out of circumstances known or foreseeable by IRMS LLC or IRMS LLC) suffered by Customer, its customers or any third party in connection with the Services provided by IRMS LLC or IRMS LLC hereunder. IRMS LLC or IRMS LLC liability hereunder shall in no event exceed an amount equal to the lesser of (i) actual monetary damages incurred by Customer or (ii) fees paid for the particular Services in question for the calendar month immediately preceding the date on which IRMS LLC and IRMS LLC received Customer's notice of nonperformance as set forth in this Agreement. In no event shall IRMS LLC or IRMS LLC be liable for any matter beyond its reasonable control, or for damages or losses wholly or partially caused by the Customer, or its employees or agents, or for any damages or losses which could have been avoided or limited by Customer giving notice to IRMS LLC and IRMS LLC as provided in Section 7. No cause of action, regardless of form, shall be brought by either party more than

14

Initial

Initial

EFT000054

## Processing and Service Agreement with ISRs

1 year after the cause of action arose, other than one for the nonpayment of fees and other amounts, including any damages, due IRMS LLC under this Agreement.

H. **Other Agreements.** IRMS LLC reserves the right to enter into other agreements pertaining to the Services with others including but not limited to without limitation banks, savings and loan associations, credit unions and other financial institutions and non-financial institutions, Independent Sales Representatives , indirect financial processors, gateway processors, or other parties that may or may not offer the same or similar services to those offered by Customer.

I. **Taxes**. Any sales, use, excise or other taxes (other than IRMS LLC income taxes) payable in connection with or attributable to the Services shall be paid by Customer. IRMS LLC may, but shall not have the obligation to pay such taxes if Customer fails to do so. In the event IRMS LLC pays such taxes, Customer shall immediately reimburse IRMS LLC upon demand and at the interest rate applicable for delinquent amounts as set forth in Section 4 hereof.

J. **Violation of Applicable Laws and Regulations.** IRMS LLC may cease providing any Service if such Service, in IRMS LLC opinion, violates any federal, state or local statute or ordinance or any regulation, order or directive of any governmental agency or court, or any published policy of IRMS LLC, related sponsoring bank, related settlement bank, federal, state or local agency, or proprietary or public network offering switching services for electronic funds transfer.

K. **No Intended Benefit to Third Party Beneficiary and No Right of Action to Third Party Beneficiary.** This Agreement is for the benefit of, and may be enforced only by, IRMS LLC and Customer and their respective successors and permitted transferees and assignees, and is not for the benefit of, and may not be enforced by, any third party, including but not limited to those third parties whose existence is disclosed, directly or indirectly to IRMS LLC.

L. **Waiver of Trial by Jury: Both Parties waives trial by jury on any issue triable of right by jury.**

M. **Attorney's fees: Customer agrees it shall be liable for any and all attorney's fees incurred by IRMS LLC or IRMS LLC whether or not in a formal proceeding, including appeals, administrative actions or quasi judicial or quasi administrative actions where such fees are incurred by IRMS LLC or IRMS LLC as a consequence or related to the scope of this agreement or any addenda hereto.**

N. **Authorization.** Each of the parties hereto represents and warrants on behalf of itself that it has full power and authority to enter into this Agreement; that the execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate or partnership or other appropriate authorizing actions; that the execution, delivery and performance of this Agreement will not contravene any applicable by-law, corporate charter, partnership or joint venture agreement, law, regulation, order or judgment; that execution, delivery and performance of this Agreement will not contravene any provision or constitute a default under any other agreement, license or contract which such party is bound; and, that this Agreement is valid and enforceable in accordance with its terms.

O. **Counterparts.** This Agreement may be executed and delivered in counterparts, each of which shall be deemed an original.

P. **Drafting.** This Agreement has been drafted by IRMS LLC as a matter of convenience only and shall not be construed in favor of either party on that account. Each party acknowledges that it has had adequate opportunity to seek the services of independent counsel, accountants and/or other professionals prior to execution of this agreement and as such, each party acknowledges that they have full knowledge, authorization, comprehension and intent with respect to each and every provision of this agreement and any addenda hereto.

## VI. AMENDMENTS

A. AMENDMENTS.

1. Any enforceable change in rules, regulations, bylaws, statutes, ordinances or other policies or laws properly passed and published by any governing body of any government, quasi-government or private association to which IRMS LLC or IRMS LLC is a member or otherwise affected shall

15

Initial

Initial

## Processing and Service Agreement with ISRs

automatically amend the provisions of this Agreement to the extent of the change that is published. IRMS LLC will make every good faith effort within its resources to assure that no such proposed rule infringes on the contractual rights of IRMS LLC or any of its customers or vendors.

2. IRMS LLC reserves the right to unilaterally amend this Agreement from time to time as reasonably required as exigencies of business dictate. Any party affected by such amendments shall have a period of fifteen (15) calendar days from the date the amendment was first put into effect to state objections and request renegotiation of terms. At all times unless otherwise stated, the amended terms of the agreement shall be in full force and effect. In the event the parties fail to reach agreement, either party may apply for arbitration under the rules of the American Arbitration Association. Both parties agree to submit any such dispute to binding arbitration and/or mediation as the circumstances suggest or require.

B. MODIFICATIONS. Except as otherwise provided herein, this Agreement may not be amended, altered or otherwise modified except in writing executed by all parties hereto.

C. ASSIGNMENTS: This Agreement may not be assigned by any ISR to any party or entity except upon written consent and permission of IRMS LLC which shall not be unreasonably withheld only in the event that the holders of equity and the management structure of the assignee are virtually identical to the original ISR. Transfers of equity or title that are strictly for estate tax purposes will be allowed. All other transfers shall be construed as prohibited Assignments.

## VII. TERM AND TERMINATION

A. TERM. The term of this Agreement shall begin on November 1st, 2017, and will continue for a period of five (5) years, provided however that IRMS may terminate this agreement anytime with or without cause.

B. RENEWAL. With respect to the end of each term of this agreement, unless ISR gives written notice by Certified Mail not later than three (3) months prior to the expiration of this agreement, this agreement shall automatically renew for one (1) additional year, subject to the then prevailing charges, rules and regulations of IRMS LLC.

C. EFFECT OF TERMINATION. Upon termination of this agreement, the ISR shall only be entitled to receive compensation for all installed units earned under this agreement only to the date of this termination in accordance with the payment schedule as set forth in **Exhibit B.**

## VIII. ENTIRE AGREEMENT

A. This document constitutes the entire agreement between IRMS LLC and ISR. It supersedes any oral or written prior or contemporaneous negotiations or representations between the parties.

## IX. AGREEMENT DATE

A. DATE OF COMMENCEMENT. It is mutually agreed to by all parties that the Date of Commencement of this Agreement shall commence as of /2/29/17.

Executed this _29_ day of _Dec_____, 2017 in agreement by all parties hereto to this Agreement

16

Initial

Initial

## Processing and Service Agreement with ISRs

| Indian River Merchant Services LLC (IRMS LLC) | Guarantor (Randy Nolte) EFT Services LLC |
|---|---|
| 22101 US HWY 19 North Clearwater, Fl 33765<br><br>Phone: 1866-515-4767<br>Email: deven@irmsfl.net | 4801 S University Drive #303 Davie, FL 33328<br><br>Phone: 1888-324-1954<br>Email: randy@efte-solutions.com |
| BY:<br><br>Signature:<br>Official Capacity: _president_ | BY:<br><br>Signature<br>Official Capacity: _Manager_ |
| Printed Name:<br><br>_Deven Wenlini_ | Printed Name<br><br>_Randy Nolte_ |
| Date:<br>_12/29/17_ | Date:<br>_12/21/17_ |
| Indian River Merchant Services LLC (IRMS LLC) | ISR: EFT Services LLC |

17 _____

Initial

Initial

## Processing and Service Agreement with ISRs

Indian River Merchant Services LLC

### EXHIBIT A

PIN Based Transaction Pricing

1) Processing Costs:

   a. **Interchange:** IRMS will retain 100% of all interchange earned on all eligible transactions

   b. **Transaction Processing Fees:** IRMS will be paid a transaction processing fee in accordance with the pricing defined below. These fees will be deducted from Surcharge settlement to ISR and settled directly to IRMS via ACH.

   c. **Transaction Fee per Approved Transaction: $ .15 (for each 12 month period and adjust if market allows)**

   d. **Transaction Fee per Approved Emerging Market (includes POB Fee): $1.50**

   e. **Transaction Fee per Approved Cash ATM Transaction Fee: $ .05**

2) Minimums: ISR agrees to a minimum monthly transaction volume of 300,000 approved transactions. Should the ISR fail to meet the minimum during any month during the team of this agreement, IRMS LLC will calculate the average Interchange and exact Surcharge fees based on 250,000 approved transactions, subtract the Interchange and Surcharge amount of the actual number of approved transactions for the current period and deduct the resulting unmet minimum from ISR's surcharge funding. Notwithstanding the foregoing, if the monthly transaction volume derived from Emerging Markets drops by 50% of it's previous three (3) months average monthly volume, both parties agree the new minimum for all monthly transactions will be 175,000 transactions per month and the transaction volume basis for calculating the fees due to IRMS will be 125,000 transactions per month.

18

Initial

Initial

EFT000058

## SERVICES AGREEMENT

This Services Agreement (the "**Agreement**") is made as of February 10, 2020 (the "**Effective Date**") by and between **Denovo Systems**, with a place of business at 1000 Ponce de Leon Avenue, Suite 2B, San Juan, Puerto Rico 00907 ("**Service Provider**"), and **One Pay Cloud LLC**, a Florida limited liability company, with a place of business at 11451 NW 36th Avenue, Miami, Florida 33167 ("**Exclusive Instance User**"), (each a "**Party**" and collectively, the "**Parties**").

WHEREAS, Service Provider has developed and provides certain software and services, including, without limitation, a web portal and mobile devices based applications, which provide Users and Merchants ("**End Users**") a System to manage the set up, management, maintenance connectivity and reporting of its card payment terminals, pin pad devices and/or vending machines ("**Terminals**") including: handling various operational aspects of the Terminal, setup, submission of transactions batches, receiving messages and notifications on various events related to the Terminal operation, as well as reviewing and tracking the transactions details, electronic copies of the receipts and customers signatures, and as needed connect it to third party vendors interesting to use such terminals, (collectively, the "**Services**"). The Services also offer a merchant the ability to offer its customers to digitally store receipts that were issued in its business, as well as offer various communication channels for the merchant to communicate with its customers (such as, but not limited to: text messages, emails, push notifications) regarding information and offers. Some Services may be accessed through the Exclusive Instance User links such as second level domain name like onepaycloud.com with option to create 3rd level domains like steam.onepaycloud.com etc. as well as SSL certificate which will be valid for 3rd level domains like *.onepaycloud.com (steam.onepaycloud .com) (the "**Exclusive Instance User Sites**") or through the iOS and Android mobile applications. The Services also include any other features, content, or applications offered from time-to-time by Exclusive Instance User in connection with the Site or the applications. (All of the foregoing is collectively the "**Systems**", which are owned by Service Provider).

WHEREAS, Exclusive Instance User desires a separate and independent access from Service provider to the STEAM management software and exclusive control of Dejavoo Point of Banking ATM terminal protocols (the "**Protocols**"), for which Service Provider has not obtained approval with any processor and for which Exclusive Instance User will be responsible to obtain the necessary approvals, along with separate and independent access to DeNovo Terminal reporting with SPIn-Proxy, and independent access to standard credit card and debit card processing and all other protocols available now or in the future on Service Provider's Systems (the "**Other Protocols**") on a non-exclusive basis.

WHEREAS, Exclusive Instance User is willing to pay for an exclusive use and maintenance of the Instance (defined below), exclusive use of the Protocols and non-exclusive independent use of the Other Protocols, as set forth in this Agreement.

NOW, THEREFORE, the Parties do hereby agree as follows:

1.    **Set up of an Exclusive Instance of STEAM, limited DeNovo and SPIn Systems.** Subject to the terms of this Agreement, Service Provider hereby will set up for Exclusive Instance User (subject to payment of the Service Fee as set forth in section 2 below) an independent instance of the Systems and its associated intellectual property (collectively, the "**Software**").

MS

2. **Exclusive use of Protocols**. Service Provider hereby also transfers to Exclusive Instance User all of Service Provider's right, title and interest and the certification responsibilities in and to the Protocols. Service Provider will no longer deploy the Protocols on its System, directly or indirectly. Exclusive Instance User hereby accepts the Protocols and acknowledges and agrees that it is solely liable for any and all uses of the Protocols by Exclusive Instance User or otherwise. Exclusive Instance User is obligated to ensure the legality and validity, accuracy and proper usage of the Protocols. Exclusive Instance User will approve and sign the Protocols before deploying it to Dejavoo terminals, solely through the Instance (defined below).

a. **Hosting of Instance**. Exclusive Instance User will set and pay for its hosting facility. Service Provider will be responsible to install the Systems, Protocols and Other Protocols for Exclusive Instance User in the Exclusive Instance User hosting facility (the "**Instance**"). Service Provider will service the Instance under its maintenance agreement with Exclusive Instance User.

b. **Updates**. The term "Updates" means upgrades, bug-fixes, new versions, new releases, enhancements or modifications to the Systems, Protocols or Other Protocols. In consideration of the Maintenance Fees (as defined below), Service Provider shall make any Updates it creates for the Systems or Other Protocols that are commercially available, available to Exclusive Instance User without additional cost in perpetuity (provided Exclusive Instance User is not in default under its obligations under this Agreement) and Service Provider shall install such Updates. Updates shall be deemed to be included in the purchase of the Instance under this Agreement, only if Maintenance Fees are paid by Exclusive Instance User.

c. **Exclusive Instance User Updates**. Exclusive Instance User shall be permitted to direct Service Provider's development team to modify and develop the Instance and Updates for the Instance, paid on an hourly basis at $50 per hour on a work for hire basis. Service Provider's failure to develop a new feature or new function will not be deemed a default by Service Provider in providing the Maintenance Services. Upon Exclusive Instance User's request, Service Provider shall provide Exclusive Instance User with a copy of the Object code for the Instance and all Updates. Exclusive Instance User shall make any Updates it creates for the Systems available to Service Provider without cost. Exclusive Instance User shall be entitled to modify and develop Service Provider Updates. Service Provider shall retain all ownership, right, title and interest in and to its Updates, and Exclusive Instance User shall not obtain any further or additional rights or interests in or to the Service Provider Updates.

d. **Exclusivity**. Exclusive Instance User shall have the right to: (i) utilize the licensed Systems and Other Protocols, on a non-exclusive basis, for its merchant boarding, updating and reporting, and (ii) the Protocols in a binary, signed format on an exclusive basis.

e. **Sale and Transfer Restriction.** Exclusive Instance User shall not have the right to sell or transfer the Instance, except as provided in Section 17.

f. **Existing users of Protocols.** Upon execution of this Agreement Service Provider will notify all existing users of the Protocols of the existence of Exclusive Instance User's system for the Protocols, and they will have 30 days to contact Exclusive Instance User for the utilization of the Protocols as Service Provider will no longer support or provide access to the Protocols after the 30 days.

MS

3. **Service Fee**. Exclusive Instance User shall pay to Service Provider a Service fee ("**Service Fee**") of $3,125,000 as follows: (i) $1,000,000 at execution, which is non-refundable, and (ii) $118,055.56 each following month for 18 months, which each Service Provider agrees is, and shall be deemed to be, full and complete consideration in exchange for Service Provider's service of the Instance to Exclusive Instance User. The Parties acknowledge and agree that if this Agreement is terminated by Exclusive Instance User pursuant to Section 12(d) and at the time of termination Service Provider has received less than $1,500,000 in Service Fees, then Exclusive Instance User agrees to pay to Service Provider on the date of termination an amount equal to the difference between $1,500,000 and the amount of Service Fees actually received by Service Provider on such termination date. Except as otherwise provided herein, any amount of the Service Fee that is paid is non-refundable.

4. **Maintenance Fees**. Exclusive Instance User shall pay to Service Provider a monthly maintenance fee of $30,000 each a month (the "**Maintenance Fee**"), in addition to the Service Fee. Payment will be made via wire transfer to Service Provider designated bank accounts. In exchange for the Maintenance Fee, Service Provider shall provide: (i) 24/7 technical support (including integration) for all Terminals on the Instance, and (ii) 20 hours per month of custom development work for the Instance, with any additional development work paid at $50 per hour, all on a work for hire basis; and (iii) Updates pursuant to Section 2(b) (the "**Maintenance Services**"). If Exclusive Instance User fails to pay the Maintenance Fee after notice of default and opportunity to cure as provided in Section 12(b) below, then Service Provider may suspend Exclusive Instance User's access to the Systems and the Maintenance Services. Provided that Exclusive Instance User continues to pay the Service Fee, a non-payment of the Maintenance Fee will not serve as a default in payment of the Service Fee. If Service Provider fails to provide the Maintenance Services, for any reason other than Exclusive Instance User's default, after notice of default and opportunity to cure as provided in Section 12(b) below, Exclusive Instance User shall stop paying the Maintenance Fee and either: (i) be entitled to the uncompiled **SYSTEMS only** source code for the Instance modules only and all Updates for no additional fee, or (iii) charge Service Provider for its costs of obtaining such Maintenance Service from another source. To secure such source code only in case of uncured failure to service, after a full payment of the Service Fees, Service Provider will put the Instance and Updates source code in escrow, which will be paid by Exclusive Instance User, with the source code to be released to Exclusive Instance User upon Exclusive Instance User's notifying the escrow agent that: (i) Exclusive Instance User has purchased a license for it as per Section 5(a) below, or (ii) Service Provider has failed to provide the Maintenance Services, for any reason other than Exclusive Instance User's default, after notice of default and opportunity to cure.

5. **Ownership of Intellectual Property**. Service Provider shall retain all ownership, right, title and interest in and to its Systems and any underlying software, patents, copyrights, trademarks, database rights, service marks, logos and trade names worldwide ("**Service Provider Intellectual Property**"), subject to the rights provided to Exclusive Instance User by this Agreement. Service Provider reserves all rights not expressly granted by this Agreement. Exclusive Instance User shall use the Service Provider Intellectual Property only as expressly permitted by this Agreement, and, except as expressly permitted by this Agreement, shall not alter sublicense, modify, transfer, rent, lease, sell, display, distribute or copy originals or copies of the Service Provider Intellectual Property in any way, or act or permit action in any way that would impair Service Provider's rights in its Service Provider Intellectual Property. In addition, Exclusive Instance User will not reverse engineer, unencrypt, disassemble, decompile or otherwise translate the Service Provider Intellectual Property or allow anyone else to do it. Exclusive Instance User acknowledges that Exclusive Instance User's use of the Service Provider

Intellectual Property shall not create in Exclusive Instance User or any other person any ownership, right, title or interest in or to such Service Provider Intellectual Property. Exclusive Instance User shall not contest the validity or enforceability of the Service Provider Intellectual Property or Service Provider's ownership thereof. Exclusive Instance User also acknowledges that any rights or goodwill that may accrue to Exclusive Instance User from the use of the Service Provider Intellectual Property shall remain the sole and separate property of Service Provider. Service Provider shall be solely responsible to enforce and protect the Service Provider Intellectual Property. Exclusive Instance User shall comply with industry regulations and shall indemnify and hold Service Provider, its affiliates, and their respective officers, directors, employees, and representatives harmless from and against any claims, liabilities, damages, fines or expenses (including attorneys' fees) in connection with the Exclusive Instance User's (i) utilization of the Protocols, and (ii) usage or implementation of the Instance.

a. **Option to Acquire a License with Instance Source Code**. After payment of the Service Fee in full, and for a period of twelve (12) months thereafter, Exclusive Instance User shall have the right to acquire a license for the uncompiled **SYSTEMS only** source code for the Instance modules only and all Updates (the "License") for the additional sum of $2,000,000. The License shall be a limited, perpetual, non-exclusive (except shall have the right to: (i) utilize the licensed Systems and Other Protocols, on a non-exclusive basis, for its merchant boarding, updating and reporting, and (ii) the Protocols in a binary, signed format on an exclusive basis), non-transferable (except that Exclusive Instance User may assign or sublicense its rights under the License: (a) to third parties as part of its business to the extent necessary to operate its business; or (b) to any person, firm or corporation that acquires all or substantially all of the assets or business of Exclusive Instance User, provided that Service Provider shall be notified in writing thirty (30) days before the transfer date and provide its written consent, such consent not to be unreasonably withheld, and any sublicensee or assignee agrees in writing to be bound by all of the terms and conditions of the License), fully paid, last license. Exclusive Instance User shall be entitled to further modify and develop the source code, but shall not thereby obtain any further or additional rights or interest in the licensed source code. Exclusive Instance User's use of the uncompiled source code will remain subject to all of the restrictions applicable to the Instance, including without limitation that: (i) the Protocols will be provided **ONLY** in **binary code** format; (ii) the only hardware that can be used with the Instance shall be Service Provider's hardware; and (iii) any transfer of the Instance or License to any POS hardware manufacturer requires Service Provider's prior written consent, which consent shall not be unreasonably withheld or delayed.

b. **Injunctive Relief**. Exclusive Instance User acknowledges that money damages may not be an adequate remedy for any breach or violation of any requirement set forth in this Section 5 and that any such breach or violation may leave Service Provider without an adequate remedy at law. Exclusive Instance User therefore agrees and acknowledges that any such breach or violation or threatened breach or violation will cause irreparable harm to Service Provider and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Service Provider shall be entitled to seek both temporary and permanent injunctive relief against the threatened breach or violation of this Section 5 or the continuation of any such breach or violation, without the necessity of proving actual damages or posting bond or other security.

6. **Exclusive Instance User's Warranties and Indemnification**. Exclusive Instance User warrants to Service Provider that: (i) Exclusive Instance User has the power and

authority to enter into this Agreement, and (ii) that the performance of this Agreement will not violate any other agreement or obligations to which Exclusive Instance User is subject.

Exclusive Instance User assumes all risk related to the Exclusive Instance User's use, quality and performance of the Instance, including the Protocols set up in it. If the Instance is used in any form that is not in approval, compliance with any and all network, bank, or card association rules and regulations, or any and all applicable laws, rules, regulations and ordinances, and governmental requirements, Exclusive Instance User shall assume full and complete responsibility as well as the full cost of all necessary servicing, repair, correction or penalties.

Exclusive Instance User shall indemnify, defend and hold harmless Service Provider and its current and former members, directors, officers, employees and agents and their respective successors, heirs and assigns (collectively, the "**Indemnitees**") from and against any claims, liabilities, costs, expenses, damages, deficiencies, losses or obligations of any kind or nature (including reasonable attorneys' fees and other costs and expenses of litigation) by or owed to a third party, based upon, arising out of, or otherwise relating to the activities of Exclusive Instance User (and any sublicensees) under this Agreement, including any cause of action relating to any product, process, or service made, used, sold or performed pursuant to any right or license granted under this Agreement including, without limitation, the use or misuse of DeNovo or Dejavoo terminals (collectively, the "**Claims**"); provided, however that Exclusive Instance User's indemnification obligations hereunder shall not apply to any Claims to the extent that it is attributable to the gross negligence or willful misconduct of any Indemnitee.

Exclusive Instance User shall, at its own expense, provide attorneys reasonably acceptable to Service Provider to defend against any actions brought or filed against any Indemnitee hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought. Any Indemnitee seeking indemnification hereunder shall promptly notify Exclusive Instance User of such Claim; provided further that any failure of or delay in such notification shall not affect Exclusive Instance User's indemnification obligation unless and to the extent such failure or delay is materially prejudicial to Exclusive Instance User. The Indemnitees shall provide Exclusive Instance User, at Exclusive Instance User's expense, with reasonable assistance and full information with respect to such Claim and give Exclusive Instance User sole control of the defense of any Claim. Neither Exclusive Instance User nor Indemnitee shall settle any Claim without the prior written consent of the other, which consent shall not be unreasonably withheld.

7.      **Service Provider's Warranties and Indemnification**. Service Provider warrants to Exclusive Instance User that: (i) Service Provider will ensure that the Systems and Other Protocols comply with all applicable laws, rules, regulations and ordinances, and governmental requirements, (ii) Service Provider has the power and authority to enter into this Agreement, and (ii) the performance of this Agreement will not violate any other agreement or obligations to which Service Provider is subject.

Service Provider has not received any threat, demand or notice of claim from any person asserting that the use of the Service Provider Intellectual Property would constitute any infringement, interference, violation, misappropriation, breach or wrongful use of the rights of any other person (collectively, "**Infringement Claims**"). Service Provider may satisfy its obligations with respect to any Infringement Claims, at Service Provider's sole election, by: (i) replacing any infringing elements with non-infringing elements of substantially equivalent functional and performance capability; (ii) modifying any infringing elements to avoid the infringement without

MS ulh

substantially eliminating the functional and performance capabilities; or (iii) obtaining a license for use of the infringing elements.

Service Provider shall indemnify and hold Exclusive Instance User and its subsidiaries, members, directors, officers, employees and agents and their respective successors, heirs and assigns harmless from and against any and all claims, liabilities, costs, expenses, damages, deficiencies, losses or obligations of any kind or nature (including reasonable attorneys' fees and other costs and expenses of litigation) by or owed to a third party, based upon, arising out of, or otherwise relating to the activities of Service Provider or Indemnitees under this Agreement, or any material breach or default in the performance or observance by Service Provider of this Agreement; provided, however that Service Provider's indemnification obligations hereunder shall not apply to any claims to the extent that it is attributable to the gross negligence or willful misconduct of Exclusive Instance User.

8.    **Limitation and Disclaimer of Warranties**. Except as expressly specified herein, Service Provider does not warrant that the Instance or Protocols will meet any particular standards or requirements or approvals of Exclusive Instance User processors, including those of the card brands, or that Exclusive Instance User's or any end user's use of the Instance will be uninterrupted or error free. EXCEPT AS EXPRESSLY SPECIFIED HEREIN, THE INSTANCE AND THE SERVICES ARE DELIVERED AND LICENSED "AS IS" WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND. EXCEPT AS EXPRESSLY SPECIFIED HEREIN, LICENSOR HEREBY DISCLAIMS ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE INSTANCE AND THE SERVICES, EITHER EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, INCLUDING IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, OF SATISFACTORY QUALITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF ACCURACY, OF QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. EXCEPT AS EXPRESSLY SPECIFIED HEREIN, LICENSOR DOES NOT WARRANT THAT THE OPERATION OF THE INSTANCE OR THE LICENSOR/DEJAVOO TERMINALS WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE INSTANCE WILL BE FIXED. EXCEPT AS EXPRESSLY SPECIFIED HEREIN, NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY LICENSOR OR ITS AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY.

9.    **Limitation of Liability**. NEITHER PARTY SHALL BE LIABLE HEREUNDER FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOSS OF GOODWILL OR REPUTATION, LOST REVENUES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE, WHETHER ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE AND HOWSOEVER INCURRED. IN NO EVENT SHALL A PARTY'S AGGREGATE LIABILITY ARISING FROM OR RELATED TO THIS AGREEMENT (EXCLUDING THIRD PARTY INDEMNITY OBLIGATIONS), OR USE OF THE INSTANCE, INCLUDING ANY CAUSE OF ACTION BASED ON WARRANTY, CONTRACT, TORT, STRICT LIABILITY, INFRINGEMENT OF THIRD PARTY RIGHTS OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY, OR USE OF THE INTELLECTUAL PROPERTIES IN A NON COMPLIANT MANNER EXCEED THE AMOUNT OF $100. The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

10.    **Confidentiality**.

a.    During the term of this Agreement, each Party may have access to certain confidential and proprietary information of the other Party (collectively, the "Confidential

MS  MW

Information"). Confidential Information may include, but is not limited to: (i) the Service Provider Intellectual Property and all Updates thereto; (ii) technical and user documentation; (iii) customer lists, prospect lists, existing agreements with vendors and business partners of either Party, and pricing proposals; (iv) marketing, sales, financial and other business information, data and plans; (v) research and development information; (vi) formulas, methods, know-how, processes, designs, new products, performance tests, product evaluations, reported problems with any software or services; (vii) information concerning the customers, potential customers, employees and service providers of either Party; and, (viii) this Agreement and the contents thereof. The disclosing Party shall retain all right, title and interest in and to all of its Confidential Information, including but not limited to any intellectual property rights embodied therein.

b.　　　Notwithstanding the foregoing, Confidential Information shall not include any information that the receiving Party can establish: (i) is or subsequently becomes publicly available through no act or omission of the receiving Party; (ii) was in the receiving Party's lawful possession prior to disclosure of such information; (iii) is subsequently disclosed to receiving Party by a third party who is not in breach of an obligation of confidentiality; (iv) is independently developed by the receiving Party without the use or benefit of the Confidential Information; or (v) is required to be disclosed under a court order or a valid subpoena, provided that the receiving Party promptly notifies the disclosing Party and provides the disclosing party an opportunity to seek an appropriate protective order. In no event shall the Service Provider Intellectual Property be considered not to be Confidential Information or to be part of the public domain.

c.　　　Confidential Information shall be used solely for each Party's performance under this Agreement and the exercise of its rights hereunder and shall not be disclosed to any third party. Each Party shall take reasonable precautions, at least as great as the precautions it takes to protect its own confidential information but, in any event, commercially reasonable precautions, to maintain the Confidential Information in strict confidence. Further, in consideration of the disclosure of Confidential Information, and other good and valuable considerations, the receipt and sufficiency of which are acknowledged, the Party receiving the Confidential Information agrees to: (i) not copy, reproduce, engineer or reverse engineer, in whole or any part, of any Confidential Information without written consent of disclosing Party; (b) disclose Confidential Information only to its employees that need to know the information for the performance of their duties; (c) not disclose Confidential Information to persons outside of itself without written consent of the providing Party unless such disclosure is required pursuant to applicable laws, regulation or court order, provided that the providing party is given reasonable notice of such law or order and an opportunity to attempt to preclude or limit such production; and, (d) return all Confidential Information, including any copies or other records, to the providing Party upon receipt of a written request from the providing Party.

d.　　　The receiving Party acknowledges and agrees that Confidential Information is proprietary to and a valuable trade secret of the disclosing Party and that any disclosure or unauthorized use of any Confidential Information will cause irreparable harm and loss to the disclosing Party. In the event of any breach of this Agreement by a receiving Party, the disclosing Party shall be entitled to obtain from any court of competent jurisdiction, without requirement or bond or other security, preliminary and permanent injunctive relief as well as an equitable accounting of all profits or benefits arising from such breach, which rights and remedies shall be cumulative and in addition to any other rights or remedies at law or in equity to which the disclosing party may be entitled.

11.　　**Privacy**.

MS MB

a. Each Party shall comply with all applicable laws, regulations and guidelines (collectively, **"Privacy Laws"**) governing consumer privacy in fulfilling its obligations hereunder.

b. Each Party will: (i) obtain and maintain all appropriate registrations and consents under the Privacy Laws in order to allow that party to perform its obligations under this Agreement; (ii) process consumer data in accordance with the Privacy Laws; and (iii) use its reasonable efforts to make sure that no act or omission by it, its employees, contractors or agents results in a breach of the obligations of either Party under the Privacy Laws.

c. Exclusive Instance User will ensure that it obtains all necessary consents from the relevant individuals before collecting, processing, storing or transferring any consumer data to Exclusive Instance User or within the Service Provider Intellectual Property.

12. **Term and Termination**.

a. Unless this Agreement be sooner terminated as provided herein, it shall remain in force for so long as Exclusive Instance User is paying the Service Fees or Maintenance Fees to Service Provider.

b. Either Party shall have the right to terminate this Agreement upon the material breach of this Agreement by the other Party, if such breach is not cured within thirty (30) days after receiving written notice thereof in accordance with the notice requirements of Section 14.

c. After payment in full of the Service Fee, Service Provider shall not have the right to terminate this Agreement.

13. **Post-Termination or Expiration Rights and Obligations**. In the event of termination of this Agreement by Service Provider pursuant to Section 12(b) above, Exclusive Instance User will immediately cease utilizing the Instance, and will immediately return to Service Provider or destroy all copies of the materials embodying the Instance, and remove the Instance and/or any applicable software from all media in Exclusive Instance User's custody, possession or control. After the termination or expiration of this Agreement, all rights and obligations of the Parties hereunder will cease except the rights of a Party with respect to a breach of this Agreement; and (b) the rights and obligations contained in Sections 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 15, 16, 18, 19 and 21. Termination shall not relieve Exclusive Instance User from paying all amounts accrued under this Agreement prior to termination and shall not limit Service Provider from pursuing any other available remedies.

14. **Notice**. Any notice relating to this Agreement shall be in writing, shall be deemed given when actually delivered or refused, and shall be sent by nationally recognized prepaid overnight courier providing proof of delivery or refusal, to the addresses set forth in the first paragraph of this Agreement, as same may be changed by providing written notice to the other Party.

15. **Severability**. If any provision of this Agreement is declared invalid or unenforceable, such provision shall be deemed modified to the extent necessary and possible to render it valid and enforceable and to accomplish the original intent of the Parties. In any event,

MS MR

the unenforceability or invalidity of any provision shall not affect any other provision of this Agreement, and this Agreement shall continue in full force and effect, and be construed and enforced, as if such provision had not been included, or had been modified as above provided, as the case may be.

16.     **Waiver**: No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement, or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of any other covenant, agreement, term or condition.

17.     **Assignability**. Exclusive Instance User may assign or sublicense the Instance: (a) to third parties as part of its business to the extent necessary to operate Its business; or (b) to any person, firm or corporation that acquires all or substantially all of the assets or business of Exclusive Instance User, provided that Service Provider shall be notified in writing thirty (30) days before the transfer date and provide its written consent, such consent not to be unreasonably withheld, and any sublicensee or assignee agrees in writing to be bound by all of the terms and conditions of this Agreement. Service Provider may assign, sell or otherwise transfer any of its rights or interest in this Agreement, whether by operation of law or otherwise, without consent of Exclusive Instance User upon thirty (30) days prior written notice. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the Parties to this Agreement and their permitted successors and assigns.

18.     **Relationship**: Nothing contained herein shall be construed to imply a joint venture, partnership or principal-agent relationship between Service Provider and Exclusive Instance User, and neither Party shall have the right, power or authority to obligate or bind the other in any manner whatsoever, except as otherwise specifically agreed to in writing.

19.     **Applicable Law and Venue**. This Agreement shall be governed exclusively by the law of the State of New York, without reference to its conflicts of law principles. This Agreement shall be construed without the aid of any canon or rule of law requiring interpretation against the party drafting the Agreement, or the portions of the Agreement in question, it being agreed that all Parties hereto have participated in the preparation of this Agreement. Each Party agrees that venue for any action under or related to this Agreement shall be exclusively in the state or federal courts located in Miami-Dade County, Florida, and the Parties each submit to the exclusive jurisdiction of such courts and waive any claim that same is an inconvenient forum. The Party prevailing in any action under or related to this Agreement shall be entitled, in addition to such other relief as may be granted, to recover from non-prevailing Party its reasonable attorneys' fees and costs (at all tribunals and levels, including on appeal, in mediation or bankruptcy, and pre-trial or post trial), including those associated with establishing such entitlement and the amount thereof. Neither Party shall be liable to the other for any indirect, incidental, consequential, punitive, special or exemplary damages, (even if that Party has been advised of the possibility of such damages), arising from any provision of this Agreement (such as, but not limited to, loss of revenue or anticipated profits or lost business); provided however, that the limitations set forth in this Section shall not apply to or in any way limit the third party indemnity obligations under this Agreement. THE PARTIES EACH HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

20.     **Counterparts and Execution**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the Parties hereto may execute this Agreement by signing any such counterpart. Signatures

on this Agreement may be made by electronic means, and proof of execution may be transmitted by electronic means. A fully executed electronic version of this Agreement shall be treated as an original in all respects.

21. **Entire Agreement and Amendment**. This Agreement comprises the complete and final expression of the rights, obligations, duties and undertakings of the Parties, and sets forth all consideration, covenants, understandings and inducements, pertaining to the Instance and the Service Provider Intellectual Property. This Agreement may be modified only in a writing signed by the duly authorized representatives of both Parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

**One Pay Cloud LLC**

By: _____
Name: Michael Shvartsman
Title: Manager

**Denovo Systems**

By: _____
Name: _Mony Bonus_
Title: _prosidat & CEO_

## SIDE LETTER TO SERVICES AGREEMENT

WHEREAS, **Denovo Systems** ("**Service Provider**"), and **One Pay Cloud LLC** ("**Exclusive Instance User**") have entered into that certain Service Agreement of even date herewith ("**Service Agreement**"); and,

WHEREAS, any capitalized terms not defined herein shall have the same meaning ascribed to it in the Service Agreement; and,

WHEREAS, Exclusive Instance User possesses the know-how and ability to use the Protocols in a compliant manner in the Market (as defined below); and,

WHEREAS, Service Provider and Exclusive Instance User desire to set forth certain additional understandings.

Now, Therefore, Service Provider and Exclusive Instance User further agree as follows:

1. Exclusive Instance User intends to use the Instance in the market for CBD and dispensary related products (the "**Market**").

2. The exclusivity provided to Exclusive Instance User in the Service Agreement is strictly for the Market through the use of the Protocols, and does not include: (i) Any pin based script ATM products outside of the Market; or (ii) Any Pin Based Debit transaction outside of the Market, or (iii) Any Credit or other electronic transaction outside of the Market, or (iv) any proven bank sponsored Market opportunity. To be a 'proven bank sponsored Market opportunity', a third party must provide Service Provider with letters from its bank sponsor and its transaction processor unequivocally agreeing to utilize the System, Protocols or Other Protocols in the Market, and Service Provider must be able to directly contact the bank sponsor and the transaction processor to validate the authenticity of the letters and provide Exclusive Instance User with proof of such validation.

3. If Service Provider or Exclusive Instance User identifies any unapproved Reseller of the System or Protocols in the Market, then within fourteen (14) calendar days of being made aware of such use, Service Provider shall: (i) terminate such Reseller's ability to board new clients for the System or Protocols in the Market; and (ii) if the unapproved Reseller is a new client of Service Provider after the date of this Agreement, Service Provider shall terminate such Reseller's access to and use of the System or Protocols in the Market. If Service Provider fails to terminate an unapproved Reseller as provided above, then: (i) Exclusive Instance User shall be entitled to deduct the sum of: (a) the number of Reseller transactions using the Protocols in the Market on the Service Provider system, multiplied by (b) the amount Exclusive Instance User is charging its clients for such transactions. If the unapproved Reseller continues to use the Protocols in the Market for more than 30 days after Service Provider being made aware of such

One Pay Cloud LLC
11451 NW 36th Avenue
Miami, FL 33167

MS. MM

use, Exclusive Instance User shall be entitled, as its sole and exclusive remedy, to the uncompiled **SYSTEMS only** source code for the Instance modules only and all Updates for no additional fee, provided that Exclusive Instance User shall continue to pay the Service Fees and Maintenance Fees, and Service Provider shall continue to provide support and transition assistance, for such time as Exclusive Instance User requires support and transition assistance from Service Provider to train Exclusive Instance User's developers on the System, Protocols and Instance. Upon completion of the transition, the Agreement shall be deemed terminated and neither party shall owe any further obligations to the other party.

4. If the federal laws and regulations are changed to permit the acceptance of electronic payments in the Market, then Exclusive Instance User may cancel the Service Agreement upon written notice to Service Provider.

IN WITNESS WHEREOF, the Parties have caused this Side Letter to Services Agreement to be executed by their duly authorized representatives.

**One Pay Cloud LLC**

By:
Name: Michael Shvartsman
Title: Manager

**Denovo Systems**

By:
Name: _Morry Bonuel_
Title: _president & cto_

One Pay Cloud LLC
11451 NW 36th Avenue
Miami, FL 33167

OPC   000447

EXHIBIT "C"

## ASSIGNMENT OF SERVICES AND LICENSE AGREEMENTS

This Assignment of Services and License Agreement (the **"Assignment"**) effective as of February 10, 2020 (the **"Effective Date"**) is entered into by and between **DeNovo Systems, LLC**, located at 1000 Ponce de Leon, Suite 203, San Juan, Puerto Rico 00907 (**"DeNovo"**), **iPOS Systems, LLC, d/b/a Dejavoo**, located at 393 Jericho Turnpike, Suite 203, Mineola, NY 11501 (collectively, **"Assignors"**) and **One Pay Cloud, LLC**, located at 11451 NW 36th Avenue, Miami, Florida 33167 (**"Assignee"**). Each may be referred to herein as a **"Party"** or collectively as **"Parties"**.

## RECITALS

**Whereas,** Assignors and Assignee entered into that certain Services Agreement dated as of February 10, 2020 (the "**License Agreement**"), pursuant to which Assignors licensed to Assignee all rights and obligations in connection with certain point of banking protocols (the "**Protocols**"); and

**Whereas,** Assignors entered into certain Services and License Agreements with third parties for use of the Protocols (the "**Service Agreements**"); and

**Whereas,** in connection with the License Agreement, Assignors desire to assign all of the rights, duties and obligations under the Service Agreements to Assignor.

**Now, therefore,** in consideration of the mutual covenants and conditions hereinafter set forth, the Parties hereto, intending to be legally bound, agree as follows:

1. **Incorporation.** The foregoing Recitals are hereby incorporated by reference as if set forth fully below. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the License Agreement.

2. **Assignment.** From the date of this Assignment forward, Assignor hereby assigns, transfers, conveys and sets over to Assignee all of its rights, duties and obligations in and to the Service Agreements in exchange for considerations acceptable to Assignors, the receipt and sufficiency of which are acknowledged by Assignors.

3. **Assumption.** From the date of this Assignment forward, Assignee hereby fully assumes all of Assignors' rights, duties and obligations in and under the Service Agreements.

4. **Governing Law.** This Assignment shall be governed exclusively by the laws of the State of New York, without regard to its conflict of laws principles, and all actions shall be exclusively in the state or federal courts located within Miami Dade County, Florida.

5. **Severability.** In the event that any part of this Assignment is deemed by a court of competent jurisdiction to be invalid or unenforceable, such provision shall be deemed to have been omitted from this Assignment. The remainder of this Assignment shall remain in full force and effect, and shall be modified to any extent necessary to give such force and effect to the remaining provisions, but only to such extent.

6. **Successors and Third Parties**. This Assignment and the rights and obligations hereunder shall bind and inure to the benefit of the Parties and their successors and permitted assigns.

7. **Counterparts; Proof of Execution.** This Assignment may be executed and delivered by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. The Parties agree that the proof of execution of this Assignment may be communicated by electronic means, and that a physical or electronic copy of this Assignment executed by all Parties may be used as an original in connection with the enforcement of this Assignment.

4881-7913-8249, v. 1

8. **Entire Agreement; Amendments**. The License Agreement and this Assignment constitute the entire agreement between the Parties and supersedes all prior agreements, understandings, and arrangements, oral or written, between the Parties with respect to the subject matter hereof. Each Party agrees that it has relied only upon the representations or warranties contained in this Assignment in determining whether to execute this Assignment. This Assignment may not be modified or amended except by an instrument or instruments in writing signed by both Parties.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

**One Pay Cloud** LLC

By: _____

Name: Michael Shvartsman

Title: Manager

**Denovo Systems, LLC**

By: _____

Name: _____

Title: _____

**i-POS Systems, LLC d/b/a Dejavoo**

By: _____

Name: _____

Title: _____

4881-7913-8249, v. 1

# COMPOSITE EXHIBIT "D"

**ONE PAY CLOUD LLC**
**PLATFORM LICENSE AGREEMENT**

This Platform License Agreement ("**Agreement**") is made and entered into as of ___April 29th___, 2020 ("**Effective Date**") by and between **One Pay Cloud LLC**, a Florida limited liability company having an office at 11451 NW 36th Avenue, Miami, FL 33167 ("**OPC**"), and EFT Services LLC ("**Licensee**") whose information is provided on **Schedule "B"** hereto. OPC and Licensee shall be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

**WHEREAS,** OPC has a proprietary platform to provide electronic payment services (the "**Platform**") for and on behalf of one or more banks and/or processors (collectively, the "**Vendors**"), and OPC is offering the Platform to dispensaries of cannabis related products (the "**Market**"); and

**WHEREAS,** the Platform currently provides Point-of-Banking payment services, directly or indirectly, for merchants in the Market, and when available will provide debit, credit and other payment services in the Market, directly or indirectly (the "**Services**"); and

**WHEREAS**, OPC and Licensee are negotiating the potential purchase (the "**Transaction**") by OPC of Licensee's assets (the "**Assets**") related to the Market as described in that certain Term Sheet between OPC and Licensee dated as of ___April 29th___, 2020 (the "**Term Sheet**");

**WHEREAS**, OPC and Licensee each desire that Licensee obtain from OPC a license to use the Platform for its business in the Market during the period of the Parties' negotiations concerning the Transaction, in connection with a processor of Licensee's choice (subject to OPC's reasonable approval), pursuant to the terms hereof.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

1. **OPC SYSTEM LICENSE.** For the Term of this Agreement and subject to Licensee's strict adherence to the terms of this Agreement, OPC grants to Licensee a limited, non-transferable, non-exclusive license to use (the "**License**") the Services and certain electronic reporting systems of OPC (collectively, the "**OPC System**"). In order to use the OPC System, Licensee shall be granted access codes to the OPC System. Licensee shall retain sole and exclusive responsibility for any and all use of such access codes or the OPC System in respect of its account therein (the "**Account**"). Except as explicitly provided herein, Licensee may not use the OPC System or the Account for or on behalf of any third party. Licensee shall indemnify and hold OPC harmless from any and all claims, losses or other liabilities arising from the use by Licensee and any Sub-Licensee (defined below) or Merchant (defined below) of the OPC System or the Account. Licensee shall not reverse engineer, decompile, disassemble, translate, modify or disclose to any third party the OPC System. Except as explicitly provided herein, Licensee shall have no right to use, market, distribute, sell, sub-license, deliver or otherwise transfer the OPC System or any part thereof either for or to any third party. Licensee shall not alter any trademarks, trade names, logos, patent or copyright notices, or other notices or markings, or add any other notices or markings of the OPC System or any part thereof, or any of the information posted therein, all of which, together with the whole of the OPC System, is Confidential Information (as defined below) of OPC. Any future additions, modifications, versions, upgrades or updates of the OPC System released to Licensee shall be deemed to be part of the OPC System and shall benefit from the restrictions set out herein.

2. **LICENSEE OBLIGATIONS.** The following are, without limitation, obligations of Licensee under this Agreement:
   2.1. **License Fees.** Licensee shall pay the fees listed on **Schedule "A"** attached hereto ("**License Fees**"), and Licensee shall ensure that each Sub-Licensee and Merchant pays the License Fees as stated on Schedule A. Licensor agrees that all of its other licensees and Merchants shall likewise be required to pay the License Fees as stated on Schedule A. Licensor and Licensee agree that each of their respective merchants boarded on the OPC System after the Effective Date shall pay the License

Fees as stated on Schedule A, and this obligation shall survive any expiration or termination of this Agreement. Licensee and its Sub-Licensees shall not offset the License Fees in any fashion, including without limitation by kickbacks, rebates, contributions, or any other method. OPC shall have the right to audit the records of Licensee to verify compliance with the terms of this Agreement, including without limitation the charging and payment of all License Fees. Licensee shall provide OPC with access to all records reasonably requested by OPC within three (3) business days of OPC's written request. To the extent OPC seeks records of Sub-Licensees, Licensee shall use its best efforts to obtain such records. If OPC's audit determines that Licensee or its Sub-Licensee has offset, undercharged or underpaid License Fees ("**Improper Fees**") by three percent (3%) or more of the total License Fees due in a calendar month, then OPC shall provide written notice to Licensee of such Improper Fees and Licensee shall pay, as agreed upon liquidated damages and not as a penalty, one and one-half times the amount of such Improper Fees to OPC within three (3) business days of such notice. If the Improper Fees are three percent (3%) or more of the total amount of License Fees due in a calendar month, then Licensee and Sub-Licensee shall each be jointly and severally liable for OPC's costs of audit. If OPC determines, through an audit or otherwise, that Licensee has participated in offsetting, undercharging or underpaying applicable License Fees, then OPC may, in its sole discretion and without further notice, in addition to any other rights or remedies that OPC may have, do any or all of the following: (i) suspend, restrict or terminate Services to Licensee; (ii) suspend, restrict or terminate Licensee's access to the OPC System; and/or (iii) terminate this Agreement. If OPC determines, through an audit or otherwise, that a Sub-Licensee has participated in offsetting, undercharging or underpaying applicable License Fees, then OPC may, in its sole discretion and without further notice, in addition to any other rights or remedies that OPC may have, do any or all of the following: (i) suspend, restrict or terminate Services to Sub-Licensee; (ii) suspend, restrict or terminate Sub-Licensee's access to the OPC System; and/or (iii) terminate the Sub-License (defined below). Notwithstanding anything in this Agreement to the contrary, Licensee shall not be obligated under any circumstance to provide OPC with information from which OPC may identify Sub-Licensees, Merchants, or Vendors with whom Licensee conducts or desires to conduct business, or any parents, subsidiaries, or affiliates thereof.

2.2. **Sub-Licensing**. For the Term of this Agreement and subject to Licensee's strict adherence to the terms of this Agreement, Licensee may grant sub-licenses to third parties, such as agents and ISOs (each a "**Sub-Licensee**"), for the use of the OPC System (each a "**Sub-License**"). Licensee must have a written agreement with each Sub-Licensee which will be substantively identical to this Agreement, and Licensee shall exclusively bear all liability for any liabilities arising in relation thereto. The terms of the Sub-Licensee agreement ("**Sub-Licensee Agreement**") shall be approved by OPC in its sole discretion. Licensee guarantees that all of its Sub-Licensees shall perform in a manner consistent with the terms hereof. Licensee shall be responsible for ensuring compliance of its Sub-Licensees with the terms of this Agreement. Without limitation, Licensee shall indemnify and hold OPC harmless from any and all claims made by any Sub-Licensee against OPC or Vendors, and from any and all claims made by third parties on account of acts or omissions of Sub-Licensees. For the avoidance of doubt, notwithstanding anything in this Agreement to the contrary, Licensee shall not be obligated under any circumstance to provide OPC with information from which OPC may identify Sub-Licensees, Merchants, or Vendors with whom Licensee conducts or desires to conduct business, or any parents, subsidiaries, or affiliates thereof.

2.3. **Merchants**. Licensee and its Sub-Licensees shall solicit merchants that are interested in procuring the Services (each such merchant that is under contract for the Services as a result of solicitation by Licensee or its Sub-Licensee shall be referred to herein as a "**Merchant**"). Each Merchant shall procure the Services pursuant to an electronic or written merchant agreement (together with application material submitted by the Merchant through Licensee or a Sub-Licensee, the "**Merchant Agreement**"). The terms of the Merchant Agreement shall be approved by OPC in its sole discretion. Licensee or its Sub-Licensee will submit a completed Merchant Agreement executed by the prospective Merchant and any addendums or other documents between Licensee or its Sub-Licensee and Merchant that address or modify the relationship or any of the terms between Licensee or its Sub-Licensee and Merchant. In the course of soliciting potential Merchants hereunder, Licensee or its Sub-Licensee may not create any liability or obligation for OPC except as may be approved by OPC in writing in advance. If OPC requests that Licensee obtain information from Merchant or its Sub-Licensee, Licensee shall use best efforts to promptly obtain such information. Licensee and its Sub-Licensees shall use their best efforts to enforce each Merchant Agreement to its fullest extent, including without

limitation pursuing legal action against the Merchant. If Licensee and/or its Sub-Licensees fail to enforce a Merchant Agreement to its fullest extent, then: (a) Licensee and/or its Sub-Licensees shall be liable to OPC for all of OPC's losses and damages due to the loss of such Merchant Agreement, including any fees and costs incurred by OPC in enforcing the Merchant Agreement; and (b) OPC, at its sole option and without releasing Licensee and/or Sub-Licensee, may: (i) step into the shoes of Licensee or Sub-Licensee and seek to enforce the Merchant Agreement; (ii) obtain such assistance from Licensee and/or Sub-Licensee as OPC may require; and (iii) require Licensee and/or Sub-Licensee to assign the Merchant Agreement or such of the rights under the Merchant Agreement as OPC requires to enforce the Merchant Agreement. For the avoidance of doubt, none of the provisions of this Section 2.3 shall be applicable to any merchant, sub-licensee, or other person to whom Licensee provided services either directly or indirectly prior to the date of this Agreement, or to any parent, subsidiary, or affiliate thereof.

2.4.   **Expenses, Tools and Instruments.**   Licensee shall be solely responsible for any and all Licensee expenses incurred in connection with this Agreement. Licensee shall furnish its own office space and any other facilities, tools, equipment, supplies or services.

2.5.   **Honesty.** The Parties will perform their obligations honestly and in a good workmanship manner, with professional diligence and demeanor. Licensee will uphold the good name of OPC and Vendors in the marketplace.

2.6.   **ACH Authorization.** In connection with any payments to or from Licensee hereunder, Licensee will complete the ACH Authorization attached hereto as **Schedule "C"** with Licensee's current banking information, and Licensee agrees to update the ACH Authorization if Licensee's banking information changes.

3. **REPRESENTATIONS AND WARRANTIES.**   Licensee represents, warrants and covenants the following to and for the benefit of OPC:

**3.1   Independently Established Business.** Licensee is engaged in an independently established business. If Licensee is an individual engaged in business under a fictitious name, Licensee must have filed the required certificate of fictitious name, and must present a copy of the certificate to OPC. If Licensee is a legally formed business entity, it must comply with all entity filing requirements and must present a copy of its filed organization documents and certificate of good standing to OPC.

**3.2   Good Standing.** If Licensee is an individual, Licensee is above the age of twenty-one (21), of the age of majority in the jurisdiction where he or she is domiciled, and is fully competent to enter into this Agreement. If Licensee is a business entity, it is validly existing and in good standing under the laws of the State where its principal office is located.

**3.3   Full Authority.** Licensee has full authority and power to enter into this Agreement and to perform its obligations under this Agreement.

**3.4   Sale of Information.** Licensee shall not use, sell, purchase, provide, disclose or exchange credit card, debit card or bank account numbers, or any information collected or received hereunder, to any third party.

**3.5   No Violation.** Licensee's performance of this Agreement will not violate any applicable law or regulation or any agreement to which Licensee is bound as of the date hereof. Without limitation, this Agreement will not cause Licensee to be in violation of any of its non-compete or non-solicitation obligations to any third party nor will Licensee perform hereunder so as to be in violation of them. Licensee is prohibited from using third party confidential information in performing hereunder and is prohibited from causing such information to be entered into the OPC Systems.

**3.6   Enforceability.** This Agreement represents a valid obligation of Licensee and is fully enforceable against it.

**3.7   Compliance.** Licensee will comply with the terms of this Agreement, with all applicable laws, and with any agreement between OPC and a Vendor relating to Licensee's use of the OPC System hereunder.

**3.8   No Litigation.** Neither Licensee nor any of its officers and/or directors: (i) are a party to any pending litigation that would have an impact on this Agreement, or (ii) have ever been fined or penalized by Visa, MasterCard or any other association in the credit, payments or banking industry.

**3.9   No Crime.** Neither Licensee nor its owners or officers has ever been convicted of a felony, or convicted of any misdemeanor involving financial crimes, fraud or dishonesty. Prior to the execution of this Agreement, Licensee has disclosed to OPC any and all information that may be relevant to OPC

in deciding whether or not to enter into this Agreement, such as prior dishonest or illegal activity by Licensee.

**4. CONFIDENTIALITY AND EXCLUSIVITY OBLIGATIONS.**

**4.1 Confidentiality Obligations**. Each Party agrees that during the Restriction Period, or such longer time as the Party has or had access to Confidential Information, it will not, directly or indirectly, breach any of the following obligations, or permit or assist any third party to breach any of the following obligations, in any capacity including as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity (collectively, the "**Confidentiality Obligations**"):

(a) **Confidential Information**. For the purposes of this Agreement, "**Confidential Information**" means this Agreement, including all attached Schedules and Exhibits, and each term and provision of this Agreement and all attached Schedules and Exhibits, the negotiations of the Parties related to this Agreement and all attached Schedules and Exhibits, the Services, the Platform, the OPC System, all proprietary, secret or confidential information or data of a Party and any of its respective affiliates, operations, employees, independent sales organizations, agents, products or services, clients, customers or potential customers, merchants or potential merchants. Confidential Information shall include, without limitation, merchant lists, lead generation methods, training programs, merchant pricing, customer lists, cardholder account numbers, pricing information, acquiring bank or processor relationships, merchant information, leasing information, financial or other data in any format, computer access codes, instruction and/or procedural manuals, payroll information, human resource or personnel information, business strategies and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information is: (i) already known to the receiving Party free of any restriction at the time it is obtained; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) publicly available through no wrongful act of the receiving Party; or (iv) independently developed by the receiving Party without reference to any Confidential Information of the other.

(b) **Non-Disclosure and Non-Use**. Each Party agrees that it will not, except as expressly required in the conduct of its obligations hereunder or as authorized in writing by the other Party, publish, disclose, or use any trade secret or Confidential Information (including without limitation such information relating to merchants, Services or Vendors' products or services) that a Party may in any way acquire by reason of its association with the other Party. Neither Party shall speak to or communicate with any media or journalist or make any public statements concerning this Agreement, Services, OPC, Licensee, or Vendors without the prior written consent of the other Party.

(c) **Legally Required Disclosure**. In the event that a Party is required by law or legal process to disclose any trade secret or Confidential Information, such Party shall provide the other Party with prompt oral and written notice, unless notice is prohibited by law (in which case such notice shall be provided as early as may be legally permissible), of any such requirement so that the affected Party may seek a protective order or other appropriate remedy. Each Party shall provide such assistance as the other Party requests, at no out of pocket expense to the assisting Party, in seeking such protective order or other appropriate remedy.

(d) **No Misappropriation of Trade Secrets/No Unfair Competition**. Each Party further promises and agrees not to engage in competition with the other Party or its Vendors, at any time after the termination of this Agreement, while making use of Confidential Information relating to the other Party or its Vendors. Each Party acknowledges and agrees that the names and addresses of each Party's Vendors, licensee's, other agents, merchants and other customers, and all other Confidential Information relating to those merchants and customers, including but not limited to account numbers, leasing information, financial information and special needs, are provided in confidence and constitute trade secrets of the disclosing Party, and that the sale or unauthorized use or disclosure of any of a Party's trade secrets or Confidential Information obtained by a Party during its association with the other Party constitutes unfair competition. Each Party promises and agrees not to engage in any unfair competition with the other Party.

(e) **Return of Confidential Information**. Upon any termination of this Agreement, each Party shall surrender to the other Party all trade secrets, Confidential Information and materials furnished

by the other Party and any materials developed by the Party from or related to the other Party's trade secrets or Confidential Information. In addition, upon any termination hereof, each Party shall cease any and all contact with any agent or employee of the other Party.

**4.2     Exclusivity.** The relationship created by this Agreement is an exclusive relationship for the Market, and Licensee agrees, for itself and its Merchants, and for its Sub-Licensees and their Merchants, to use the Services in the Market on an exclusive basis for all new Merchants boarded on or after the Effective Date. Licensee warrants and covenants that, during the Term, Licensee shall not enter into a new contract with any party other than OPC for services similar to the Services, without OPC's prior written consent, which consent may be withheld in OPC's sole discretion. Payment terminals approved by OPC, in its sole discretion, shall be the only terminals connected to the Platform or used with the Services. Notwithstanding anything to the contrary herein, Licensee may maintain the services provided to any Licensee merchants or customers boarded prior to the Effective Date. If Licensee seeks to move any merchants or customers from their existing Licensee Relationship, Licensee shall only board such merchants or customers with OPC. Licensee shall require similar disclosures and restrictions from its Merchants, and from its Sub-Licensees and their Merchants.

**4.3     Added Services Exclusivity.** The exclusivity granted under Section 4.2 shall extend to all new services added to the Services during the Term, such as debit, credit and other payment services (the "**Added Services**"), on a going forward basis. With respect to the other sections of this Agreement, the Added Services shall be deemed to be included in the Services. Licensee and its Sub-Licensees shall use their best efforts to have Merchants contract to use the Added Services through OPC. If any of the Added Services require that the Merchant have a direct relationship with OPC as an ISO of a Vendor, then: (a) Licensee and/or its Sub-Licensee shall immediately assign such Merchant to OPC as to such Added Service; (b) OPC is hereby granted a power of attorney tied to an interest from the Licensee and each of its Sub-Licensees to complete such assignment if necessary; (c) Licensee and/or its Sub-Licensee shall become a sub-ISO of OPC as to such Added Service at industry standard residual rates. If Licensee or its Merchants, or its Sub-Licensees or their Merchants, have existing relationships for any of the Added Services at the time the Added Services are live on the Platform (the "**Added Services Live Date**"), then the Licensee or its Merchants, or its Sub-Licensees or their Merchants, may maintain such relationships and the services provided as of the Added Services Live Date; provided that, during the Term, Licensee or its Merchants, or its Sub-Licensees or their Merchants, shall not enter into a new contract, or renew an existing contract, with any party other than OPC for services similar to the Added Services.

**4.4     Breach.** Licensee agrees and understands that any breach of its obligations under this Section shall: (a) cause grave and irreparable damages to OPC; and (b) entitle OPC, in its sole discretion and with five (5) days advance notice and an opportunity to cure, in addition to any other rights or remedies that OPC may have, to do any or all of the following: (i) suspend, restrict or terminate Licensee's access to the OPC System; (ii) terminate this Agreement; and/or (iii) pursue any other rights or claims available to OPC. To the extent that any breach of the obligations under this Section are caused or aided by a Sub-Licensee and/or Merchant, OPC, in its sole discretion and with five (5) days advance notice and an opportunity to cure, in addition to any other rights or remedies that OPC may have, shall be entitled to do any or all of the following: (x) suspend, restrict or terminate Services to Sub-Licensee and/or Merchant; (y) suspend, restrict or terminate Sub-Licensee's and/or Merchant access to the OPC System; and/or (z) terminate the Sub-License and/or Merchant Agreement. The time periods referred to in this Section shall be stayed and extended during any violation or breach of the terms of this Section.

**4.5     Exception.** Notwithstanding anything in this Section 4 to the contrary or any other provision of this Agreement to the contrary, Licensee shall, during the pendency of the Term Sheet, be permitted to take all such actions and engage with all such third parties as are necessary for Licensee, in its sole discretion, to board new Licensee locations on terminals provided by suppliers other than i-POS Systems, LLC d/b/a Dejavoo ("Dejavoo") or any of Dejavoo's parents, subsidiaries, or affiliates ("Non-Dejavoo Terminals"), provided that all such new Licensee locations are subject to a Merchant Agreement approved by OPC as provided in Section 2.3 above. Licensee shall not be subject to this Agreement with respect to any existing Licensee locations using Non-Dejavoo Terminals. Notwithstanding anything to the contrary herein, if the Point of Banking

protocols provided by OPC are unable to send transactions to the processor for more than a twelve (12) hour period, Licensee may switch affected existing locations to Non-Dejavoo Terminals.

**5.     TERM AND TERMINATION.**

**5.1     Term.** The term of this Agreement shall be for an initial term of seventy-five (75) days commencing on the Effective Date (the "**Term**"). For the avoidance of doubt, the Parties may at any time agree in a writing executed by both Parties to renew this Agreement for such term as the parties may desire.

**5.2     Termination.** Notwithstanding the above, the Parties will have the following rights:

(a) **Termination by Transaction Closing.** This Agreement will automatically terminate if OPC and the Licensee consummate a Transaction, such termination to be effective as of the Closing Date as defined in the relevant terms of such Transaction. In the event of termination pursuant to this Section 5.2(a), OPC shall waive all fees for Seller's use of the platform provided for in this Agreement and shall reimburse to Seller at Closing any such fees previously received by OPC and/or its affiliates.

(b) **Automatic Termination.** This Agreement will automatically terminate if: (i) Vendors prohibit or prevent, in any fashion, OPC from providing the services set forth in this Agreement; (ii) a bankruptcy or similar petition is filed by or against a Party that is not dismissed within sixty (60) days; or (iii) death, dissolution or other event causes Licensee to cease to exist.

(c) **Termination for Cause.** A Party may terminate this Agreement, following five (5) days advance written notice and an opportunity to cure (unless a sooner termination is required by a Vendor), upon the occurrence of an Event of Default by the other Party, as defined below.

(d) **Termination Pursuant to Term Sheet.** This Agreement will terminate pursuant to those terms of the Term Sheet that provide for termination of the Agreement under the circumstances set forth therein.

**5.3     Event of Default.** Each of the following occurrences will constitute an "**Event of Default**" under this Agreement:

(a) **False Representation.** If any representation or warranty made by a Party or any of its employees, officers, or directors proves to have been false or misleading in any material respect as of the date made, or becomes materially false or misleading at any time.

(b) **Regulatory Breach.** If either Party is in material breach of applicable laws.

(c) **Breach.** If either Party fails to observe any material obligation specified in this Agreement.

(d) **Confidentiality Breach.** If either Party breaches any Confidentiality Obligations.

**5.4     Post-Termination Obligations.** Upon termination of this Agreement for any reason, no Party shall have any further obligation pursuant to the terms of this Agreement except for: (i) obligations occurring prior to the date of termination or by law, and (ii) obligations contained herein which are expressly made to extend beyond the Term of this Agreement.

**6.     INDEMNIFICATION AND LIMITATION OF LIABILITY.**

**6.1     Indemnification.** Each Party shall save, defend, indemnify, reimburse and hold the other Party, Vendors and their respective affiliates, shareholders, directors, officers, agents and employees (each an "**Indemnified Party**") harmless from and against all suits, actions, proceedings, losses, claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees, expert witness fees and costs of defense) in connection with any consultation, negotiation, or actual action, suit, claim, losses or proceeding to which an Indemnified Party shall be made a party by reason of any:

(a) acts or omissions of the indemnifying Party or any of its affiliates;

(b) any bad faith, willful malfeasance or negligence of the indemnifying Party or any of its affiliates;

(c) violation of this Agreement or any applicable law, including, without limitation, any and all fines or fees imposed by any Vendor;

(d) fraudulent or dishonest conduct or misrepresentation of the indemnifying Party; or,

(e) Event of Default or other breach of the terms hereof by the indemnifying Party.

**6.2** **Selection of Counsel.** In the event a Party makes any claim for indemnity under this Agreement, it shall have the right (subject to its right of reimbursement hereunder), but not the obligation, to pursue the suit with counsel of its choice. To the extent the claim is brought by a third party, each Party agrees to cooperate in such an action. Each Party agrees not to settle any claim for which indemnification hereunder may be sought without prior written consent of the other Party, which shall not be unreasonably withheld. If a Party employs an attorney to enforce the terms of this Section, such Party shall be entitled to recover its reasonable attorneys' fees (including reasonable fees for in-house attorneys) and court costs from the other Party in the event it obtains a final, non-appealable judgment in its favor.

**6.3** **Limitation of Liability.** THE SERVICES OF OPC ARE PROVIDED ON AN "AS-IS", "AS AVAILABLE" BASIS. OPC SHALL HAVE NO LIABILITY TO LICENSEE WITH RESPECT TO ANY BREACHES BY A VENDOR. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, OPC EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES AND CONDITIONS, INCLUDING ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, AS WELL AS ANY WARRANTIES THAT THE SERVICES PROVIDED BY OPC (AS DISTINCT FROM SERVICES PROVIDED BY A VENDOR) OR THAT THE OPERATION OF SUCH SERVICES WILL BE INTERRUPTION OR ERROR FREE. OPC DOES NOT REPRESENT OR WARRANT THAT THE OPC SYSTEM OR SERVICES WILL BE AVAILABLE, ACCESSIBLE, UNINTERRUPTED, TIMELY, SECURE, ACCURATE, COMPLETE, OR ENTIRELY ERROR- FREE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NEITHER PARTY, NOR ITS LICENSEES AND AGENTS, SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TO THE OTHER PARTY OR ANY THIRD PARTY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES, EVEN IF THE PARTY HAS BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING. EXCEPT AS REQUIRED BY LAW, AND EXCLUDING THE INDEMNITY OBLIGATIONS HEREIN, IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER PARTY OR ANY THIRD PARTY FROM ANY ACTION OR CLAIM (WHETHER BASED ON AN ACTION OR CLAIM IN CONTRACT, TORT OR OTHERWISE) IN ANY WAY CONNECTED WITH OR ARISING OUT OF THIS AGREEMENT (AND ALL OTHER AGREEMENTS BETWEEN OPC AND LICENSEE) EXCEED THE LESSER OF THE AGGREGATE OF ALL FEES PAID BY LICENSEE DURING THE THREE (3) MONTHS PRIOR TO THE EVENT GIVING RISE TO LIABILITY OR $10,000.

**6.4** **Losses.** All losses due to fraud or chargebacks incurred by OPC or Vendors will be borne by Licensee or its Sub-Licensee, except to the extent that such losses are due to OPC's gross negligence or breach of this Agreement. Licensee and its Sub-Licensee will also be liable to OPC for any liability or loss incurred by OPC or Vendors arising out of Licensee's or its Sub-Licensee's breach hereof, negligence, fraud, intentional wrongdoing or submission of information that was in any way false or misleading or that Licensee or its Sub-Licensee should have known was false or misleading, except to the extent that such losses are due to OPC's gross negligence or breach of this Agreement.

**7.** **RELATIONSHIP OF THE PARTIES.**

**7.1** **Independent Contractor.** It is understood that Licensee is an independent contractor, and is not, and shall not be deemed to be, an employee of OPC for any purpose. Nothing in this Agreement or the Parties' relationship shall be construed to give either Party the power to direct and control the day-to-day activities of the other. The general conduct of work performed by Licensee and its representatives shall be under Licensee's sole control. Licensee is not entitled to workers compensation insurance, unemployment compensation insurance, pension or profit sharing or other benefits or rights of any kind or nature from or through OPC or Vendors. Nothing in this Agreement or the course of dealing of the Parties shall be construed to constitute the Parties hereto as partners, joint venturers or as agents or employees of one another or as authorizing either Party to obligate the other in any manner. Licensee shall not: (a) bind OPC or Vendors to any contract or agreement; (b) incur any obligation on behalf of OPC or Vendors; (c) release, assign or transfer any agreement, claim, security or any other asset of OPC or Vendors; (d) borrow or lend any money in the name of OPC or Vendors; (e) submit to any claim or liability related to the

Merchant Agreements; or (f) allow judgment to be taken or confessed against OPC or Vendors. Licensee, being an independent contractor, shall not receive as compensation, or be reimbursed, for any of the following: (w) additional work materials, (x) business facilities, telephone, automobile or any other equipment, (y) any OPC or Vendors employee benefit, or (z) any other cost or expense incurred by Licensee.

8. **GENERAL PROVISIONS.**

   **8.1 Entire Agreement.** This Agreement supersedes all prior agreements and understandings between Licensee and OPC and their respective directors, officers, shareholders, agents or representatives. This Agreement is the entire agreement between the Parties respecting the subject matter hereof and there are no representations, warranties or commitments other than those expressed herein. Licensee also represents that prior to this Agreement Licensee was neither employed by OPC or any of its affiliates, nor has it acted in the role of independent contractor for OPC or any of its affiliates. Notwithstanding anything in this Section 8.1 to the contrary, in the event of a conflict between this Agreement and the Term Sheet, the Term Sheet shall control.

   **8.2 Force Majeure.** Neither Party shall be liable in damages or have the right to terminate this Agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its reasonable control, for the duration of such delay or default beyond its reasonable control, including, but not limited to, natural disasters, government restrictions (including the denial or cancellation of any export or other necessary license), wars, insurrections and/or any other cause beyond the reasonable control of the Party whose performance is affected.

   **8.3 Injunctive Relief.** If Licensee breaches any of the Confidentiality Obligations of this Agreement, OPC will suffer irreparable harm and the total amount of monetary damages for any injury to OPC will be impossible to calculate and therefore an inadequate remedy. Accordingly, Licensee agrees and understands that upon its actual or threatened breach of any of the provisions contained in Section 4.1, OPC shall be entitled to the immediate grant of injunctive relief enjoining such actual or threatened violation by Licensee, or any person acting in concert with Licensee, without the requirement of posting a bond; and that OPC may exercise any other rights and seek any other remedies to which OPC may be entitled at law, in equity or under this Agreement for any violation of such obligations.

   **8.4 Non-Solicitation of Employees.** Licensee agrees that during the Term hereof and for a period of two (2) years thereafter neither Licensee nor any of its Sub-Licensees or their affiliates shall entice, induce or in any manner influence any employee of OPC to leave such employment for the purpose of engaging in similar employment with Licensee, any affiliate of Licensee, or their affiliates.

   **8.5 Amendments and Waivers.** Except as provided for herein, no modification, amendment or waiver under this Agreement shall be valid unless in a writing and signed by Licensee and an officer of OPC. Notwithstanding the foregoing, OPC may amend the pricing applicable to Licensee under this Agreement on notice to Licensee delivered by e-mail. For the avoidance of doubt, OPC shall not amend the pricing applicable to Licensee in any manner that results in Licensee being subject to pricing different from that provided by OPC to its other ISOs and agents, as provided for in the Term Sheet.

   **8.6 Credit and Criminal Background Check Authorization.** The undersigned Licensee acknowledges and hereby voluntarily consents to OPC obtaining a background check on Licensee, its shareholders, directors and officers, if any, and Licensee authorizes and instructs OPC to obtain credit and criminal background and/or driving record reports from a third party (utilizing a social security number trace or other information such as name, address or driver's license number) as OPC deems necessary and appropriate in order to comply with OPC's obligations to Vendors. This authorization and instruction will take effect upon the signature by Licensee of this Agreement, and will last throughout the duration of this Agreement. OPC may be obliged to disclose the results of such background checks to Vendors. Licensee consents to such disclosure, as it relates to Licensee, its shareholders, directors and officers, if any.

   **8.7 Notice.** Any notices or other communications required or permitted to be given pursuant to this Agreement shall be sufficient if hand delivered or sent by certified mail, return receipt requested, or by Federal Express or other nationally recognized express delivery service, (postage

or other commercial delivery fees prepaid and confirmation of delivery obtained), to OPC at its address appearing on the first page hereof and to Licensee at the address appearing on **Schedule "B"**, or at such other address as a Party may designate for such purpose by notice so given to the other Party. Notices shall be deemed given and received when actually received or refused, as noted on the delivery receipt. Notwithstanding the foregoing, OPC may provide notice to Licensee via e-mail to the e-mail address on **Schedule "B"** or to such other e-mail address as is normally used by Licensee in e-mail communications with OPC. Such e-mail notices shall be deemed given and received when sent, provided OPC does not receive an "undeliverable" notification from the e-mail service.

**8.8    Successors and Assigns**. Licensee may not assign this Agreement without the prior written consent of OPC, which shall not be unreasonably withheld, and any unauthorized attempted assignment will be null and void. If Licensee enters into an asset sale, purchase or stock sale or exchange agreement with a third party that would effectuate a sale or merger of 25% of more of the equity or assets in Licensee's business or rights hereunder without OPC's written consent, OPC will have the right to terminate this Agreement immediately. Except as set forth above, this Agreement shall inure to the successors and permitted assigns of the Parties hereto.

**8.9    Governing Law, Choice of Law and Forum**. This Agreement shall be exclusively construed in accordance with and governed by the laws of the State of Florida without regard to conflicts of law principles. Any legal actions or proceedings brought to enforce the terms of this Agreement shall be filed exclusively in Miami-Dade County, Florida in a court of competent jurisdiction.

**8.10  Arbitration**. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof (each a "Dispute"), shall be settled by arbitration. In the event the Parties are unable to reach agreement, after attempts to resolve any given Dispute through direct good faith negotiations, either Party may commence arbitration in Miami-Dade County, Florida with an accredited arbitration association. "Arbitration" means appointing one neutral arbitrator to preside over the Dispute in accordance with the provisions of the Florida Arbitration Code (Chapter 682, Florida Statutes, as amended or replaced), and enter a binding decision on the Dispute, by which the Parties must abide. With respect to any matters of procedure not addressed in the Florida Arbitration Code, such matters of procedure shall be determined according to the Commercial Arbitration Rules, including the Emergency Interim Relief Procedures, then in effect of the American Arbitration Association. The Parties shall mutually select a single arbitrator to resolve the Dispute(s); provided that if one Party fails to participate in the selection of an arbitrator within five (5) business days of receipt of written notice, the arbitrator shall be the arbitrator selected by the other Party. The language of the arbitration shall be English. The arbitrator shall render a decision promptly after the submission of the Dispute(s), and shall apply the standards of a reasonable, prudent businessperson. The arbitrator shall not have the power to award punitive, exemplary, indirect, consequential or special damages. The administrative cost of the arbitration, including the cost of the arbitrators, shall be borne equally by the Parties. Each Party shall be responsible for the payment of its own attorneys' fees and expenses. The arbitrator shall not be empowered to add to, subtract from, delete or in any other way modify the terms of this Agreement. Notwithstanding anything to the contrary herein, any Party shall have the limited right to seek equitable relief in the form of a temporary restraining order or preliminary injunction in a court of competent jurisdiction to protect itself from actual or threatened irreparable injury resulting from an alleged breach of this Agreement pending a final decision in arbitration.

**8.11  Attorneys' Fees**. As a consequence of any action, suit or proceeding brought in a court of competent jurisdiction under this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party its costs, expenses, and its reasonable attorneys' fees and costs at all levels and in all tribunals (including pre-trial and post-trial proceedings, proceedings to enforce collection, and reasonable fees for in-house attorneys).

**8.12  Execution and Delivery**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement may be made by electronic means. An electronic version of this fully executed Agreement shall be treated as an original for all purposes.

**8.13  Severability**. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

**8.14 Construction, Capacity and Counsel.** For purposes of construction, this Agreement will be deemed as being drafted by both Parties, equally. Licensee is executing this Agreement in Licensee's capacity as a business and not as an individual consumer. Licensee has had opportunity to seek legal advice prior to the execution hereof.

**8.15 Survival.** The following provisions survive termination of this Agreement: 2.1 License Fees, 3 Representations and Warranties, 4.1 Confidentiality, 5 Term and Termination, 6 Indemnification, and 8 General.

Intending to be legally bound, the Parties have signed this Agreement as of the Effective Date:

**Licensee**

**One Pay Cloud LLC**

By:_____

Printed Name: _Randy Nolte_

Title (if company Licensee): _Managing Member_ Date: _____

Date: _4/29/2020_

Business Name (if any):

_ECT Services LLC_

**Schedule "A"**
**License Fees**

| Description | Licensee Rate | Sub-Licensee Minimum Sell Rate | Merchant Minimum Sell Rate |
|---|---|---|---|
| Approved Market Withdrawal Transaction Fee | $0.50 | $2.25 | $2.75 |
| Decline Fee (New Merchants Only) | --- | $1.00 | $1.00 |
| Onboarding Fee (Key Setup – per Key) | $50.00 | $75.00 | $75.00 |
| Monthly Platform Fee per Terminal | $10.00 | $10.00 | $10.00 |
| Chargeback | --- | $25.00 | $25.00 |
| Annual Compliance fee per location | --- | $100.00 | $100.00 |
| Monthly statement fee per location | --- | $25.00 | $25.00 |

**Schedule "B"**
**Licensee Information**

Licensee's Company Name (if any): _____*EFT Services Llc*_____

Licensee's Name (if an individual) or name and title of person signing for company if Licensee is a company:

_____*Randy Nolte    Managing Member*_____

Mailing Address: _____*4801 S University Dr #303*_____

Phone Number: _____*754 701 4040*_____

Email Address: _____*rnolte @ EFTservice.com*_____

## Schedule "C"
### AUTHORIZATION FOR ACH DEBITS / CREDITS

**Company/Depositor Name as Shown on Bank Records**

**Bank Name**

**ABA Routing Number**

**Account Number**
☐ Checking ☐ Business
☐ Savings ☐ Personal

Subject to: (i) the terms set forth in your agreement with One Pay Cloud LLC ("Agreement"), (ii) the Operating Rules of the National Automated Clearing House Association (NACHA), and (iii) applicable federal regulations governing Automated Clearing House ("ACH") transactions, I (we) do hereby authorize One Pay Cloud LLC and any partner, parent or subsidiary of One Pay Cloud LLC ("MFF") to initiate debit and credit entries to the account specified above ("Account") for obligations owing from time to time under the Agreement. Company/Depositor agrees to maintain sufficient funds in the Account to cover ACH transactions. In the event that MFF incurs any charges or fees due to failure of an ACH debit to properly process to the Account, or in the event that the Account does not have sufficient funds to permit the ACH debit to go through, I (we) hereby grant MFF the authority to debit the Account for all such charges and expenses incurred together with a $25 administrative fee per failed ACH. This authorization is to remain in full force and effect until MFF has received written notification from me or another duly authorized representative of Company/Depositor of the termination of this approval in such time and in such manner as to afford MFF a reasonable opportunity to act on it. I (we) certify that the appropriate authorizations are in place to allow me(us) to authorize this method of settlement. All changes to the identification of the Account must be made in writing. I (we) understand that if the ABA Routing Number and/or Account Number is incorrect, and funds are incorrectly deposited, MFF will attempt to assist in the recovery of such funds but has no liability as to restitution of the same. I (we) agree that MFF's assistance in recovering the funds, where available, will be debited from the Account at MFF's current hourly rate for such work.

I (we) certify under penalty of perjury that I (we) am (are) duly authorized as a check signer on the Account and am (are) authorized to provide all relevant consents and representations contained in this ACH Authorization.

Dated this _____ day of _____, 20_____.

**Authorized Signature in Agreement with Bank Records**

### ATTACH A VOIDED CHECK



## ONE PAY CLOUD LLC
## PLATFORM LICENSE AGREEMENT

This Platform License Agreement ("**Agreement**") is made and entered into effective as of February 10, 2020 ("**Effective Date**") by and between **One Pay Cloud LLC**, a Delaware limited liability company having an office at 11451 NW 36th Avenue, Miami, FL 33167 ("**OPC**"), and **Transact First LLC**, a Delaware limited liability company having an office at 16192 Coastal Highway, Lewes, Delaware 19958 ("**Licensee**") whose information is provided on **Schedule "B"** hereto. OPC and Licensee shall be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

**WHEREAS,** OPC has a proprietary platform to provide electronic payment services (the "**Platform**") for and on behalf of one or more banks and/or processors (collectively, the "**Vendors**"), and OPC is offering the Platform to dispensaries of cannabis related products (the "**Market**"); and

**WHEREAS,** the Platform currently provides Point-of-Banking payment services, directly or indirectly, for merchants in the Market, and when available will provide debit, credit and other payment services in the Market, directly or indirectly (the "**Services**"); and

**WHEREAS**, Licensee desires a license to use the Platform for its business in the Market, in connection with a processor of Licensee's choice (subject to OPC's reasonable approval), pursuant to the terms hereof.

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements contained herein, the Parties agree as follows:

1. **OPC SYSTEM LICENSE.** For the Term of this Agreement and subject to Licensee's strict adherence to the terms of this Agreement, OPC grants to Licensee a limited, non-transferable, non-exclusive license to use ("**License**") the Services and certain electronic reporting systems of OPC (collectively, the "**OPC System**"). In order to use the OPC System, Licensee shall be granted access codes to the OPC System. Licensee shall retain sole and exclusive responsibility for any and all use of such access codes or the OPC System in respect of its account therein (the "**Account**"). Except as explicitly provided herein, Licensee may not use the OPC System or the Account for or on behalf of any third party. Licensee shall indemnify and hold OPC harmless from any and all claims, losses or other liabilities arising from the use of the OPC System or the Account. Licensee shall not reverse engineer, decompile, disassemble, translate, modify, decompile or disclose to any third party the OPC System. Except as explicitly provided herein, Licensee shall have no right to use, market, distribute, sell, sub-license, deliver or otherwise transfer the OPC System or any part thereof either for or to any third party. Licensee shall not alter any trademarks, trade names, logos, patent or copyright notices, or other notices or markings, or add any other notices or markings of the OPC System or any part thereof, or any of the information posted therein, all of which, together with the whole of the OPC System, is Confidential Information (as defined below) of OPC. Any future additions, modifications, versions, upgrades or updates of the OPC System released to Licensee shall be deemed to be part of the OPC System and shall benefit from the restrictions set out herein. OPC will monitor the use of the OPC System by Licensee in order to verify compliance of Licensee with the terms of this Agreement.
2. **LICENSEE OBLIGATIONS.** The following are, without limitation, obligations of Licensee under this Agreement:
   2.1. **License Fees.** Licensee shall pay the fees listed on **Schedule "A"** attached hereto ("**License Fees**"), and Licensee shall ensure that each Sub-Licensee (defined below) and Merchant (defined below) pays the License Fees as stated on Schedule A. Licensor agrees that all of its other licensees and Merchants shall likewise be required to pay the License Fees as stated on Schedule A. Licensee and its Sub-Licensees shall not offset the License Fees in any fashion, including without limitation by kickbacks, rebates, contributions, or any other method. OPC shall have the right to audit the records of Licensee and its Sub-Licensees to verify compliance with the terms of this Agreement, including without limitation the charging and payment of all License Fees. Licensee and each Sub-Licensee shall provide OPC with access to all records reasonably requested by OPC within three (3) business days of OPC's written request. If OPC's audit determines that Licensee or its Sub-Licensee has offset, undercharged or underpaid License Fees ("**Improper Fees**") by three percent (3%) or more of the total License Fees

due in a calendar month, then Licensee shall pay, as agreed upon liquidated damages and not as a penalty, double the amount of such Improper Fees to OPC within three (3) business days. If the Improper Fees are three percent (3%) or more of the total amount of License Fees due in a calendar month, then License and Sub-Licensee shall each be jointly and severally liable for OPC's costs of audit. If OPC determines, through an audit or otherwise, that Licensee has participated in offseting, undercharging or underpaying applicable License Fees, then OPC may, in its sole discretion and without further notice, in addition to any other rights or remedies that OPC may have, do any or all of the following: (i) suspend, restrict or terminate Services to Licensee; (ii) suspend, restrict or terminate Licensee's access to the OPC System; and/or (iii) terminate this Agreement. If OPC determines, through an audit or otherwise, that a Sub-Licensee has participated in offseting, undercharging or underpaying applicable License Fees, then OPC may, in its sole discretion and without further notice, in addition to any other rights or remedies that OPC may have, do any or all of the following: (i) suspend, restrict or terminate Services to Sub-Licensee; (ii) suspend, restrict or terminate Sub-Licensee's access to the OPC System; and/or (iii) terminate the Sub-License (defined below).

2.2. **Sub-Licensing**. For the Term of this Agreement and subject to Licensee's strict adherence to the terms of this Agreement, Licensee may grant sub-licenses to third parties, such as agents and ISOs (each a "**Sub-Licensee**"), for the use of the OPC System (each a "**Sub-License**"). Licensee must have a written agreement with each Sub-Licensee which will be substantively identical to this Agreement, and Licensee shall exclusively bear all liability for any liabilities arising in relation thereto. The terms of the Sub-Licensee agreement ("**Sub-Licensee Agreement**") shall be approved by OPC in its sole discretion. Licensee guarantees that all of its Sub-Licensees shall perform in a manner consistent with the terms hereof. Licensee shall be responsible for ensuring compliance of its Sub-Licensees with the terms of this Agreement. Upon request by OPC, each Sub-Licensee shall enter into a non-solicitation and confidentiality agreement directly with OPC in a form prescribed by OPC. Without limitation, Licensee shall indemnify and hold OPC harmless from any and all claims made by any Sub-Licensee against OPC or Vendors, and from any and all claims made by third parties on account of acts or omissions of Sub-Licensees.

2.3. **Merchants**. Licensee and its Sub-Licensees shall solicit merchants that are interested in procuring the Services (each such merchant that is under contract for the Services as a result of solicitation by Licensee or its Sub-Licensee shall be referred to herein as a "**Merchant**"). Each Merchant shall procure the Services pursuant to an electronic or written merchant agreement (together with application material submitted by the Merchant through Licensee or a Sub-Licensee, the "**Merchant Agreement**"). The terms of the Merchant Agreement shall be approved by OPC in its sole discretion. Licensee or its Sub-Licensee will submit a completed Merchant Agreement executed by the prospective Merchant and any addendums or other documents between Licensee or its Sub-Licensee and Merchant that address or modify the relationship or any of the terms between Licensee or its Sub-Licensee and Merchant. In the course of soliciting potential Merchants hereunder, Licensee or its Sub-Licensee may not create any liability or obligation for OPC except as may be approved by OPC in writing in advance. If OPC requests information from Merchant, Licensee or its Sub-Licensee shall promptly obtain such information. Licensee and its Sub-Licensees shall use their best efforts to enforce each Merchant Agreement to its fullest extent, including without limitation pursuing legal action against the Merchant. If Licensee and/or its Sub-Licensees fail to enforce a Merchant Agreement to its fullest extent, then: (a) Licensee and/or its Sub-Licensees shall be liable to OPC for all of OPC's losses and damages due to the loss of such Merchant Agreement, including any fees and costs incurred by OPC in enforcing the Merchant Agreement; and (b) OPC, at its sole option and without releasing Licensee and/or Sub-Licensee, may: (i) step into the shoes of Licensee or Sub-Licensee and seek to enforce the Merchant Agreement; (ii) obtain such assistance from Licensee and/or Sub-Licensee as OPC may require; and (iii) require Licensee and/or Sub-Licensee to assign the Merchant Agreement or such of the rights under the Merchant Agreement as OPC requires to enforce the Merchant Agreement.

2.4. **Expenses, Tools and Instruments**. Licensee shall be solely responsible for any and all Licensee expenses incurred in connection with this Agreement. Licensee shall furnish its own office space and any other facilities, tools, equipment, supplies or services.

2.5. **Disclosure of Additional Relationships**. Licensee shall disclose to OPC on the attached **Schedule "C"** any relationships between Licensee, or any of its affiliates, and any third parties for services in the Market similar to the Services or that are competitors of OPC in the Market ("**Licensee Relationships**"). Neither Licensee nor any of its affiliates or Sub-Licensees shall enter into an

agreement with OPC's Vendors or any competitors of OPC for services similar to the Services in or related to the Market.

2.6. **Honesty**. Licensee will perform its obligations honestly and in a good workmanship manner, with professional diligence and demeanour. Licensee will uphold the good name of OPC and Vendors in the marketplace.

2.7. **ACH Authorization**. In connection with any payments to or from Licensee hereunder, Licensee will complete the ACH Authorization attached hereto as **Schedule "D"** with Licensee's current banking information, and Licensee agrees to update the ACH Authorization if Licensee's banking information changes.

3. **REPRESENTATIONS AND WARRANTIES.** Licensee represents, warrants and covenants the following to and for the benefit of OPC:

3.1 **Independently Established Business.** Licensee is engaged in an independently established business. If Licensee is an individual engaged in business under a fictitious name, Licensee must have filed the required certificate of fictitious name, and must present a copy of the certificate to OPC. If Licensee is a legally formed business entity, it must comply with all entity filing requirements and must present a copy of its filed organization documents and certificate of good standing to OPC.

3.2 **Good Standing.** If Licensee is an individual, Licensee is above the age of twenty-one (21), of the age of majority in the jurisdiction where he or she is domiciled, and is fully competent to enter into this Agreement. If Licensee is a business entity, it is validly existing and in good standing under the laws of the State where its principal office is located.

3.3 **Full Authority.** Licensee has full authority and power to enter into this Agreement and to perform its obligations under this Agreement.

3.4 **Sale of Information.** Licensee shall not use, sell, purchase, provide, disclose or exchange credit card, debit card or bank account numbers, or any information collected or received hereunder, to any third party.

3.5 **No Violation.** Licensee's performance of this Agreement will not violate any applicable law or regulation or any agreement to which Licensee is bound as of the date hereof. Without limitation, this Agreement will not cause Licensee to be in violation of any of its non-compete or non-solicitation obligations to any third party nor will Licensee perform hereunder so as to be in violation of them. Licensee is prohibited from using third party confidential information in performing hereunder and is prohibited from causing such information to be entered into the OPC Systems.

3.6 **Enforceability**. This Agreement represents a valid obligation of Licensee and is fully enforceable against it.

3.7 **Compliance.** Licensee will comply with the terms of this Agreement, with all applicable laws, and with any agreement between OPC and a Vendor.

3.8 **No Litigation.** Neither Licensee nor any of its officers and/or directors: (i) are a party to any pending litigation that would have an impact on this Agreement, or (ii) have ever been fined or penalized by Visa, MasterCard or any other association in the credit, payments or banking industry.

3.9 **No Crime.** Neither Licensee nor its owners or officers has never been convicted of a felony, or convicted of any misdemeanor involving financial crimes, fraud or dishonesty. Prior to the execution of this Agreement, Licensee has disclosed to OPC any and all information that may be relevant to OPC in deciding whether or not to enter into this Agreement, such as prior dishonest or illegal activity by Licensee.

4. **NON-SOLICITATION; NON-CIRCUMVENTION; EXCLUSIVITY.**

4.1 **Non-Solicitation.** OPC agrees that during the Term hereof and for a period of two (2) years thereafter (the "**Restriction Period**"), OPC will not directly call on, solicit, take away, or attempt to directly call on, solicit or take away, any Merchants, Sub-Licensees, agents or employees of Licensee. Notwithstanding the foregoing, OPC shall be permitted to have contact with Sub-Licensees and Merchants in connection with providing the Services and OPC System. Licensee agrees that during the Restriction Period neither Licensee nor any of its Sub-Licensees or affiliates will directly or indirectly engage in the following conduct, or permit or assist any third party to engage in the following conduct, in any capacity including as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity ("**Non-Solicitation Obligations**"):

(a)     **Merchants.** Licensee or any of its affiliates, or any of its Sub-Licensees or their affiliates, shall not call on, solicit, take away, or attempt to call on, solicit or take away, any merchants or customers that are boarded directly with OPC. Licensee and its Sub-Licensees may solicit merchants or customers that are boarded with OPC through other licensee's or agents, provided that such merchants or customers are re-boarded with OPC through Licensee or its Sub-Licensees. Licensee and its Sub-Licensees shall not call on, solicit, take away, or attempt to call on, solicit or take away, any merchants or customers that are boarded with OPC through other licensee's or agents and seek to board such merchants or customers with a provider other than OPC. If Licensee or its Sub-Licensee is re-boarding another licensee's or agent's merchant or customer: (i) Licensee or its Sub-Licensee must provide a letter from the merchant or customer terminating the prior licensee or agent and agreeing to transfer its payment services to Licensee, and (ii) the new Merchant Agreement with OPC must be provided to OPC and must not be on any terms less favorable to OPC than the prior agreement. Licensee shall not be in breach of this section should a Merchant require services not offered by OPC, provided that OPC is first offered a reasonable opportunity to provide such services;

(b)     **Agents and Employees.** Entice, induce or in any manner influence any person or entity who is, or shall be in the direct or indirect service of OPC to leave the same for the purpose of engaging in a similar business or being employed by or associated with any other business; or

(c)     **Vendors.** Enter into any negotiation, contract or otherwise solicit any bank, financial institution or payment services vendor in the Market with whom OPC has an ongoing or pending business relationship, for the purpose of entering into any direct or indirect business arrangement or contract between Licensee or its Sub-Licensee and such bank, financial institution or vendor, where performance of the solicited/negotiated/proposed business arrangement or contract would permit Licensee or its Sub-Licensee to obtain or provide services in the Market that are substantially similar to or in direct competition with the Services, whether or not such bank, financial institution or vendor continues or discontinues its business relationship with OPC, provided that Licensee's representations in this section shall not be a breach of this Agreement as to any third party disclosed to OPC on Schedule C with whom Licensee maintains a current business relationship at the time this Agreement becomes effective.

**4.2     Non-Circumvention.** During the Restriction Period it is expressly agreed by each Party that it will not: (a) directly or indirectly initiate, solicit, negotiate, contract or enter into any business transactions, agreements or undertakings with any third party identified or introduced by the other Party; or (b) seek to by-pass, compete with, avoid or circumvent the other Party from any business opportunity with any third party identified or introduced by the other Party.

**4.3     Exclusivity.** The relationship created by this Agreement is an exclusive relationship for the Market, and Licensee agrees, for itself and its Merchants, and for itself and its Sub-Licensees and their Merchants, to use the Services in the Market on an exclusive basis. Except for Licensee Relationships, Licensee is not presently a party to any contract for services in the Market similar to the Services besides this Agreement. Licensee warrants and covenants that, during the Term, Licensee shall not enter into a new contract with any party other than OPC for services similar to the Services, without OPC's prior written consent, which consent may be withheld in OPC's sole discretion. Payment terminals approved by OPC, in its sole discretion, shall be the only terminals connected to the Platform or used with the Services. Notwithstanding anything to the contrary herein, Licensee may maintain its Licensee Relationships and maintain the services provided to any Licensee merchants or customers through such Licensee Relationships as of the Effective Date. If Licensee seeks to move any merchants or customers from their existing Licensee Relationship, Licensee shall only board such merchants or customers with OPC. Licensee shall require similar disclosures and restrictions from its Merchants, and from its Sub-Licensees and their Merchants.

**4.4     Added Services Exclusivity.** The exclusivity granted under Section 4.3 shall extend to all new services added to the Services during the Term, such as debit, credit and other payment services (the "**Added Services**"), on a going forward basis. With respect to the other sections of this Agreement, the Added Services shall be deemed to be included in the Services. Licensee and its Sub-Licensees shall use their best efforts to have Merchants contract to use the Added Services through OPC. If any of the Added Services require that the Merchant have a direct relationship with OPC as an ISO of a Vendor, then: (a) Licensee and/or its Sub-Licensee shall immediately assign such Merchant to OPC as to such Added Service; (b) OPC is hereby granted a power of attorney tied to an interest from the Licensee

and each of its Sub-Licensees to complete such assignment if necessary; (c) Licensee and/or its Sub-Licensee shall become a sub-ISO of OPC as to such Added Service at industry standard residual rates. If Licensee or its Merchants, or its Sub-Licensees or their Merchants, have existing relationships for any of the Added Services at the time the Added Services are live on the Platform (the "**Added Services Live Date**"), then the Licensee or its Merchants, or its Sub-Licensees or their Merchants, may maintain such relationships and the services provided as of the Added Services Live Date; provided that, during the Term, Licensee or its Merchants, or its Sub-Licensees or their Merchants, shall not enter into a new contract, or renew an existing contract, with any party other than OPC for services similar to the Added Services.

**4.5    Breach.** Licensee agrees and understands that any breach of its obligations under this Section shall: (a) cause grave and irreparable damages to OPC; and (b) entitle OPC, in its sole discretion and with five (5) days advance notice and an opportunity to cure, in addition to any other rights or remedies that OPC may have, to do any or all of the following: (i) suspend, restrict or terminate Licensee's access to the OPC System; (ii) terminate this Agreement; and/or (iii) pursue any other rights or claims available to OPC. To the extent that any breach of the obligations under this Section are caused or aided by a Sub-Licensee and/or Merchant, OPC, in its sole discretion and with five (5) days advance notice and an opportunity to cure, in addition to any other rights or remedies that OPC may have, shall be entitled to do any or all of the following: (x) suspend, restrict or terminate Services to Sub-Licensee and/or Merchant; (y) suspend, restrict or terminate Sub-Licensee's and/or Merchant access to the OPC System; and/or (z) terminate the Sub-License and/or Merchant Agreement. The time periods referred to in this Section shall be stayed and extended during any violation or breach of the terms of this Section.

**4.6    Interpretation.** In the event that any court shall finally hold that the time, territory or any other provision of this Section constitutes an unreasonable restriction against Licensee or its Sub-Licensees or Merchants, Licensee agrees that the provisions hereof shall not be rendered void but shall apply as to such time, territory and other extent as such court may judicially determine constitutes a reasonable restriction under the circumstances involved. OPC and Licensee each request that any such court make a determination of what would constitute a reasonable restriction under the circumstances involved and to reform this Agreement accordingly. This Section shall survive termination of this Agreement and shall inure to the benefit of OPC, its successors and assigns.

5.    **CONFIDENTIALITY OBLIGATIONS.**

**5.1 Confidentiality Obligations.** Each Party agrees that during the Restriction Period, or such longer time as the Party has or has access to Confidential Information, it will not, directly or indirectly, breach any of the following obligations, or permit or assist any third party to breach any of the following obligations, in any capacity including as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity (collectively, the "**Confidentiality Obligations**"):

(a) **Confidential Information.** For the purposes of this Agreement, "**Confidential Information**" means this Agreement, including all attached Schedules and Exhibits, and each term and provision of this Agreement and all attached Schedules and Exhibits, the negotiations of the Parties related to this Agreement and all attached Schedules and Exhibits, the Services, the Platform, the OPC System, all proprietary, secret or confidential information or data of a Party and any of its respective affiliates, operations, employees, independent sales organizations, agents, products or services, clients, customers or potential customers, merchants or potential merchants. Confidential Information shall include, without limitation, merchant lists, lead generation methods, training programs, merchant pricing, customer lists, cardholder account numbers, pricing information, acquiring bank or processor relationships, merchant information, leasing information, financial or other data in any format, computer access codes, instruction and/or procedural manuals, payroll information, human resource or personnel information, business strategies and the terms and conditions of this Agreement. Information shall not be considered Confidential Information to the extent, but only to the extent, that such information is: (i) already known to the receiving Party free of any restriction at the time it is obtained; (ii) subsequently learned from an independent third party free of any restriction and without breach of this Agreement; (iii) publicly available through no wrongful act of the receiving Party; or (iv) independently developed by the receiving Party without reference to any Confidential Information of the other.

(b) **Non-Disclosure and Non-Use**. Each Party agrees that it will not, except as expressly required in the conduct of its obligations hereunder or as authorized in writing by the other Party, publish, disclose, or use any trade secret or Confidential Information (including without limitation such information relating to merchants, Services or Vendors' products or services) that a Party may in any way acquire by reason of its association with the other Party. Neither Party shall speak to or communicate with any media or journalist or make any public statements concerning this Agreement, Services, OPC, Licensee, or Vendors without the prior written consent of the other Party.

(c) **Legally Required Disclosure**. In the event that a Party is required by law or legal process to disclose any trade secret or Confidential Information, such Party shall provide the other Party with prompt oral and written notice, unless notice is prohibited by law (in which case such notice shall be provided as early as may be legally permissible), of any such requirement so that the affected Party may seek a protective order or other appropriate remedy. Each Party shall provide such assistance as the other Party requests, at no out of pocket expense to the Party, in seeking such protective order or other appropriate remedy.

(d) **No Misappropriation of Trade Secrets/No Unfair Competition**. Each Party further promises and agrees not to engage in competition with the other Party or its Vendors, at any time after the termination of this Agreement, while making use of Confidential Information relating to the other Party or its Vendors. Each Party acknowledges and agrees that the names and addresses of each Party's Vendors, licensee's, other agents, merchants and other customers, and all other Confidential Information relating to those merchants and customers, including but not limited to account numbers, leasing information, financial information and special needs, are provided in confidence and constitute trade secrets of the disclosing Party, and that the sale or unauthorized use or disclosure of any of a Party's trade secrets or Confidential Information obtained by a Party during its association with the other Party constitutes unfair competition. Each Party promises and agrees not to engage in any unfair competition with the other Party.

(e) **Return of Confidential Information**. Upon any termination of this Agreement, each Party shall surrender to the other Party all trade secrets, Confidential Information and materials furnished by the other Party and any materials developed by the Party from or related to the other Party's trade secrets or Confidential Information. In addition, upon any termination hereof, each Party shall cease any and all contact with any agent or employee of the other Party.

6. **TERM AND TERMINATION.**

6.1 **Term**. The term of this Agreement shall be for an initial term of five (5) years commencing on the Effective Date (the "**Initial Term**"). Thereafter, this Agreement shall automatically renew for successive, additional five (5) year terms (each a "**Renewal Term**") unless any Party hereto provides the other written notice of its intent not to renew one hundred eighty (180) days prior to the expiration of the then-current Term. The Initial Term together with each Renewal Term shall be referred to herein as the "**Term**".

6.2 **Termination**. Notwithstanding the above, the Parties will have the following rights:

(a) **Automatic Termination**. This Agreement will automatically terminate if: (i) Vendors prohibit or prevent, in any fashion, OPC from providing the services set forth in this Agreement; (ii) a bankruptcy or similar petition is filed by or against a Party that is not dismissed within sixty (60) days; or (iii) death, dissolution or other event causes Licensee to cease to exist.

(b) **Termination For Cause**. A Party may terminate this Agreement, following 30 days advance notice and an opportunity to cure (unless a sooner termination is required by a Vendor), upon the occurrence of an Event of Default by the other Party, as defined below.

6.3 **Event of Default**. Each of the following occurrences will constitute an "**Event of Default**" under this Agreement:

(a) **False Representation**. If any representation or warranty made by a Party or any of its employees, officers, or directors proves to have been false or misleading in any material respect as of the date made, or becomes materially false or misleading at any time.

(b) **Regulatory Breach**. If Licensee is in material breach of applicable laws, or if Vendors determine that Licensee is in material breach of applicable laws.

(c) **Breach.** If either Party fails to observe any material obligation specified in this Agreement. Notwithstanding the previous sentence, (i) the fourth such breach by Licensee will be deemed an Event of Default by Licensee without notice or the opportunity to cure; and (ii) in the event that OPC determines that a breach by Licensee is not reasonably capable of being cured, then no advance notice or opportunity to cure shall be provided to Licensee notwithstanding any provision herein to the contrary.

(d) **Non-Solicitation, Non-Circumvention, Exclusivity or Confidentiality Breach.** If Licensee breaches any Non-Solicitation Obligations, non-circumvention obligations, exclusivity obligations or Confidentiality Obligations.

**6.4    Post-Termination Obligations.** Upon termination of this Agreement for any reason, no Party shall have any further obligation pursuant to the terms of this Agreement except for: (i) obligations occurring prior to the date of termination or by law, and (ii) obligations contained herein which are expressly made to extend beyond the Term of this Agreement.

7.    **INDEMNIFICATION AND LIMITATION OF LIABILITY.**

**7.1    Indemnification.** Each Party shall save, defend, indemnify, reimburse and hold the other Party, Vendors and their respective affiliates, shareholders, directors, officers, agents and employees (each an "**Indemnified Party**") harmless from and against all suits, actions, proceedings, losses, claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees, expert witness fees and costs of defense) in connection with any consultation, negotiation, or actual action, suit, claim, losses or proceeding to which an Indemnified Party shall be made a party by reason of any:

(a) acts or omissions of the indemnifying Party or any of its affiliates;

(b) any bad faith, willful malfeasance or negligence of the indemnifying Party or any of its affiliates;

(c) violation of this Agreement or any applicable law, including, without limitation, any and all fines or fees imposed by any Vendor;

(d) fraudulent or dishonest conduct or misrepresentation of the indemnifying Party; or,

(e) Event of Default or other breach of the terms hereof by the indemnifying Party.

**7.2    Selection of Counsel.** In the event a Party makes any claim for indemnity under this Agreement, it shall have the right (subject to its right of reimbursement hereunder), but not the obligation, to defend the suit with counsel of its choice. Each Party agrees to cooperate in such an action. Each Party agrees not to settle any claim for which indemnification hereunder may be sought without prior written consent of the other Party, which shall not be unreasonably withheld. If an attorney is employed by OPC to enforce the terms of this Section, OPC shall be entitled to recover its reasonable attorneys' fees (including reasonable fees for in-house attorneys) and court costs from Licensee.

**7.3    Limitation of Liability.** THE SERVICES OF OPC ARE PROVIDED ON AN "AS-IS", "AS AVAILABLE" BASIS. OPC SHALL HAVE NO LIABILITY TO LICENSEE WITH RESPECT TO ANY BREACHES BY A VENDOR. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, OPC EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES AND CONDITIONS, INCLUDING ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT, AS WELL AS ANY WARRANTIES THAT THE SERVICES PROVIDED BY OPC (AS DISTINCT FROM SERVICES PROVIDED BY A VENDOR) OR THAT THE OPERATION OF SUCH SERVICES WILL BE INTERRUPTION OR ERROR FREE. OPC DOES NOT REPRESENT OR WARRANT THAT THE OPC SYSTEM OR SERVICES WILL BE AVAILABLE, ACCESSIBLE, UNINTERRUPTED, TIMELY, SECURE, ACCURATE, COMPLETE, OR ENTIRELY ERROR- FREE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NEITHER PARTY, NOR ITS LICENSEES AND AGENTS, SHALL, UNDER ANY CIRCUMSTANCES, BE LIABLE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, TO THE OTHER PARTY OR ANY THIRD PARTY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES, EVEN IF THE PARTY HAS BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.    EXCEPT AS REQUIRED BY LAW, AND EXCLUDING THE INDEMNITY OBLIGATIONS HEREIN, IN NO EVENT SHALL OPC'S LIABILITY TO LICENSEE OR ANY THIRD PARTY FROM ANY ACTION OR CLAIM (WHETHER BASED ON AN ACTION OR

CLAIM IN CONTRACT, TORT OR OTHERWISE) IN ANY WAY CONNECTED WITH OR ARISING OUT OF THIS AGREEMENT (AND ALL OTHER AGREEMENTS BETWEEN OPC AND LICENSEE) EXCEED THE LESSER OF THE AGGREGATE OF ALL FEES PAID BY LICENSEE DURING THE THREE (3) MONTHS PRIOR TO THE EVENT GIVING RISE TO LIABILITY OR $10,000.

**7.4  Losses.** All losses due to fraud or chargebacks incurred by OPC or Vendors will be borne by Licensee or its Sub-Licensee, except to the extent that such losses are due to OPC's gross negligence or breach of this Agreement. Licensee and its Sub-Licensee will also be liable to OPC for any liability or loss incurred by OPC or Vendors arising out of Licensee's or its Sub-Licensee's breach hereof, negligence, fraud, intentional wrongdoing or submission of information that was in any way false or misleading or that Licensee or its Sub-Licensee should have known was false or misleading, except to the extent that such losses are due to OPC's gross negligence or breach of this Agreement.

**8.  RELATIONSHIP OF THE PARTIES.**

**8.1  Independent Contractor.** It is understood that Licensee is an independent contractor, and is not, and shall not be deemed to be, an employee of OPC for any purpose. Nothing in this Agreement or the Parties' relationship shall be construed to give either Party the power to direct and control the day-to-day activities of the other. The general conduct of work performed by Licensee and its representatives shall be under Licensee's sole control. Licensee is not entitled to workers compensation insurance, unemployment compensation insurance, pension or profit sharing or other benefits or rights of any kind or nature from or through OPC or Vendors. Nothing in this Agreement or the course of dealing of the Parties shall be construed to constitute the Parties hereto as partners, joint ventures or as agents or employees of one another or as authorizing either Party to obligate the other in any manner. Licensee shall not: (a) bind OPC or Vendors to any contract or agreement; (b) incur any obligation on behalf of OPC or Vendors; (c) release, assign or transfer any agreement, claim, security or any other asset of OPC or Vendors; (d) borrow or lend any money in the name of OPC or Vendors; (e) submit to any claim or liability related to the Merchant Agreements; or (f) allow judgment to be taken or confessed against OPC or Vendors. Licensee, being an independent contractor, shall not receive as compensation, or be reimbursed, for any of the following: (w) additional work materials, (x) business facilities, telephone, automobile or any other equipment, (y) any OPC or Vendors employee benefit, or (z) any other cost or expense incurred by Licensee.

**9.  GENERAL PROVISIONS.**

**9.1  Entire Agreement.** This Agreement supersedes all prior agreements and understandings between Licensee and OPC and their respective directors, officers, shareholders, agents or representatives. This Agreement is the entire agreement between the Parties respecting the subject matter hereof and there are no representations, warranties or commitments other than those expressed herein. Licensee also represents that prior to this Agreement Licensee was neither employed by OPC or any of its affiliates, nor has it acted in the role of independent contractor for OPC or any of its affiliates.

**9.2  Force Majeure.** Neither Party shall be liable in damages or have the right to terminate this Agreement for any delay or default in performing hereunder if such delay or default is caused by conditions beyond its reasonable, for the duration of such delay or default beyond its reasonable control, control including, but not limited to, natural disasters, government restrictions (including the denial or cancellation of any export or other necessary license), wars, insurrections and/or any other cause beyond the reasonable control of the Party whose performance is affected.

**9.3  Injunctive Relief.** If Licensee breaches any of the Non-Solicitation Obligations, non-circumvention obligations, exclusivity obligations, or Confidentiality Obligations of this Agreement, OPC will suffer irreparable harm and the total amount of monetary damages for any injury to OPC will be impossible to calculate and therefore an inadequate remedy. Accordingly, Licensee agrees and understands that upon its actual or threatened breach of any of the provisions contained in Section 4 or 5, OPC shall be entitled to the immediate grant of injunctive relief enjoining such actual or threatened violation by Licensee, or any person acting in concert with Licensee, without the requirement of posting a bond; and that OPC may exercise any other rights and seek any other

remedies to which OPC may be entitled to at law, in equity or under this Agreement for any violation of such obligations.

**9.4    Amendments and Waivers**. Except as provided for herein, no modification, amendment or waiver under this Agreement shall be valid unless in a writing and signed by Licensee and an officer of OPC. Notwithstanding the foregoing, OPC may amend the pricing applicable to Licensee under this Agreement on notice to Licensee delivered by e-mail.

**9.5    Credit and Criminal Background Check Authorization**. The undersigned Licensee acknowledges and hereby voluntarily consents to OPC obtaining a background check on Licensee, its shareholders, directors and officers, if any, and Licensee authorizes and instructs OPC to obtain credit and criminal background and/or driving record reports from a third party (utilizing a social security number trace or other information such as name, address or driver's license number) as OPC deems necessary and appropriate in order to comply with OPC's obligations to Vendors. This authorization and instruction will take effect upon the signature by Licensee of this Agreement, and will last throughout the duration of Licensee's involvement with OPC. OPC may be obliged to disclose the results of such background checks to Vendors. Licensee consents to such disclosure, as it relates to Licensee, its shareholders, directors and officers, if any.

**9.6    Notice**. Any notices or other communications required or permitted to be given pursuant to this Agreement shall be sufficient if hand delivered or sent by certified mail, return receipt requested, or by Federal Express or other nationally recognized express delivery service, (postage or other commercial delivery fees prepaid and confirmation of delivery obtained), to OPC at its address appearing on the first page hereof and to Licensee at the address appearing on **Schedule "B"**, or at such other address as a Party may designate for such purpose by notice so given to the other Party. Notices shall be deemed given and received when actually received or refused, as noted on the delivery receipt. Notwithstanding the foregoing, OPC may provide notice to Licensee via e-mail to the e-mail address on **Schedule "B"** or to such other e-mail address as is normally used by Licensee in e-mail communications with OPC. Such e-mail notices shall be deemed given and received when sent, provided OPC does not receive an "undeliverable" notification from the e-mail service.

**9.7    Successors and Assigns**. Licensee may not assign this Agreement without the prior written consent of OPC, which shall not be unreasonably withheld, and any unauthorized attempted assignment will be null and void. If a company Licensee enters into an asset sale, purchase or stock sale or exchange agreement with a third party which would effectuate a sale or merger of 25% of more of the equity or assets in Licensee's business or rights hereunder without OPC's written consent, OPC will have the right to terminate this Agreement immediately. Except as set forth above, this Agreement shall inure to the successors and permitted assigns of the Parties hereto.

**9.8    Governing Law, Choice of Law and Forum**. This Agreement shall be exclusively construed in accordance with and governed by the laws of the State of Florida without regard to conflicts of law principles.  Any legal actions or proceedings brought to enforce the terms of this Agreement shall be filed exclusively in Miami-Dade County, Florida in a court of competent jurisdiction.

**9.9    Arbitration**. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof (each a "Dispute"), shall be settled by arbitration. In the event the Parties are unable to reach agreement, after attempts to resolve any given Dispute through direct good faith negotiations, either Party may commence arbitration in Miami-Dade County, Florida with an accredited arbitration association. "Arbitration" means appointing one neutral arbitrator to preside over the Dispute in accordance with the provisions of the Florida Arbitration Code (Chapter 682, Florida Statutes, as amended or replaced), and enter a binding decision on the Dispute, by which the Parties must abide. With respect to any matters of procedure not addressed in the Florida Arbitration Code, such matters of procedure shall be determined according to the Commercial Arbitration Rules, including the Emergency Interim Relief Procedures, then in effect of the American Arbitration Association. The Parties shall mutually select a single arbitrator to resolve the Dispute(s); provided that if one Party fails to participate in the selection of an arbitrator within five (5) business days of receipt of written notice, the arbitrator shall be the arbitrator selected by the other Party. The language of the arbitration shall be English. The arbitrator shall render a decision promptly after the submission of the Dispute(s), and shall apply the standards of a reasonable, prudent businessperson. The arbitrator shall not have the power to award punitive, exemplary,

indirect, consequential or special damages. The administrative cost of the arbitration, including the cost of the arbitrators, shall be borne equally by the Parties. Each Party shall be responsible for the payment of its own attorneys' fees and expenses. The arbitrator shall not be empowered to add to, subtract from, delete or in any other way modify the terms of this Agreement. Notwithstanding anything to the contrary herein, any Party shall have the limited right to seek equitable relief in the form of a temporary restraining order or preliminary injunction in a court of competent jurisdiction to protect itself from actual or threatened irreparable injury resulting from an alleged breach of this Agreement pending a final decision in arbitration.

**9.10 Attorneys' Fees.** As a consequence of any action, suit or proceeding brought in a court of competent jurisdiction under this Agreement, the prevailing Party shall be entitled to recover from the non-prevailing Party its costs, expenses, and its reasonable attorneys' fees and costs at all levels and in all tribunals (including pre-trial and post-trial proceeedings, proceedings to enforce collection, and reasonable fees for in-house attorneys).

**9.11 Execution and Delivery.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Execution and delivery of this Agreement may be made by electronic means. An electronic version of this fully executed Agreement shall be treated as an original for all purposes.

**9.12 Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect.

**9.13 Construction, Capacity and Counsel.** For purposes of construction, this Agreement will be deemed as being drafted by both Parties, equally. Licensee is executing this Agreement in Licensee's capacity as a business and not as an individual consumer. Licensee has had opportunity to seek legal advice prior to the execution hereof.

**9.14 Survival.** The following provisions survive termination of this Agreement: 2.1 License Fees, 3 Representations and Warranties, 4 Non-Solicitation, 5 Confidentiality, 6 Term and Termination, 7 Indemnification, and 9 General.

Intending to be legally bound, the Parties have signed this Agreement as of the Effective Date:

**Licensee**

By: _____

Printed Name: Michael Park

Title (if company Licensee): CLO

Date: February 10, 2020

Business Name (if any):

**Transact First LLC**

**One Pay Cloud LLC**

By: _____
    Michael Shvartsman, Manager

Date: February 10, 2020

**Schedule "A"**
**License Fees**

| Description | Licensee Rate | Sub-Licensee Minimum Sell Rate | Merchant Minimum Sell Rate |
|---|---|---|---|
| Market Transaction Fee | $0.50 | $2.25 | $2.75 |
| Decline Fee | --- | $1.00 | $1.00 |
| Onboarding Fee (Key Setup – per Key) | $50.00 | $75.00 | $75.00 |
| Monthly Platform Fee per Terminal | $10.00 | $10.00 | $10.00 |
| Chargeback | --- | $25.00 | $25.00 |
| Annual Compliance fee per location | --- | $100.00 | $100.00 |
| Monthly statement fee per location | --- | $25.00 | $25.00 |

## Schedule "B"
## Licensee Information

Licensee's Company Name (if any): **Transact First LLC**

Licensee's Name (if an individual) or name and title of person signing for company if Licensee is a company:

Michael Park, CLO

Mailing Address:  11451 NW 26th Avenue, Miami, FL 33167

Phone Number: 866.242.3020

Email Address: oksana@transactfirst.com

## Schedule "C"
## Licensee Existing Relationships

| NAME OF PARTY | SERVICES | END OF TERM DATE |
|---|---|---|
| | | |
| | | |
| | | |

## Schedule "D"
## AUTHORIZATION FOR ACH DEBITS / CREDITS

Transact First LLC
**Company/Depositor Name as Shown on Bank Records**

Chase Bank
**Bank Name**
267084131
**ABA Routing Number**

_____

**Account Number**
☒ **Checking**    ☒ **Business**
  **Savings**     **Personal**

Subject to: (i) the terms set forth in your agreement with One Pay Cloud LLC ("Agreement"), (ii) the Operating Rules of the National Automated Clearing House Association (NACHA), and (iii) applicable federal regulations governing Automated Clearing House ("ACH") transactions, I (we) do hereby authorize One Pay Cloud LLC and any partner, parent or subsidiary of One Pay Cloud LLC ("MFF") to initiate debit and credit entries to the account specified above ("Account") for obligations owing from time to time under the Agreement. Company/Depositor agrees to maintain sufficient funds in the Account to cover ACH transactions. In the event that MFF incurs any charges or fees due to failure of an ACH debit to properly process to the Account, or in the event that the Account does not have sufficient funds to permit the ACH debit to go through, I (we) hereby grant MFF the authority to debit the Account for all such charges and expenses incurred together with a $25 administrative fee per failed ACH. This authorization is to remain in full force and effect until MFF has received written notification from me or another duly authorized representative of Company/Depositor of the termination of this approval in such time and in such manner as to afford MFF a reasonable opportunity to act on it. I (we) certify that the appropriate authorizations are in place to allow me(us) to authorize this method of settlement. All changes to the identification of the Account must be made in writing. I (we) understand that if the ABA Routing Number and/or Account Number is incorrect, and funds are incorrectly deposited, MFF will attempt to assist in the recovery of such funds but has no liability as to restitution of the same. I (we) agree that MFF's assistance in recovering the funds, where available, will be debited from the Account at MFF's current hourly rate for such work.

I (we) certify under penalty of perjury that I (we) am (are) duly authorized as a check signer on the Account and am (are) authorized to provide all relevant consents and representations contained in this ACH Authorization.

Dated this **10th** day of **February, 2020.**

_____

**Authorized Signature in Agreement with Bank Records**

### ATTACH A VOIDED CHECK



DocuSign Envelope ID: ████████████████████████

EXHIBIT "E"

## ADDENDUM TO SOFTWARE DEVELOPMENT AND SERVICE AGREMENT

This **Addendum** to Software Development and Service Agreement is made this 30th day of June 2022 (this "Addendum") by and between by and between **DeNovo Systems, LLC** ("DeNovo" or "Developer") located at 1000 Ponce de León, Suite 2A, San Juan, Puerto Rico, 00907 and **One Pay Cloud, LLC** ("OPC" or "Customer"), 21550 Biscayne Blvd., Ste. 400, Aventura, FL 33180. DeNovo and OPC are sometimes collectively referred to herein as the "Parties" and individually as a "Party".

WHEREAS DeNovo is in the business of, among other things, marketing and selling point-of-sale cloud based software for Dejavoo POS terminals and certain other products and services related to payment processing.

WHEREAS IPOS Systems, LLC, parent company of DeNovo, and Customer entered into ████ ████████████████████████████████████████████ pursuant to which One Pay Cloud owns the Protocols and has exclusive use of them.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

WHEREAS the parties executed a **Software Development and Service Agreement** on August 26, 2021, for DeNovo to develop to OPC, ████████████
████████████████████████████████████████████

WHEREAS the parties agreed that the development ████████████████████
████████████████████████████████████████████

WHEREAS the parties now desire to amend the Agreement to include the terms and conditions for ████████████████████

NOW THEREFORE, in exchange for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. **Overview of Project**: DeNovo agreed to provide certain solution and services to OPC. The solution is to ████████████████████████████████████
████████████████████████████████████████████

IPOS-000011

DocuSign Envelope ID: ███████████████████████

Addendum to Software Development and Services Agreement  2

One Pay Cloud, LLC

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

## 2. Description of Services:

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

## 3. Cost/Pricing:

The cost for the development of the solution and the services to be provided to OPC for

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

- **Development Fee**

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

IPOS-000012

DocuSign Envelope ID: ████████████

Addendum to Software Development and Services Agreement

3

████

One Pay Cloud, LLC



- **Processing and Maintenance Fees**



- **Credit Host certification**



4. **Delivery Date:** Estimated date of delivery Q1 of 2022 (February-March)

Except as amended by this Addendum, the terms and covenants and conditions of the SD&S Agreement shall continue in full force and effect, and the SD&S Agreement is hereby ratified in its entirety.

DocuSign Envelope ID: █████████████████

Addendum to Software Development and Services Agreement      4
██████
One Pay Cloud, LLC

5. **Reseller Agreement & Equipment Pricing**



DeNovo reserves the right to adjust all hardware and equipment prices due to increase caused by supply chain issues such as increase in transportation costs, component costs, the imposition or increase in import taxes.

The special price for Android (new version/ P-line) is contingent upon the removal of Verifone terminals by OPC and the delivery of the Verifone terminals to DeNovo. (DeNovo will exchange up to 3,000 terminals).

6. **Intellectual Property Ownership**

"Intellectual Property Rights" (IP) (as defined in Section 4 of the SD&S Agreement) of the ████████████████ are retained by DeNovo.

DeNovo retains all IP rights not expressly granted in the SD&S Agreement and this Addendum.

DeNovo will provide OPC a right to use the POB as a service.

DocuSign Envelope ID: █████████████████████████

Addendum to Software Development and Services Agreement

5

One Pay Cloud, LLC

The █████████████ will run on Information Technology (IT) infrastructure that is owned and operated by OPC but managed by DeNovo under this Agreement.

█████████████████ setup on OPC instance is an extension of the POB Protocols to which OPC has IP rights to POB encryptions as defined by OPC.

DeNovo works as per specs provided and assumes no liability as per agreed upon in SD&S Agreement.

## 7. General Provisions

This Addendum shall be binding upon and inure to the benefit of the parties hereto and to the extent allowed by law, their respective successors, assigns and legal representatives.

As stated in the SD&S, said agreement as well as this Addendum shall be construed in accordance with the laws of the Commonwealth of Puerto Rico.

IN WITNESS WHEREOF, the Parties hereto have caused this ADDENDUM to be executed on the date first written above.

DeNovo Systems, LLC

By _Mony Zenou_
62EFBC7D37934D4

Name:   Shlomo Zenou

Title:    President

Date:

One Pay Cloud, LLC

By _____

Name: Michael Shvartsman

Title: CEO

Date:

IPOS-000015

**DocuSign**

## Certificate Of Completion

Envelope Id: █████████████████████

Subject: Please DocuSign: OPC 20220630 Addendum to Software Agreement.pdf

Source Envelope:

| | |
|---|---|
| Document Pages: 5 | Signatures: 1 |
| Certificate Pages: 5 | Initials: 0 |
| AutoNav: Enabled | |
| EnvelopeId Stamping: Enabled | |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | |

Status: Completed

Envelope Originator:
Maritere Figueroa
393 Jericho Turnpike
Suite 203
Mineola, NY 11501
iposlegal@ipospr.com
IP Address: █████████████

## Record Tracking

| Status: Original | Holder: Maritere Figueroa | Location: DocuSign |
|---|---|---|
| 7/11/2022 12:40:18 PM | iposlegal@ipospr.com | |

| **Signer Events** | **Signature** | **Timestamp** |
|---|---|---|
| Mony Zenou | —DocuSigned by: *Mony Zenou* —62EFBC7D37934D4 | Sent: 7/11/2022 12:43:41 PM |
| mzenou@ipospr.com | | Viewed: 7/17/2022 4:18:13 AM |
| CEO | | Signed: 7/17/2022 4:18:25 AM |
| Card Payment Services, Inc. | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style Using IP Address: █████████ Signed using mobile | |
| Electronic Record and Signature Disclosure: Accepted: 7/17/2022 4:18:13 AM ID: █████████████████████ | | |

| **In Person Signer Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Editor Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Agent Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Intermediary Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Certified Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Carbon Copy Events** | **Status** | **Timestamp** |
|---|---|---|
| Odemaris Diaz | **COPIED** | Sent: 7/11/2022 12:43:41 PM |
| odiaz@ipospr.com | | Viewed: 7/11/2022 1:24:55 PM |
| Security Level: Email, Account Authentication (None) | | |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |

| **Witness Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Notary Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Envelope Summary Events** | **Status** | **Timestamps** |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/11/2022 12:43:41 PM |
| Certified Delivered | Security Checked | 7/17/2022 4:18:13 AM |
| Signing Complete | Security Checked | 7/17/2022 4:18:25 AM |
| Completed | Security Checked | 7/17/2022 4:18:25 AM |

IPOS-000016

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

IPOS-000017



Electronic Record and Signature Disclosure
Parties agreed to: Mony Zenou

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, IPOS System / Denovo System (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

IPOS-000018

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact IPOS System / Denovo System:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: iposlegal@ipospr.com

**To advise IPOS System / Denovo System of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at iposlegal@ipospr.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from IPOS System / Denovo System**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to iposlegal@ipospr.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with IPOS System / Denovo System**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

IPOS-000019

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to iposlegal@ipospr.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

## Acknowledging your access and consent to receive and sign documents electronically

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify IPOS System / Denovo System as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by IPOS System / Denovo System during the course of your relationship with IPOS System / Denovo System.

IPOS-000020



June 17, 2022

**Via UPS Overnight with Copy by Email**
Indian River Merchant Services, LLC
22101 U.S. Hwy 19N
Clearwater, Florida 33765
Attn: President
DWWerling@efxfs.com

Re:     Notice of Termination—*Sponsorship Agreement-ATM Independent Sales Organization*
         Notification of Funding of Reserve Account

Dear President,

***Notice of Default and Termination of Agreement***

Please allow this letter ("Letter") to serve as Pueblo Bank & Trust's ("PB&T" or the "Bank") Notice of Termination of the above-referenced agreement (the "Agreement") between Indian River Merchant Services, LLC ("IRMS") and the Bank.  As you are aware, Section 7.2 of the Agreement allows a party to terminate the Agreement "immediately without notice to the other party in the event of . . . (iii) any material adverse change in the nature of conduct of the business of the other party . . . ."  In addition, a party may terminate the Agreement in certain other events of default:

- failure to comply with Rules and all regulatory requirements including federal, state and card brands;

- intentional misrepresentation at application stage (either ISO or Owner/Operator) by ISO;

- failure to support and monitor Owner/Operators;

- failure to notify Bank of adverse or material changes in any Owner/Operator financial condition during Owner/Operator association with Bank;

- adoption of general business practices that endanger the financial soundness of Bank;

- material breach of any representation of warranty made by ISO and any officer thereof, herein or in any written statements or certificates now or later furnished by or for ISO in connection herewith

Agreement, § 7.2(D).

Based on an ongoing bank investigation into irregularities associated with IRMS' portfolio of ATMs[1] and various communications from third parties, the Bank has discovered the following violations of the Agreement:

1) Material Change in Conduct of the Business of IRMS:

    a. IRMS agreed that it would "investigate prospective ATM Owners on behalf of Bank; . . . evaluate prospective ATM Owners, and accept only those businesses into the ATM Program that fully comply with the credit policies. . . . ; provide Bank a list of its Terminal locations including ATM Owner/Operator, ATM Owner name, Terminal details (Transaction count and volume and Terminal type). . . .; comply with . . . all Rules and Applicable Law. . . . ; ensure that Terminals meet Debit Network standards and requirements, including but not limited to proper Terminal labeling and disclosures. . . ." (Agreement, § 2.1). IRMS has failed to satisfy these requirements and has materially increased the financial, regulatory, and reputational risks to the Bank.

    b. IRMS agreed that it was performing site inspections for all ATM locations, validating the ATM owner's business, and performing background and credit checks on all principals of each owner. (Agreement, Ex. C). As more fully detailed below, IRMS has not conducted its business consistent with these representations and has materially increased the financial, regulatory, and reputational risks to the Bank.

    c. IRMS agreed that it would "comply with the terms of [the Agreement], with PCI-DSS, with the [Network] Rules, and with all applicable local, state and federal laws and regulations." (Agreement, § 6.1(C)). IRMS has failed to do so and has materially shifted the risks associated with its business operations.

    d. IRMS terminal locations are falsely transmitting transaction information to the card processing Networks (each, a "Network"). In particular, the Terminal ID, Merchant Category Code, Merchant Name, Merchant Address, and Merchant State are all falsified. These business failures by IRMS have materially shifted the risks to the Bank due to this failure in IRMS's business operations.

    e. IRMS' conduct, as detailed in this Letter constitutes a "material adverse change in the nature of conduct of the business of [IRMS], as carried on at the date hereof." (Agreement, § 7.2(e)). The conduct of IRMS, fraudulent submissions to the Network, fraudulent submissions to the Bank, failure to oversee the Owners/Operators, failure to collect and verify information as set forth in the Agreement, and conduct in breach of the Network Rules has materially increased the financial, regulatory, and reputational risks to the processor, the Network, and the Bank.

2) Falsified Records, Intentional Misrepresentations, and Failure to Monitor Owners/Operators:

    a. It has come to Bank's attention that IRMS is falsifying information relating to its terminal locations and the classification of the associated merchants. A review of this

---

[1] References are made to the "1Q22" reporting of ATM locations submitted by IRMS.

data indicates that roughly 3% of these addresses do not exist and 35% incorrectly list the address. Only 62% of the sample could be confirmed as a valid address.

b. Review of a sampling of these addresses indicate that many otherwise valid addresses are not the addresses of the merchant reported by IRMS. For example, in many instances, the address is for a different merchant. Instead, a *nearby address* is for a marijuana dispensary whose name is loosely connected to that shown in IRMS' records. For example:

   i. In records submitted by IRMS, "Clinic Holly #1" shows an address of 2025 South Colorado Blvd. in Denver, Colorado. There is no such address. However, at 2020 South Colorado Blvd. in Denver, Colorado is "The Clinic Colorado-Medical & Recreational Dispensary." Upon visiting the location, the transaction from the cashless ATM shows "The Clinic" at 2020 S. Colorado St. and a Terminal ID matching the one shown for "Clinic Holly #1." The IRMS records do not classify this as a cannabis dispensary and instead code it as "GASA."

   ii. In records submitted by IRMS, "Trinidads Calling 1" shows an address of 102 Independence Parkway in Trinidad, Colorado. There is no such address. However, at 1000 Independence Road in Trinidad, Colorado is "Trinidad's Higher Calling U, LLC," a cannabis dispensary. Upon visiting the location, the transaction from the cashless ATM shows "Trinidads Higher Calling U" at 1000 Independence Rd. The IRMS records do not classify this as a cannabis dispensary and instead code it as "REST."

3) Failure to Comply with Rules:

a. Through secret shopping by personnel of the Bank, we understand that IRMS' sponsored Owners/Operators are engaging in "cashless ATM" transactions in violation of the Network Rules.[2] Such transactions cannot be processed under the Rules.

b. A transaction that is encoded as Merchant Category Code ("MCC") 6011 (Financial Institutions—Automated Cash Disbursements) may only be used to dispense cash and may not be used for point-of-sale ("POS") transactions. These machines are generating ATM transactions showing MCC 6011 and reflecting the dispensing of cash. The Bank, through its investigation, is aware that these merchants are not dispensing cash and are, instead, using the receipt from these transactions to make counter purchases for marijuana with the "difference" between the purchase price and the ATM transaction amount being shown as "change" paid to the customer.

c. Transaction information submitted to the Card Networks does not match information reflected on the terminal receipts related to the location of the ATMs.

d. Transaction information submitted to the Card Networks does not accurately reflect the merchant, the terminal location, or the merchant address.

---

[2] See, also, Visa, *Cashless ATM and Misuse of ATM Transactions Prohibited*, VISA BUSINESS NEWS (December 2, 2021).

    e. ATM transaction receipts incorrectly state that cash is being dispensed.

    f. ATM transaction receipts do not reflect the terms of the transaction or match the receipt provided by the cannabis merchant to customers.

4) Breach of Section 2.1:

    a. IRMS, as detailed above, has violated multiple provisions of Section 2.1 of the Agreement. These include violations of subparts (i), (ii), (iv), (v), (xiii), (xvii), and (xix).

5) Breach of Section 5.1 and 6.1:

    a. IRMS, as detailed above, has violated the Network Rules relating to the proper processing of transactions, coding of MCCs, registration of merchant locations, registration of merchant names, and receipt requirements. (Agreement, § 5.1(B)).

    b. IRMS has not "compl[ied] with the terms of [the] Agreement, with PCI-DSS, with the [Network] Rules, and with all applicable local, state and federal laws and regulations." (Agreement, § 6.1(C)).

6) Additional Events of Default (Section 7.3):

    a. It is an Event of Default if "[a]ny representation or warranty made by [IRMS] or any of its employees, officers, or directors proves to have been false or misleading in any material respect as of the date made, or becomes false or misleading at arty time, including but not limited to material misrepresentation of information." (Agreement, § 7.3(B)).

    b. It is an Event of Default if "ISO: (i) knowingly engages in fraudulent activities or activities that violate Applicable Law or the Rules or which cause Bank to violate the same; (ii) operates in an unsound or unsafe manner; (iii) engages in activities or omits to take actions which, in Bank's reasonable determination, may impose financial risk on Bank or which result in undue economic hardship or damage to the reputation, business or goodwill of Bank or the Debit Networks." (Agreement, § 7.3(C)).

7) Violations of Exhibit C—Credit and Underwriting Criteria:

    a. IRMS does not follow the Credit and Underwriting policy approved by the Bank, as set forth in Exhibit C to the Agreement. These include violations of the minimum standards set forth in items 4, 5, 7, and 10.

Section 7.2(E) of the Agreement provides Bank with the right to "terminate this Agreement immediately without notice. . . .", Bank is hereby providing IRMS with notice of the immediate termination of this Agreement and notice of its intent to discontinue sponsorship of the terminals operated by IRMS. Given the significant risk that these actions pose to the Network, the Bank will discontinue all sponsorship of IRMS as of 5:00 pm ET on June 30, 2022. The exercise of this right under the Agreement is not, and shall not, act as a waiver of Bank's other rights that it may have at law, in equity, or otherwise under the Agreement.

### *Demand for Indemnity*

In addition, this Letter shall serve as Bank's notice that, should it incur any costs, claims, losses, damages, fines, or liabilities as a result of the transactions referenced above, it intends to assert its right to indemnity under Section 9.1 of the Agreement.

### *Creation of Reserve Account*

Pursuant to Section 2.8(A) and (B) of the Agreement, Bank is electing to require the funding of a Reserve Account by IRMS.  As such, Bank hereby demand that IRMS remit the following sum to the Bank within two (2) business days of the date of this letter: Five Hundred Thousand ($500,000.00) Dollars.

### *Notification Program to Networks*

Bank requests that IRMS engage in a full audit of its records (in compliance with the Agreement) relating to each of the Owner/Operators of the various ATM terminals.  In particular, Bank requests that you provide on the list labeled "1Q2022," which listings inaccurately reflect the actual location of the terminals or the name of the business.  In addition, the Bank requests that you mark each entry to indicate whether such inaccurate information was provided to IRMS by the Owner/Operator.  In addition to working with the Networks to address the discontinuation of sponsorship and investigation into these transactions, the Bank will develop a program to complete all reporting to the Networks related to the Owners/Operators. Upon provision of this information, the Bank will determine, pursuant to the Rules, which Owners/Operators should be properly reported to the Networks.

---

### *Immediate Discontinuation of Processing*

**Bank hereby directs IRMS to immediately discontinue any activities relating to the processing of transactions by the Owner/Operators of its ATM terminals by 5:00 pm ET on June 30, 2022.**

**Notice will be provided to IRMS's processor of this suspension.**

---

As set forth in the Agreement, the Bank reserves the right to recover all attorney's fees, expenses, and costs associated with pursuing recourse and protecting the Bank's rights under the Agreement.  In addition, please be further advised that the Bank reserves the right to take any and all other actions, and to pursue any and all remedies available by contract, law, or in equity.  These remedies may include taking steps to enforce any personal guaranties provided by any other person or entity on behalf of IRMS.

We trust that IRMS will also retain possession of and protect all documents (electronic or hard copy) that may have relevance to these matters, including any information submitted by Owners/Operators of the various ATM units.

Nothing contained herein constitutes or shall be construed as a waiver of any legal or equitable rights or remedies which Bank may have, all of which are expressly reserved and remain in full force and effect. Your prompt response is essential.

If you wish to discuss this matter, please contact me immediately. PB&T looks forward to your prompt confirmation of the removal of the terminals from Network processing and to any additional information you can add relating to the oversight failures associated with this ATM Program, any information submitted by owners/operators, and the identities of individual(s) involved in submitting the inaccurate information to the Bank and Networks.

Sincerely,

Kim Bennett
President & CEO
Pueblo Bank & Trust

# EXHIBIT "5"

UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

ONE PAY CLOUD, LLC,    Case No. 24-10349-LMI

    Debtor.    Chapter 11

--------------------------------------------------------------------------------------------------------

INDIAN RIVER MERCHANT SERVICES, LLC,

    Plaintiff,    Adv. Proc. No. 24-01327-LMI

v.

ONE PAY CLOUD, LLC,
TRANSACT FIRST, INC.,
I-POS SYSTEMS, LLC, and
DENOVO SYSTEMS, LLC.

    Defendants.
-------------------------------------------------------------/

**I-POS SYSTEMS, LLC AND DENOVO SYSTEMS, LLC'S MOTION TO DISMISS ADVERSARY COMPLAINT**

Specially-appearing movants i-POS Systems, LLC ("i-POS") and Denovo Systems, LLC ("Denovo"; collectively, the "Movants"), both non-debtors in this bankruptcy proceeding, hereby move this Honorable Court to dismiss the Adversary Complaint ("AC") filed against them by Plaintiff Indian River Merchant Services, LLC ("IRMS"), pursuant to FRBP 7012 and FRCP 12(b)(1), 12(b)(6), and applicable law. Movants do not waive their objection to the Court's exercise of personal jurisdiction over them by filing this Motion to Dismiss. In support of this motion, Movants state as follows:

///

///

1

As required by FRBP 7012 and FRCP 12(b), Movants hereby state that Movants respectfully do not consent to the entry of final orders or judgment by the bankruptcy Court in this adversary proceeding.

## BACKGROUND

1. Movant i-POS is a holding company. Movant Denovo is a subsidiary of i-POS.

2. Neither of the Movants has any existing business relationship with the Debtor, One Pay Cloud, LLC ("Debtor" or "OPC"). All business ties between Movants and Debtor ended in 2023. No payments or transfers have been made between Movants and Debtor since 2023.

3. Debtor's voluntary petition for Chapter 11 bankruptcy was filed on January 15, 2024. (ECF #1 in Case No. 24-10349-LMI.)

4. Purported creditor IRMS filed a claim against Debtor on March 25, 2024 (Claim 2-1).

5. Debtor filed an objection to IRMS's claim on April 16, 2024 (ECF #83). This matter was heard on June 27, 2024, but no order relating to this objection has yet been filed.

6. Third Party EFT Services LLC ("EFT"), with which IRMS allegedly had a contractual relationship, filed a lawsuit against Movants in the U.S. District Court, Southern District of New York, on February 27, 2020, Case No. CV 01757.

7. In January 2024, long after EFT dismissed its action against i-POS, IRMS filed a motion to unseal records in the New York case. Movants had never even heard of the name IRMS until this filing. Movants have never done business with IRMS.

8. Movants had never even heard of the name Pueblo (IRMS's alleged sponsor bank) until June 2024, when IRMS filed its AC against Movants in this case. Movants have never done business with Pueblo.

9. EFT's lawsuit against i-POS arose out of Movants i-POS's anticipatory termination of a license agreement with EFT in which the use of certain software technology developed by Denovo called the Protocols was licensed to EFT. After i-POS began to suspect EFT of misusing the Protocols, i-POS requested that EFT discontinue such misuse. In response, EFT filed the lawsuit and a demand for injunctive relief.

10. Earlier, on February 10, 2020, i-POS had assigned all rights to the Protocols to Debtor OPC. Thereafter, i-POS no longer had any control over the use or licensing of the Protocols. EFT dismissed the lawsuit with prejudice on March 21, 2020.

11. Certain documents in the EFT lawsuit against i-POS, produced by i-POS, were filed under seal. On January 9, 2024, Devin Werling, owner of IRMS, filed a nonparty request seeking the unsealing of these documents, citing public interest and not disclosing the nature of IRMS's interest in that lawsuit.

12. In this bankruptcy proceeding, IRMS filed multiple Rule 2004 notices for examination of i-POS as a nonparty, non-debtor witness. i-POS produced certain documents to IRMS in compliance with these notices. IRMS never disclosed to i-POS its intention to file an adversary complaint against i-POS or Denovo.

13. On June 20, 2024, IRMS filed the AC, alleging claims against Debtor and Movants, among other parties, arising solely under state law and not bankruptcy law, including fraud and tortious interference with contract. (ECF #219.)

14. The primary tortfeasor in IRMS's saga appears to be EFT, but IRMS did not file an adversary bankruptcy proceeding against EFT.

15. IRMS had in fact filed a lawsuit against EFT more than three years ago, on May 24, 2021, in the State Court of Florida, County of Pinellas, Case No. 21-2572-CI ("Florida State Action").

16. Movants' counsel were not aware until July 5, 2024 that, on January 29, 2024, and then again on May 3, 2024, IRMS attempted to seek leave of court in the Florida State Action to amend its complaint ("Motion to Amend") to join Movants as defendants in the State Action, alleging substantially the same claims as they now do in the AC. This proposed joinder was buried deep in IRMS's Claim 2-1 as an attachment to "Exhibit A" to "Exhibit A". The Florida state court denied this request on May 13, 2024. IRMS never disclosed these facts to counsel or, as far as Movants are aware, to the Court during oral arguments.

17. IRMS served multiple Rule 2004 examination notices on i-POS, in contravention of the pending proceeding rule. Under the "pending proceeding" rule, discovery demands from parties

3

involved in a pending non-bankruptcy proceeding must be served in compliance with FRCP 45 and 30 and other discovery rules as directed by FRBP 9016 and 9014. *See In re National Assessment, Inc.*, 547 B.R. 63, 65 (Bankr. W.D.N.Y. 2016).

18.      The AC does not allege that Movants had any business or other relationship with IRMS, or with any of the third parties with whom IRMS allegedly had contractual relationships, including EFT and Pueblo.

19.      Movants contend that the AC falls outside of this Court's subject matter jurisdiction and fails to state a claim upon which relief can be granted.

## **LEGAL STANDARDS**

20.      FRBP 7012 and FRCP 12(b)(1) provide that an adversary complaint shall be dismissed for lack of subject matter jurisdiction.

21.      FRBP 7012 and FRCP 12(b)(6) provide that an adversary complaint shall be dismissed for failure to state a claim upon which relief can be granted.

22.      In a complaint, the plaintiff has the burden to allege a plausible set of facts establishing jurisdiction. (*Physician Hosps. of America v. Sebelius* (5th Cir. 2012) 691 F.3d 649, 652; *Ware v. Best Buy Stores, L.P.* (7th Cir. 2021) 6 F.4th 726, 732; *Bushnell, Inc. v. Brunton Co.* (Dist KS 2009) 659 F.Supp.2d 1150, 1157—complaint must contain "sufficient jurisdictional facts to state a claim which is plausible on its face".)

23.      The Court is not limited to considering the allegations of the complaint. It may consider extrinsic evidence; and if the evidence is disputed, it may weigh the evidence and determine the facts in order to satisfy itself as to its power to hear the case: "[T]he existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." (*Roberts v. Corrothers* (9th Cir. 1987) 812 F.2d 1173, 1177; *Broidy Capital Mgmt. LLC v. Benomar* (2nd Cir. 2019) 944 F.3d 436, 441; *Cartwright v. Garner* (6th Cir. 2014) 751 F.3d 752, 759-760—court may consider evidence outside the pleadings.)

///

///

4

## **LACK OF SUBJECT MATTER JURISDICTION**

24. Movants are non-debtors and are not subject to the subject matter jurisdiction of this Court for the claims asserted against them in the AC under 28 USC §1334. Movants request that the Court dismiss the AC pursuant to FRCP 12(b)(1).

25. Plaintiff's claims in the AC ("the Claims"), alleging tortious interference and fraud, arise solely under Florida state law.

26. None of the Claims is a "core proceeding" within the meaning of 28 USC §157(c)(1) & (2). None of the Claims invokes a substantive right created by the federal bankruptcy law. Each of the Claims exists solely outside of bankruptcy. (*Stern v. Marshall* (2022) 564 U.S. 462, 476; *In re Harris Pine Mills* (9th Cir. 1995) 44 F.3d 1431, 1435.)

27. None of the Claims alleges any of categories of core proceedings listed in 28 USC §157(b)(2), such as fraudulent transfers, preference payments, non-dischargeability, or objection to plan confirmation. IRMS has alleged none of these categories against the Movants or even against the Debtor. The Trustee has not filed any avoidance or turnover action.

28. Movants respectfully request this Court to determine whether the each of the Claims constitutes a core or noncore proceeding. (28 USC §157(b)(3); *In re Harlow Properties, Inc.* (9th Cir BAP 1985) 56 BR 794, 798.)

29. The rights being invoked in the Claims exist independently of Title 11, depend on state law for resolution, allegedly existed prior to the filing of the bankruptcy petition here, and were not significantly affected by the filing of the bankruptcy case. (*In re Goodman* (9th Cir. 1993) 991 F.2d 613, 617.)

30. Here, the Claims are not central to this bankruptcy case and are not traditionally decided by bankruptcy judges. Movants, as non-debtors, have been unreasonably forced to litigate in this Court. (*In re Beugen* (BC ND CA 1988) 81 BR 994, 1000.)

31. Nor does this Court have "related to" jurisdiction over the Claims. The outcome of this proceeding could not conceivably have any effect on the estate being or to be administered in bankruptcy. No conceivable outcome could alter the Debtor's rights, liabilities, options, or

freedoms of action. There is no nexus between the Claims and this bankruptcy petition. (*Pacor, Inc. v. Higgins* (3rd Cir. 1984) 743 F.2d 984, 994; *In re Fietz* (9th Cir. 1988) 852 F.2d 455, 457; *In re American Home Mortg. Holding* (2012) 477 B.R. 517, 529-530.)

32.     Here, Movants (non-debtors) have not guaranteed Debtor's alleged debts, secured the purported creditors' claims, made any claims against Debtor, incurred any debt to Debtor, or received assignment of Debtor's contractual rights. Movants do not own any property jointly with Debtor. Nor has IRMS alleged any such guarantee, security, claims, debt, assignment, or joint ownership attributable to Movants.

33.     Even if IRMS were to prevail against the Movants in its adversary proceeding, any damages IRMS could recover from Movants or even Debtor would not be available for distribution to the other creditor(s), as such recovery would not become assets of the bankruptcy estate. Therefore, the Claims can have no conceivable outcome on the final resolution of Debtor's bankruptcy petition.

## **FAILURE TO STATE A CLAIM**

34.     Alternatively, if the Court does not agree that it lacks subject matter jurisdiction over the Claims, then Movants, without waiving any objection to the Court's exercise of personal jurisdiction over them, respectfully request that the Court dismiss the Claims under FRBP 7012 and FRCP 12(b)(6) for failure to state a claim. (*Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 570.)

35.     The AC against Movants is barred as res judicata. A dismissal for failure to state a claim, or failure to prosecute, constitutes a final judgment for purposes of the res judicata analysis. (*Plaut v. Spendthrift Farm Inc.* (1995) 514 U.S. 211, 228.) While no order has not been filed in the Florida State Action relating to the May 13, 2024 hearing on IRMS's Motion to Amend, it can be reasonably presumed that the state court's denial of the Motion to Amend is functionally equivalent to a dismissal for failure to state a claim or failure to prosecute.

36.     Additionally, on the face of the AC, it fails to state a claim.

37.    Count I ("Tortious Interference with advantageous business relationship") and Count II ("Tortious Interference with Contract") fail to state a claim. The "tortious interference" category of claims arises under state law. (*Franklin v. Brown* (Fla. Dist. Ct. App. 1964) 159 So. 2d 893, 895.)

38.    Florida state law requires four elements to establish tortious interference with a contractual or business relationship: (1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform; and (4) damage to the plaintiff resulting from the third person's failure to perform. (*Seminole Tribe of Florida v. Times Pub. Co., Inc.* (2001) 780 So. 2d 310, 315; *Howard v. Murray* (2015) 184 So. 3d 1155, 1166.)

39.    Here, the facts alleged by IRMS are insufficient to meet the elements of IRMS's tortious interference claims. IRMS pleads the legal conclusion that Movants "knew of the relationship" between IRMS and Pueblo and between IRMS and EFT, but alleges no facts whatsoever in support of that conclusion. (AC Nos. 66, 67, 74.) IRMS cannot make such factual allegations, because they would be false. Movants were, in fact, not aware of the existence of IRMS until long after the alleged facts giving rise to IRMS's causes of action occurred. Movants were not aware of any relationship between IRMS and EFT. Nor were Movants aware of Pueblo's existence, much less Pueblo's alleged relationship or contract with IRMS. The court need not accept as true legal conclusions, legal conclusions couched as factual allegations, or inferences unsupported by the facts set out in the complaint. (*O'Bryan v. Holy See* (6th Cir. 2009) 556 F.3d 361, 376; *Lacano Investments, LLC v. Balash* (9th Cir. 2014) 765 F.3d 1068, 1071-1072—legal conclusions disregarded even if cast as factual allegations.)

40.    IRMS's causation argument, attempting to link Movants to the harms IRMS allegedly suffered under IRMS's tortious interference claims, is quite tenuous and fails for that reason. IRMS alleges that 1) Movants developed some software (AC No. 54), 2) assigned the rights to the

7

software to Debtor OPC (No. 55), 3) OPC licensed the software to EFT (*ibid*), and 4) EFT inputted fraudulent data into IRMS's compliance protocols, "through" the software (Nos. 56, 57).

41.     What is more important here than what IRMS has alleged is what IRMS has not alleged. First, IRMS has not alleged that the Protocols were developed for the express purpose of masking cashless ATM transactions at cannabis dispensaries. Second, IRMS has not alleged that Movants, after assigning the rights to the Protocols to OPC, retained any control over how the Protocols would be used or altered, or had any advance knowledge of how OPC, EFC, or any other entity intended to use the software. (Movants, in fact, retained no such control and had no such knowledge.) Third, IRMS has not alleged that OPC, after licensing the Protocols to EFC, had any advance knowledge of how EFC intended to use the Protocols. Fourth, IRMS has not alleged that EFC's illicit activity in inputting fraudulent data into IRMS's compliance protocols required the use of the Protocols.

42.     In short, IRMS has not alleged that Movants, by the mere act of developing the Protocols, knew or could possibly have known precisely how the Protocols would be used, far down the supply chain in the distant future. These missing allegations, which IRMS would be unable to make via an amendment of the AC, are required to satisfy the causation element of tortious interference.

43.     Count III ("Fraud") fails to state a claim. A fraud claim arises under state law. (*Beagle v. Bagwell* (Fla. Dist. Ct. App. 1964) 169 So. 2d 43, 45.)

44.     Under Florida law, the elements of the cause of action for fraud are: 1) A false statement concerning a material fact, 2) Knowledge by the person making the statement that the representation is false, 3) The intent by the person making the statement that the representation will induce another to act on it, and 4) Reliance on the representation to the injury of the other party. (*Lance v. Wade* (Fla. 1984) 457 So. 2d 1008, 1011; *Hollywood Lakes Country Club, Inc. v. Community Ass'n Services, Inc.* (Fla. Dist. Ct. App. 2000) 770 So. 2d 716, 718.)

45.     Moreover, claims for fraud must be pleaded with particularity. Florida Rule of Civil Procedure 1.120(b) states "In all averments of fraud or mistake, the circumstances constituting

fraud or mistake shall be stated with such particularity as the circumstances may permit." This means that an affirmative defense or claim "must clearly and concisely set out the essential facts of the fraud, and not just legal conclusions." (*Thompson v. Bank of New York* (Fla. Dist. Ct. App. 2003) 862 So. 2d 768, 769-70.)

46.     Here, IRMS has pleaded no facts to support the claim of fraud, much less particularized ones. The insufficiency of IRMS's fraud claim, much like its interference claims, is shown by what IRMS has not alleged. IRMS has not alleged that Movants made any statement to IRMS, false or otherwise. Even assuming that the development of the Protocols can legally constitute a "statement", IRMS can establish no knowledge of falsity attributable to the Movants. Nor has IRMS shown that Movants intended to induce IRMS to act on such nonexistent statements. IRMS cannot show this because Movants were not aware of IRMS's existence until long after the alleged acts occurred. Finally, IRMS has not shown that it relied on any such nonexistent statements.

47.     Count IV ("Aiding and Abetting Fraud") fails to state a claim. The elements of this claim are: 1) There existed an underlying fraud, 2) The defendant had knowledge of the fraud; and 3) The defendant provided substantial assistance to advance the commission of the fraud. (*ZP No. 54 Ltd. Partnership v. Fidelity and Deposit Co. of Maryland* (Fla. Dist. Ct. App. 2005) 917 So. 2d 368, 372; *Gilson v. Flagler Bank* (Fla. Dist. Ct. App. 2020) 303 So. 3d 999, 1002.)

48.     Here, similar to its claim for fraud, IRMS has alleged no facts, much less particularized ones, to support its claim for aiding and abetting fraud. Assuming that EFT had perpetrated fraud on IRMS, IRMS has not shown that Movants had any knowledge of such fraud, nor that Movants intended to provide or did provide substantial assistance, or assistance of any kind, to advance the commission of that fraud. IRMS's claim for fraud essentially rests on the proposition that the responsibility for third party EFT's acts or omissions can be attributable to the licensor (OPC) of the software which EFT may or may not have used to further its acts, and to the original developer of the software (Denovo). This proposition is akin to holding Microsoft, Inc. responsible for a third party's misuse of Windows 11 to perpetrate wire fraud. This proposition should be rejected as unsupported by law.

9

49. Count V ("Conspiracy To Tortiously Interfere With Contract and Business Relationship") fails to state a claim. An action for conspiracy to interfere with one's profession requires a combination of two or more persons or entities, having a common purpose, seeking to accomplish the underlying tort of interference. (*Greenberg v. Mount Sinai Medical Center of Greater Miami, Inc.* (1993) 629 So. 2d 252, 256.) Another court stated that Florida does not recognize an independent cause of action for civil conspiracy. (*Allocco v. City of Coral Gables* (11th Cir. 2003) 221 F. Supp. 2d 1317, 1360-61.)

50. Count VI ("Conspiracy To Commit Fraud") fails to state a claim. Florida does not recognize an independent cause of action for civil conspiracy. (*Allocco v. City of Coral Gables* (11th Cir. 2003) 221 F. Supp. 2d 1317, 1360-61.)

51. The elements for conspiracy generally are: 1) An agreement between two or more parties; 2) To do an unlawful act or to do lawful act by unlawful means; 3) An overt act in furtherance of the conspiracy; and 4) Damage to the plaintiff as a result of the act performed in furtherance of it. (*Gilson v. Flagler Bank* (Fla. Dist. Ct. App. 2020) 303 So. 3d 999, 1002; *Walters v. Blankenship* (Fla. Dist. Ct. App. 2006) 931 So. 2d 137, 140.)

52. Here, IRMS has not alleged that there was any agreement between Movants and any other party to do any unlawful act or any lawful act by unlawful means. IRMS admits that the use of cashless ATM "Scrip" machines at cannabis dispensaries is a "legal grey area" (AC No. 26), indicating that the use of such machines is not unlawful. IRMS has not shown that anything the Movants did, i.e., developing or licensing the Protocols, is unlawful. Nor has IRMS articulated any sort of "overt act" attributable to the Movants in furtherance of a nonexistent conspiracy. IRMS has not alleged any particularized facts to describe any conspiratorial activity between Movants and any other party.

WHEREFORE, Movants respectfully request that this Honorable Court dismiss Plaintiff's Adversary Complaint against Movants with prejudice, and grant such other and further relief as this Court deems just and proper.

///

## CERTIFICATION

Undersigned counsel certifies they have attempted to confer in good faith with IRMS counsel regarding the withdrawal of the Adversary Complaint. As of the filing of this Motion to Dismiss, the pertinent issues have not been resolved, but counsel will continue to try to resolve the issues prior to the hearing on this Motion.

DATED this 9th day of July, 2024.

By:    */s/ Gustavo A. Bravo, Esq.*
Gustavo A. Bravo, Esq.
FL Bar No. 551287
**BRAVO LAW**
1555 Bonaventure Blvd., Suite 157
Weston, Florida 33326
Tel.: 954-790-6711
Email: gbravo@lawbravo.com

*/s/ Chuanchi Tang, Esq.*
Chuanchi "Tren" Tang, Esq.
CA Bar No. 249238
(Admitted *Pro Hac Vice*)
**GLOBAL LEGAL LAW FIRM**
322 Encinitas Boulevard
Encinitas, CA 92024
Tel.: 888-846-8901
Email: ttang@attorneygl.com

***Counsel for i-POS Systems LLC and Denovo Systems LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished via electronic transmission through the Court's CM/ECF system on this 9th day of July, 2024.

By:    */s/ Chuanchi Tang, Esq.*
Chuanchi "Tren" Tang, Esq.
(*Admitted Pro Hac Vice*)
CA Bar No. 249238

11

# EXHIBIT "6"

UNITED STATES DISTRICT COURT
SOUTHERN OF NEW YORK
-----------------------------------------------------

| | |
|---|---|
| EFT Services LLC and IPN LLC d/b/a Paybotic | Case No. 20 CV 01757 |
| Plaintiff, | |
| v. | |
| i-POS Systems LLC d/b/a Dejavoo and Defendants Systems, LLC, | |
| Defendant. | |

## DECLARATION OF MONY ZENOU

1.      I am the Chief Executive Officer of i-POS Systems LLC d/b/a

Dejavoo ("Dejavoo") and Defendants Systems, LLC ("Denovo," and collectively

with Dejavoo, "Defendants")

2.      I submit this Declaration in support of Defendants Opposition to

Plaintiffs' EFT Services LLC ("EFT") and IPN LLC d/b/a Paybotic's ("Paybotic,"

and collectively with EFT, "Plaintiffs") Motion for a Preliminary Injunction ("the

Motion").

3.      ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

1

4.                     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Background on the Protocols**

5.        In or around 2019, Defendants developed the technology, software, and code (the "Protocols") ") to allow for a payment mechanism that would streamline certain transactions in the payments ecosystem by reducing the touch points and accordingly streamline communication points so that funds are verified faster.

6.       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7.       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████

████████████████████████████

8. From February through November 2019, Defendants had licensed the Protocols to five entities.

**The Licenses to Plaintiffs.**

9.     On or about March 11, 2019, Dejavoo entered into the Services and License Agreement with EFT (the "EFT Agreement"). (See attached as "Exhibit A" a true and correct copy of the EFT Agreement.) Under the EFT Agreement, Dejavoo licensed "Technology," which included only the Protocols.

10.     The EFT Agreement set forth that the license was limited to "the applicable use restrictions associated with the license granted herein." (See Exhibit A, at § 3.) The EFT Agreement set forth that the license was perpetual provided that Customer is at all times in full compliance with the terms of the [Services Agreement.] (*Ibid.*)

11.     The EFT Agreement also provided that Dejavoo would provide separate services under the Exhibit A of the EFT Agreement. Those included that Dejavoo, for a one time fee of $15,000, would provide an "Interface a Genmega, Triton Emulation protocol to EFT gateway on Dejavoo Terminals." The detail set forth that the license was limited to EFT using the Protocols only through EFT's

3

own Gateway, (the "EFT Gateway"), which was EFT's proprietary payment mechanism to communicate transactions to a processor.

12.     On or about November 4, 2019, Denovo and Paybotic entered into the Services and License Agreement (the "Paybotic Agreement"). (See attached as "Exhibit B" a true and correct copy of the Paybotic Agreement.)  The Paybotic Agreement mirrored the EFT Agreement, accept that it processes transactions solely through the use of the Gateway, "Columbus Data," instead of EFT's Gateway, and that Paybotic had the dual responsibility of confirming the certification of compliance from Columbus Data prior to its use. EFT is a HOST Gateway while Paybotic has an agreement with a processor entity, "CDS" thus, Paybotic is not the actual processor.

13.     ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

4

## Defendants' Compliance Concerns

14.

15.

16.

17.

**Defendants' Undertaking to Correct its Compliance Concerns.**

18.     Once Defendants learned of the potential misuse of the Protocols, they undertook to update and close the gaps in the code that would allow ISOs and/or merchants to improperly use the Protocols.

19.

6

███████████████████████████████████████████

██████████████████████████

20.      In or around late January 2020, Defendants then announced to all licensees that they intended to close access for new merchant boarding in the near future.

21.      Immediately thereafter, Defendants sent a draft of the "Updated License Agreement Template" (the "Updated License Agreement Template" executed by one licensee.) ) to all of its licensees, including Plaintiffs.  (See attached as "Exhibit C" a true and correct copy of the Updated License Agreement Template.)  The Updated License Agreement Template was materially the same as the EFT and Paybotic Agreements.  The only difference was that the licensees would need to certify that they were operating in compliance with the Card Brands and regulations.  The Updated License Agreement Template also removed language that specifically excluded references that Plaintiffs leaned on to operate the Protocols illegally.

22.      Except for Plaintiffs, all of Defendants' other licensees agreed to the change, including Ron Nolte of Sterling Payment Solutions, LLC, the brother of Randy Nolte, the principal of EFT).

**Notices to EFT Regarding Compliance Concerns and Notice of Assignment.**

23.      On January 14, 2020, Defendants sent notice to EFT regarding the compliance concern and the need for them to execute an Updated License Agreement and that their continued use of the Protocols would be contingent upon certifying their compliant use of the Protocols.   In subsequent calls, it was discussed that absent certification, EFT would otherwise be in breach of the EFT Agreement.

24. ███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████

**Notices to Paybotic Regarding Compliance Concerns and Notice of Assignment.**

25(a).   ████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

8

█████████████       ███████████████████████████████

████████████████████████████████████████████

███████████

25.████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███████████

26. On February 10, 2020, Mr. Miller responded that "We're sending this most recent updated agreement version to legal for review and will circle back shortly. Please trust that we're taking care of this with the utmost priority."

27. Paybotic's response was apparently to file this action despite that it had since October 2019 to consider/ratify the compliance updates or find an alternative solution.

28.████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

9

**Defendants's Assignment of the Protocols**

29. Based on its concerns, Defendants decided that it would be prudent to exit the space.  On or about February 10, 2020, Defendants entered into an agreement with OnePayCloud, LLC ("OPC"), under which Defendants sold all of its rights to use the Protocols and the respective sublicenses to OPC.

30. OPC has confirmed that it owns the license, and that it had no intent to terminate Plaintiffs' licenses.

**Additional Compliance Concerns and the Termination of EFT and Paybotic.**

31. ███████████████████████████████████████

████████████████████████████████   ████████████

█████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████.

32. ███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

10

33. The Injunctive Order requires that Defendants be indentured to continue to provide services and features that are not included in the licensed technology. Defendants only licensed the Protocols to Plaintiffs. Plaintiffs had remained free to use the Protocols, in compliance with the license. The Protocol licensed is to use the Protocols related to Plaintiffs' respective EFT/Columbus Data Gateways only. These Licenses do not include the application, the systems upon which Plaintiffs board their accounts, nor any ongoing service.

34. Thus, the Injunctive Order included obligations that Defendants provide service and other functions that it has legally assigned to a third party. Defendants' successor, OPC, is the correct party, and Plaintiffs were well aware of this and simply sued Defendants to leverage their negotiations with OPC.

35. Due to these breaches, to the extent that Plaintiffs contend that Defendants have any existing duty as a Licensee, despite that Defendants have assigned all rights to OPC, Defendants have terminated the Paybotic and EFT Agreement effective March 4, 2020. (See attached as "Exhibit D" a true and correct copy of the March 4, 2020 Termination Letters.)

36. Here, Plaintiffs drastically misled the Court by relying on incomplete facts and misleading statements. Those incomplete facts and misleading statements are as follows.

11

37. The statement that there is no product or existing software to compete with the Protocols is false. Plaintiffs are in negotiations with the Defendants' successor, which is one reason that Plaintiffs are refusing to agree to alter the terms of their use to be compliant with the rules and regulations.

38. Further, EFT admits that it had an alternative solution and freely chose to migrate to Defendants' Protocols.  See ¶ 11 of the Complaint.

39. Importantly, Defendants never stated that they would "cut off the software and shut off terminals."  Defendants expressly stated that merchants would remain active and live, but that Plaintiffs needed to certify compliance before submitting new accounts.  Defendants also never stated that they would terminate Plaintiffs' merchants.  Nor did Defendants state that they would terminate Plaintiffs.  Defendants only stated that after the end of February 2020 no new merchants will be boarded on its systems, but can be boarded on other system, if available, absent their compliance confirmation. The Updated License Agreement Template did not expand termination rights, it actually limited those rights.

40. It is also false that Plaintiffs only learned of Defendants' compliance concerns that jeopardized their continued use of the licenses on February 26, 2020.  Plaintiffs falsely state that on "[February] 26, 2020  . . . Plaintiffs learned that defendants will take steps to commence this process . . ." in reference to that Defendants would terminate Plaintiffs.  Plaintiff was first notified in January 14,

12

2020 of the need to address the compliance concerns.  And were again notified on January 23, 28, 2020, and then multiple times throughout February 2020 of the need to certify compliance under the Updated License Agreement.

41. It is also false that Plaintiffs helped develop the Protocols.  Plaintiffs did not participate at all in developing the Protocols.  Plaintiff only supplied sample receipt and observed and quantified the accuracy of Defendants' work product.   As set forth under the EFT and Paybotic Agreements, Plaintiffs licensed the existing Protocols for the use only on specific Gateways, which were already built and functioning.  Plaintiffs assert no facts or evidence on how they helped develop the Dejavoo protocols. That is untrue.

42. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████ █ █████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████

13

43. Also important is that the EFT and Paybotic Agreements at dispute do not authorize, nor even mention, any purported use of the Protocols or any services under the EFT and Paybotic Agreements for anything related to CBD or Cannabis. Defendants did not condone, ratify, nor grant any right for Plaintiffs to use the Protocols related to CBD or Cannabis.

44. The claims that Plaintiffs would not have purchased Dejavoo terminals unless their licenses under the EFT and Paybotic Agreements was not perpetual are false. Paybotic bought and installed Dejavoo terminals well before it got a license from Defendants. Dejavoo terminals are entirely reprogrammable and useable for any other purpose.

45. Also, Plaintiffs did not purchase all of the terminals that they used from Dejavoo. Many if not most of Plaintiffs' terminals were purchased from third parties. Also, Dejavoo's terminals are entirely reprogrammable, reusable for multiple purposes, and have a high resale value.

46. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████  ██████████████████████████████████████

14



47. The Dejavoo terminals are entirely reprogrammable and useable for any other purpose. Any the purchase of the terminals, roughly $200 is quickly recouped in mere days, maximum a week or two of processing.

48. Further, any business in the "legal" marijuana and cannabis space is speculative and risky. With the everchanging regulations, most merchant processing solutions are short lived due to that loopholes are closed through regulatory enforcement.

49. Here, Defendants tried to get in front of the enforcement action when they learned that Plaintiffs were using the Protocols in violation of the Card Brand and network rules.

50. Plaintiffs assert no facts or evidence to substantiate any of its claims that Dejavoo has interfered with Plaintiffs' customers.

15

51. ████████████████████████████████████████

████████████████████████████████████████

████████████

52. On February 28, 2020, OPC has confirmed that it owns the license, and that it had no intent to terminate Plaintiffs..

53. I have paid my attorneys in excess of $25,000 preparing for and opposing this motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 4, 2020.

Mony Zenou

16

# EXHIBIT A

# EXHIBIT A

SERVICES AND LICENSE AGREEMENT

THIS SERVICES AND LICENSE AGREEMENT (this "Agreement") is made as of March 11th, 2019 (the "Effective Date") by and between i-POS Systems, LLC d/b/a Dejavoo ("Dejavoo"), located at 393 Jericho Turnpike, Suite 203, Mineola, NY 11501, and EFT Services LLC ("Customer"), located at 4801 S University Drive #303 Davie, FL 33328.

WHEREAS, Dejavoo is in the business of, among other things, marketing and selling point-of-sale terminals ("Dejavoo Terminals") and certain products and services related to payment processing;

WHEREAS, Customer desires for Dejavoo to develop certain integration software ("Technology") in connection with its purchase of the Dejavoo Terminals and to acquire a license from Dejavoo to use such Technology, and Dejavoo is willing to provide such development services and grant such license, in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in exchange for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1) Definitions. Except as otherwise indicated, and unless the context otherwise clearly requires, the following terms shall have the meanings set forth below:

"Improvements" means any amendments, modifications, derivative works, revisions, changes, customizations or other improvements.

"Intellectual Property Rights" means all worldwide: (a) patents, patent applications and other patent rights; (b) rights associated with works of authorship, including copyrights, trademarks, registrations and applications for registration of trademarks and copyrights, mask work rights, mask work applications and mask work registrations; (c) rights relating to the protection of trade secrets and confidential information; (d) rights analogous to those set forth herein and any other proprietary rights relating to intangible property; and (e) divisions, continuations, renewals, reissues and extensions of the foregoing (as applicable), now existing or hereafter filed, issued, or acquired.

2) Description of Services; Fees. Dejavoo agrees to develop the Technology and provide certain services (collectively, "Services") as described on Exhibit A attached hereto (the "Work Order"). The fees for the Services ("Fees") are set forth in the Work Order. Dejavoo shall invoice Customer for the Fees. All invoices are due and payable within fifteen (15) days after the date of the invoice. Any amount past due will be subject to 1.5% interest per month. If any legal action or other proceeding is brought regarding Customer's non-payment of Dejavoo's invoices the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level.

3) License. Subject to the terms and conditions of this Agreement, and upon payment of all applicable Fees, Dejavoo hereby grants to Customer a limited, non-exclusive, non-transferable, with the limited right to sublicense to users of the Dejavoo Terminals, license to use the Technology solely with the Dejavoo Terminals as an integrated product. Customer's use of the Technology may not exceed the applicable use restrictions associated with the license granted herein. Provided that Customer is at all times in full compliance with the terms of this Agreement, the license granted herein is perpetual.

4) Ownership. Customer hereby acknowledges that the Technology, all Improvements and all Intellectual Property Rights protecting or pertaining to any aspect of the Technology (or any Improvements) are

1

and shall remain the sole and exclusive property of Dejavoo. This Agreement does not convey title or ownership to Customer or any third party, including any merchant, but instead gives Customer only the limited right to use the Technology with Dejavoo Terminals as an integrated product, strictly in accordance with the express provisions, and under the express limitations, contained in this Agreement. Dejavoo reserves all rights not expressly granted by this Agreement.

5) <u>Restrictions</u>. Except as expressly set forth in this Agreement, Customer has no right to use, make, sublicense, modify, transfer, rent, lease, sell, display, distribute or copy originals or copies of the Technology, or to permit anyone else to do so. In addition, Customer will not reverse engineer, unencrypt, disassemble, decompile or otherwise translate the Technology or allow anyone else to do it. Customer shall not remove any patent, copyright or trademark or other intellectual property notices that may appear on any part of the Technology or the Dejavoo Terminals.

6) <u>Audit Rights</u>. Customer authorizes Dejavoo or its designee to audit its compliance with this Agreement, as Dejavoo deems reasonable.

7) <u>Maintenance and Support</u>. Dejavoo is not required to provide any updates or upgrades to the Technology. Any such updates or upgrades and the applicable fees thereto will be mutually agreed to by the parties pursuant to a Work Order. Dejavoo is not required to provide any support services for the Technology. Support may be arranged between the parties at mutually agreed upon terms and rates pursuant to a Work Order.

8) <u>Customer Obligations</u>. Customer shall not (i) make any statements concerning the Technology or the Dejavoo Terminals except as specifically authorized by Dejavoo in writing, or (ii) make any representations or warranties on behalf of Dejavoo. Customer is responsible to Dejavoo for all liabilities incurred by Dejavoo attributable to any end user's use of the Technology or Dejavoo Terminal in violation of this Agreement.

9) <u>Termination of License</u>. Dejavoo may immediately terminate this Agreement and the license granted herein upon written notice in the event Customer breaches any provision of this Agreement. In the event of termination of this Agreement by Dejavoo as provided herein, Customer will immediately cease utilizing the Technology, and will immediately return to Dejavoo or destroy all copies of the materials embodying the Technology, and remove the Technology from all media in Customer's custody, possession or control.

10) <u>Confidentiality</u>. Customer acknowledges that it may receive or learn proprietary, secret or confidential information or data relating to Dejavoo and its operations, products or services ("Confidential Information") in connection with the transactions contemplated hereunder. Customer agrees to hold all such information in the strictest of confidence, and to not use or disclose or sell such information for any purpose whatsoever without the prior written consent of Dejavoo.

11) <u>Warranty Disclaimer</u>. Except as expressly specified herein, Dejavoo does not warrant that the Technology will meet any particular standards or requirements, including those of the card brands, or that Customer's or any end user's use of the Technology will be uninterrupted or error free. THE TECHNOLOGY AND THE SERVICES ARE DELIVERED AND LICENSED "AS IS" WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND. DEJAVOO HEREBY DISCLAIMS ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE TECHNOLOGY AND THE SERVICES, EITHER EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, INCLUDING IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, OF SATISFACTORY QUALITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF ACCURACY, OF QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. DEJAVOO

2

DOES NOT WARRANT THAT THE OPERATION OF THE TECHNOLOGY OR THE DEJAVOO TERMINALS WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE TECHNOLOGY WILL BE FIXED.  NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY DEJAVOO OR ITS AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY.

12) <u>Limitation of Liability</u>.  DEJAVOO SHALL NOT BE LIABLE HEREUNDER FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOSS OF GOODWILL OR REPUTATION, LOST REVENUES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE, IN EACH CASE WHETHER ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE AND HOWSOEVER INCURRED.  IN NO EVENT SHALL DEJAVOO'S AGGREGATE LIABILITY ARISING FROM OR RELATED TO THIS AGREEMENT, OR USE OF THE TECHNOLOGY, INCLUDING ANY CAUSE OF ACTION BASED ON WARRANTY, CONTRACT, TORT, STRICT LIABILITY, INFRINGEMENT OF THIRD PARTY RIGHTS OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY, EXCEED THE AMOUNT OF $100.  The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

13) <u>Indemnification</u>. The entire risk as to the quality and performance of the Technology is with Customer. Should the Technology prove defective, Customer assumes the cost of all necessary servicing, repair or correction. Use of the Technology is at Customer's sole risk. Customer assumes full responsibility for the appropriate use of the Technology and agrees to indemnify, defend and hold Dejavoo, its officers, directors, employees or agents (collectively "Indemnities") harmless from and against any and all claims, demands causes of action losses, expense (including attorneys' fees) or liability, from any and all claims or actions arising from use or misuse of the Technology or Dejavoo Terminals.

14) <u>Governing Law and Consent to Jurisdiction</u>. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES. EACH PARTY CONSENTS AND SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION TO THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK, NEW YORK FOR ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15) <u>General Provisions</u>:
   a) <u>Remedies</u>. Customer expressly agrees that monetary damages would be inadequate to compensate Dejavoo for any breach by Customer of any covenants or agreements set forth herein. Accordingly, Customer agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to Dejavoo and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Dejavoo shall be entitled to obtain both temporary and permanent injunctive relief against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of proving actual damages or posting bond or other security *(to the extent that Dejavoo is required to post bond or other security, the parties agree and stipulate that $1,000 is sufficient for such bond or other security)*.
   b) <u>Assignment</u>. Customer shall not have the right to assign or otherwise transfer its rights or obligations under this Agreement without the prior written consent of Dejavoo. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.
   c) <u>Notices</u>. All notices or other communication required or permitted to be given hereunder must be in writing and given by personal delivery, facsimile or e-mail transmission (if contact information

3

is provided for the specific mode of delivery), or first class mail, postage prepaid, sent to the addresses set forth herein.

d) Jury Waiver. The parties hereby voluntarily, knowingly, irrevocably and unconditionally waive any right to jury trial in resolving any dispute (whether based upon contract, tort or otherwise) between or among them arising out of or in any way related to this Agreement.

e) Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same agreement. The signatures to this Agreement may be evidenced by facsimile or PDF copies reflecting one or more parties' signatures hereto, and any such facsimile or PDF copy shall be sufficient to evidence the signature of such party or parties as if it were an original signature.

f) Independent Contractors. The parties will be deemed to be independent contractors and will not be considered to be agent, servant, joint venturer or partner of the other. Neither party shall make any express or implied agreements, warranties, guarantees or representations, enter into any contracts or other obligations, or be obligated by or have any liability under any agreement or representations made by the other party that are not expressly authorized in writing. Each party's authority shall be limited to the matters expressly set forth in this Agreement.

g) Entire Agreement. This Agreement and all exhibits hereto represent the entire understanding and agreement between the parties regarding the subject matter of this Agreement, and supersedes all other negotiations, understandings and representations (if any), whether oral or written, made by and between such parties. There have been no representations, express or implied, other than as set forth in this Agreement. The terms of this Agreement may be modified or changed only by a written agreement signed by all of the parties and which provides it is an amendment to it.

h) Representation on Authority of Parties/Signatories. Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

i) Survival. All agreements that by their context are intended to survive the termination of this Agreement will survive termination of this Agreement.

*[signature page follows]*

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date first above mentioned

**i-POS Systems, LLC d/b/a Dejavoo**

By: ██████████████████

Name: ~~Joseph Brello~~

Title: ~~COO~~

Customer: _EFT SERVICE LLC_

By: ██████████████████

Name: _Randy Nolte_

Title: _Managing Member_

5

Exhibit A

Schedule A-1

| | |
|---|---|
| Project Name: Genmega POS | Start Date: February 2019 |
| Ownership: Dejavoo | Fee Structure: One time $15,000 |

Description of Project / Scope of Work:

Interface a GenMega, Triton Emulation protocol to EFT gateway on Dejavoo Terminals

Requirements Detail:

Submit Unattended function such as Withdrawal and Balance inquiry through Dejavoo terminals connecting and approving through EFT Gateway, as per their specifications. Perform all other terminal necessary functions such as reports, downloads etc.

Deliverables:

1. Manual key injection
2. Withdrawal
3. Balance Inquiry
4. Key Exchange
5. Host Totals
6. Closing batch

Summary: Enable dual keys slot programing in the terminal, Perform key Exchanges as needed and connect to EFT Gateway

Maintenance Requirements:
As needed, check production performance and make adaptation to enable connectivity.

Summary Report:      ☐ Required

Acceptance Date: March 11th, 2019

Comments: Subject to Customer approval and Verification of proper format submitting transactions request and responses through its gateway .

6

# EXHIBIT B




# EXHIBIT B

SERVICES AND LICENSE AGREEMENT

THIS SERVICES AND LICENSE AGREEMENT (this "Agreement") is made as of November 4th, 2019 (the "Effective Date") by and between DeNovo Systems, LLC ("DeNovo"), located at 1000 Ponce de Leon, Suite 203, San Juan, Puerto Rico, 00907 and Paybotics, ("Customer"), located at 120 S. Dixie Hwy, West Palm Beach, FL 33401.

WHEREAS, DeNovo is in the business of, among other things, marketing and selling point-of-sale software ("Software for Dejavoo Terminals") and certain products and services related to payment processing;

WHEREAS, Customer desires for DeNovo to develop certain integration software ("Technology") in connection with its purchase of the DeNovo Terminals and to acquire a license from DeNovo to use such Technology, and DeNovo is willing to provide such development services and grant such license, in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in exchange for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1) Definitions. Except as otherwise indicated, and unless the context otherwise clearly requires, the following terms shall have the meanings set forth below:

"Improvements" means any amendments, modifications, derivative works, revisions, changes, customizations or other improvements.

"Intellectual Property Rights" means all worldwide: (a) patents, patent applications and other patent rights; (b) rights associated with works of authorship, including copyrights, trademarks, registrations and applications for registration of trademarks and copyrights, mask work rights, mask work applications and mask work registrations; (c) rights relating to the protection of trade secrets and confidential information; (d) rights analogous to those set forth herein and any other proprietary rights relating to intangible property; and (e) divisions, continuations, renewals, reissues and extensions of the foregoing (as applicable), now existing or hereafter filed, issued, or acquired.

2) Description of Services; Fees. DeNovo agrees to develop the Technology and provide certain services (collectively, "Services") as described on Exhibit A attached hereto (the "Work Order"). The fees for the Services ("Fees") are set forth in the Work Order. DeNovo shall invoice Customer for the Fees. All invoices are due and payable within fifteen (15) days after the date of the invoice. Any amount past due will be subject to 1.5% interest per month. If any legal action or other proceeding is brought regarding Customer's non-payment of DeNovo's invoices the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level.

3) License. Subject to the terms and conditions of this Agreement, and upon payment of all applicable Fees, DeNovo hereby grants to Customer a limited, non-exclusive, non-transferable, with the limited right to sublicense to users of the DeNovo Terminals, license to use the Technology solely with the DeNovo Terminals as an integrated product. Customer's use of the Technology may not exceed the applicable use restrictions associated with the license granted herein. Provided that Customer is at all times in full compliance with the terms of this Agreement, the license granted herein is perpetual.

4) Ownership. Customer hereby acknowledges that the Technology, all Improvements and all Intellectual Property Rights protecting or pertaining to any aspect of the Technology (or any Improvements) are

1

and shall remain the sole and exclusive property of DeNovo. This Agreement does not convey title or ownership to Customer or any third party, including any merchant, but instead gives Customer only the limited right to use the Technology with DeNovo Terminals as an integrated product, strictly in accordance with the express provisions, and under the express limitations, contained in this Agreement. DeNovo reserves all rights not expressly granted by this Agreement.

5) Restrictions. Except as expressly set forth in this Agreement, Customer has no right to use, make, sublicense, modify, transfer, rent, lease, sell, display, distribute or copy originals or copies of the Technology, or to permit anyone else to do so. In addition, Customer will not reverse engineer, unencrypt, disassemble, decompile or otherwise translate the Technology or allow anyone else to do it. Customer shall not remove any patent, copyright or trademark or other intellectual property notices that may appear on any part of the Technology or the DeNovo Terminals.

6) Audit Rights. Customer authorizes DeNovo or its designee to audit its compliance with this Agreement, as DeNovo deems reasonable.

7) Maintenance and Support. DeNovo is not required to provide any updates or upgrades to the Technology. Any such updates or upgrades and the applicable fees thereto will be mutually agreed to by the parties pursuant to a Work Order. DeNovo is not required to provide any support services for the Technology. Support may be arranged between the parties at mutually agreed upon terms and rates pursuant to a Work Order.

8) Customer Obligations. Customer shall not (i) make any statements concerning the Technology or the DeNovo Terminals except as specifically authorized by DeNovo in writing, or (ii) make any representations or warranties on behalf of DeNovo. Customer is responsible to DeNovo for all liabilities incurred by DeNovo attributable to any end user's use of the Technology or DeNovo Terminal in violation of this Agreement.

9) Termination of License. DeNovo may immediately terminate this Agreement and the license granted herein upon written notice in the event Customer breaches any provision of this Agreement. In the event of termination of this Agreement by DeNovo as provided herein, Customer will immediately cease utilizing the Technology, and will immediately return to DeNovo or destroy all copies of the materials embodying the Technology, and remove the Technology from all media in Customer's custody, possession or control.

10) Confidentiality. Customer acknowledges that it may receive or learn proprietary, secret or confidential information or data relating to DeNovo and its operations, products or services ("Confidential Information") in connection with the transactions contemplated hereunder. Customer agrees to hold all such information in the strictest of confidence, and to not use or disclose or sell such information for any purpose whatsoever without the prior written consent of DeNovo.

11) Warranty Disclaimer. Except as expressly specified herein, DeNovo does not warrant that the Technology will meet any particular standards or requirements, including those of the card brands, or that Customer's or any end user's use of the Technology will be uninterrupted or error free. THE TECHNOLOGY AND THE SERVICES ARE DELIVERED AND LICENSED "AS IS" WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND. DENOVO HEREBY DISCLAIMS ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE TECHNOLOGY AND THE SERVICES, EITHER EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, INCLUDING IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, OF SATISFACTORY QUALITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF ACCURACY, OF QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. DENOVO

DOES NOT WARRANT THAT THE OPERATION OF THE TECHNOLOGY OR THE DENOVO TERMINALS WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE TECHNOLOGY WILL BE FIXED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY DENOVO OR ITS AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY.

12) Limitation of Liability. DENOVO SHALL NOT BE LIABLE HEREUNDER FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOSS OF GOODWILL OR REPUTATION, LOST REVENUES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE, IN EACH CASE WHETHER ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE AND HOWSOEVER INCURRED. IN NO EVENT SHALL DENOVO'S AGGREGATE LIABILITY ARISING FROM OR RELATED TO THIS AGREEMENT, OR USE OF THE TECHNOLOGY, INCLUDING ANY CAUSE OF ACTION BASED ON WARRANTY, CONTRACT, TORT, STRICT LIABILITY, INFRINGEMENT OF THIRD PARTY RIGHTS OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY, EXCEED THE AMOUNT OF $100. The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

13) Indemnification. The entire risk as to the quality and performance of the Technology is with Customer. Should the Technology prove defective, Customer assumes the cost of all necessary servicing, repair or correction. Use of the Technology is at Customer's sole risk. Customer assumes full responsibility for the appropriate use of the Technology and agrees to indemnify, defend and hold DeNovo, its officers, directors, employees or agents (collectively "Indemnities") harmless from and against any and all claims, demands causes of action losses, expense (including attorneys' fees) or liability, from any and all claims or actions arising from use or misuse of the Technology or DeNovo Terminals.

14) Governing Law and Consent to Jurisdiction. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES. EACH PARTY CONSENTS AND SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION TO THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK, NEW YORK FOR ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15) General Provisions:
   a) Remedies. Customer expressly agrees that monetary damages would be inadequate to compensate DeNovo for any breach by Customer of any covenants or agreements set forth herein. Accordingly, Customer agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to DeNovo and that, in addition to any other remedies that may be available, in law, in equity or otherwise, DeNovo shall be entitled to obtain both temporary and permanent injunctive relief against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of proving actual damages or posting bond or other security (to the extent that DeNovo is required to post bond or other security, the parties agree and stipulate that $1,000 is sufficient for such bond or other security).
   b) Assignment. Customer shall not have the right to assign or otherwise transfer its rights or obligations under this Agreement without the prior written consent of DeNovo. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.
   c) Notices. All notices or other communication required or permitted to be given hereunder must be in writing and given by personal delivery, facsimile or e-mail transmission (if contact information

3

is provided for the specific mode of delivery), or first class mail, postage prepaid, sent to the addresses set forth herein.

d) Jury Waiver. The parties hereby voluntarily, knowingly, irrevocably and unconditionally waive any right to jury trial in resolving any dispute (whether based upon contract, tort or otherwise) between or among them arising out of or in any way related to this Agreement.

e) Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same agreement. The signatures to this Agreement may be evidenced by facsimile or PDF copies reflecting one or more parties' signatures hereto, and any such facsimile or PDF copy shall be sufficient to evidence the signature of such party or parties as if it were an original signature.

f) Independent Contractors. The parties will be deemed to be independent contractors and will not be considered to be agent, servant, joint venturer or partner of the other. Neither party shall make any express or implied agreements, warranties, guarantees or representations, enter into any contracts or other obligations, or be obligated by or have any liability under any agreement or representations made by the other party that are not expressly authorized in writing. Each party's authority shall be limited to the matters expressly set forth in this Agreement.

g) Entire Agreement. This Agreement and all exhibits hereto represent the entire understanding and agreement between the parties regarding the subject matter of this Agreement, and supersedes all other negotiations, understandings and representations (if any), whether oral or written, made by and between such parties. There have been no representations, express or implied, other than as set forth in this Agreement. The terms of this Agreement may be modified or changed only by a written agreement signed by all of the parties and which provides it is an amendment to it.

h) Representation on Authority of Parties/Signatories. Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

i) Survival. All agreements that by their context are intended to survive the termination of this Agreement will survive termination of this Agreement.

*[signature page follows]*

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date first above mentioned

**DeNovo Systems, LLC**

By: ███████████████████

Name: _Meny Temer_

Title: _president & CEO_

Customer: _PAYBOTIC_

By: ███████████████████

Name: _MAXIMILIAN MILLER_

Title: _PRESIDENT & CEO_

5

Exhibit A

Schedule A-1

| | |
|---|---|
| Project Name: Genmega POS | Start Date: February 2019 |
| Ownership: DeNovo | Fee Structure: One-time $15,000 (paid to Dejavoo) + $0.15 per transaction and Mandatory DeNovo Monthly charge of $6.95 per location and additional $2.95 per additional TPN's in a single location. |

Description of Project / Scope of Work:

Interface a GenMega, Triton Emulation protocol to a designated switch into Columbus Data on DeNovo Terminals (Vega or Android).

Requirements Detail:

Submit Unattended function such as Withdrawal and Balance inquiry through DeNovo terminals connecting and approving through the Gateway, as per their specifications. Perform all other terminal necessary functions such as reports, downloads etc.

Deliverables:

1. Manual key injection
2. Withdrawal
3. Balance Inquiry
4. Key Exchange
5. Host Totals
6. Closing batch

Summary: Enable single or dual keys slot programing in the terminal, Perform key Exchanges as needed and connect to the Gateway

Maintenance Requirements:
As needed, check production performance and make adaptation to enable connectivity.

Summary Report:     ☐ Required

Acceptance Date: Q1, 2020

Comments: Subject to DeNovo receiving detailed API and Customer approval and Verification of proper format submitting transactions request and responses through its gateway. Both DeNovo and Customer will be equally responsible for coordination and execution of final certification to Columbus Data.

6

# EXHIBIT C

# EXHIBIT C

SERVICES AND LICENSE AGREEMENT

THIS SERVICES AND LICENSE AGREEMENT (this "Agreement") is made as of October 23rd , 2019 (the "Effective Date") by and between i-POS Systems, LLC d/b/a Dejavoo ("Dejavoo"), located at 393 Jericho Turnpike, Suite 203, Mineola, NY 11501, and Sterling Payment Solutions LLC, 4801 S. University Dr. suite 300, Davie FL 33328 as pertaining to revised Exhibit A (A-1a).

WHEREAS, Dejavoo is in the business of, among other things, marketing and selling point-of-sale terminals ("Dejavoo Terminals") and certain products and services related to payment processing;

WHEREAS, Customer desires for Dejavoo to develop certain integration software ("Technology") in connection with its purchase of the Dejavoo Terminals and to acquire a license from Dejavoo to use such Technology, and Dejavoo is willing to provide such development services and grant such license, in accordance with the terms and conditions of this Agreement.

NOW THEREFORE, in exchange for the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1) Definitions. Except as otherwise indicated, and unless the context otherwise clearly requires, the following terms shall have the meanings set forth below:

"Improvements" means any amendments, modifications, derivative works, revisions, changes, customizations or other improvements.

"Intellectual Property Rights" means all worldwide: (a) patents, patent applications and other patent rights; (b) rights associated with works of authorship, including copyrights, trademarks, registrations and applications for registration of trademarks and copyrights, mask work rights, mask work applications and mask work registrations; (c) rights relating to the protection of trade secrets and confidential information; (d) rights analogous to those set forth herein and any other proprietary rights relating to intangible property; and (e) divisions, continuations, renewals, reissues and extensions of the foregoing (as applicable), now existing or hereafter filed, issued, or acquired.

2) Description of Services; Fees. Dejavoo agrees to develop the Technology and provide certain services (collectively, "Services") as described on Exhibit A attached hereto (the "Work Order"). The fees for the Services ("Fees") are set forth in the Work Order. Dejavoo shall invoice Customer for the Fees. All invoices are due and payable within fifteen (15) days after the date of the invoice. Any amount past due will be subject to 1.5% interest per month. If any legal action or other proceeding is brought regarding Customer's non-payment of Dejavoo's invoices the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs, whether incurred before suit, during suit, or at the appellate level.

3) License. Subject to the terms and conditions of this Agreement, and upon payment of all applicable Fees, Dejavoo hereby grants to Customer a limited, non-exclusive, non-transferable, with the limited right to sublicense to users of the Dejavoo Terminals, license to use the Technology solely with the Dejavoo Terminals as an integrated product. Customer's use of the Technology may not exceed the applicable use restrictions associated with the license granted herein. Provided that Customer is at all times in full compliance with the terms of this Agreement, the license granted herein is perpetual.

4) Ownership. Customer hereby acknowledges that the Technology, all Improvements and all Intellectual Property Rights protecting or pertaining to any aspect of the Technology (or any Improvements) are

1

and shall remain the sole and exclusive property of Dejavoo. This Agreement does not convey title or ownership to Customer or any third party, including any merchant, but instead gives Customer only the limited right to use the Technology with Dejavoo Terminals as an integrated product, strictly in accordance with the express provisions, and under the express limitations, contained in this Agreement. Dejavoo reserves all rights not expressly granted by this Agreement.

5) Restrictions. Except as expressly set forth in this Agreement, Customer has no right to use, make, sublicense, modify, transfer, rent, lease, sell, display, distribute or copy originals or copies of the Technology, or to permit anyone else to do so. In addition, Customer will not reverse engineer, unencrypt, disassemble, decompile or otherwise translate the Technology or allow anyone else to do it. Customer shall not remove any patent, copyright or trademark or other intellectual property notices that may appear on any part of the Technology or the Dejavoo Terminals.

6) Audit Rights. Customer authorizes Dejavoo or its designee to audit its compliance with this Agreement, as Dejavoo deems reasonable.

7) Maintenance and Support. Dejavoo is not required to provide any updates or upgrades to the Technology. Any such updates or upgrades and the applicable fees thereto will be mutually agreed to by the parties pursuant to a Work Order. Dejavoo is not required to provide any support services for the Technology. Support may be arranged between the parties at mutually agreed upon terms and rates pursuant to a Work Order.

8) Customer Obligations. Customer shall not (i) make any statements concerning the Technology or the Dejavoo Terminals except as specifically authorized by Dejavoo in writing, or (ii) make any representations or warranties on behalf of Dejavoo. Customer is responsible to Dejavoo for all liabilities incurred by Dejavoo attributable to any end user's use of the Technology or Dejavoo Terminal in violation of this Agreement.

9) Termination of License. Dejavoo may immediately terminate this Agreement and the license granted herein upon written notice in the event Customer breaches any provision of this Agreement. In the event of termination of this Agreement by Dejavoo as provided herein, Customer will immediately cease utilizing the Technology, and will immediately return to Dejavoo or destroy all copies of the materials embodying the Technology, and remove the Technology from all media in Customer's custody, possession or control.

10) Confidentiality. Customer acknowledges that it may receive or learn proprietary, secret or confidential information or data relating to Dejavoo and its operations, products or services ("Confidential Information") in connection with the transactions contemplated hereunder. Customer agrees to hold all such information in the strictest of confidence, and to not use or disclose or sell such information for any purpose whatsoever without the prior written consent of Dejavoo.

11) Warranty Disclaimer. Except as expressly specified herein, Dejavoo does not warrant that the Technology will meet any particular standards or requirements, including those of the card brands, or that Customer's or any end user's use of the Technology will be uninterrupted or error free. THE TECHNOLOGY AND THE SERVICES ARE DELIVERED AND LICENSED "AS IS" WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND. DEJAVOO HEREBY DISCLAIMS ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE TECHNOLOGY AND THE SERVICES, EITHER EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, INCLUDING IMPLIED WARRANTIES AND/OR CONDITIONS OF MERCHANTABILITY, OF SATISFACTORY QUALITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF ACCURACY, OF QUIET ENJOYMENT, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. DEJAVOO

2

DOES NOT WARRANT THAT THE OPERATION OF THE TECHNOLOGY OR THE DEJAVOO TERMINALS WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE TECHNOLOGY WILL BE FIXED. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY DEJAVOO OR ITS AUTHORIZED REPRESENTATIVES SHALL CREATE A WARRANTY.

12) <u>Limitation of Liability</u>. DEJAVOO SHALL NOT BE LIABLE HEREUNDER FOR CONSEQUENTIAL, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOSS OF GOODWILL OR REPUTATION, LOST REVENUES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE, IN EACH CASE WHETHER ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE AND HOWSOEVER INCURRED. IN NO EVENT SHALL DEJAVOO'S AGGREGATE LIABILITY ARISING FROM OR RELATED TO THIS AGREEMENT, OR USE OF THE TECHNOLOGY, INCLUDING ANY CAUSE OF ACTION BASED ON WARRANTY, CONTRACT, TORT, STRICT LIABILITY, INFRINGEMENT OF THIRD PARTY RIGHTS OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY, EXCEED THE AMOUNT OF $100. The foregoing limitations will apply even if the above stated remedy fails of its essential purpose.

13) <u>Indemnification</u>. The entire risk as to the quality and performance of the Technology is with Customer. Should the Technology prove defective, Customer assumes the cost of all necessary servicing, repair or correction. Use of the Technology is at Customer's sole risk. Customer assumes full responsibility for the appropriate use of the Technology and agrees to indemnify, defend and hold Dejavoo, its officers, directors, employees or agents (collectively "Indemnities") harmless from and against any and all claims, demands causes of action losses, expense (including attorneys' fees) or liability, from any and all claims or actions arising from use or misuse of the Technology or Dejavoo Terminals.

14) <u>Governing Law and Consent to Jurisdiction</u>. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES. EACH PARTY CONSENTS AND SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION TO THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK, NEW YORK FOR ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

15) <u>General Provisions</u>:
   a) <u>Remedies</u>. Customer expressly agrees that monetary damages would be inadequate to compensate Dejavoo for any breach by Customer of any covenants or agreements set forth herein. Accordingly, Customer agrees and acknowledges that any such violation or threatened violation will cause irreparable injury to Dejavoo and that, in addition to any other remedies that may be available, in law, in equity or otherwise, Dejavoo shall be entitled to obtain both temporary and permanent injunctive relief against the threatened breach of this Agreement or the continuation of any such breach, without the necessity of proving actual damages or posting bond or other security *(to the extent that Dejavoo is required to post bond or other security, the parties agree and stipulate that $1,000 is sufficient for such bond or other security)*.
   b) <u>Assignment</u>. Customer shall not have the right to assign or otherwise transfer its rights or obligations under this Agreement without the prior written consent of Dejavoo. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.
   c) <u>Notices</u>. All notices or other communication required or permitted to be given hereunder must be in writing and given by personal delivery, facsimile or e-mail transmission (if contact information

3

is provided for the specific mode of delivery), or first class mail, postage prepaid, sent to the addresses set forth herein.

d) <u>Jury Waiver</u>. The parties hereby voluntarily, knowingly, irrevocably and unconditionally waive any right to jury trial in resolving any dispute (whether based upon contract, tort or otherwise) between or among them arising out of or in any way related to this Agreement.

e) <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same agreement.  The signatures to this Agreement may be evidenced by facsimile or PDF copies reflecting one or more parties' signatures hereto, and any such facsimile or PDF copy shall be sufficient to evidence the signature of such party or parties as if it were an original signature.

f) <u>Independent Contractors</u>. The parties will be deemed to be independent contractors and will not be considered to be agent, servant, joint venture or partner of the other.  Neither party shall make any express or implied agreements, warranties, guarantees or representations, enter into any contracts or other obligations, or be obligated by or have any liability under any agreement or representations made by the other party that are not expressly authorized in writing.  Each party's authority shall be limited to the matters expressly set forth in this Agreement.

g) <u>Entire Agreement</u>. This Agreement and all exhibits hereto represent the entire understanding and agreement between the parties regarding the subject matter of this Agreement, and supersedes all other negotiations, understandings and representations (if any), whether oral or written, made by and between such parties. There have been no representations, express or implied, other than as set forth in this Agreement. The terms of this Agreement may be modified or changed <u>only</u> by a written agreement signed by all of the parties and which provides it is an amendment to it.

h) <u>Representation on Authority of Parties/Signatories</u>. Each person signing this Agreement represents and warrants that he or she is duly authorized and has legal capacity to execute and deliver this Agreement. Each party represents and warrants to the other that the execution and delivery of the Agreement and the performance of such party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on such party and enforceable in accordance with its terms.

i) <u>Survival</u>.  All agreements that by their context are intended to survive the termination of this Agreement will survive termination of this Agreement.

*[signature page follows]*

4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the date first above mentioned

**i-POS Systems, LLC d/b/a Dejavoo**

By:_____
Name: Mony Zenou
Title: President & CEO


**Customer:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

By:▮▮▮▮▮▮▮▮▮▮▮
Name ▮▮▮▮▮▮▮▮▮▮▮
Title:▮▮▮▮▮▮▮▮▮▮▮

5

Exhibit A

Schedule A-1a

| Project Name:  Genmega POS | Start Date: October 2019 |
|---|---|
| Ownership: Dejavoo | Fee Structure:<br>**(a) Revised as of October 2019 for Sterling Payments:**<br>**Mandatory** - DeNovo Monthly 7.95 for 1ˢᵗ TPN and $2.95 for additional TPN in a single location, and $0.10 per transaction. |
| Description of Project / Scope of Work:<br><br>Interface a GenMega, Triton Emulation protocol on Dejavoo Terminals with processors that Dejavoo currently has successfully integrated with. | |
| Requirements Detail:<br><br>Submit Unattended function such as Withdrawal and Balance inquiry through Dejavoo terminals connecting and approving through EFT Gateway, as per their specifications. Perform all other terminal necessary functions such as reports, downloads etc. | |
| Deliverables:<br><br>1. Manual key injection<br>2. Withdrawal<br>3. Balance Inquiry<br>4. Key Exchange<br>5. Host Totals<br>6. Closing batch<br><br>Summary: Enable dual keys slot programing in the terminal, Perform key Exchanges as needed and connect. | |
| Maintenance Requirements:<br>As needed, check production performance and make adaptation to enable connectivity. | |
| Summary Report:        ☐ Required | |
| Acceptance Date: On Going | |
| Comments: Subject to Customer approval and Verification of proper format submitting transactions request and responses through its gateway | |

# EXHIBIT D

# EXHIBIT D



**Christopher R. Dryden, Esq.**
cdryden@attorneygl.com
**James C. Huber, Esq.**
jhuber@attorneygl.com

March 4, 2020

**Sent Via First-Class Mail and Email**
EFT Services, LLC
Attn: Randy Nolte
4801 S. University Dr. #303
Davie, FL 33328
Email: randy@efte-solutions.com

Charles M. Miller
1350 Broadway
New York, NY 10018
cmiller@tarterkrinsky.com

**Re:     CONFIDENTIAL ~ Notice of Termination;
Notice to Preserve Records.**

Mr. Randy Nolte:

Global Legal Law Firm represents IPOS Systems, LLC ("IPOS") regarding the Services and License Agreement between IPOS and EFT Services, LLC ("EFT") (the "Agreement").  The purpose of this letter is to confirm that IPOS has assigned the license granted to EFT under the Agreement to One Pay Cloud, LLC, ("OPC") and to whatever degree that EFT claims that such assignment was void, to terminate the Agreement.

Further, this letter shall put EFT on notice to preserve all documents, correspondence, and other evidence related to IPOS and EFT. EFT's activities amount unfair business practices and if EFT does not take all remedial actions, IPOS is prepared to pursue all available legal remedies.

First, as EFT is aware, IPOS has assigned EFT's license to OPC.  Should EFT desire to discuss the continued use of the Protocols, it should contact OPC as the rightful owner of EFT's license. Notwithstanding that, to whatever degree that EFT claims that IPOS has any continuing obligations under the Agreement, IPOS hereby terminates the Agreement.

Under the Agreement, EFT is required to ensure that all of IPOS's information is held in confidence and that EFT shall not make any statements concerning IPOS or its technology, except as authorized by IPOS in writing, nor make any representations or warranties on behalf of IPOS.  EFT has violated these terms by, including without limitation, its statements to OPC, EFT's merchant customers, and other individuals in the payments industry.  Those statements include the false

Main Office: San Diego Office: 380 Stevens Avenue, Suite 311, Solana Beach, CA 92075
Los Angeles Office: 1801 Century Park East, Suite 2400, Los Angeles, CA 90067
TELEPHONE: (888) 846-8901 ∎ FAX: (888) 846-8902

Page 2

statement that IPOS was the architect of a scheme to allow for the misuse of the technology licensed under the Agreement (the "Protocols"). The truth, and further grounds for termination, is that EFT has knowingly misused the Protocols licensed under the Agreement.

This is memorialized through EFT's refusal to execute a document memorializing that EFT was not operating the Protocols in violation of applicable law, the Card Brand Rules, and applicable regulations. IPOS therefore can safely surmise that EFT is not operating the Protocols in compliance with such laws, rules, and regulations.

Last, IPOS has learned that EFT and its family and affiliates has used the Protocols beyond the allowable scope authorized under the Agreement. The only licensed Protocol is EFT Gateway. Thus, EFT's use of any other protocols is beyond the scope of the Agreement. And IPOS has only recently learned that such use may violate the Card Brand Rules

Thus, IPOS hereby terminates the Agreement for each and all of the foregoing reasons. IPOS reminds EFT of its obligations to return all confidential information and to immediately cease its use of the Protocols.

**Notice to Preserve Records**: IPOS hereby further requests that EFT take all necessary action to **preserve all records and communications** relating to this matter. This notice applies to EFT's on and off-site computer systems and removable electronic media plus all computer systems, services, and devices (including all remote access and wireless devices) used for EFT's overall operation. This includes, but is not limited to, e-mail and other electronic communications; electronically stored documents, records, images, graphics, recordings, spreadsheets, databases; calendars, system usage logs, contact manager information, telephone logs, internet usage files, deleted files, cache files, user information, and other data. Further, this notice applies to archives, backup and disaster recovery tapes, discs, drives, cartridges, voicemail and other data. All operating systems, software, applications, hardware, operating manuals, codes, keys and other support information needed to fully search, use, and access the electronically stored information.

Please send the Firm confirmation of EFT's compliance with this demand by close of business Friday, March 13, 2020.

For the firm,

James C. Huber, Esq.
Global Legal Law Firm
JCH



**Christopher R. Dryden, Esq.**
cdryden@attorneygl.com
**James C. Huber, Esq.**
jhuber@attorneygl.com

March 4, 2020

<u>**Sent Via First-Class Mail and Email**</u>
IPN LLC, DBA Paybotic
Attn: Max Miller
120 S. Dixie Hwy,
West Palm Beach, FL 33401
Email: max@paybotic.com

Charles M. Miller
1350 Broadway
New York, NY 10018
cmiller@tarterkrinsky.com

**Re:   CONFIDENTIAL ~ Notice of Termination;
Notice to Preserve Records.**

Mr. Maximillian Miller:

Global Legal Law Firm represents Denovo Systems, LLC ("Denovo") regarding the Services and License Agreement between Denovo and IPN LLC, DBA Paybotic, ("Paybotic") (the "Agreement").  The purpose of this letter is to confirm that Denovo has assigned the license granted to Paybotic under the Agreement to One Pay Cloud, LLC, ("OPC") and to whatever degree that Paybotic claims that such assignment was void, to terminate the Agreement.

Further, this letter shall put Paybotic on notice to preserve all documents, correspondence, and other evidence related to Denovo and Paybotic. Paybotic's activities amount unfair business practices and if Paybotic does not take all remedial actions, Denovo is prepared to pursue all available legal remedies.

First, as Paybotic is aware, Denovo has assigned Paybotic's license to OPC.  Should Paybotic desire to discuss the continued use of the Protocols, it should contact OPC as the rightful owner of Paybotic's license. Notwithstanding that, to whatever degree that Paybotic claims that Denovo has any continuing obligations under the Agreement, Denovo hereby terminates the Agreement.

Under the Agreement, Paybotic is required to ensure that all of Denovo's information is held in confidence and that Paybotic shall not make any statements concerning Denovo or its technology, except as authorized by Denovo in writing, nor make any representations or warranties on behalf of Denovo.  Paybotic has violated these terms by, including without limitation, its statements to OPC, LLC, Paybotic's merchant customers, and other individuals in the payments industry.  Those

Page 2

statements include the false statement that Denovo was the architect of a scheme to allow for the misuse of the technology licensed under the Agreement (the "Protocols").  The truth, and further grounds for termination, is that Paybotic has knowingly misused the Protocols licensed under the Agreement.

This is memorialized through Paybotic's refusal to execute a document memorializing that Paybotic was not operating the Protocols in violation of applicable law, the Card Brand Rules, and applicable regulations. Denovo therefore can safely surmise that Paybotic is not operating the Protocols in compliance with such laws, rules, and regulations.

Last, Denovo knows that Paybotic has used the Protocols beyond the allowable scope authorized under the Agreement.  Paybotic was only authorized to use the Protocols through Columbus Data, and Paybotic had the joint responsibility of receiving certification for the Protocols, which never occurred.  Thus, Paybotic's use of the Protocols through Columbus Data was never authorized under the Agreement because it was not operating under proper certification, and the use of the other POB protocols is not under the scope of the Agreement.  And Denovo has only recently learned that such use may violate the Card Brand Rules

Thus, Denovo shall terminate the Agreement for each and all of the foregoing reasons.  Denovo reminds Paybotic  of its obligations to return all confidential information..

**Notice to Preserve Records**: Denovo hereby further requests that Paybotic take all necessary action to **preserve all records and communications** relating to this matter. This notice applies to Paybotic's on and off-site computer systems and removable electronic media plus all computer systems, services, and devices (including all remote access and wireless devices) used for Paybotic's overall operation. This includes, but is not limited to, e-mail and other electronic communications; electronically stored documents, records, images, graphics, recordings, spreadsheets, databases; calendars, system usage logs, contact manager information, telephone logs, internet usage files, deleted files, cache files, user information, and other data. Further, this notice applies to archives, backup and disaster recovery tapes, discs, drives, cartridges, voicemail and other data. All operating systems, software, applications, hardware, operating manuals, codes, keys and other support information needed to fully search, use, and access the electronically stored information.

Please send the Firm confirmation of Paybotic's compliance with this demand by close of business Friday, March 13, 2020.

For the firm,

James C. Huber, Esq.
Global Legal Law Firm
JCH

# EXHIBIT "7"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

ONE PAY CLOUD, LLC,

Case No. 24-10349-LMI

Chapter 11

Debtor

_____/

## <u>NOTICE OF TAKING RULE 2004 EXAMINATION *DUCES TECUM* OF DEJAVOO</u>

TO: iPOS Systems d/b/a Dejavoo Systems
c/o Joe Casella, COO/President
393 Jericho Turnpike, Ste. 203
Mineola, NY  11501

Indian River Merchant Services LLC ("IRMS") hereby gives notice that it will take the Rule 2004 examination *duces tecum* of iPOS Systems. ("Dejavoo") under oath on April 24, 2024, at 9:30 am EST. The examination will be conducted via Zoom video conference at a link to be provided by IRMS's counsel. The examination may continue day to day until completed.

The examination is pursuant to Bankruptcy Rule 2004 and Local Rule 2004-1, and will be taken before an officer authorized to record the testimony. The scope of the examination shall be as described in Bankruptcy Rule 2004. Pursuant to Local Rule 2004-1 no order shall be necessary.

Dejavoo is further requested to produce all of the documents specified in **Schedule A** on or before April 17, 2024 at the following location and by email to mstavros@jennislaw.com; djennis@jennislaw.com; and marj@jennislaw.com.

Jennis Morse
606 E. Madison Street
Tampa, Florida 33602

Page 1 of 8

4872-9270-8015, v. 2

DATED this 3rd day of April 2024.

/s/ *Michael A. Stavros*
Michael A. Stavros
Florida Bar No. 1033851
**Jennis Morse**
Address: 606 East Madison Street Tampa, FL 33602
Email: mstavros@jennislaw.com
      djennis@jennislaw.com
      ecf@jennislaw.com
Telephone: (813) 229-2800

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via electronic transmission through the Court's CM/ECF system on this 3rd day of April 2024.

/s/ *Michael A. Stavros*
Michael A. Stavros

4872-9270-8015, v. 2

## SCHEDULE A

## INSTRUCTIONS AND DEFINITIONS

**A.** The following definitions apply to terms as they are used herein, regardless of tense or whether the terms are used in the singular, plural, or possessive case.

**B.** All words and phrases are to be interpreted according to their ordinary usage and meaning unless otherwise defined herein.

**C.** As used herein, the singular and masculine form of nouns and pronouns shall embrace, and be read and applied as, the plural or feminine or neutral, as circumstances may make appropriate, if not already so designated.

## GENERAL DEFINITIONS

**D.** "And" and "or" shall be construed to mean "and/or" as context permits.

**E.** "Agent" shall mean any present or former agents, employees, officers, directors, attorneys, independent contractors, or any other Persons acting at the direction of or on behalf of another.

**F.** "Communication" shall mean every manner of transmitting or receiving information, whether orally or in writing, as well as any recordings or copies thereof, including information transmitted by correspondence, telephone, telegraph, e-mail, or other electronic digital communications, facsimile, or other Document.

**G.** "Describe" shall mean to state the place, date of, identity of the persons involved in, and identity of the documents involved where relevant in the facts, transactions, communications, events, circumstances or occurrences in question, and state the nature and subject matter of the facts, transactions, communications, events, circumstances or occurrences in question, including the identification of any documents evidencing same.

4872-9270-8015, v. 2

**H.** "Document" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure, and shall include, without limitation, every written, printed, typed, recorded, reported, magnetically or electrically impulsed, or graphic record or material including every draft and/or non-identical copy thereof of every type and description that is in the actual or constructive possession, control, or custody of you or your attorneys, including, but not limited to, all correspondence, letters, memoranda, notes, contracts, proposed contracts or agreements, whether or not actually consummated, leases, reports, logs, studies, summaries, opinions, certificates, agendas, bulletins, newsletters, articles, notices, announcements, instructions, charts, manuals, models, publications, books, minutes (including minutes of board of directors meetings and executive meetings, partnership meetings, and management or executive partnership committee meetings), computer printouts, schedules, film, microfilm, microfiche, videotape, tape, or other voice and/or picture recordings, simulations, intra and inter-company memoranda, articles of newspapers, magazines and other publications, telegrams, purchase orders, offers, inquiries, lists, proposals, invoices, plans, specifications, addenda, statements, canceled checks, confirmation slips, evidence of payments, bills, diaries, calendars, bills of lading, pamphlets, brochures, communications, agreements, listings, accounts, records of account, ledger sheets, vouchers, audits, questionnaires, recordings, transcriptions, floppy discs, computer printouts, e-mail, writings, drawings, graphs, charts, photographs, phonographs, or any other data, compilation, or written material of any kind or character. This term includes all Electronically Stored Information in its native format including, without limitation, e-mails and all Documents attached to such e-mails.

**I.** "ESI" or "Electronically Stored Information" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure, including, without limitation, all electronic,

4872-9270-8015, v. 2

mechanical, magnetic, or optical records or representations of any kind including, without limitation, electronic mail (e-mail), computer files, computer programs, tapes, all Documents which may be stored on a computer or hard drive, computer disk, computer tape, CD-Rom, DVD-Rom, or any other electronically stored information which is capable of being viewed on a computer (including, but not limited to, computer related devices like handheld PDAs), and is savable or transferable on any computer data storage media and any mechanical recording or production of any oral material.

J.     "Evidencing" or "evidences" shall mean concerning, relating to, referencing, referring to, describing, constituting, supporting, or refuting or any variant thereof includes located in, considered in connection with, bearing, bearing on, indicating, reporting on, recording, alluding to, responding to, related to, opposing, favoring, connected with, commenting on, in respect of, about, regarding, discussing, showing, reflecting, analyzing, and being.

K.     "Identify," "identity," and "identification," mean directly or indirectly naming, describing, discussing, listing, delineating, or otherwise referring to the specified subject matter.

L.     "Including" shall mean to encompass or comprise as a part of a whole or group, and shall not be limiting.

M.     "Person" means all individual natural persons, partnerships, limited liability companies, corporations, business entities, and/or organizations.

N.     "Relate to," "related to," or "relating to" shall mean to deal with, refer to, be in connection with or akin to, consist of, concern, constitute, comprise, establish, "evidence," "identify," list, mention (whether directly or indirectly), substantiate, or in any way pertain, in whole or in part, to the subject.

Page 5 of 8

4872-9270-8015, v. 2

**O.** "State the basis" means that your answer should include all factual, all legal and all other information upon which "your" answer is based, the method by which such information was obtained, including any inquiries made, "identification," as such term is defined in these definitions for interrogatories, of all individuals, "persons," entities and "documents," by which such information was obtained and/or produced.

## SPECIFIC DEFINITIONS

**A.** The term "Debtor" or "One Pay" means the Debtor in the instant bankruptcy case, an entity named One Pay Cloud, LLC.

**B.** The term "IRMS" means Indian River Merchant Services.

**C.** The term "Transact First" means Transact First Inc.

**D.** The term "Dejavoo" means I-POS Systems LLC d/b/a Dejavoo.

**E.** The term "Denovo" means Denovo Systems, LLC.

## INSTRUCTIONS FOR PRODUCING DOCUMENTS

**1.** Each paragraph below shall operate and be construed independently; and, unless otherwise indicated, no paragraph limits the scope of any other paragraph.

**2.** The documents produced for inspection shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the paragraph set forth below.

**3.** The party under the subpoena should furnish any additional or supplemental documents subject to this Schedule "A" which are created or discovered after the original production of documents.

**4.** Schedule "A" is intended to cover all documents in the possession of the party under the subpoena or subject to its custody or control, including information in the possession,

Page 6 of 8

4872-9270-8015, v. 2

custody, or control of its attorneys, accountants, investigators, experts, employees, agents and any other person employed on its behalf, not merely such information as is known of its own personal knowledge.

5.      Unless stated otherwise, the following requests seeks documents for the period of time commencing January 1, 2020 through the present.

6.      All ESI is to be produced in its native format, unless otherwise agreed to by the parties.

7.      If you are not producing any given "document" because it is not in your possession, custody or control or because you are claiming a privilege in connection therewith and/or that it is work-product, then "identify" each individual to whom the original or a copy was sent and each date of its receipt and each date of its transmittal or other disposition by (1) you and (2) any other individual (naming such other individual) who, at the time, either received, transmitted or otherwise disposed of such "documents" and/or any copy thereof.

8.      If you believe that any of the following discovery requests call for information or "documents" subject to a claim of privilege, answer or produce so much as is not objected to, state that part of each discovery request as to which you raise an objection and set forth the basis for your claim of privilege with respect to such information as you refuse to give, including a statement a describing the nature of the information withheld.

9.      For each "document" as to which you claim privilege exists, **(i)** identify the date of the "documents," **(ii)** a general description of the subject matter of the "documents," **(iii)** the name(s) of the individual(s) who prepared the "documents," **(iv)** the name(s) of the individual(s) for whom each such "document" was intended, **(v)** the name(s) of the individual(s) who received such "document," and **(vi)** the nature of the privilege being asserted.

4872-9270-8015, v. 2

## DOCUMENTS TO BE PRODUCED

1.      All documents and communications related to transfers between the Debtor to Dejavoo.

2.      All documents or communications related to cancellation, termination, or suspension of the Debtor's licensing agreement with Dejavoo.

3.      All contracts or agreements with Dejavoo and any communications regarding same.

4.      All documents or communications between Dejavoo and One Pay containing the following: "marijuana" "cannabis" "state licensed" and "dispensary.

5.      All documents evidencing, referring or relating to a business relationship, contract, or other agreement between the Debtor, Dejavoo, Transact First, and Michael Shvartsman.

***IRMS expressly reserves the right to request additional documents and amend this Notice of Taking 2004 Examination.***

4872-9270-8015, v. 2

# UNITED STATES BANKRUPTCY COURT

Southern District of Florida

In re ONE PAY CLOUD, LLC                                    Case No. 24-10349-LMI
                    Debtor

                                                           Chapter 11

## SUBPOENA FOR RULE 2004 EXAMINATION

To: iPOS Systems d/b/a Dejavoo Systems, c/o Joe Casella, COO/President
*(Name of person to whom the subpoena is directed)*

[X]    *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at an examination under Rule 2004, Federal Rules of Bankruptcy Procedure and Local Rule 2004-1.

| PLACE | Jennis Morse 606 East Madison Street Tampa, FL 33602 | DATE AND TIME April 24, 2024 at 9:30 a.m. (EST) |
|-------|------------------------------------------------------|--------------------------------------------------|

The examination will be recorded by this method: Court Reporter

[X]    *Production:* **YOU ARE COMMANDED** to produce the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material at the time, date, and place set forth below (if different from that of the examination):

| PLACE | Jennis Morse 606 East Madison Street Tampa, FL 33602 | DATE AND TIME April 17, 2024 |
|-------|------------------------------------------------------|-------------------------------|

*(Description of documents, electronically stored information, or objects)*
See attached Schedule A

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: April 3, 2024

          CLERK OF COURT                    OR

          _____                    _____
          *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing Indian River Merchant Services LLC who issues or requests this subpoena, are: Michael Stavros, Jennis Morse, 606 East Madison Street, Tampa, FL  33602 (813) 229-2800 mstavros@jennislaw.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

4856-9240-2611, v. 3

---

PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

4856-9240-2611, v. 3

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13) (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:

(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*

*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*

*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*

*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the

(iv) subjects a person to undue burden.

*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

information until the claim is resolved.

. . .

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

---

4856-9240-2611, v. 3

## SCHEDULE A

## INSTRUCTIONS AND DEFINITIONS

**A.** The following definitions apply to terms as they are used herein, regardless of tense or whether the terms are used in the singular, plural, or possessive case.

**B.** All words and phrases are to be interpreted according to their ordinary usage and meaning unless otherwise defined herein.

**C.** As used herein, the singular and masculine form of nouns and pronouns shall embrace, and be read and applied as, the plural or feminine or neutral, as circumstances may make appropriate, if not already so designated.

## GENERAL DEFINITIONS

**D.** "And" and "or" shall be construed to mean "and/or" as context permits.

**E.** "Agent" shall mean any present or former agents, employees, officers, directors, attorneys, independent contractors, or any other Persons acting at the direction of or on behalf of another.

**F.** "Communication" shall mean every manner of transmitting or receiving information, whether orally or in writing, as well as any recordings or copies thereof, including information transmitted by correspondence, telephone, telegraph, e-mail, or other electronic digital communications, facsimile, or other Document.

**G.** "Describe" shall mean to state the place, date of, identity of the persons involved in, and identity of the documents involved where relevant in the facts, transactions, communications, events, circumstances or occurrences in question, and state the nature and subject matter of the facts, transactions, communications, events, circumstances or occurrences in question, including the identification of any documents evidencing same.

**H.** "Document" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure, and shall include, without limitation, every written, printed, typed, recorded, reported, magnetically or electrically impulsed, or graphic record or material including every draft and/or non-identical copy thereof of every type and description that is in the actual or constructive possession, control, or custody of you or your attorneys, including, but not limited to, all correspondence, letters, memoranda, notes, contracts, proposed contracts or agreements, whether or not actually consummated, leases, reports, logs, studies, summaries, opinions, certificates, agendas, bulletins, newsletters, articles, notices, announcements, instructions, charts, manuals, models, publications, books, minutes (including minutes of board of directors meetings and executive meetings, partnership meetings, and management or executive partnership committee meetings), computer printouts, schedules, film, microfilm, microfiche, videotape, tape, or other voice and/or picture recordings, simulations, intra and inter-company memoranda, articles of newspapers, magazines and other publications, telegrams, purchase orders, offers, inquiries, lists, proposals, invoices, plans, specifications, addenda, statements, canceled checks, confirmation slips, evidence of payments, bills, diaries, calendars, bills of lading, pamphlets, brochures, communications, agreements, listings, accounts, records of account, ledger sheets, vouchers, audits, questionnaires, recordings, transcriptions, floppy discs, computer printouts, e-mail, writings, drawings, graphs, charts, photographs, phonographs, or any other data, compilation, or written material of any kind or character. This term includes all Electronically Stored Information in its native format including, without limitation, e-mails and all Documents attached to such e-mails.

**I.** "ESI" or "Electronically Stored Information" shall have the same meaning as in Rule 34, Federal Rules of Civil Procedure, including, without limitation, all electronic,

mechanical, magnetic, or optical records or representations of any kind including, without limitation, electronic mail (e-mail), computer files, computer programs, tapes, all Documents which may be stored on a computer or hard drive, computer disk, computer tape, CD-Rom, DVD-Rom, or any other electronically stored information which is capable of being viewed on a computer (including, but not limited to, computer related devices like handheld PDAs), and is savable or transferable on any computer data storage media and any mechanical recording or production of any oral material.

**J.** "Evidencing" or "evidences" shall mean concerning, relating to, referencing, referring to, describing, constituting, supporting, or refuting or any variant thereof includes located in, considered in connection with, bearing, bearing on, indicating, reporting on, recording, alluding to, responding to, related to, opposing, favoring, connected with, commenting on, in respect of, about, regarding, discussing, showing, reflecting, analyzing, and being.

**K.** "Identify," "identity," and "identification," mean directly or indirectly naming, describing, discussing, listing, delineating, or otherwise referring to the specified subject matter.

**L.** "Including" shall mean to encompass or comprise as a part of a whole or group, and shall not be limiting.

**M.** "Person" means all individual natural persons, partnerships, limited liability companies, corporations, business entities, and/or organizations.

**N.** "Relate to," "related to," or "relating to" shall mean to deal with, refer to, be in connection with or akin to, consist of, concern, constitute, comprise, establish, "evidence," "identify," list, mention (whether directly or indirectly), substantiate, or in any way pertain, in whole or in part, to the subject.

4856-9240-2611, v. 3

**O.**     "State the basis" means that your answer should include all factual, all legal and all other information upon which "your" answer is based, the method by which such information was obtained, including any inquiries made, "identification," as such term is defined in these definitions for interrogatories, of all individuals, "persons," entities and "documents," by which such information was obtained and/or produced.

## SPECIFIC DEFINITIONS

**A.**     The term "Debtor" or "One Pay" means the Debtor in the instant bankruptcy case, an entity named One Pay Cloud, LLC.

**B.**     The term "IRMS" means Indian River Merchant Services.

**C.**     The term "Transact First" means Transact First Inc.

**D.**     The term "Dejavoo" means I-POS Systems LLC d/b/a Dejavoo.

**E.**     The term "Denovo" means Denovo Systems, LLC.

## INSTRUCTIONS FOR PRODUCING DOCUMENTS

**1.**     Each paragraph below shall operate and be construed independently; and, unless otherwise indicated, no paragraph limits the scope of any other paragraph.

**2.**     The documents produced for inspection shall be produced as they are kept in the usual course of business or shall be organized and labeled to correspond with the paragraph set forth below.

**3.**     The party under the subpoena should furnish any additional or supplemental documents subject to this Schedule "A" which are created or discovered after the original production of documents.

**4.**     Schedule "A" is intended to cover all documents in the possession of the party under the subpoena or subject to its custody or control, including information in the possession,

4856-9240-2611, v. 3

custody, or control of its attorneys, accountants, investigators, experts, employees, agents and any other person employed on its behalf, not merely such information as is known of its own personal knowledge.

5. Unless stated otherwise, the following requests seeks documents for the period of time commencing January 1, 2020 through the present.

6. All ESI is to be produced in its native format, unless otherwise agreed to by the parties.

7. If you are not producing any given "document" because it is not in your possession, custody or control or because you are claiming a privilege in connection therewith and/or that it is work-product, then "identify" each individual to whom the original or a copy was sent and each date of its receipt and each date of its transmittal or other disposition by (1) you and (2) any other individual (naming such other individual) who, at the time, either received, transmitted or otherwise disposed of such "documents" and/or any copy thereof.

8. If you believe that any of the following discovery requests call for information or "documents" subject to a claim of privilege, answer or produce so much as is not objected to, state that part of each discovery request as to which you raise an objection and set forth the basis for your claim of privilege with respect to such information as you refuse to give, including a statement a describing the nature of the information withheld.

9. For each "document" as to which you claim privilege exists, **(i)** identify the date of the "documents," **(ii)** a general description of the subject matter of the "documents," **(iii)** the name(s) of the individual(s) who prepared the "documents," **(iv)** the name(s) of the individual(s) for whom each such "document" was intended, **(v)** the name(s) of the individual(s) who received such "document," and **(vi)** the nature of the privilege being asserted.

## DOCUMENTS TO BE PRODUCED

**1.**     All documents and communications related to transfers between the Debtor to Dejavoo.

**2.**     All documents or communications related to cancellation, termination, or suspension of the Debtor's licensing agreement with Dejavoo.

**3.**     All contracts or agreements with Dejavoo and any communications regarding same.

**4.**     All documents or communications between Dejavoo and One Pay containing the following: "marijuana" "cannabis" "state licensed" and "dispensary.

**5.**     All documents evidencing, referring or relating to a business relationship, contract, or other agreement between the Debtor, Dejavoo, Transact First, and Michael Shvartsman.

*IRMS expressly reserves the right to request additional documents and amend this Notice of Taking 2004 Examination.*

4856-9240-2611, v. 3

# EXHIBIT "8"

UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

ONE PAY CLOUD, LLC,                                    Case No. 24-10349-LMI

      Debtor.                                                   Chapter 11

----------------------------------------------------------------------------------------------------------

INDIAN RIVER MERCHANT SERVICES, LLC,

      Plaintiff,                                                  Adv. Proc. No. 24-01327-LMI

v.

ONE PAY CLOUD, LLC,
TRANSACT FIRST, INC.,
I-POS SYSTEMS, LLC, and
DENOVO SYSTEMS, LLC.

      Defendants.
-------------------------------------------------------------/

**I-POS SYSTEMS, LLC AND DENOVO SYSTEMS, LLC'S MOTION FOR RULE 11**

**SANCTIONS AGAINST INDIAN RIVER MERCHANT SYSTEMS, LLC**

Specially-appearing movants i-POS Systems, LLC ("i-POS") and Denovo Systems, LLC ("Denovo"; collectively, the "Movants"), both non-debtors in this bankruptcy proceeding, hereby move this Honorable Court for an Order awarding sanctions under FRBP 9011 and FRCP 11 against Plaintiff Indian River Merchant Services, LLC ("IRMS") in favor of Movants for the reasons stated below, including but not limited to IRMS's failure to withdraw IRMS's Adversary Complaint ("AC") filed against Movants despite the AC's lack of subject matter jurisdiction and failure to state a claim, as well as the AC being barred by res judicata. Movants served this motion on IRMS at least 21 days prior to its filing and attempted to meet and confer with IRMS in good faith to persuade IRMS to withdraw the AC with respect to Movants and dismiss Movants from

1

the adversary proceeding. IRMS refused to do so. In support of this motion for sanctions, Movants state as follows:

1. As required by FRBP 7012 and FRCP 12(b), Movants hereby state that Movants respectfully do not consent to the entry of final orders or judgment by the bankruptcy Court in this adversary proceeding.

2. On January 15, 2024 (ECF #1 in Case No. 24-10349-LMI), Debtor One Pay Cloud, LLC ("Debtor" or "OPC") filed a voluntary petition for Chapter 11 bankruptcy.

3. On March 25, 2024 (Claim 2-1), purported creditor IRMS filed a claim against Debtor.

4. On April 3, 2024 (ECF #73), IRMS filed a Rule 2004 notice of examination of i-POS ("2004 Notice"), which was at the time a nonparty, non-debtor witness in this proceeding. In the 2004 Notice, IRMS sought, among other documents, all contracts between Dejavoo (the name used by IRMS to identify i-POS) and OPC. IRMS later represented to the Court at the May 1, 2024 hearing that IRMS had inadvertently stated "Dejavoo" instead of "Denovo." The 2004 Notice was served on i-POS only and not Denovo.

5. On April 16, 2024 (ECF #83), Debtor filed an objection to IRMS's claim.

6. On April 23, 2024 (ECF #104), i-POS filed a motion to quash and for protective order against IRMS's broad 2004 Notice. In this motion, i-POS stated its suspicion that IRMS was taking advantage of the broad scope of Rule 2004 to seek production of evidence to be used not against the Debtor, but against non-debtor i-POS.

7. On May 9, 2024 (ECF #129), the Court entered an order granting in part and denying in part i-POS's motion to quash. The order directed IRMS to narrow the scope of its 2004 Notice.

8. On May 20, 2024 (ECF #149), IRMS filed a second amended 2004 notice on i-POS.

9. On May 28, 2024 (ECF #165), the Court granted Debtor's emergency motion (ECF #125) for sanctions against IRMS for making misrepresentations of the Court's ruling regarding lifting the automatic stay to the Florida state court.

10. On June 7, 2024 (ECF #187), i-POS responded to IRMS's second amended notice, and produced documents to IRMS, redacted under trade secret and confidentiality privileges.

2

11.     On June 11, 2024 (ECF #191), IRMS moved for in-camera review of i-POS's redacted documents.

12.     On June 17, 2024, the Court agreed to review in-camera i-POS's redacted documents.

13.     On June 17, 2024 (ECF #209), IRMS filed a third amended Rule 2004 notice on i-POS.

14.     On June 20, 2024 (ECF #219 [ECF #1 in Adversary Proceeding No. 24-01327-LMI]), IRMS filed an adversary complaint against Debtor, non-debtors i-POS and Denovo, and another non-debtor Transact First, Inc., alleging tortious interference with contract, fraud, and conspiracy claims.

15.     Movants had no prior knowledge of IRMS's intention to file an adversary complaint against them. Even as late as three days prior to the filing, at the June 17 hearing, IRMS failed to declare its intention to file the AC against Movants. Movants believe that this deliberate concealment was designed to facilitate Movants' cooperation with IRMS's 2004 Notice.

16. On June 21, 2024 (ECF #223), the Court entered an Order accepting most of i-POS's redactions in response to ECF #191.

17.     On June 27, 2024, the Court heard Debtor's objection to IRMS's claim. The Court sustained Debtor's objection with respect to IRMS's attempted filing of a state court action against Debtor. IRMS did not disclose to Movants or the Court at this hearing that in the state court action, IRMS also attempted to join Movants as defendants. The order granting in part the Debtor's objection was filed on July 12, 2024 (ECF #259).

18.     Earlier, on May 27, 2024 (ECF #165), this Court awarded sanctions against IRMS requested by OPC (ECF #125) for misrepresenting this Court's ruling to the state court – specifically, by falsely alleging that this Court would reconsider its denial of the automatic stay against OPC if the state court ruled that OPC is an indispensable party.

19.     IRMS has not attempted to serve the summons and complaint on i-POS, despite that service being required within 7 days of filing the adversary complaint under FRBP 7004(e).

20.     IRMS attempted to serve Denovo on June 26, 2024. However, the service was defective. The package delivered contained only a copy of the adversary complaint but not the summons.

3

The papers were delivered in person to an administrative assistant working at Denovo, rather than delivered or addressed to an officer or other authorized agent of Denovo to accept service. The assistant was asked to sign an "acknowledgement of receipt of the complaint" but was not informed was actually the summons, and did not receive a copy of the summons, signed or unsigned. No copy of the summons or complaint was ever mailed to the attention of any individual authorized to receive service on behalf of Denovo. The certificate of service on Denovo (Adv. Proc. ECF #14) was not filed until July 29, 2024.

21.     On July 2, 2024 (ECF #232 in Chapter 11 docket), IRMS filed a Rule 7030 Notice of Deposition of i-POS scheduled for July 15, 2024, a purported "amendment" of the 2004 Notice in ECF #209. IRMS did not properly file this notice as part of the adversary docket.

22.     IRMS's Rule 7030 Notice is significantly broader in scope than its previous Rule 2004 notices. Movants' counsel agreed to the July 15 date without being informed by IRMS counsel that the Rule 7030 Notice would be much broader in scope than the amended 2004 Notice. Because the Rule 7030 Notice was filed in the Chapter 11 docket and not the adversary proceeding docket, Movants' counsel was led to believe that the scope of the Rule 7030 Notice would be the same as the Rule 2004 Notice.

23.     When i-POS filed its first motion to quash IRMS's Rule 2004 notice on April 23, 2024 (ECF #104), Movants' counsel were aware that, on May 24, 2021, IRMS filed a Florida state court action, Case No. 21-002572-CI ("State Action"), against EFT Services LLC ("EFT"), the primary wrongdoer alleged in the AC who breached its contract with IRMS. Movants' counsel were also aware that IRMS attempted in 2024 to seek leave of court to amend its complaint ("Motion to Amend") to add Debtor OPC as a defendant in the State Action. It appears that IRMS made this attempt twice, on January 29, 2024, and then again on May 3, 2024.

24.     However, Movants' counsel were not aware, until July 5, 2024, shortly prior to the service of this Motion for Sanctions, that IRMS also attempted to join Movants as defendants in the State Action in the same Motion to Amend, and that IRMS's proposed amended complaint alleged substantially the same claims against Movants that IRMS now raises in the AC. To Movants'

4

knowledge, IRMS never disclosed these facts to this Court in any of the hearings in which i-POS participated via counsel. Movants' counsel subsequently discovered on July 5, 2024 that the proposed amended complaint was hidden as an attachment to an exhibit of an exhibit to IRMS's creditor claim 2-1. The proof of claim itself did not mention Movants at all.

25.     Movants' counsel also discovered on July 5, 2024 in the Florida state docket that the Florida state court, in a hearing on May 13, 2024, had already denied the Motion to Amend in its entirety, despite IRMS's attempt to withdraw the Motion to Amend shortly before the May 13 hearing. The order denying that motion was filed on July 16, 2024. To Movants' counsel's knowledge, IRMS never disclosed the fact to this Court that the state court had already denied IRMS's attempt to join Movants as defendants in the State Action. IRMS only advised the Court at the June 27 hearing that IRMS's attempt to join Debtor was denied.

26.     As a matter of law, IRMS's AC against Movants is barred as res judicata. A dismissal for failure to state a claim, or failure to prosecute, constitutes a final judgment for purposes of the res judicata analysis. (Plaut v. Spendthrift Farm Inc. (1995) 514 U.S. 211, 228.) The state court's denial of the Motion to Amend is functionally equivalent to a dismissal for failure to state a claim or failure to prosecute.

27.     Having already been barred in the State Action from pursuing its unmeritorious claims for fraud and tortious interference with contract against Movants, IRMS now improperly attempts a repeat performance before this Court by filing the AC, despite such claims being also barred here under the doctrine of res judicata.

28.     Moreover, IRMS attempted to take Rule 2004 examinations of i-POS under false pretenses and in contravention of the pending proceeding rule, which states that discovery demands between parties involved in a pending non-bankruptcy proceeding must be served in compliance with FRCP 45 and 30 and other discovery rules as directed by FRBP 9016 and 9014. See In re National Assessment, Inc., 547 B.R. 63, 65 (Bankr. W.D.N.Y. 2016).

29.      Movants became "involved in a pending non-bankruptcy proceeding", via-a-vis IRMS's Motion to Amend in the Florida State Action, months before IRMS served its first Rule 2004 notice on i-POS.

30.      Had IRMS disclosed its attempts to join Movants as defendants to the Florida State Action, or declared its intention to file the AC against them, Movants' counsel would not have produced documents to IRMS in this bankruptcy proceeding under Rule 2004, stipulated to the July 3, 2024 Rule 2004 examination date, or stipulated to "amend" the July 3 date to the improperly-noticed Rule 7030 deposition date of July 15 before Movants had been served with the adversary complaint and before a Rule 26(f) conference has been conducted.

31.      Another fact in aggravation is that, on January 9, 2024, IRMS, via its owner Devin Werling, filed a nonparty request to a court in New York presiding over a lawsuit filed by EFT against i-POS on February 27, 2020, but dismissed by EFT with prejudice on March 21, 2020. The New York court had ordered certain documents filed by i-POS in that case to be placed under seal. IRMS requested the unsealing of these documents, claiming "the public's right of access". That court has not yet ruled on this request. This was the first time Movants learned of the name IRMS. Movants still did not know anything about IRMS until i-POS was first served with the bankruptcy subpoena in April 2024. Mr. Werling never disclosed to the New York court that IRMS would soon file its first Motion to Amend on January 29, 2024 to join Movants as defendants in the Florida State Action. IRMS never served the Motion to Amend on Movants, despite naming them as defendants to be joined. IRMS never served its original Proof of Claim on Movants, despite Movants' rights being potentially affected by this filing.

32.      On July 9, 2024 (ECF #10 in Adv. Proc. No. 24-01327-LMI), Movants filed a motion to dismiss IRMS's adversary complaint for lack of subject matter jurisdiction and failure to state a claim. Movants also filed a motion to stay discovery, (ECF #236 in Chapter 11 Case No. 24-10349-LMI), including the Rule 7030 deposition noticed for July 15, 2024. Movants withdrew the motion to stay after stipulation with IRMS that no discovery would occur prior to the entry of a ruling on the motion to dismiss.

6

33.   IRMS's litigation misconduct are summarized here in chronological order as the basis for the Court's award of sanctions against IRMS to deter future misconduct:

a. IRMS filed a nonparty "public right of access" request to the New York court to gain access to Movant's protected documents under seal, all the time concealing the fact that it intended to sue Movants;

b. IRMS twice filed the Motion to Amend in the Florida State Action, both times without serving notice to Movants, despite attempting to join them as defendants;

c. IRMS served Rule 2004 notices of examination on i-POS, a non-debtor and a third-party witness in this bankruptcy proceeding, all the time concealing the fact that IRMS intended to sue Movants, both in the Florida State Action and in this bankruptcy Court;

d. IRMS sought to abuse the broad scope of Rule 2004 to improperly gain access to the documents of i-POS as a non-debtor witness, circumventing the rules of discovery under the Federal Rules of Civil Procedure;

e. At the hearings before the Court in which i-POS participated via counsel, IRMS withheld the facts that it attempted to join Movants as defendants in the Florida State Action and that the Florida state court had already denied the Motion to Amend, and continued to demand Rule 2004 discovery from i-POS, whose counsel IRMS knew or should have known, based on their correspondence, had no knowledge of the attempted joinder and subsequent denial;

f. IRMS concealed the fact that it planned to file an adversary complaint against Movants, as of only 3 days before filing, when the Court sought an update of the proceeding;

g. IRMS filed an adversary complaint against Movants which clearly fails to state a claim and over which the Court clearly lacks subject matter jurisdiction, and which is clearly barred by the doctrine of res judicata;

7

h. IRMS sought to circumvent discovery rules under the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure by "amending" its Rule 2004 notice of examination of i-POS to a Rule 7030 deposition notice on i-POS, before IRMS has even served the summons and complaint on i-POS or conducted a Rule 26 conference, all the time concealing the fact from Movants' counsel that IRMS intended to significantly broaden the scope of discovery and deny Movants sufficient time to prepare for it;

i. IRMS failed to serve the summons and complaint on Denovo properly and failed to attempt to serve the same on i-POS. These circumstances made it difficult for Movants to comply with certain deadlines, such as the demand for jury trial.

34. Accordingly, Movants respectfully request that the Court award sanctions against IRMS in the form of all attorney fees incurred by Movants, first as a witness in this bankruptcy proceeding, then as a defendant in the adversary proceeding.

35. Movants further respectfully request that the Court enter an order enjoining all further discovery requests IRMS may contemplate to serve on Movants as well as nonparty Dejavoo Systems, LLC (a wholly-owned subsidiary of i-POS) as nonparty witnesses, if and after Movants' motion to dismiss them from the adversary proceeding is granted. Movants have already produced all documents responsive to IRMS's demand as modified by the Court. The Court has reviewed those documents in camera. IRMS has no reason to continue to harass Movants or Dejavoo Systems LLC with future discovery requests.

36. The relief requested in ¶35, above, was not included in the service copy of this Motion for Sanctions, because Movants' counsel learned only after the service of this Motion that IRMS intended to continue serving discovery requests on Movants as nonparty witnesses even if and after their motion to dismiss them from the adversary proceeding is granted.

37. The filed Rule 11 motion need not be identical to the served copy to comply with the safe harbor notice requirement of Rule 11, so long as the service copy gives sufficient notice that sanctions would be sought under Rule 11 and identifies the acts of misconduct on which the request

8

for sanctions is based. In re Koper, No. 8-13-74213-LAS, 2020 WL 5075549, at *7 (Bankr. E.D.N.Y. Aug. 25, 2020). The service copy delivered to IRMS counsel put IRMS on notice of the source of sanctions and the underlying acts of misconduct.

38.     Movants certify under FRCP 26(c)(1) that, prior to the filing of this Motion for Sanctions, the parties attempted to confer in good faith in an effort to resolve their dispute without court action, and that this Motion (sans the requested relief against discovery) was served on July 9, 2024, at least 21 days prior to its filing. Movants stated that this Motion would not be filed if IRMS dismissed Movants from the adversary proceeding. IRMS acknowledged receipt of the service copy, alleged there were factual and legal issues in the Motion, but did not specify those issues or respond to Movants' subsequent attempts to meet and confer on this Motion. Movants notified IRMS on July 26, 2024 of the additional relief requested to enjoin further discovery. The parties stipulated that Movants may file this Motion for Sanctions on August 5, 2024 if Movants do not receive further communication from IRMS counsel regarding this Motion before then. Movants have not received any such communication.

WHEREFORE, Movants respectfully request that this Honorable Court grant their motion for Rule 11 sanctions against IRMS in the form of attorney fees incurred and an ordering enjoining future discovery if and after Movants' motion to dismiss is granted, and grant such other and further relief as this Court deems just and proper.

///
///
///
///
///
///
///

## CERTIFICATION

Undersigned counsel certifies they have attempted to confer in good faith with IRMS counsel regarding IRMS's timely withdrawal of the Adversary Complaint and dismissal of Movants from the adversary proceeding as the precondition for Movants to refrain from filing a motion for Rule 11 sanctions. As of the filing of this Motion for Sanctions, the pertinent issues have not been resolved, but counsel will continue to try to resolve the issues prior to the hearing on this Motion.


DATED this 5th day of August, 2024.     By:    */s/ Gustavo A. Bravo, Esq.*

Gustavo A. Bravo, Esq.
FL Bar No. 551287
**BRAVO LAW**
1555 Bonaventure Blvd., Suite 157
Weston, Florida 33326
Tel.: 954-790-6711
Email: gbravo@lawbravo.com

*/s/ Chuanchi Tang, Esq.*
Chuanchi "Tren" Tang, Esq.
CA Bar No. 249238
(Admitted *Pro Hac Vice*)
**GLOBAL LEGAL LAW FIRM**
322 Encinitas Boulevard
Encinitas, CA 92024
Tel.: 888-846-8901
Email: ttang@attorneygl.com

***Counsel for i-POS Systems LLC and Denovo Systems LLC***


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished via electronic transmission through the Court's CM/ECF system on this 5th day of August, 2024.

By:    */s/ Chuanchi Tang, Esq.*
Chuanchi "Tren" Tang, Esq.
(*Admitted Pro Hac Vice*)
CA Bar No. 249238

10

# EXHIBIT "9"



**ORDERED in the Southern District of Florida on March 13, 2025.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:                                                    CASE NO.  24-10349-BKC-LMI

ONE PAY CLOUD, LLC,                            Chapter  7

       Debtor.

_____/

INDIAN RIVER MERCHANT                    ADV. CASE NO. 24-1327-LMI
SERVICES, LLC,

       Plaintiff,
vs.

ONE PAY CLOUD, LLC, TRANSACT
FIRST, INC., I-POS SYSTEMS, LLC,
and
DENOVO SYSTEMS, LLC,

       Defendants.

_____/

**ORDER DENYING MOTION OF I-POS SYSTEMS, LLC AND**

**DENOVO SYSTEMS, LLC FOR RULE 11 SANCTIONS AGAINST
INDIAN RIVER MERCHANT SYSTEMS, LLC.**

This matter came before the Court for hearing on January 8, 2025 (the "Hearing"), on I-Pos Systems, LLC and Denovo Systems, LLC's Motion For Rule 11 Sanctions Against Indian River Merchant Systems, LLC (ECF #19) (the "Motion"). The Court has reviewed the Motion, IRMS's Response to Movants' Rule 11 Motion (ECF #54), and I-POS and Denovo's Reply in Support of Rule 11 Sanctions (ECF #61). Having considered the pleadings, the argument of counsel at the Hearing, and the applicable rules and case law, it is hereby **ORDERED** that the Motion is **DENIED**.

# # #

Copies furnished to:
Zachary P. Hyman, Esq.

*Attorney Hyman is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*

2

# EXHIBIT "10"

JUDGE KOELTL

20 CV 01757

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EFT Services LLC, and IPN LLC d/b/a Paybotic, | Civil Action No._____ |
| Plaintiffs, | |
| v. | COMPLAINT |
| i-POS Systems LLC d/b/a Dejavoo, and DeNovo Systems, LLC, | |
| Defendants. | |

Plaintiffs EFT Services LLC ("EFT") and IPN LLC d/b/a Paybotic ("Paybotic," and with

EFT, "Plaintiffs"), by and through their undersigned counsel, as and for their Verified Complaint

against Defendants i-POS Systems, LLC d/b/a Dejavoo ("Dejavoo") and DeNovo Systems, LLC

("DeNovo," and with Dejavoo, "Defendants") herein allege as follows:

## NATURE OF THE ACTION

This dispute arises from an unsatisfied licensor's efforts to bully its licensees out of the

non-exclusive, *perpetual* software licenses to which the parties agreed because the licensor has

purported to have sold a single *exclusive* license to a third party for a lot more money. The

defendant licensor has told the plaintiff licensees that it has unilaterally terminated their licenses

and will cut off plaintiffs' access to the licensed software on March 1, 2020. On March 26,

2020, the day before plaintiffs commenced this action and filed this Motion, plaintiffs learned

that defendants would take steps to commence this process on February 28, 2020.

Because the plaintiff licensees operate niche businesses, the licensed software is a unique

product for which no substitute exists. It is an essential part of the licensee's businesses. The

licensees' are electronic payment processors who use the software to run terminals operated by

the licensees' customers that enable holders of credit and debit cards to get cash through a

{Client/086405/1/02036333.DOCX;3 }

specific type of transaction at specific types of retail locations. The licensees electronically process those transactions in return for fees. The transactions cannot be done without the software.

The unsatisfied defendant licensor has already crippled the licensees' niche businesses by (i) cutting off their access to the parts of the software that allow them to provide technical support to their customers and the retail merchants in whose establishments the terminals are located, leaving their customers and merchants stranded with hundreds of inoperable terminals that the licensees are powerless to fix, and (ii) blocking the licensees' customers from adding new merchant customers, thereby cutting off any growth in their customers' and, in turn, the licensees' businesses. The licensor's actions have already caused the licensees to lose business and has been devastating to the licensees' reputations and good will.

Defendants have told the plaintiffs that they will cut off the software and shut down the terminals on March 1, 2020. Plaintiffs have sought injunctive relief because if defendants are not restrained from doing so, plaintiffs' customers will have no choice but abandon plaintiffs and instead seek new licenses from the third party to whom defendants claim they have sold an exclusive license. This will effectively shut plaintiffs out of their niche market, and irreversibly and completely obliterate their reputations and good will.

Further, if defendants shut down plaintiffs' niche businesses at this time, plaintiffs will miss out on what can only be described as a "boom period" in their niche market, which is rapidly expanding due to recent and continuing changes in the legal regime governing that market. Because it is impossible to predict with any accuracy what further changes might occur to the fast-changing legal regime, it is difficult to predict how fast and how far plaintiffs' niche

market will expand.  If defendants are not restrained plaintiffs will effectively be shut out of this boom period and, instead, wiped out.

## THE PARTIES

1.      Plaintiff EFT is a Florida limited liability company with its principal place of business at 4801 S. University Drive, #303, Davie, Florida 33328.

2.      Plaintiff Paybotic is a Florida limited liability company with its principal place of business at 120 S. Dixie Highway, West Palm Beach, Florida 33401.

3.      On information and belief, Defendant Dejavoo is a Delaware limited liability company with its principal place of business at 393 Jericho Turnpike, Suite 203, Mineola, New York 11501.

4.      On information and belief, Defendant DeNovo is a Puerto Rico limited liability company with its principal place of business at 393 Jericho Turnpike, Suite 203, Mineola, New York 11501.  On information and belief.  Dejavoo and DeNovo are owned and controlled by the same person and operate as a single business.  Accordingly, for simplicity all references to Dejavoo shall refer to Dejavoo and DeNovo collectively.

## JURISDICTION AND VENUE

5.      The Court's jurisdiction over this dispute is based on the parties' diversity of citizenship under 28 U.S.C. § 1332(a)(1) because it is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

6.      This Court has jurisdiction over Defendants Dejavoo and DeNovo because, on information and belief, their principal places of business are in the State of New York.  Further, each of EFT, Paybotic, Dejavoo, and DeNovo has signed a contract that is the subject of this action, which provides that "EACH PARTY CONSENTS AND SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION TO THE STATE AND FEDERAL COURTS LOCATED

IN NEW YORK, NEW YORK FOR ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY."

## FACTS

### A.   EFT is a Family Business and Industry Pioneer

7.   EFT is a family business started by Randy Nolte in 2001. Randy is 100% owner of EFT, which he runs with his daughter Liz and son Ryan.

8.   EFT is an electronic payment processor for point of sale ("POS") transactions through which a cardholder uses a credit or debit card to obtain cash by (i) inserting a credit or debit card into a card reading device, or "terminal," located at a retail merchant, (ii) entering a PIN on a keypad, (iii) receiving a receipt for the desired amount of money, and (iv) presenting that receipt to the merchant who dispenses cash to the cardholder. The cardholder may use some or all the cash to buy goods and/or services from the merchant.

9.   EFT's direct customers are "Independent Sales Organizations" or "ISOs" that purchase POS terminals from a manufacturer and then transacts with retail merchants to place those terminals in the merchants' places of business. EFT provides its ISO customers with the specialized software needed to operate that manufacturer's POS terminals, provides technical support to the ISOs, and processes cardholder transactions performed on terminals using that software. EFT receives a fee for processing those transactions.

10.   In 2014, EFT pioneered the introduction of POS transaction services to state licensed cannabis dispensaries ("SLCDs"). Recent changes in state laws have resulted in a dramatic expansion of the SLCD market and, with it, the demand for POS transaction services by SLCD merchants.

**B.   EFT Migrates its SLCD Business to a Custom
Software Application Developed and Licensed by Defendant Dejavoo**

11.   By 2019, EFT had determined that the software application it had been using for its SLCD business could no longer support its continuing expansion.

12.   Defendant Dejavoo is a POS software developer and manufacturer of POS terminals. In January 2019, Jennifer Gonzales ("Gonzales"), who had previously worked as sales manager at EFT's then-current software and terminal provider, contacted EFT to introduce EFT to Dejavoo, where she had been recently hired as West Coast Sales Manager.

13.   Thereafter, EFT and Dejavoo negotiated and executed a 5-page Services and License Agreement dated as of March 11, 2019 (the "EFT Perpetual License").[1] Pursuant to the EFT Perpetual License, Dejavoo agreed to work with EFT to create a unique, customized software application designed to support EFT's SLCD business (the "SLCD Application"). The parties agreed that the SLCD Application would operate only on terminals purchased from Dejavoo. The SLCD Application would, among other things, handle such tasks as (i) reading the information from credit and debit cards inserted into a Dejavoo Terminal; (ii) directing cardholder transactions to EFT for processing, and (iii) distributing the fees associated with the transaction.

14.   In addition, the SLCD Application would allow EFT's ISO customers add new SLCD merchant accounts, and would allow EFT to provide technical support to its ISO customers.

15.   Pursuant to the EFT Perpetual License, Dejavoo granted EFT "a limited, non-exclusive, non-transferable, with the limited right to sublicense to users of the Dejavoo

---

[1] A copy of the EFT Perpetual License is attached as Exhibit 1 to the Declaration of Randy Nolte, executed February 27, 2020 ("Randy Decl.").

Terminals, license to use the Technology [i.e., the SLCD Application] *solely with the Dejavoo Terminals as an integrated product*" and specified that "[p]rovided that [EFT] is at all times in full compliance with the terms of this Agreement, *the license granted herein is perpetual.*" (EFT Perpetual License ("PL") § 3 (emphasis added).)

16.     The SLCD Application is unique and there is currently no existing software application that can replace it.  Nevertheless, in reliance on the EFT Perpetual License, EFT migrated its SLCD business to the SLCD Application.  Because the SLCD Application could be run only on Dejavoo Terminals, EFT's ISO customers were required to purchase approximately 1,900 new Dejavoo Terminals at an expense of more than $350,000.  *EFT's ISO customers made those purchases in reliance on EFT's continuing ability to provide the software necessary to operate those terminals.*

17.     Although the SLCD Business is expanding rapidly, a current snapshot shows that at least 1,230 Dejavoo Terminals operated by more than 380 merchants in 35 states and the District of Columbia depend on the SLCD Application provided under the EFT Perpetual License to continue providing POS payment services to cardholders.  Again, although these numbers are changing quickly, a current snapshot indicates that in recent months cardholders have conducted about 220,000 transactions per month through these terminals.

C.     **Paybotic Enters Into a Separate Perpetual License**

18.     In November 2019, one of EFT's ISO customers, Plaintiff Paybotic, entered into a separate agreement (the "Paybotic Perpetual License," and with the EFT Perpetual License, the "Perpetual Licenses")[2], with terms virtually identical to those in the EFT Perpetual License.  The

---

[2] A copy of the Paybotic Perpetual License is attached as Exhibit 1 to the Declaration of Max Miller, executed February 27, 2020 ("M. Miller Decl.").

Paybotic Perpetual License would enable Paybotic to build its own network of ISO customers for whom it could process transactions independently of EFT.

19.     Pursuant to the Paybotic Perpetual License, Dejavoo granted Paybotic "a limited, non-exclusive, non-transferable, with the limited right to sublicense to users of the [Dejavoo] Terminals, license to use the Technology [i.e., the SLCD Application] *solely with the [Dejavoo] Terminals as an integrated product*" and specified that "[p]rovided that [Paybotic] is at all times in full compliance with the terms of this Agreement, the license granted herein is perpetual." (Paybotic Perpetual License ("PL") § 3.)

20.     As discussed above, the SLCD Application is unique and there is currently no existing software application that can replace it.  Nevertheless, in reliance on the Paybotic Perpetual License, Paybotic committed to using the application to build its ISO customer base. Because the SLCD Application could be run only on Dejavoo Terminals, Paybotic's ISO customers have been required to purchase approximately 1,900 new Dejavoo Terminals at an expense of more than $400,000.  Paybotic's ISO customers made those purchases in reliance on Paybotic's continuing ability to provide the software necessary to operate those terminals.

21.     Although the SLCD Business is expanding rapidly, a current snapshot shows that more than 2,700 Dejavoo Terminals operated by more than 426 merchants in 35 states and the District of Columbia depend on the SLCD Application supplied under the Paybotic Perpetual License to continue providing POS payment services to cardholders.  Again, although these numbers are changing quickly, a current snapshot indicates that in recent months cardholders have conducted about 300,000 transactions per month through these terminals.

**D.      Dejavoo Tries to Bully EFT and Paybotic Out of the Perpetual Licenses**

22.     On a telephone call on January 9, 2020, Gonzales advised Liz and Randy Nolte that Dejavoo was, without explanation, purporting to terminate the EFT Perpetual License.  Later

that day Gonzales emailed a proposed new agreement, which replaced the perpetual license provision in the EFT Perpetual License with a provision permitting Dejavoo to terminate EFT's license at will with 72 hours' notice (the "Terminable License").

23.     On or about January 21, 2020, Gonzales advised Max Miller ("Miller"), Paybotic's President and CEO and Eveline Dang ("Dang"), Paybotic's Vice President, that Dejavoo was, without explanation, purporting to terminate the Paybotic Perpetual License.  Later that day Gonzales emailed a copy of the Terminable License, which replaced the perpetual license provision in the Paybotic Perpetual License with a provision permitting Dejavoo to terminate Paybotic's license at will with 72 hours' notice.

24.     EFT and Paybotic refused to sign the Terminable License.

25.     On or about February 3, 2020, Christopher Clarke ("Clarke"), Dejavoo's Corporate Sales Manager, advised EFT and Paybotic that Dejavoo, without any advance notice would immediately be "pushing" substantial changes in its software operating systems that would likely require significant adjustments to the SLCD Application to avoid operating problems and potential shut downs.  Both EFT and Paybotic objected to the immediate software push on the grounds that it would take them at least 30 days to make the necessary adjustments to ensure that the Dejavoo Terminals they supported would remain operable.  Clarke gave both a few more days, which was not nearly enough time to prepare for the software push.

26.     On February 2, 2020, Mony Zenou, CEO of Dejavoo ("Zenou"), emailed Miller and Dang that "[t]he software push we are doing this week will be in correlation with the new contract [i.e., the Terminable License].  It's advisable to sign it."  Zenou threatened that "[a]s of March 1st, we will no longer accept any [of the Dejavoo Terminals supported by Paybotic] on our systems," and that "should you elect to reject the revised contract, we will no longer be able

to accept any new orders from you or board any new merchants on our system, even in the transition period [prior to March 1st]." On or about the same day, Zenou issued the same threat to EFT verbally. In practical terms, Zenou's threats meant that, among other things, neither Paybotic nor EFT, nor any of their ISO customers, could add new merchant customers or provide merchant customers with technical support.

27.     On February 7, 2020, Dang advised Clarke that one of Paybotic's ISOs had reported that some its merchants had reported that Dejavoo's software push had left their Dejavoo Terminals inoperable. Dang reminded Clarke that Paybotic's ISO customer could not help its merchant customer because Dejavoo had cut off access to technical service. Accordingly, Dang asked Clarke, "would you be able to enable technical service steam access for [the ISO customer] so that they can better support their customers whose all [Dejavoo Terminals] were down after losing the TID in the [Dejavoo Terminals]. I would really appreciate it."

28.     Clarke responded, "we will do this now, until the issues are resolved. Lets [*sic*] hope by Monday, *then we will shut everyone back off*."

29.     On Thursday, February 13, 2020, Clarke emailed Ryan Nolte "A little reminder about signing the agreement [i.e., the Terminable License]. We were hoping to have it back this week. *I will continue to allow access to the portal [i.e., the SLCD Application] until end of business on Friday[, February 14, 2020]*." (emphasis added.)

30.     On February 17, 2020, Dang emailed Clarke, "Hi Chris, We have several merchants that need updating the fees and some other parameters on their [Dejavoo Terminals]. Not being able to edit the [Dejavoo Terminals] is causing some of our merchants to temporarily stop processing, and its interrupting both theirs and our business." Accordingly, Dang requested

that Clarke "Please grant us Steam access immediately so that we can resume supporting our merchants as usual. Best Regards, Eveline."

31.     Clarke responded "Eveline, as per Mony [Zenou], until Max returns the signed [Terminable] agreement, AND Mony [Zenou] returns it back to Max signed as well, I cannot…."

E.     **Dejavoo's Reason for Bullying EFT Becomes Clear:  More Money**

32.     During a meeting on February 12, 2020, Michael Shvartsman ("Shvartsman"), owner of POS transaction processor, One Pay Cloud LLC ("OPC"), advised Ryan Nolte that Dejavoo had purported to sell OPC an exclusive license to the SLCD Application for a "seven figure" price. Dejavoo later confirmed Shvartsman's representation.

33.     On a telephone call on February 19, 2020, and then on near-daily calls to Ryan Nolte ever since, Shvartsman has repeatedly told Ryan Nolte that Dejavoo's sale to OPC of an exclusive license for the SLCD Application terminated EFT's Perpetual License, and, accordingly EFT would only be permitted access to the SLCD Application if EFT signed a new, 11-page "standard agreement" with OPC by March 1, 2020.  Shvartsman provided Ryan Nolte with a copy of OPC's standard agreement, which imposed numerous new fees and conditions on the use of the SLCD Application, including onerous "Non-Solicitation; Non-Circumvention; Exclusivity," "Confidentiality," and "Term and Termination" provisions.

34.     At the same time as Shvartsman was calling Ryan Nolte, he was also calling Max Miller and Eveline Dang of Paybotic making the same representations and demanding that Paybotic also sign OPC's standard agreement.

35.     In effect Shvartsman claimed that Dejavoo's sale to OPC of an exclusive license gave him a monopoly over the SLCD Application, and thus, over the SLCD market empowering him to shut EFT and Paybotic out of the market EFT had pioneered.

{Client/086405/1/02036333.DOCX;3 }                          10

36.     To drive home the point that Dejavoo had cut Paybotic off from any technical support, on February 21, 2020, Clarke sent Miller and Dang the following email: "Paybotic, do not send my team any requests to make changes to your files."

37.     In repeated telephone conversations with EFT and Paybotic since Clarke's email to Paybotic on February 21, 2020, Zenou and Clarke have continuously threatened that on March 1, 2020, Dejavoo will cut off access to the software for both licensees, all of their ISO customers' and all of their ISO customers, merchant customers if they do not sign the Terminable Agreement.  That action will squeeze both EFT and Paybotic out of the SLCD market that EFT pioneered, thereby handing OPC a virtual monopoly.

38.     Simply put, without access to the SLCD Application, which EFT helped to develop, EFT and Paybotic will lose their ISO customers and the fees for processing cardholder transactions for the ISO customers' merchant customers.  Further EFT and Paybotic will be shut out of the rapidly expanding SLCD market, destroying EFT and Paybotic by depriving them of the essential service required to operate their businesses while leaving hundreds of merchants with nearly 2000 useless Dejavoo Terminals and no alternative to provide POS transaction services to their customers.

**F.     Dejavoo Assists OPC in Soliciting EFT's ISO Clients**

39.     To date, OPC has solicited at least nine to 10 of EFT and Paybotic's largest ISO customers whose merchant customers rely on the Perpetual Licenses to operate Dejavoo Terminals in their stores.  Dejavoo has assisted OPC in soliciting the ISO customers by confirming to them that EFT and Paybotic's Perpetual Licenses have been terminated and that they are no longer able to support their merchant customers.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment – The Perpetual Licenses)

40.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 40 hereof as if fully set forth herein.

41.     Plaintiffs asserts that the Perpetual Licenses remain in full force and effect.

42.     Dejavoo asserts that it has terminated the Perpetual Licenses.

43.     An actual present and justiciable controversy has arisen between the parties concerning whether the Perpetual Licenses remain in full force and effect.

44.     EFT seeks a declaratory judgment that the Perpetual Licenses remain in full force and effect.

45.     Although the value of such a declaration is difficult to determine, it is in no event less than the $75,000 jurisdictional threshold.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment – The Purported OPC License)

46.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 46 hereof as if fully set forth herein.

47.     Dejavoo asserts that it has granted OPC an exclusive license to the SLCD Application that terminates the Perpetual Licenses.

48.     Plaintiffs asserts that the Perpetual Licenses remain in full force and effect because Dejavoo did not have exclusive rights in the SLCD Application to sell to OPC because Dejavoo had previously sold Plaintiffs perpetual, non-exclusive rights in that same software.

49.     An actual present and justiciable controversy has arisen between the parties concerning whether any grant of a license to OPC could terminate the Perpetual Licenses.

50.     EFT seeks a declaratory judgment that any grant of a license from Dejavoo to OPC could not terminate Plaintiffs' preexisting Perpetual Licenses and thus, that Plaintiffs' Perpetual License remain in full force and effect.

51.     Although the value of such a declaration is difficult to determine, it is in no event less than the $75,000 jurisdictional threshold.

<b><u>THIRD CAUSE OF ACTION</u></b>

<b>(Breach of Contract)</b>

52.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 52 hereof as if fully set forth herein.

53.     The Perpetual Licenses constitute valid and binding agreements between Plaintiffs and Dejavoo.

54.     Plaintiffs have performed all their material obligations under the Perpetual Licenses.

55.     Dejavoo has breached Sections 3 and 9 of the Perpetual Licenses by purporting to terminate the Perpetual Licenses without (i) identifying any breach by either Plaintiff of the Perpetual Licenses, or (ii) providing written notice to either Plaintiffs of any such breach.

56.     By breaching the Perpetual License, Dejavoo has damaged Plaintiffs in an amount to be determined at trial, but in no event less than the jurisdictional threshold of $75,000.

<b><u>FOURTH CAUSE OF ACTION</u></b>

<b>(Breach of the Covenant of Good Faith and Fair Dealing)</b>

57.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 57 hereof as if fully set forth herein.

58.     Dejavoo has a duty of good faith and fair dealing that arises out of the Perpetual Licenses, which obligates it, among other things, not to purport to grant any third party an

exclusive license terminating the Perpetual Licenses, or to assist any such third party in soliciting Plaintiffs' ISO customers by representing falsely to those customers that Dejavoo has granted any third party such a license that terminates the Perpetual Licenses.

59.     By reason of the conduct set forth above, Dejavoo has breached its duty of good faith and fair dealing to Plaintiffs.  Among other things, Dejavoo has breached its duty of good faith and fair dealing by intentionally purporting to grant OPC a purported exclusive license in the SLCD Application and assisting OPC to solicit EFT's ISO customers by representing to those customers that Dejavoo has granted OPC such a license that terminates EFT's Perpetual License.

60.     By breaching its covenant of good faith and fair dealing, Dejavoo has damaged Plaintiffs in an amount to be determined at trial, but in no event less than the jurisdictional threshold of $75,000.

61.     Dejavoo's conduct was willful, malicious, and done with the intent to harm Plaintiffs such that punitive and/or exemplary damages should be awarded.

**WHEREFORE**, Plaintiffs demand judgment against Dejavoo as follows:

(i)     For injunctive relief in the form of an order temporarily, preliminarily, and/or permanently (a) Prohibiting Dejavoo from taking or permitting to be taken any action that would in any way interfere with Plaintiffs obtaining the full benefit of the Perpetual Licenses, including but not limited to interfering in any way with the full use of the SLCD Application by any person having access to that application through either Perpetual License as of the date this Order, including but not limited to (1) placing any restrictions on any feature of the SLCD Application, (2)

pushing out system changes in such a manner as to disable EFT and/or Paybotic Terminals, and/or (3) making changes to individual terminal software files without EFT's and/or Paybotic's permission, as applicable; and (b) Directing Dejavoo and its affiliates to immediately restore all functions of which Plaintiffs have been deprived, including but not limited to (1) Steam administrative access, (2) full technical customer support (phone and email), and (3) access to SPIN requests for ISO and ISV (independent software vendors) to enable Paybotic's ISOs and ISV partners to integrate their software with Dejavoo terminals;

(ii)     Prohibiting Dejavoo from representing to any person in any manner that either Perpetual License is no longer in full force and effect; and

(iii)    Prohibiting Dejavoo from representing to any person in any manner that Dejavoo has granted One Payment Cloud, LLC ("OPC") or any other third party an exclusive license to the SLCD Application.

(iv)     For declaratory relief in the form of an order declaring that the Perpetual Licenses remain in full force and effect;

(v)      For declaratory relief in the form of an order declaring that any purported sale by Dejavoo of a license to the SLCD Application to OPC or any other third party is without affect to the existing Perpetual Licenses previously granted to plaintiffs;

(vii)   For damages in an amount to be determined at trial; and

(viii)   For such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        February 27, 2020

TARTER KRINSKY & DROGIN LLP
Attorneys for Plaintiffs

By: _____
    Charles M. Miller
    Richard C. Schoenstein
    1350 Broadway
    New York, New York 10018
    (212) 216-8000
    cmiller@tarterkrinsky.com
    rschoenstein@tarterkrinsky.com

## VERIFICATION

STATE OF FLORIA     )

                      )ss:

COUNTY OF BROWARD  )

Randy Nolte, being duly sworn, states under penalty of perjury:

I am the sole owner of EFT Services LLC ("EFT"), one of the plaintiffs in the above-captioned action. I have read the foregoing Verified Complaint, know the contents thereof and the same concerning EFT are true to my knowledge, except those matters that are alleged on information and belief. As to those matters alleged on information and belief, I believe them to be true based upon my inspection of books and records maintained by EFT, which are in my custody and control, publicly available information, my familiarity with the parties involved and/or my experiences in, and knowledge of, the point-of-sale transaction business.

_____
Randy Nolte

Sworn to before me this
27th day of February 2020


NOTARY PUBLIC

Notary Public State of Florida
Candace Effron
My Commission GG 929705
Expires 11/06/2023

## VERIFICATION

STATE OF FLORIA          )

                                )ss:

COUNTY OF WEST PALM )

Max Miller, being duly sworn, states under penalty of perjury:

I am President and CEO of Plaintiff IPN LLC d/b/a Paybotic ("Paybotic"), one of the plaintiffs in the above-captioned action. I have read the foregoing Verified Complaint, know the contents thereof and the same concerning Paybotic are true to my knowledge, except those matters that are alleged on information and belief. As to those matters alleged on information and belief, I believe them to be true based upon my inspection of books and records maintained by Paybotic, which are in my custody and control, publicly available information, my familiarity with the parties involved and/or my experiences in, and knowledge of, the point-of-sale transaction business.

                                                       _____
                                                       Max Miller

Sworn to before me this
27 day of February 2020

_____
NOTARY PUBLIC

HYUN MIN L CASH
Notary Public - State of Florida
Commission # GG 913788
My Comm. Expires Nov 5, 2023